No. 20-4441
IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

════════════════════

UNITED STATES OF AMERICA,

Appellant,

v.

ALI AL-TIMIMI,

Defendant-Appellee.

════════════════════

Appeal from a Judgment of the
United States District Court for the Eastern District of Virginia
The Hon. Leonie M. Brinkema, District Judge
(Dist. Ct. No. 1:04-cr-385-LMB)

────────────────

APPELLEE'S SUPPLEMENTAL APPENDIX, VOLUME 1 OF 2

────────────────

Thomas M. Huff
Attorney-at-Law
P.O. Box 2248
Leesburg, VA 20177
(703) 665-3756

Jonathan Turley
The George Washington
 University Law School
2000 H St., N.W.
Washington, DC 20052
(202) 994-7001

*Attorneys for Defendant-Appellee*

Dated: August 31, 2020

# TABLE OF CONTENTS

## VOLUME 1 OF 2

District Court's Order Denying Government's Motion to Stay,
   entered August 28, 2020 (Dkt. No. 532)................... SA 1890

Exhibit A to Defendant's Opposition to Stay,
   August 20, 2020 e-mail correspondence with government counsel
   regarding defendant's release plan (Dkt. No. 530, Ex. A).... SA 1893

Transcript of Jury Trial proceedings before
   the Hon. Leonie M. Brinkema on April 4, 2005............ SA 1897

      Testimony of Nabil Gharbieh:
         Direct examination by Mr. Gibbs. ................. SA 1897
         Cross examination by Mr. MacMahon. ............. SA 1959
         Redirect examination by Mr. Gibbs. .............. SA 2000
         Recross examination by Mr. MacMahon............ SA 2007

      Testimony of Muhammad Aatique:
         Direct examination by Mr. Kromberg.............. SA 2009

Transcript of Jury Trial proceedings before
   the Hon. Leonie M. Brinkema on April 5, 2005............ SA 2096

      Testimony of Muhammad Aatique (resumed):
         Direct examination by Mr. Kromberg.............. SA 2096
         Cross examination by Mr. Yamamoto.............. SA 2116
         Redirect examination by Mr. Kromberg............ SA 2186
         Recross examination by Mr. Yamamoto............ SA 2207

Testimony of <u>Donald Surratt</u>:
    Direct examination by Mr. Gibbs. . . . . . . . . . . . . . . . . SA 2210
    Cross examination by Mr. MacMahon. . . . . . . . . . . . . SA 2276
    Redirect examination by Mr. Gibbs. . . . . . . . . . . . . . . SA 2291
    Recross examination by Mr. MacMahon. . . . . . . . . . . . SA 2294

Transcript of Jury Trial proceedings before
    the Hon. Leonie M. Brinkema on April 14, 2005. . . . . . . . . . . SA 2296

Testimony of <u>Luther Kennedy</u>:
    Direct examination by Mr. Yamamoto. . . . . . . . . . . . . SA 2296
    Cross examination by Mr. Kromberg. . . . . . . . . . . . . . SA 2304
    Redirect examination by Mr. Yamamoto. . . . . . . . . . . SA 2323
    Recross examination by Mr. Kromberg.. . . . . . . . . . . . SA 2328

Testimony of <u>D. Curtis Jamison</u>:
    Direct examination by Mr. Yamamoto. . . . . . . . . . . . . SA 2332
    Cross examination by Mr. Gibbs.. . . . . . . . . . . . . . . . . SA 2349

Transcript of post-verdict proceedings before
    the Hon. Leonie M. Brinkema on April 26, 2005. . . . . . . . . . . SA 2352

Def. Exh. 57—July 23, 2003 letter from
    AUSA Gordon Kromberg to Yong Kwon's attorney. . . . . . . . SA 2358

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:04-cr-385 (LMB) |
| ALI AL-TIMIMI, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

On August 18, 2020, defendant Ali Al-Timimi ("defendant" or "Al-Timimi") was granted release from custody pending his appeal of his 2005 convictions and sentence. The Order, which granted Al-Timimi's Motion for Release from Custody Pending Appeal pursuant to 18 U.S.C. § 3145(c), imposed multiple restrictions to ensure that Al-Timimi did not abscond or pose a risk to the health or safety of others. Among these restrictions was a requirement that Al-Timimi be placed in a 14-day quarantine so that he could not infect anyone with COVID-19, as well as strict conditions of release, including home confinement with GPS monitoring and several limitations on his ability to communicate with others. The United States Probation Office has investigated and approved the residence in which he will live. Before the Court is the government's Motion for a Stay ("Motion"), in which the government requests a stay of the execution of the August 18, 2020 Order while it appeals the decision to grant Al-Timimi release from custody to the Fourth Circuit. Al-Timimi has filed an opposition to the Motion, to which the government has replied. For the following reasons, the Motion will be denied.

A stay of an order pending appeal of that order is "an exercise of judicial discretion" and "the propriety of its issue is dependent upon the circumstances of the particular case." Realvirt, LLC v. Lee, 220 F. Supp. 3d 704, 705 (E.D. Va. 2016) (quotation omitted). Courts consider four

factors to determine whether such a stay is appropriate: "(1) whether the stay applicant has made a strong showing that he [or she] is likely to succeed on the merits; (2) whether the applicant will be irreparably harmed absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Id. (quotation omitted). "[A] stay is considered extraordinary relief for which the moving party bears a heavy burden." Personhuballah v. Alcorn, 155 F. Supp. 3d 552, 558 (E.D. Va. 2016) (quotation omitted).

Here, for the many reasons set out in Al-Timimi's forceful and persuasive opposition to the Motion, the government has not met its heavy burden with regard to any of the stay factors. First, the government has not made a strong showing that it is likely to succeed on the merits of its appeal of the Order granting Al-Timimi release from custody. Giving all due consideration to the serious nature of the offenses involved in Al-Timimi's convictions, Al-Timimi's compelling track record since this case began clearly demonstrates that he is not likely to flee or pose a danger to others while his direct appeal is resolved. As the Court discussed in its 16-page Memorandum Opinion, the government consented to Al-Timimi's release during his trial, when any likelihood of his flight or danger was squarely before the Court, and he fully complied with all of the conditions of his release during that period. In addition, Al-Timimi's direct appeal presents multiple substantial questions of law, including questions about the inchoate nature of his convictions and the effect on his convictions of intervening Supreme Court authority. There are also two exceptional reasons why Al-Timimi's continued detention is no longer appropriate: the significant risks to his health posed by the COVID-19 pandemic as long as he remains in a congregate facility, and the unique procedural posture of this case, which presents a substantial risk of unjust confinement.

SA 001891

Second, the government has not demonstrated that it will be irreparably harmed absent a stay. The government's two-paragraph argument as to this factor rests entirely on the serious nature of Al-Timimi's convictions, and is directly undermined by the government having waited seven days before noticing its appeal of the August 18, 2020 Order. Third, the issuance of a stay risks substantial injury to Al-Timimi. Al-Timimi has multiple medical conditions which increase his risk of severe illness if he were to contract COVID-19, which has recently reached several of the facilities near where he is being held. Moreover, resolution of Al-Timimi's direct appeal is likely to take at least a year given that the Court has not completely resolved all of the issues on remand, which risks further unjust confinement. Again, it bears emphasizing that at least two of Al-Timimi's convictions will likely be vacated before his appeal returns to the Fourth Circuit, and should he prevail on appeal, he may well have already served excess years in prison. Lastly, the public interest does not favor a stay. In addition to the risk of unjust confinement, Al-Timimi has only been granted release pending resolution of his direct appeal and has already served 15 years in prison.[1] For these reasons, it is hereby

ORDERED that the government's Motion [Dkt. No. 525] be and is DENIED.

The Clerk is directed to forward copies of this Order to counsel of record.

Entered this 28th day of August, 2020.

Alexandria, Virginia

_____/s/_____

Leonie M. Brinkema
United States District Judge

---

[1] The government's argument that the delays in Al-Timimi's direct appeal are of his own making is not well-taken. Al-Timimi noticed his direct appeal two days after his sentencing and has vigorously pursued that appeal ever since. Moreover, as the government well knows, a signifcant amount of the delay associated with the Fourth Circuit's first remand of Al-Timimi's direct appeal was due to the government having unreasonably restricted the Court's resources by refusing to clear any of the Court's judicial clerks for access to certain classified materials. Other delays have been caused by significant changes in the legal landscape underlying Al-Timimi's convictions. This kind of extremely weak argument undermines the integrity of the government's position.

3

**SA 001892**

# Exhibit A



Thomas Huff <thuff@law.gwu.edu>

---

## Ali Al-Timimi travel

Kromberg, Gordon (USAVAE) <Gordon.Kromberg@usdoj.gov>       Thu, Aug 20, 2020 at 5:10 PM
To: Thomas Huff <thuff@law.gwu.edu>
Cc: Jonathan Turley <jturley@law.gwu.edu>

> Thanks for getting back to me on this.
>
> Gordon
>
>
> **From:** Thomas Huff <thuff@law.gwu.edu>
> **Sent:** Thursday, August 20, 2020 5:07 PM
> **To:** Kromberg, Gordon (USAVAE) <GKromberg@usa.doj.gov>
> **Cc:** Jonathan Turley <jturley@law.gwu.edu>
> **Subject:** Re: Ali Al-Timimi travel
>
> Hi Gordon,
>
> I think we'll have to respectfully decline so long as the case is still ongoing. (Actually - given that John Wyman was a trial witness, I think the Order technically prohibits them from talking during the pendency of the appeal.)
>
> Thank you for relaying the offer though.
>
> Best,
>
> Tom
>
>
> On Thu, Aug 20, 2020 at 4:47 PM Kromberg, Gordon (USAVAE) <Gordon.Kromberg@usdoj.gov> wrote:
>
>> Tom,
>>
>> I have a volunteer eager to share the driving with you.
>>
>> Seriously, former FBI case agent John Wyman is no longer doing case work, and is now at the FBI's Behavioural Analysis Unit.  He asked me to relay to you that he would love the opportunity to talk to your client (under conditions in which nothing your client said could be used against him).  He said that he could share the driving.

SA 001894

He said that, based on their conversations from years ago, your client might even be interested in talking to him about how the world has changed in the last 15 years.

I won't be insulted if you respond by saying that he's crazy for asking, and I'm crazy for passing that request on to you.

Gordon

**From:** Thomas Huff <thuff@law.gwu.edu>
**Sent:** Thursday, August 20, 2020 3:50 PM
**To:** Jeffrey Smihal <Jeff_Smihal@vaep.uscourts.gov>
**Cc:** Jonathan Turley <jturley@law.gwu.edu>; Kromberg, Gordon (USAVAE) <GKromberg@usa.doj.gov>; sotpo@bop.gov
**Subject:** Re: Ali Al-Timimi travel

Understood -- I will put together an itinerary once the arrangements are finalized and submit it to you. Best regards,

Tom

(My apologies for the duplicate email; I neglected to reply-all the first time.)

On Thu, Aug 20, 2020 at 3:47 PM Jeffrey Smihal <Jeff_Smihal@vaep.uscourts.gov> wrote:

Mr. Huff,

Once the arrangements are made I would appreciate  you submitting an itinerary as far as the travel arrangements and overnight stops, etc.  Once I have that I can coordinate a time to meet him to install the Location Monitoring equipment.

**From:** Thomas Huff <thuff@law.gwu.edu>
**Sent:** Thursday, August 20, 2020 3:42 PM
**To:** Jeffrey Smihal <Jeff_Smihal@vaep.uscourts.gov>
**Cc:** Jonathan Turley <jturley@law.gwu.edu>; gordon.kromberg@usdoj.gov; sotpo@bop.gov
**Subject:** Re: Ali Al-Timimi travel

Thank you, Jeffrey.

Ms. Otto: I'm attaching a copy of the release Order. I would also be happy to file a short motion with the Court, requesting a modification of the Order so that it explicitly names me as the person to whom he should be released. Please let me know if you would like me to do that.

Best regards,


Tom




On Thu, Aug 20, 2020 at 3:31 PM Jeffrey Smihal <Jeff_Smihal@vaep.uscourts.gov> wrote:

> Thanks.  It is my understanding the Judge would prefer he not fly at this point so she is fine with you picking him up and can provide or change the bond order as/if needed.
>
>
> **From:** Thomas Huff <thuff@law.gwu.edu>
> **Sent:** Thursday, August 20, 2020 3:28 PM
> **To:** Jeffrey Smihal <Jeff_Smihal@vaep.uscourts.gov>
> **Cc:** Jonathan Turley <jturley@law.gwu.edu>; gordon.kromberg@usdoj.gov; sotpo@bop.gov
> **Subject:** Re: Ali Al-Timimi travel
>
>
> Hi Jeffrey,
>
>
> Thank you for reply. I am Al-Timimi's other attorney, and I would be happy to drive him back. (I have actually made a similar drive from Denver to DC a number of times before.)
>
>
> If this is an acceptable arrangement for you and the Judge, I would be happy to coordinate with Ms. Otto about his pick up.
>
>
> Tom
>
>
> On Thu, Aug 20, 2020 at 3:06 PM Jeffrey Smihal <Jeff_Smihal@vaep.uscourts.gov> wrote:
>
>> Jonathan,
>>
>>
>> I just spoke with Judge Brinkema and advised her of the options to return Mr. Al-Timimi to Virginia assuming the release plan gets approved.  She does not believe flying would be the best thing for him due to COVID nor does she think the USMS would be able or willing to transport him directly from there to here.  Therefore she asked that you coordinate the transportation of him to Virginia.  I have copied Sarah Otto from the CMC ADX on this email and she can coordinate his pick up from the BOP side.
>>
>>
>> Thanks!

1        And finally, "On December 24, 2001, the United States

2    designated Lashkar-e-Taiba a foreign terrorist organization

3    pursuant to Section 219 of the Immigration and Nationality Act."

4        That concludes the stipulation, Judge.  Thank you.

5        And, Judge, at this time, we would call Nabil Gharbieh

6    to the stand.

7        THE COURT:  All right.

8        NABIL GHARBIEH, GOVERNMENT'S WITNESS, AFFIRMED

9                    DIRECT EXAMINATION

10   BY MR. GIBBS:

11   Q.   Good afternoon, sir,

12   A.   Good afternoon.

13   Q.   Sir, would you please state your name for the record and also

14   spell it for the record?

15   A.   My name is Nabil Gharbieh.  N-a-b-i-l is my first name.  Last

16   name is G-h-a-r-b-i-e-h.

17   Q.   All right.  Sir, if you could pull the microphone up a little

18   bit, I think it will amplify your voice a little bit, but it's

19   important to keep your voice up so everyone can hear you.  Okay?

20   A.   Okay.

21   Q.   Mr. Gharbieh, which city do you live in?

22   A.   I live in Annandale, Virginia.

23   Q.   How long have you lived in Annandale, Virginia?

24   A.   Roughly 15 years.

25   Q.   Are you a U.S. citizen?

1  A.    Yes, sir, I am.

2  Q.    Now, what is your educational background?

3  A.    I graduated from George Mason University with a degree in

4  communications.

5  Q.    And when did you graduate from George Mason with a degree in

6  communications?

7  A.    1998.

8  Q.    And what is your current occupation?

9  A.    I am a network engineer.

10  Q.    And could you tell us what a network engineer does?

11  A.    Maintains and manages a technical environment of computers.

12  Q.    And how long have you been a network engineer?

13  A.    About three or four years now.

14  Q.    Mr. Gharbieh, were you living in Annandale, Virginia, back on

·15  September 11, 2001?

16  A.    Yes, sir, I was.

17  Q.    And on that particular day, did you go to a gathering at the

18  Dar al-Arqam Islamic Center?

19  A.    Yes, I did.

20  Q.    Can you explain to the jury what the Dar al-Arqam Islamic

21  Center is?

22  A.    The Islamic Center, CIIE were the initials, Center for

23  Islamic Information and Education, was a -- it used to be a study

24  circle at a sheikh by the name of Sheikh Jaafar Idris's house.  He

25  used to teach us Islamic studies, and Dr. Ali Al-Timimi used to

1  sit in on these lectures, and he used to teach at the end.

2  And the class got very popular and grew, and as it grew

3  and demand for women wanted to attend, because it was such a small

4  group, it was men at first, and women requested, so we got

5  together, myself, Dr. Ali Timimi, Yousuf Idris, Sheikh Jaafar

6  Idris, Haytham Hantash, and some others, and we formed this

7  organization called Dar al-Arqam where we would teach Islamic

8  studies.

9  Q.  And was this teaching Islamic studies in English?

10 A.  Yes, sir, it was.

11 Q.  So was it primarily to recent converts to Islamic?

12 A.  Or people learning the faith whose native language was

13 English, yes.

14 Q.  All right.  And just for the record, you -- I'm sorry.  Okay.

15 Just for the record, you listed the name of a number of

16 people -- names of a number of people who helped establish the Dar

17 al-Arqam, including yourself.  I want to go through those just so

18 you could spell those for the record, if you would.  The first one

19 you mentioned was Sheikh Jaafar Idris.

20 A.  Yes, sir.  I guess that would be J-a-f-a-r I-d-r-i-s.

21 Q.  All right.  And you also mentioned a Yousuf Idris?

22 A.  Yes.  Y-u-s-u-f I-d-r-i-s.

23 Q.  All right.  And what was the relationship between Jaafar

24 Idris and Yousuf Idris?

25 A.  Father and son.

1  Q. Who was the father?

2  A. Sheikh Jaafar Idris.

3  Q. And you also mentioned an individual by the name of Haytham;

4  is that correct?

5  A. Yes.

6  Q. What's Haytham's full name?

7  A. H-a-y-t-h-a-m is his first name, and his last name is, I

8  think it's Hantash, H-a-n-t-a-s-h.

9  Q. And then you mentioned Ali Al-Timimi, that he was one of the

10  founders as well; is that correct?

11  A. Yes, sir.

12  Q. All right. Is Ali Al-Timimi here in the courtroom?

13  A. Yes, sir, he is.

14  Q. All right. Would you please point him out for the jury and

15  just indicate what he's wearing?

16  A. He's the gentleman in the middle with the beard.

17        MR. MAC MAHON: We'll stipulate to the identification.

18        THE COURT: All right.

19        MR. GIBBS: All right, thank you.

20  Q. Now, you said that you and these other people established the

21  Dar al-Arqam Islamic Center. Roughly when was that?

22  A. To the best of my recollection, it would have been around '99

23  or 2000.

24  Q. And where was the Dar al-Arqam located when you and these

25  other people helped to establish it?

1  A.   Falls Church, Virginia.

2  Q.   Now, you mentioned that, you know, the names of the people

3  that helped to set it up.  Was there some sort of a board or a

4  governing authority for Dar al-Arqam?

5  A.   I guess similar to a board.

6  Q.   Okay.  And you say "similar to a board."  Who would the

7  members on this entity that's similar to a board have been?

8  A.   Dr. Ali Al-Timimi; Sheikh Jaafar; Yousuf; Mohammad

9  Al-Qahtani, who was another person who helped form it.  It would

10 probably be them.

11 Q.   Okay.  So basically, it's the people you just named with the

12 exception of the Mohammad Al-Qahtani, and again, I'll ask if you

13 could please spell his name for the record as well.

14 A.   M-u-h-a-m-m-a-d A-l-Q-a-h-t-a-n-i.

15 Q.   All right, thank you.

16      Now, some of the people you mentioned that were part of

17 the board at Dar al-Arqam, one of the ones I wanted to ask about

18 was Sheikh Jaafar Idris.  What was the relationship between Sheikh

19 Jaafar and Ali Al-Timimi?

20 A.   I guess Sheikh Jaafar was -- he's a scholar in our faith, the

21 Islamic faith, and Dr. Ali Timimi was more of -- aside from a

22 friendship, Dr. Ali would have respected Sheikh Jaafar as an elder

23 and faith and in age.

24 Q.   All right.  So Sheikh Jaafar was older than Ali Timimi?

25 A.   Yes, sir.

1  Q.   And you said there was a friendship between them as well; is

2  that correct?

3  A.   Yes, sir.

4  Q.   Now, what was the relationship between Yousuf Idris and Ali

5  Timimi?

6  A.   That of a friendship.

7  Q.   Now, what was -- other than being on the board or part of the

8  governing body for Dar al-Arqam, what was Ali Timimi's role at the

9  Dar al-Arqam?

10 A.   A lecturer.

11 Q.   And if you could, tell us who were the most regular lecturers

12 at Dar al-Arqam.

13 A.   Unless we had a substitute, it was Dr. Ali Al-Timimi.

14 Q.   So he was the person who lectured there the most?

15 A.   Yes, sir.

16 Q.   Now, prior to September 11, 2001, what was your relationship

17 with Ali Timimi like?

18 A.   Prior to 2001?

19 Q.   Yes, sir.

20 A.   I was getting to know Dr. Ali Al-Timimi roughly around '99,

21 '98 and -- from '97 from him teaching at Sheikh Jaafar's house,

22 just getting to know him through the classes, escalating to a

23 point where we, you know, formed Dar al-Arqam together.

24 Q.   And would you attend his lectures on a regular basis?

25 A.   Yes, sir.

1  Q.   All right.   If I could, I'd like to have you take a look at

2  Government's Exhibit 10A41.

3            THE COURT:   Any objection to that?

4            MR. MAC MAHON:   No objection, Your Honor.

5            THE COURT:   All right, it's in.

6            (Government's Exhibit No. 10A41 was received in

7  evidence.)

8            MR. GIBBS:   We can go ahead and put it on the board

9  then -- or on the screen then.

10            THE COURT:   Mr. Gibbs, unless you blow it up, I don't

11  think it's going to help the jury a whole lot.

12            MR. GIBBS:   Right.   Yeah, if we can enlarge that top

13  part, that would be great.

14  Q.   All right.   And, Mr. Gharbieh, you can take a look probably

15  at the TV screen.   Can you see that?

16  A.   Yes, sir, I can.

17  Q.   All right.   Now, what is this document that you're looking

18  at, 10A41?

19  A.   This is an e-mail in reference to a trip that I myself along

20  with Abdullah Zikria helped form to Delaware with Dr. Ali

21  Al-Timimi.

22  Q.   And what was the purpose of this trip to Delaware with

23  Dr. Ali Al-Timimi?

24  A.   He had a friend whose -- who was an imam of a mosque there

25  that I guess they were either building or rebuilding, and it was a

1  mosque, like, in a poor neighborhood, and he wanted to visit them,

2  and he was to give a lecture over there.

3  Q.   Who was to give a lecture over there?

4  A.   Dr. Ali Al-Timimi.

5  Q.   All right.  Now, it lists the names of six brothers here.  If

6  you could just for the record identify who these people are?

7  A.   Haroon Zikria was the, was the cousin of Abdullah Zikria.

8  They helped us get the -- in reference to me, they helped us get

9  the land where we did some paintball.  And Ibrahim Al-Hamdi was a

10 person who did -- who was a friend.  All these guys are friends

11 who we went paintballing with, Yong Kwon and Seif Chapman and

12 myself.

13 Q.   All right.  Now, I'd like to show you some photographs, and

14 just indicate if these are some of the people listed in this

15 e-mail.  First we'll pull up Exhibit 1J7, if we could.

16          THE COURT:  Are you going to move these pictures in as

17 you're discussing them?

18          MR. GIBBS:  I can, Judge, sure, if that's easier, or I

19 can do them at the end.

20          THE COURT:  Well, let's get them going as you're going.

21 Any objection to any of the photographs going in of the

22 individuals?

23          MR. MAC MAHON:  Not of this series, Your Honor.

24          THE COURT:  All right, 1J7 is in.

25          (Government's Exhibit No. 1J7 was received in evidence.)

1  BY MR. GIBBS:

2  Q.   And can you for the record identify --

3  A.   Yong Kwon.

4  Q.   All right.  And he's one of the people listed in that e-mail?

5  A.   Yes, sir.

6  Q.   And how about, I believe we had Exhibit 3H1?

7            THE COURT:  All right, that's also in.

8            (Government's Exhibit No. 3H1 was received in evidence.)

9            THE WITNESS:  That's Ibrahim Al-Hamdi.

10  BY MR. GIBBS:

11  Q.   And I think we have a better picture of him.  If we can pull

12  up 1J2?

13  A.   Yeah, Ibrahim Al-Hamdi.

14  Q.   That's him, okay.

15            He's also listed in that e-mail, correct?

16  A.   Yes, sir.

17  Q.   All right.  Now, have you ever seen Ali Al-Timimi at Ibrahim

18  Hamdi's house before?

19  A.   Yes, sir, I have.

20  Q.   How did that come about?

21  A.   I think on two occasions at Dar al-Arqam after Dr. Ali would

22  teach a class, we would go to have dinner afterwards, and on two

23  of the occasions, twice they were at Ibrahim Al-Hamdi's house.

24  Q.   All right.  And you said we would go have dinner elsewhere.

25  Do you recall anybody else that was there at Ibrahim Al-Hamdi's

1  house when Timimi had dinner there?

2  A.    It was roughly 30 to 40 people.  It was a lot of people.

3  Pretty much the people that were listed in this e-mail with the

4  exception of Seif Chapman.  Ibrahim Al-Hamdi himself, Abdullah

5  Zikria, myself, just the people, regular attendees at Dar

6  al-Arqam.

7  Q.    And regular attendees of Ali Al-Timimi's lectures?

8  A.    Yes, sir.

9  Q.    All right.  And you mentioned Seif Chapman.  If we could pull

10  up Exhibit 1J4 and have you identify that?

11  A.    That's Seif Chapman.

12  Q.    And he's also listed in that e-mail?

13  A.    Yes, sir.

14        MR. GIBBS:  And again, we'd move this one in as well.

15        THE COURT:  Yes, 1J2 and 1J4 are both in.

16        MR. GIBBS:  Thank you.

17        (Government's Exhibit Nos. 1J2 and 1J4 were received in

18  evidence.)

19  BY MR. GIBBS:

20  Q.    Now, going back to the e-mail regarding to the Delaware trip

21  for a moment, in that e-mail, you refer to Ali Al-Timimi as

22  "Sheikh."  Can you explain what the term "sheikh" means?

23  A.    Literal definition is either an older person you call him out

24  of respect, or a person more knowledgeable than you in the faith

25  out of respect, and Dr. Ali was both.

1  Q.   All right.  So you were using "sheikh" in both terms?

2  A.   Yes, sir.

3  Q.   And when you say more knowledgeable in the faith, in the

4  faith of what?

5  A.   Islam.

6  Q.   Now, what exactly was your role in helping organize this trip

7  to Delaware, if anything?

8  A.   I don't know who rented the car.  I didn't do too much other

9  than -- I don't remember who, who rented the van.  I think it was

10 Abdullah, but we just -- I coordinated the brothers through the

11 e-mails, and we went out together.

12 Q.   All right.  So you were, you were essentially informing

13 Timimi of the status of the trip?

14 A.   Yes, sir.

15 Q.   And just describe briefly what happened at Delaware.  What

16 did you do up there?

17 A.   We went and visited his friend, who was an imam at a mosque,

18 and we had dinner afterwards.

19 Q.   And did Timimi speak?

20 A.   Yes, sir, he did.

21 Q.   And did the group travel back together from Delaware in that

22 same van?

23 A.   Yes, sir, we did.

24 Q.   And on the ride back from Delaware, did Timimi speak to the

25 group while referring to a particular book?

1  A.   Yes, he did.

2  Q.   And could you describe what happened?

3  A.   One of the books that we were going -- or the only book that

4  I recollect was a green booklet called 40 Hadeeths on Jihad.

5         THE COURT:   I'm sorry, called what?

6         THE WITNESS:   40 Hadeeths -- h-a-d-d-i-t-h-s, I would

7  say -- traditions of the Prophet Muhammad.

8  BY MR. GIBBS:

9  Q.   All right.   So "hadeeths" mean traditions of the Prophet?

10  A.   Yes, sir.

11  Q.   And what does "jihad" mean?

12  A.   Jihad is a struggle that ranges from protecting your house,

13  protecting yourself, your community, to the highest state of

14  jihad, which is fighting against your evil desires.

15  Q.   And can it also mean fighting in the sense of combat?

16  A.   Yes, sir.

17  Q.   And how long was Timimi reading from this 40 Hadeeths on

18  Jihad from the trip back to Delaware?

19  A.   I think he only read three or four of the hadeeths, each

20  hadeeth maybe taking a page or two.

21  Q.   All right.   Now, moving forward from this Delaware trip, have

22  you ever heard Timimi in other instances discussing if there are

23  any legitimate jihad movements in the world which are following

24  the proper creed?

25  A.   Dr. Ali's been asked that question maybe numerous times at

1  Dar al-Arqam as well as anywhere else in regards to are there, are

2  there groups, jihad groups who train for the state of jihad that

3  creed -- from a creed perspective are on the proper creed, and

4  Dr. Ali's opinion to the best of my recollection, hearing it

5  several times, would be no, but the closest ones would be that of

6  just due to -- he didn't have too much knowledge about the creed

7  of the two groups, the group out in Chechnya and LET, which is

8  Lashkar-e-Taiba, and he said that these two groups were closer to

9  the proper creed than other creeds that he definitely disagreed

10 with.

11 Q.   And what, what is your understanding of what it means to

12 follow the proper creed?

13 A.   To follow the correct understanding of Islam.

14 Q.   And you said that you've heard him ask these questions on

15 multiple occasions.  How would these questions come up?

16         MR. MAC MAHON:  Your Honor, object.  If we could get a

17 time frame here, please?

18         THE COURT:  All right, sustained.

19 BY MR. GIBBS:

20 Q.   Now, these questions that you talked about, did these occur

21 prior to September 11, 2001?

22 A.   Yes, sir.

23 Q.   And do you know roughly within which time frame you recall

24 these questions being asked?

25 A.   At the time where the Chechen struggle was in its prime in

1  the news.

2  Q.  And how would these questions come up?

3  A.  Questions and answers after the lecture Dr. Ali would give.

4  Q.  All right.  So people from the audience would ask these

5  questions?

6  A.  Yes, sir.

7  Q.  Now, you mentioned the two groups.  You mentioned Chechnya,

8  and you mentioned Lashkar-e-Taiba.  Let's start with

9  Lashkar-e-Taiba.  Who do you know -- well, first of all, what is

10  Lashkar-e-Taiba to the best of your knowledge?

11  A.  A group out in Pakistan who held training camps for jihad.

12  Q.  And jihad specifically where?

13  A.  In Pakistan.

14  Q.  And how do you know about Lashkar-e-Taiba?

15  A.  I've heard the name from Ibrahim Al-Hamdi and in

16  question-and-answer sessions.

17  Q.  Okay.  Other than Ibrahim Al-Hamdi and the

18  question-and-answer sessions, did you ever talk to anybody else

19  who discussed Lashkar-e-Taiba?

20  A.  Not to the best of my recollection.

21  Q.  And Timimi had said that although it may not be perfect, it's

22  closest -- LET is closer to the perfect -- to the proper creed?

23          MR. MAC MAHON:  Your Honor, that's a leading question.

24          THE COURT:  Sustained.

25  BY MR. GIBBS:

1  Q.   All right.  If you could just summarize what Ali Timimi said
2  about Lashkar-e-Taiba in terms of following the proper creed?
3          MR. MAC MAHON:  That's asked and answered, Your Honor.
4          THE COURT:  I think that is repetitious, and so I'm
5  going to sustain that objection.
6          MR. GIBBS:  All right, I'll move on, Judge.
7  Q.   You also mentioned a second group that he talked about
8  related to the struggle in Chechnya; is that correct?
9  A.   Yes, sir.
10 Q.   And when Timimi answered these questions, did he refer to any
11 particular individuals?
12         MR. MAC MAHON:  Same objection as to the time frame,
13 Your Honor.  How do we know this is pre-9/11?
14         THE COURT:  Well, he's given a non-date-related
15 orientation; I mean, I heard his earlier testimony; but can you
16 give a time frame at least by year as to what we're talking about
17 here?
18         THE WITNESS:  2000.
19         THE COURT:  2000?  All right, go ahead.
20 BY MR. GIBBS:
21 Q.   And would he talk about these issues on more than one
22 occasion?
23         THE WITNESS:  Your Honor, 2000 and 2001, but definitely
24 pre-September 11.
25         THE COURT:  All right.  We're talking about Chechnya

1  now.

2          THE WITNESS:  Chechnya probably -- it would probably be

3  2001 but pre-September 11.

4          THE COURT:  All right, go ahead.

5  BY MR. GIBBS:

6  Q.  And would he talk about Lashkar-e-Taiba and the struggle in

7  Chechnya on more than one occasion to your recollection?

8  A.  Aside from one -- aside from one session that was on the

9  Buddhist statue, I don't recollect that he gave a speech

10 specifically about that, but he was asked during the

11 question-and-answer sessions questions.

12 Q.  About Chechnya?

13 A.  About Chechnya, yes, sir.

14 Q.  And he also talked about it during a lecture on the Buddhist

15 statues?

16 A.  Yes, sir.

17 Q.  And is that related to the destruction of the Buddhist

18 statues in Afghanistan?

19 A.  Yes, sir.

20 Q.  Now, in any of his conversations about -- or any of his

21 statements about Chechnya, did he refer to any particular

22 individuals?

23 A.  In regards to Lashkar-e-Taiba, I never heard him mention an

24 individual.  In regards to the Chechen jihad, the name -- the most

25 popular name was brought up, Omar Khatab.

1 Q. Okay. And it's Omar Khatab?

2 A. Khatab.

3 Q. Could you spell that for the record?

4 A. I think it would roughly be O-m-a-r, last name

5 A-l-K-h-a-t-i-b.

6 Q. All right. Was he ever referred to as Ibn Khatab?

7 A. Probably Ibn Khatab, yes.

8 Q. And who is Omar Khatab or Ibn Khatab?

9 A. From my understanding, he was the leader of the Chechen

10 jihad.

11 Q. And how did you gain this understanding about Ibn Khatab?

12 A. Different lectures from different -- not just Dar al-Arqam,

13 from different places: the Internet, qoqaz.net, which is a

14 website, q-o-q-a-z.net; the news.

15 Q. Now, qoqaz.net, is that a website dedicated to a particular

16 topic?

17 A. Jihad.

18 Q. And is it related to jihad in a particular area?

19 A. Chechnya.

20 Q. And is this a website that you've looked at yourself?

21 A. Yes, sir.

22 Q. And is it a website that some of the other, some of the other

23 brothers that you knew from Dar al-Arqam also looked at?

24 A. Yes, sir.

25 Q. And specifically who if you can recall?

1   A.   Yong Kwon; Ibrahim Al-Hamdi; myself; Seif Chapman; Caliph

2   Basha, K-h-a-l-i-f B-a-s-h-a.  Probably a lot of -- it's a very

3   popular site because it reported the news, so a lot of -- I really

4   don't know anybody who didn't -- nobody I knew didn't see that

5   website or read over it.

6   Q.   All right, thank you.

7          Now, you mentioned this Khatab individual.  If we could

8   pull up Exhibit 10G4 so you could take a look at it?

9          And do you recognize 10G4?

10  A.   That's him, sir.

11  Q.   That's Khatab?

12  A.   Khatab.

13         THE COURT:  Any objection to that going in?

14         MR. MAC MAHON:  No, Your Honor.

15         THE COURT:  All right, it's in.

16         (Government's Exhibit No. 10G4 was received in

17  evidence.)

18  BY MR. GIBBS:

19  Q.   And what was it that Timimi said about either Khatab or the

20  jihad in Chechnya as far as why they were very close to following

21  the proper creed?

22  A.   I don't recollect the answer to that question, sir.

23  Q.   Okay.  And can you explain what it means to follow the proper

24  creed?

25         MR. MAC MAHON:  Your Honor, I object to that.  If he

1   doesn't remember what Dr. Al-Timimi says, I don't see the

2   relevance of the testimony.

3            THE COURT:  Well, the answer needs to be what you recall

4   Dr. Al-Timimi saying would be the creed, and if he hasn't said

5   that, then you can't answer the question.

6            THE WITNESS:  I wouldn't be able to answer that

7   question.

8            MR. GIBBS:  Okay.  That's fine.

9   Q.   Next what I'd like to do is have you take a look -- I think

10  we'll use Elmo for this -- this is part of Exhibit 3A8, Judge.

11           THE COURT:  Wait.  Before you put it on, is there any

12  objection to 3A8?

13           MR. MAC MAHON:  No, Your Honor, no objection.

14           THE COURT:  All right.  3A8, is that right, Mr. Gibbs?

15           MR. GIBBS:  Correct, Judge.

16           THE COURT:  That's in.

17           (Government's Exhibit No. 3A8 was received in evidence.)

18  BY MR. GIBBS:

19  Q.   And, Mr. Gharbieh, do you recognize this?

20  A.   Yes, sir, I do.

21  Q.   What is it?

22  A.   It's a label to a DVD that -- or a CD that I ordered called

23  "Russian Hell 2000" that was also on the website for free,

24  indicating -- I mean, showing clips of the Chechen jihad.

25  Q.   And you said you ordered it.  How many copies did you

1  actually order?

2  A.  I ordered two.

3  Q.  And what was the purpose of ordering two of them?

4  A.  One was for Seif Chapman.

5  Q.  And why did you want to get one for him?

6  A.  He requested one.

7  Q.  And --

8  A.  I told him I was getting one, and he told me to grab him one.

9  Q.  And did you order this online?

10 A.  Yes, sir, I did.

11 Q.  Now, did you show this DVD to any of your friends?

12 A.  I don't recall myself specifically showing it to somebody,

13 but I let people borrow it.  I don't have anyone -- I forgot who

14 took it from me.

15 Q.  But you loaned it out to somebody --

16 A.  Yes, sir.

17 Q.  -- and no longer have it?

18 A.  No, sir, I don't have it.

19 Q.  All right.  Now, do you recall a particular scene from this

20 DVD that depicts Ibn Khatab?

21 A.  A couple of scenes, yes, sir.

22 Q.  Okay.  Do you recall one that involves a Russian prisoner?

23 A.  Yes, sir.

24 Q.  Okay.  And if you could just -- well, actually, if we could

25 play that, Judge?

```
1              THE COURT:  All right.  Any objection?

2              MR. MAC MAHON:  I made a prior objection.  We can

3    approach the bench if you want, Your Honor.

4              THE COURT:  Well, if there's nothing changed, then --

5              MR. MAC MAHON:  Same objection that I made before.

6              THE COURT:  All right, I've ruled that this is

7    admissible.  And you're going to play it now?

8              MR. GIBBS:  Yes, Judge.

9              THE COURT:  For purposes of the record, what exhibit

10   number is this?

11             MR. GIBBS:  3A8.

12             THE COURT:  It's still part of 3A8, all right.

13             MR. GIBBS:  Yes, Judge.  This was the cover, and this is

14   the DVD itself playing.

15             THE COURT:  All right, that's fine.

16             Now, I just want to make sure that all the jurors can

17   see.  The jurors on the far end, are you able to see the screen

18   all right?  Yes?

19             A JUROR:  When they isolate it and enlarge it, yes.

20             THE COURT:  All right.  If not, what we may want to do

21   in the afternoon is see if we can get another small screen to put

22   on the end of your table so that the jurors on this end can get

23   the same access.  We'll try to work that in by this afternoon.

24             MR. GIBBS:  Okay.  That would be good, Judge.  Thank

25   you.
```

1          (Excerpt of Government's Exhibit 3A8 was played.)

2   BY MR. GIBBS:

3   Q.   All right.  Now, Mr. Gharbieh, is that one of the scenes that

4   you recall seeing in the "Russian Hell 2000" DVD?

5   A.   Yes, sir.

6   Q.   And did you recognize Khatab in any of that video?

7   A.   Yes, sir.  He's the one that did the shooting at the end.

8   Q.   And at the very end, there was some music playing.  Is there

9   a particular term for that type of music that we heard?

10  A.   It's actually Koran.  That was actually a verse in the Koran.

11  Q.   Okay.  And this was the, one of the scenes from the "Russian

12  Hell 2000" DVD, but was this footage also available on the Qoqaz

13  site as well?

14  A.   Yes, sir.

15  Q.   All right.  Now, I'd like to move forward from that if I

16  could.  You mentioned that in 2000, when you went on the trip to

17  Delaware, that Yong Kwon was one of the people that went with you,

18  correct?

19  A.   Yes, sir.

20  Q.   Now, how did you and Yong Kwon first meet?

21  A.   I knew Yong just by face, but I was formally introduced to

22  him in a place called Ravi Kabob, R-a-v-i Kabob, in Arlington,

23  with Dr. Ali Al-Timimi.  He introduced us.

24  Q.   And during that -- and was it at Ravi Kabob that you and Yong

25  Kwon were first formally introduced to one another?

1  A.   Yes, sir, that was the place.

2  Q.   And during that first meeting, did the two of you, meaning

3  you and Yong Kwon, discuss the notion of jihad?

4  A.   Yes, sir, we did.

5  Q.   And what did the two of you discuss?

6  A.   We were talking about maybe forming a group like -- and go

7  out and do some paintballing for personal jihad training.

8  Q.   And what's the connection between paintball to personal jihad

9  training?

10 A.   It was multi-purposed.  One was -- the obvious was the

11 combat, and then it was also for personal struggle because you're

12 out there with no food and in the heat, overdressed, and it helped

13 you overcome struggles within yourself and patience.

14 Q.   And why did you and Yong Kwon feel like it was beneficial to

15 start this personal jihad training?

16 A.   We -- we believed that this was part of our faith.

17 Q.   And where did you get that understanding from?

18 A.   Different lectures, different articles, different articles on

19 the Internet.

20 Q.   And you say different lectures.  What lectures, if any, did

21 you hear that gave you this understanding of the benefits of

22 personal jihad training?

23 A.   It's a hard question to answer because it's such a wide topic

24 that it's rare to find a person on a scholarly level that didn't

25 talk or address that topic of jihad.  Chechnya was a hot topic at

1  the time. It was a motivating factor. The topics would come up
2  at Dar al-Arqam during questions and answers, and we just felt
3  like this was something that because we weren't partaking in a
4  real jihad, that we felt like by doing this, we would fulfill our
5  duties.
6  Q.  And did you and Yong Kwon, in fact, start a personal jihad
7  training group?
8  A.  Yes, sir, we did.
9  Q.  And who did you invite to join this group?
10  A.  The paintball group was -- we ran it -- myself and Yong Kwon
11  ran the idea by Caliph Basha and Idris Surratt and -- Idris
12  Surratt and Hammad -- and I can't remember his last name -- Hammad
13  is H-a-m-a-d, Idris Surratt, I-d-r-i-s S-u-r-r-a-t -- and they
14  were friends that I've known just seeing them at the mosque, and I
15  was talking to Yong, and we were looking for people who wanted to
16  partake in the paintballing, and I ran it by Caliph, excuse me,
17  myself and Yong ran it by Caliph, and he said that he knew -- he
18  was thinking along the same lines as well, and he wanted to do the
19  same thing, and he knew a couple of brothers that wanted to do the
20  same thing.
21       So we said, "Okay. Bring who you want to bring, and
22  we'll bring who we want to bring, and then we'll start
23  paintballing."
24  Q.  And after you started doing this, did Timimi ever find out
25  about the personal jihad training?

1  A.   Yes, he did.

2  Q.   All right.  How did he find out about it?

3  A.   Myself and Yong Kwon approached him and maybe some others

4  that I can't recollect, and we told him this was something that we

5  were doing.

6         MR. MAC MAHON:  Your Honor, if we could get the time

7  frame on this, please?

8         THE COURT:  Yes.

9         THE WITNESS:  Pre-September -- time frame would be

10  around, probably around June of -- probably around June of -- I'm

11  sorry, the best I can do is the year, and it would be around 2000.

12         THE COURT:  All right.

13  BY MR. GIBBS:

14  Q.   All right.  And you said you and Yong Kwon and perhaps some

15  others approached him, and what did you tell him?

16  A.   That we were doing, we were doing this paintballing, and we

17  got people together, and we just ran it by him.

18  Q.   And what was the purpose that you wanted to run this by him?

19  A.   Being that he was our respected both elder and knowledge

20  person we looked up to, we wanted to run it by him more than

21  likely for his, you know, his opinion and his acceptance of it.

22  Q.   And did he give you his opinion and his acceptance of it?

23  A.   Not -- no, not really.  No.  He -- we just ran it by him, and

24  he just, I guess, accepted it that we were doing it.  He didn't

25  say not to or, "I applaud this; keep doing it."

1  Q.   And was there anybody else that you wanted to run this by

2  that you were doing it other than Ali Timimi?

3  A.   No, sir.

4  Q.   Now, other than telling -- and was this pretty soon after you

5  had started this personal jihad training group that you told

6  Timimi about this?

7  A.   Yes, sir.

8  Q.   All right.  Was there any other time other than that first

9  time that you also discussed with Timimi this personal jihad

10 training that you were engaged in?

11           MR. MAC MAHON:  Your Honor, objection to the form of the

12 question.  If he talked to him about paintball, he could ask him

13 if he talked about paintball, but the government's spin of

14 personal jihad training --

15           THE COURT:  All right.

16           MR. MAC MAHON:  -- there hasn't been any testimony to

17 lay the foundation that there was ever a discussion with Ali

18 Al-Timimi about that.

19           MR. GIBBS:  Well, Judge, I think the witness used the

20 term when he described it initially.

21           THE COURT:  I think he did, too, so I'm going to

22 overrule that objection, and you can certainly probe it on cross.

23           MR. MAC MAHON:  Thank you, Your Honor.

24 BY MR. GIBBS:

25 Q.   Do you want me to repeat the question?

1  A.  Yes, sir.

2  Q.  All right.  Other than that first time, did you have a

3  subsequent discussion with Ali Timimi about this personal jihad

4  training that you and the others were doing?

5  A.  The only other time was when Seif Chapman approached myself,

6  Yong Kwon, some others, pulled us to the side at Dar al-Arqam

7  after Dr. Ali had just spoken, and he -- we stood in a group by a

8  tree, and he asked if any -- in a circle formation, he asked if

9  any of us had any visitors recently, and we said, "No, we don't

10  know what you're talking about."

11        And he said, "Did the FBI ever approach any of you?"

12        And we were shocked and said, "No."

13        And he said that they came to his job and they were

14  asking about the paintballing that we were doing, and an FBI

15  question, "Is there anything that we should know, and is there

16  anything that you're hiding, because it will eventually come out,

17  so you might as well let us know now."

18        So after that, myself and Yong Kwon and Seif and some of

19  the other guys went to Dr. Ali at Dar al-Arqam after the lecture,

20  and we told him -- actually, it was outside of Dar al-Arqam, and

21  we told him that this happened.

22  Q.  Well, first of all, whose idea was it to go talk to Ali

23  Al-Timimi?

24  A.  Myself and Yong Kwon and Seif Chapman.

25  Q.  And why did you choose him to tell this about?

1 A.   He was our -- again, a person's opinion that we respected and
2 we sought after.  I mean, nobody else knew about the paintballing
3 that we could even bring it up in the first place and to have to
4 explain the story all over again, and so he already knew about it,
5 so we figured we'd go ask him.
6 Q.   And did you, in fact, tell him about what had happened with
7 Seif Chapman?
8 A.   Yes, sir.
9 Q.   What was his response?
10 A.   He said it was, it was something that we brought upon
11 ourselves.  It was pretty much our faults because we used to meet
12 publicly in a big group covered in camouflage, and we would have
13 our paintball guns, and we would meet, and we'd go out there
14 together, and he said that we brought it upon ourselves meeting
15 like that, and he quoted a verse from -- a chapter in the Koran,
16 Yusuf -- or Joseph -- where the father advised his sons to enter a
17 city through different doors, and he asked us to not quit, because
18 if we quit, we're going to look like we did something wrong, and
19 we felt we didn't do anything wrong, so he said to just keep doing
20 it but just don't meet up the way you guys meet up.
21          And then he said, "Or you can gather together and just
22 play soccer."
23 Q.   And did you, in fact, take his advice and become essentially
24 more discreet in the way you organized yourselves?
25 A.   Yes, sir.

1  Q.   And how did you go about doing that?

2  A.   We just divided the paintball group into a car, whatever a

3  car could fit.  Each person -- whoever was driving with whoever

4  would coordinate with that person to meet at whatever, and

5  everybody just met at the paintball field.

6  Q.   All right, thank you.

7        Now, you mentioned some of the people that took part in

8  this training group with you.  I want to show you some more

9  photographs if we could, starting with Exhibit 1A1.

10       I'm sorry, let me go to the next one; that's the wrong

11  exhibit.  We'll do 1J1.

12            THE COURT:  All right, any objection?  I assume not.

13            MR. MAC MAHON:  No objection, Your Honor.

14            THE COURT:  All right, 1J1 is in.

15            (Government's Exhibit No. 1J1 was received in evidence.)

16  BY MR. GIBBS:

17  Q.   Who is that?

18            MR. MAC MAHON:  I'm sorry, Your Honor, can I sit down

19  when I say that?  I know that you always want us to stand up.

20            THE COURT:  No, you need the exercise.  It's good for

21  you.

22            MR. MAC MAHON:  Thank you, Your Honor.

23  BY MR. GIBBS:

24  Q.   And 1J1, do you know who that is?

25  A.   Ismail Royer.

1 Q.  And how do you know him?

2 A.  I worked with him at CARE.

3 Q.  Can you explain what CARE is?

4 A.  An Islamic advocacy group in Washington, D.C.

5 Q.  And did he take part in this training group that you and Kwon

6 had formed?

7 A.  Yes, sir.

8 Q.  And the next one is 1J3.

9         THE COURT:  No objection?

10         MR. MAC MAHON:  It hasn't come up yet, Your Honor.

11         THE COURT:  All right.

12         MR. MAC MAHON:  I'm not sure who that is, Your Honor.

13 I'm sorry, I'll have to wait.

14         THE COURT:  Ask the question.

15         MR. GIBBS:  All right.

16 Q.  Do you recognize 1J3?

17 A.  Yes, sir, I do.

18 Q.  All right.  Who is that?

19 A.  Masaud Khan.

20 Q.  All right.  How do you know him?

21 A.  Through Yong Kwon.

22         THE COURT:  All right, that's in.

23         (Government's Exhibit No. 1J3 was received in evidence.)

24         THE COURT:  Hold on one second.

25         MR. MAC MAHON:  No objection.

 1            THE COURT:  All right, it's in.

 2  BY MR. GIBBS:

 3  Q.   All right.  Did he -- now, Khan, did he ever take part in the

 4  personal jihad training?

 5  A.   No, sir.

 6  Q.   All right, let's go to the next one, which is 1J5.  Do you

 7  recognize that person?

 8  A.   Hammad.

 9  Q.   And is this the Hammad or "Hammad" you spoke about earlier?

10  A.   Yes, sir.

11            THE COURT:  Any objection?

12            MR. MAC MAHON:  No, Your Honor.

13            THE COURT:  All right, it's in.

14            (Government's Exhibit No. 1J5 was received in evidence.)

15  BY MR. GIBBS:

16  Q.   And did he also take part in this training?

17  A.   Yes, sir.

18  Q.   All right.  Do you know if he was ex-military?

19  A.   Yes, sir.

20  Q.   Do you know what branch of the service?

21  A.   I believe it would be the Air Force.

22  Q.   And if we could go to the next one, which is 1J6?

23  A.   Caliph.

24  Q.   And is he one of the people you mentioned earlier as well?

25  A.   Yes, sir.

1          MR. GIBBS:  All right, Judge, I would move it in if

2  there's no objection.

3          THE COURT:  Any objection?

4          MR. MAC MAHON:  No objection.

5          THE COURT:  All right, it's in.

6          (Government's Exhibit No. 1J6 was received in evidence.)

7  BY MR. GIBBS:

8  Q.   And did Caliph also take part in the personal jihad training?

9  A.   Yes, sir.

10 Q.   And then if we could move to 1J8?

11 A.   Mahmood Hasan.

12 Q.   And how do you know Mahmood Hasan?

13 A.   I've known him from George Mason University vaguely, and then

14 he got involved with Dar al-Arqam when we started to get to know

15 each other more and more.

16 Q.   And did he also take part in the personal jihad training?

17 A.   Yes, sir.

18          MR. GIBBS:  All right, I would move that in as well,

19 Your Honor.

20          THE COURT:  Any objection?

21          MR. MAC MAHON:  No objection, Your Honor.

22          THE COURT:  All right, it's in.

23          (Government's Exhibit No. 1J8 was received in evidence.)

24 BY MR. GIBBS:

25 Q.   The next exhibit is 1J9.

1  A.    Mohammed Aatique.

2  Q.    And how do you know Mohammed Aatique?

3  A.    Paintballing.

4  Q.    So he was also part of this group?

5  A.    Yes, sir.

6  Q.    And did he also attend the Dar al-Arqam?

7  A.    Yes, sir.

8  Q.    But he wasn't as regular as some other people?

9  A.    No, sir.

10         MR. GIBBS:   Okay.  We would move that one in and then

11 move next to 1J10.

12         THE COURT:   Any objection to either?

13         MR. MAC MAHON:   No, Your Honor.

14         THE COURT:   All right, they're both in.

15         (Government's Exhibit Nos. 1J9 and 1J10 were received in

16 evidence.)

17 BY MR. GIBBS:

18 Q.    And do you recognize the person depicted in Exhibit 1J10?

19 A.    Idris Surratt.

20 Q.    And who was Idris Surratt?

21 A.    He also went paintballing with us, and I mentioned him

22 earlier as myself and Yong Kwon approached in regards to the

23 paintball.

24 Q.    And did -- do you know if he was in -- had previously been in

25 the military?

1  A.   To the best of my knowledge, he was in the Army.

2  Q.   And finally, Exhibit 1J13.  Do you recognize this individual?

3  A.   Ali Chandia.

4  Q.   And who was Ali Chandia?

5  A.   He was just a person that used to come to Dar al-Arqam.

6  Q.   And did he ever take part in the training?

7  A.   No, sir.

8  Q.   Okay.  Do you know what Ali Chandia's relationship with

9  Timimi was?

10        MR. MAC MAHON:  Can we get a time frame on that, please,

11  Your Honor?

12        THE COURT:  Yes, and time frame.

13        THE WITNESS:  I apologize that it's just the year, not

14  so much as a month, but it's 2000.

15        THE COURT:  All right.

16        THE WITNESS:  I remember he helped out Dr. Ali Al-Timimi

17  with a lecture that took place in Maryland, and they were

18  translating a book together, I believe, or he was helping him put

19  a book together that was left at Dar al-Arqam, and Ali told me

20  that it was some book that him and Dr. Ali Al-Timimi were working

21  on.

22  BY MR. GIBBS:

23  Q.   All right.  When you say Ali told you, you're talking about

24  Ali Asad Chandia?

25  A.   I'm sorry, yes, sir.

1 Q.   Okay.

2          THE COURT:   For the record, 1J13 is in evidence.

3          MR. GIBBS:   Oh, thank, Judge.  I appreciate that.

4          (Government's Exhibit No. 1J13 was received in

5 evidence.)

6 BY MR. GIBBS:

7 Q.   All right.  Mr. Gharbieh, other than this -- the paintball

8 that you talked about, was there anything else that you and the

9 other members of this group did to prepare yourself for this

10 personal jihad training?

11 A.   I'm not sure I understood the question.

12 Q.   Well, you had talked about the paintball.  Was there anything

13 else that you and these other people whose pictures we've seen did

14 together in order to train yourself for this personal jihad

15 training?

16 A.   No, sir.

17 Q.   Did -- do you yourself or did you yourself at one time own

18 any firearms?

19 A.   Yes, sir.

20 Q.   And what type of firearm did you get?

21 A.   It's not an AK-47, but it resembles one of an AK-47.

22 Q.   All right.  And I might need Mr. Wood's assistance on this

23 one, but I believe Exhibit 7A42 is in the courtroom.  If I could

24 just have you take a look at that?

25 A.   That is my rifle, sir.

1   Q.   All right.  And you said it's not an AK-47, but it resembles

2   one.  In what way does it resemble one?

3   A.   It's -- I guess from a, from a gun perspective, it's from the

4   same family.

5   Q.   And so this is -- it's a rifle, obviously, correct?

6   A.   Correct.

7   Q.   All right.  Is it automatic or semiautomatic?

8   A.   Semi.

9   Q.   And where did you get this gun?

10  A.   A gun show out in Woodbridge.

11              MR. GIBBS:  Okay.  That's fine, thank you.

12              And we would move this into evidence, Your Honor.

13              THE COURT:  Any objection?

14              MR. MAC MAHON:  Same objection I made before, Your

15  Honor.

16              THE COURT:  All right.  It's overruled, so it's in.

17              (Government's Exhibit No. 7A42 was received in

18  evidence.)

19              MR. MAC MAHON:  Thank you.

20  BY MR. GIBBS:

21  Q.   Now, you mentioned that you got this rifle at a gun show in

22  Woodbridge.  Did you go out to that gun show with anybody else?

23  A.   Yes, sir, with Yong Kwon, with Khan, Ismail Royer, and

24  Ibrahim Al-Hamdi and Seif Chapman.

25  Q.   All right.  And you bought the particular weapon that is

1  Government Exhibit 7A42 at that gun show, correct?

2  A.    Yes, sir.

3  Q.    All right.  Did anybody else get any weapons at that gun

4  show?

5  A.    Ismail Royer.

6  Q.    What type of weapon did he get?

7  A.    Very similar, same family, but not an AK-47.

8  Q.    And other than you and Ismail Royer, did you know anybody

9  else in this personal jihad training group that you had helped

10  establish that also got rifles?

11  A.    Yes, sir.

12  Q.    All right, who else do you know from the group that got

13  rifles?

14  A.    Myself, Yong Kwon, Seif Chapman, Idris Surratt or Caliph --

15  they were sharing one; I don't know who it belonged to -- Hammad,

16  Ibrahim Al-Hamdi.  I can't remember anybody else.

17  Q.    And did all those people get similar types of weapons?

18  A.    With the exception of Yong Kwon and Seif Chapman.

19  Q.    All right.  Well, let's start with them.  What type of gun

20  did Yong Kwon get?

21  A.    An AR-14, which is from the same family and looks like an

22  M-16.

23  Q.    And what kind of gun did -- you said Kwon got a different

24  type and who else?

25  A.    Seif Chapman, who had the same.

1  Q.   He got an AR-15 type?

2  A.   Right.

3  Q.   And then other than those two, what types of guns did the

4  other people you mentioned get?

5  A.   Similar to the one I had, AK-47s.  They were either AK-47s or

6  from the same family tree.

7  Q.   All right.  Was there any particular reason that a number of

8  people from this group either got AK-47s or got guns very similar

9  to AK-47s?

10        MR. MAC MAHON:  Objection.  Lack of foundation, Your

11  Honor.

12        THE COURT:  If you know.  If you-all discussed it.  In

13  other words, don't just guess, but if there's -- if you know of

14  your own knowledge why this particular type of weapon was being

15  purchased, you can testify to that.  So overruled.

16        THE WITNESS:  Ibrahim Al-Hamdi and Ismail Royer said to

17  get those guns.  A legitimate reason was, was cost, but another

18  reason was that if anybody ever went to a training, a jihad

19  training camp overseas, they would train with that type of gun, so

20  it's better to know -- be familiar with that as opposed to

21  anything else.

22  BY MR. GIBBS:

23  Q.   And in an attempt to familiarize yourselves with these types

24  of weapons, did you actually go out and, and shoot these weapons?

25  A.   Yes, sir, we did.

1  Q.  And where did you go shoot these weapons?

2  A.  At the NRA range and at a military range.

3  Q.  How did you get into a military range?

4  A.  Seif Chapman's ID.

5  Q.  And was he also ex-military?

6  A.  Yes, sir.

7  Q.  Do you know what branch of the service?

8  A.  Marine Corps.

9  Q.  Now, at some point, Mr. Gharbieh, did there come a time that

10  you became less involved with this jihad training group?

11  A.  Roughly -- yes, sir.  Roughly April and May of 2000.

12  Q.  Was it 2000?

13  A.  I'm sorry, 2001.

14  Q.  And was there a particular reason you became less involved

15  with .this particular group?

16  A.   It got redundant to me after a while, and I started to lose

17  interest in all of it, the paintballing, the talks, and at that

18  point, people were going overseas for training camps, to Pakistan.

19  I don't know that they had gone anywhere else.

20       And I started -- although I was told that that was legal

21  in the United States to do that and that was a legal group, which

22  was why I was okay with the fact that people went, after a while,

23  it started -- it started sinking in that after they started

24  leaving more towards 2001, it was something that I wasn't going to

25  do, and I thought it just brought too much, I guess, unnecessary

1  attention to those guys, so I didn't want to have anything to do
2  with it.

3         THE COURT:  All right, I think at this point, Mr. Gibbs,
4  I try to give the jury a lunch break around 1:00.

5         MR. GIBBS:  Sure.

6         THE COURT:  So, Ladies and Gentlemen, we're going to
7  take our one-hour lunch break at this time and reconvene at 5
8  after two.  You're not required to stay in the building.  If you
9  want to go out and walk, that's fine, but just make sure again my
10  cautions about avoiding any contact with anybody about this case,
11  all right?  We'll see you back here at 5 after.

12         (Recess from 12:05 p.m., until 1:05 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              A F T E R N O O N   S E S S I O N

2                        (Defendant and Jury present.)

3              THE COURT:  All right, Mr. Gibbs?

4              MR. GIBBS:  Thank you, Judge.

5    Q.   All right.  Now, Mr. Gharbieh, before we took our afternoon

6    break, you had testified that one of the concerns you had that

7    caused you to withdraw from this training group was you found out

8    that some people were going to camps, correct?

9    A.   Yes, sir.

10   Q.   All right.  Specifically, what did you find out as it regards

11   camps?

12   A.   That they were going to a camp in Pakistan that was a jihad

13   training camp.

14   Q.   And what is your understanding of what a jihad training camp

15   is?

16   A.   Combat preparation.

17   Q.   And who was it specifically that you learned had gone to this

18   jihad training camp in Pakistan?

19   A.   Ismail Royer, Ibrahim Al-Hamdi, Yong Kwon, Masaud Khan.  I

20   can't -- I'm drawing blanks.

21   Q.   Okay.  But before September 11, were there particular people

22   that you learned had gone to this jihad training camp?

23   A.   Yes, sir, Masaud Khan and Ismail Royer.

24   Q.   How about Ibrahim Hamdi?

25   A.   And Ibrahim Hamdi, yes, sir.

1  Q.   What was it about that fact that concerned you?

2  A.   In regards to the guys going over to the camps?  What

3  concerned me about that?

4  Q.   Right, yeah.  What concerned -- what about that concerned you

5  that you decided to withdraw from this training group here in the

6  United States?

7  A.   Oh, kind of, I guess, to me what would be the obvious, at the

8  time, for a while, it was just talk, and it was talk about how

9  they were legal, and it was just talk.  Then when actual

10  implementation started taking place and people started requesting

11  that I do one or -- well, later, people started requesting later

12  that I do one or the other, I guess to me it's the obvious.  I

13  just -- once I saw people were actually really going and that was

14  part of it, I didn't want to be a part of that, that light.

15  Q.   Okay.  So before, there had been talked about jihad training

16  in camps, correct?

17  A.   Yes, sir.

18  Q.   But did the fact that people actually did it make you realize

19  this had turned into a reality?

20  A.   Yes, sir.

21  Q.   And is that a reality you wanted to distance yourself from?

22  A.   Yes, sir.

23  Q.   All right.  Now, Mr. Gharbieh, moving forward to September

24  11, 2001, did you go to the Dar al-Arqam Islamic Center that day?

25  A.   Yes, sir.

1  Q.   And were there discussions at the Dar al-Arqam that day about

2  the attacks that had occurred on 9/11?

3  A.   Yes, sir.

4  Q.   And did Ali Timimi discuss those attacks?

5  A.   Yes, sir.

6  Q.   All right.  Specifically, what did Ali Timimi say at the Dar

7  al-Arqam that day?

8  A.   He mentioned that the attacks were something America --

9  was an event that America had coming due to the foreign policy

10 that America had held towards the Middle East.

11 Q.   And when he made that comment, that this was something that

12 America had coming because of its foreign policy that it had

13 towards the Middle East, did anyone at the Dar al-Arqam respond to

14 him?

15 A.   To my recollection, Haytham Hantash questioned him and asked

16 him questions in regards to his statement, yes.

17 Q.   All right.  And how many people were there when Ali Timimi

18 made this statement about how America had the 9/11 attacks coming

19 to it?

20 A.   I'd be safe to assume around at least eight maybe.

21 Q.   And do you remember specifically who some of the people were

22 there when Ali Timimi made this statement?

23 A.   Some of them included myself; Sheikh Jaafar Idris; Haytham;

24 Yousuf Idris; Fahad, F-a-h-a-d, Khan, K-h-a-n.  There's probably

25 three or four more.  Abdullah Zikria and maybe, like, two or three

1   others.

2   Q.   All right.  And based on some of the names you've told us,

3   you know, Haytham, Sheikh Jaafar, Yousuf Idris, I mean, these were

4   people who were part of the leadership at Dar al-Arqam, correct?

5   A.   Yes.

6   Q.   And what did, what did Haytham say to Timimi after he made

7   this comment about how America had the 9/11 attacks coming to it?

8           MR. MAC MAHON:  Objection to hearsay, Your Honor.

9           THE COURT:  Well, is it being offered for the truth of

10  its contents?

11          MR. GIBBS:  No.  It's being offered for -- to explain

12  why Ali Timimi responded as he did.

13          THE COURT:  I think it's not hearsay then.  I'll

14  overrule the objection.

15          THE WITNESS:  Can you repeat the question?

16  BY MR. GIBBS:

17  Q.   Sure.  What did Haytham Abu Hantash say after Ali Timimi made

18  this statement about how America had the attacks of 9/11 coming to

19  it?

20  A.   He questioned him in regards to if Dr. Ali had the opinion --

21  the Islamic opinion to his understanding if what happened was

22  Islamically justified.

23  Q.   And how did Haytham Hantash appear when he said this?

24  A.   Challenging.

25  Q.   And what was it about him that makes you say he appeared

1 challenging?

2 A. Nothing I can really describe other than I know Haytham

3 personally, and I know his demeanor. It wasn't a demeanor more,

4 Please explain. It was more like, What do you mean, sir? Are you

5 trying to say that -- not in those words, paraphrasing -- so are

6 you saying what happened was Islamically justified?

7 Q. All right. So is it fair to say Haytham appeared upset?

8 A. It's fair to say.

9 Q. And what was Timimi's response to him when he was confronted

10 like this?

11 A. He brushed off and mentioned that no, he wouldn't say that

12 this was an Islamically correct or justified situation, but it was

13 just -- aside from that, it was just, it was just something that

14 America had coming due to their foreign policy.

15 Q. And what do you mean when you said Ali Timimi brushed it off?

16 A. Well, in a calm, collected manner, he didn't really

17 address -- he answered the question. His answer was no, it was

18 not Islamically justified, but in a calm manner, he said, but the

19 fact was -- and I'm paraphrasing -- but the point was is this is

20 something that America had coming due to their foreign policy

21 towards the Middle East and other countries.

22 Q. And did Haytham appear to remain upset that Timimi continued

23 to voice that opinion at the Dar al-Arqam?

24 　　　　　　MR. MAC MAHON: Objection to the foundation, Your Honor.

25 There isn't any -- nothing in terms of -- I have a speaking

1  objection.

2  THE COURT:  Rather than object -- yes.  And I think it's

3  also a leading question.  Just do it in a non-leading fashion.

4  Sustained.

5  MR. GIBBS:  Sure, Judge.

6  Q.  And how did Haytham respond to that statement by Ali Timimi?

7  A.  I remember leaving at one point, and that was very close to

8  the point that I left, the conversation, and I remember, though I

9  don't recall at all the discussion, that it was a little bit of a

10  back-and-forth between Haytham and Dr. Ali.

11  Q.  Okay.  And you mentioned that when Ali Timimi made this

12  statement about America having the attacks of 9/11 coming to it,

13  that Haytham specifically questioned him about that.  How about

14  you, though?  Did you question him there at the Dar al-Arqam?

15  A.  No, sir.

16  Q.  Why not?

17  A.  It wasn't my place to question.  Out of culture and religious

18  respect, with the presence of Sheikh Jaafar, a scholar in the

19  faith, around, it wouldn't have been my role to question anything.

20  It would be a disrespect to Dr. Ali Timimi and a disrespect to --

21  it's just not my place.  There's people with more knowledge in the

22  area and older than me, so I wouldn't be able to out of respect

23  challenge anything.

24  Q.  Okay.  So when you say it's not your place, you're talking

25  about your place in terms of age and knowledge?

1  A.    Yes, sir.

2  Q.    Now, how did that gathering of the Dar al-Arqam on September

3  11, 2001, how did it ultimately end?

4  A.    I don't remember how it wrapped up.  I was in the back

5  working on producing some tapes, but I remember closing the door.

6          So to answer your question, I don't know how it was

7  concluded, but afterwards, I know Dr. Ali had left at that point,

8  and Haytham and Sheikh Jaafar were discussing the comments, and,

9  and Dr. Ali said something in regards to this is his opinion, and

10  Sheikh Jaafar had expressed that it's his opinion that Dar

11  al-Arqam did not want said on their behalf or said period and this

12  subject was not to be touched, and they alluded that Dr. Ali

13  Timimi said that this was his opinion and he's not going to back

14  down from it if anybody asks him about it.

15          So apparently, they had asked him to leave and --

16          MR. MAC MAHON:  Your Honor, object.  He's speculating

17  now as far as I can tell.

18          THE COURT:  All right.  Again, unless you know of your

19  own knowledge, you can't speculate.  So I'm sustaining the

20  objection unless you know of your own knowledge.

21          THE WITNESS:  Your Honor, the only reason why I said

22  that was because at the end, Sheikh Jaafar and Haytham had made a

23  decision to ask him not to --

24          MR. MAC MAHON:  That's hearsay, Your Honor.

25          THE COURT:  I think -- are you calling another witness

1 on this topic?

2        MR. GIBBS: I don't believe on this one, no, Judge.

3        THE COURT: Well, I think now we are in the area of

4 hearsay, so I'm going to sustain the objection.

5        MR. GIBBS: All right. That's fine, Your Honor.

6 Q. Now, to your knowledge, did Ali Timimi ever speak at the Dar

7 al-Arqam again after September 11, 2001?

8 A. No, sir.

9 Q. And you had mentioned that Sheikh Jaafar and Haytham were

10 talking at the end of the gathering that day. Were those two part

11 of the leadership at Dar al-Arqam?

12 A. Yes, sir.

13 Q. So they could make decisions on behalf of Dar al-Arqam?

14 A. Yes, sir.

15 Q. Now, was a decision also made at Dar al-Arqam about what to

16 do with any of the materials that Dar al-Arqam sold after that

17 gathering on September 11?

18 A. Just about the one, one tape cover of one of the sets that

19 Dr. Ali gave a lecture on.

20 Q. And what was the decision with regards to that one tape

21 cover?

22 A. To rip it -- to rip them and dispose of them.

23        MR. GIBBS: And if we could pull up Exhibit 10T1,

24 please?

25        THE COURT: Is there any objection to that?

1     MR. MAC MAHON:  No objection, Your Honor.

2     THE COURT:  All right, it's in.

3     MR. GIBBS:  Thank you, Judge.

4  Q.   Mr. Gharbieh, could you identify Exhibit 10T1?

5  A.   Yes, sir.  That's the cover of a cassette album that Dr. Ali

6  Al-Timimi gave a lecture on maybe back, if I'm not mistaken, early

7  '90s or it was a while ago, in regard to the topic of the New

8  World Order, and that was a cover that was made by some guys that

9  we knew in Australia who we did our printing with because they did

10 it for cheap.

11     And in regards to that picture with respect to September

12 11, Haytham decided and Mohammad Al-Qahtani decided that they

13 didn't want to have that picture on the covers, and also, you

14 know, with what had happened on September 11, they were afraid

15 that somebody would draw a conclusion based on that.  So they felt

16 it wasn't fit.

17     So they didn't get rid of the tapes.  They just got rid

18 of the -- we were asked to rip the covers and dispose of them.

19 Q.   All right.  And you said this decision was made by Haytham

20 and Mohammad Qahtani?

21 A.   Yes, sir.

22 Q.   And again, these are two of the leaders at Dar al-Arqam?

23 A.   Yes, sir.

24 Q.   So that they were qualified to make that decision?

25 A.   Yes, sir.

1  Q.   All right.  And in terms of the exhibit itself, 10T1, you

2  said this is a cover of some lectures that Timimi did.  So this is

3  a cover for a tape series, correct?

4  A.   Yes, sir.

5  Q.   And these tapes were sold at the Dar al-Arqam?

6  A.   Yes, sir.

7  Q.   All right.  Now, you testified earlier that Ali Timimi was

8  the most regular speaker, live speaker at the Dar al-Arqam,

9  correct?

10 A.   Correct.

11 Q.   All right.  How about among the tapes that were sold at Dar

12 al-Arqam?  Was he also one of the more prolific people at Dar

13 al-Arqam?

14 A.   Are you asking if he -- if most of the tapes that were sold

15 were more by him than anyone else?

16 Q.   Correct.

17 A.   Yes, sir.

18 Q.   More were by him?

19 A.   Yes, sir.

20 Q.   And if you could take a look, you know, we've looked at the

21 cover, but I believe the entire exhibit itself, which I'd like to

22 move into evidence, is next to you there.

23         THE COURT:  Is there any objection to all of 10T1 going

24 in?

25         MR. MAC MAHON:  No, Your Honor.

1          THE COURT:  All right, it's in.

2          (Government's Exhibit No. 10T1 was received in

3   evidence.)

4          MR. GIBBS:  Does he have that?

5          THE WITNESS:  Yes, sir.

6   BY MR. GIBBS:

7   Q.   If you could just hold that up?

8          Okay.  That's fine.  Okay.  All right.

9          And so this is a plastic container that those "New World

10  Order" tapes are in, correct?

11  A.   Yes, sir.

12  Q.   Do you know how many tapes are in this series?

13  A.   At least eight.

14  Q.   You can go ahead and open it up.

15  A.   I'm sorry, six.

16  Q.   Okay.  Six tapes.  Okay.  Thank you.

17         Can you just hold that up just so the jury can -- okay.

18  That's fine.

19         And you can just set that exhibit off to the side, sir.

20  Thank you.

21         Now, Mr. Gharbieh, at some point after that gathering at

22  the Dar al-Arqam on September 11, were you contacted by Yong Kwon?

23  A.   Yes, sir.

24  Q.   How long after that 9/11 was it that Yong Kwon contacted you?

25  A.   Roughly a week.

1  Q.   And when, when he contacted you, what did he tell you, if

2  anything?

3  A.   He mentioned that Dr. Ali was giving a speech at his house,

4  and he invited me to come over.

5  Q.   All right.  And -- now, you've said a couple of times, you

6  said that Dr. Ali was giving a speech at his house.  Now, at that

7  time, was Ali Timimi referred to as "Doctor"?

8  A.   No, "Sheikh."

9  Q.   Okay.  And was it your practice then to refer to him as

10  "Sheikh"?

11  A.   Yes, sir.

12  Q.   All right.  When did you learn that he actually can also be

13  addressed as Doctor?

14  A.   Recently.

15  Q.   Do you remember how recently?

16  A.   Maybe within a month.

17  Q.   And that's because he's gotten his Ph.D. recently?

18  A.   Yes, sir.

19  Q.   Okay.  And when Yong Kwon told you that Sheikh Ali was going

20  to be at his house, did he tell you anything else?

21  A.   No, sir.

22  Q.   And what did you do as a result of that conversation?

23  A.   I called a friend of mine, Sherdil Loynab -- S-h-e-r-d-i-l,

24  Loynab, L-o-y-n-a-b -- and I told him that he was -- he's a born

25  Muslim, but he wanted to learn more about his faith, and I told

1  him that Dr. Ali was giving a lecture and if he wanted to attend,

2  "I'll come and get you," and he wanted to attend.

3          So I picked him up, and I went to Yong Kwon's house, and

4  we went to the lecture there.

5  Q.   Okay.  Now, I believe you testified earlier that you had seen

6  Timimi at Ibrahim Hamdi's house on at least two occasions, but

7  other than that, was Yong Kwon's house the first time that you had

8  ever seen Timimi at the home of a member of this jihad training

9  group that you had formed?

10  A.   Yes, sir.

11  Q.   And when you and Sherdil went to Yong Kwon's house, who did

12  you see when you first got there?

13  A.   Caliph Basha, Ismail Royer, Yong Kwon, Dr. Ali, Mohammed

14  Aatique, Masaud Khan, and maybe there was, like, three or four

15  other people.  I can't recall.

16  Q.   And of the people that you saw there with Timimi that night

17  at Kwon's house, how many of them did you know that owned

18  firearms?

19  A.   Probably everyone.

20  Q.   And of the people you saw that night with Timimi, how many of

21  them did you know who had taken part in the personal jihad

22  training that you and Yong Kwon had started?

23  A.   All except Masaud Khan.

24  Q.   And when you first walked into Kwon's house, how was everyone

25  arranged inside?

1  A.    Sitting in a circle.

2  Q.    And what happened when you first walked into Kwon's house

3  with Sherdil Loynab?

4  A.    Dr. Ali was concluding a speech.  He concluded saying

5  something in regards to, "And that's what would happen.  And after

6  a long period of time, there would be peace on earth, but it would

7  be after a long, a long struggle, but at the end, everything will

8  be okay."

9        And the conversation just concluded at that point.

10 Q.    Okay.  And was there any visible reaction when you first

11 walked into the house with Sherdil Loynab?

12       MR. MAC MAHON:  Objection, Your Honor, as to foundation.

13 What exactly does he means by "reaction"?  By whom?

14       THE COURT:  Well, then he'd be leading.  I think "visual

15 reaction" is not -- or "any reaction" maybe is a better word.

16       Was there any reaction from the people when you entered

17 the house?

18       THE WITNESS:  Just a pause.  There was just a pause, and

19 everybody was looking at me.

20       THE COURT:  All right.

21 BY MR. GIBBS:

22 Q.    And who actually paused?  I mean, who was speaking that they

23 paused at that point?

24 A.    Dr. Ali.

25 Q.    Now, was there anything about Sherdil that distinguished him

1 from the other people at Kwon's house that day?

2 A.    He was not part of the paintball group or -- but he was new

3 to the crowd, period.

4 Q.    And had he ever taken part in the personal jihad training?

5 A.    No, sir.

6 Q.    Did he own a gun?

7 A.    No, sir.

8 Q.    Now, this -- when Timimi paused like that, had you ever seen

9 him react to you that way before the night at Kwon's house?

10 A.    No, sir.

11 Q.    Now, after Timimi wrapped up his remarks, did anyone else

12 talk to you there at Kwon's house that day?

13 A.    Yes, sir.

14 Q.    And who else talked to you?

15 A.    Ismail Royer.

16 Q.    And what did Ismail Royer say to you?

17 A.    He actually asked to speak to me on the side, and he asked me

18 what am I doing bringing Sherdil to a group like this?  And I got

19 upset with him, and I said, "What are you doing meeting like

20 this?"

21         And this was after September 11, and I said, "Especially

22 at a time like this, what are you, you know, what are you guys

23 doing?  What is this all about?"

24         And then he said, "I'll tell you later.  Just go drop

25 Sherdil off and come back."

1        And I told him that -- I got fed up, and I told

2 him, "I'm not coming back." My exact words to him were, "I'm not

3 coming back, and you-all shouldn't be gathering like this

4 anymore."

5        And I took Sherdil and I left.

6 Q.   And did you say anything to Sherdil when you took him and

7 left?

8 A.   On the way out, he asked me, he said, "Why" --

9        MR. MAC MAHON:  Your Honor, I object.  This witness is

10 going to testify in the case.  It would be hearsay as to what he

11 said.

12        MR. GIBBS:  Judge, again, I'm not offering it --

13        THE COURT:  Wait a minute.  The question is not hearsay,

14 and if the witness is then going to say what he said in response

15 to the question, this witness is available to be cross-examined.

16 So overruled.  Go ahead.

17        THE WITNESS:  I lost track of the question.

18 BY MR. GIBBS:

19 Q.   That's fine.  What did you say to Sherdil when you told him

20 you were going to leave Kwon's house?

21 A.   Oh, he asked me, "Why are we leaving so early?"

22        And I said, "Trust me, you don't want to sit with this

23 group, and one day you'll thank me.  You just don't want to get

24 involved with stuff like this."

25 Q.   And why did you make the comment to him, "Trust me, you don't

1   want to be with this group," to Sherdil when you told him it was

2   time to leave?

3   A.   It was the guys that I went paintballing with.  It was the

4   guys that talked about jihad, guys who had been to training camps,

5   and to me, all of that just led to it was the same topic that

6   these guys usually talked about when they got together.  It was

7   the concept of jihad.

8   Q.   And "jihad" meaning physically fighting?

9   A.   Yes, sir.

10  Q.   Now, did you, in fact, take Royer's suggestion and drop

11  Sherdil off and then come back to the meeting?

12  A.   No, sir.

13  Q.   And why not?

14  A.   Fulfilling what I told to Ismail, that I was not coming back

15  and I didn't want to partake in this.

16  Q.   And did there later come a time at some point after the

17  meeting at Kwon's house that Ismail Royer re-contacted you?

18  A.   About a week after that.

19  Q.   And where was it that he re-contacted you?

20  A.   I was at a gym, and he called me on my cell phone, and he

21  told me that he wanted to meet with me.  So we met at a park in

22  Annandale.

23  Q.   And what happened at the park in Annandale?

24  A.   He went straight to the point.  He said to me that, hey,

25  look, you know, you know Dr. Ali -- Sheikh Ali's opinion as well

1  as the scholars' opinions of Islam that all Muslims in this

2  country should be either making hijra, which is leaving this

3  country for a Muslim country, or should be going to a training

4  camp.

5        And he said, "Which one" -- he said, "A couple of the

6  brothers are going overseas soon, so I'm going around telling

7  everybody, you know." So he asked me which one was I going to do.

8  Q.   And what did you tell him?

9  A.   I told him that I wasn't partaking in that. I told him no,

10  and I told him that I'm the only son to my mother and that my

11  jihad was going to be to take care of my mother and father

12  according to a tradition of the Prophet Muhammad that I, that I

13  followed.

14  Q.   Now, you testified that Royer said, "You know the opinion of

15  Sheikh Ali and the other scholars that you either need to make

16  hijra or go to a training camp." What was your understanding of

17  the significance of a training camp?

18  A.   Combat training.

19  Q.   Combat training to do what?

20  A.   To learn jihad.

21  Q.   And in your, in your response to Royer, you talked about your

22  jihad to your parents, correct?

23  A.   Yes, sir.

24  Q.   That it was -- your personal jihad would be not to fight but

25  to take care of your parents, right?

1  A.  Yes, sir.

2  Q.  And why did you feel the need to discuss with him jihad, as

3  opposed to hijra?

4  A.  Because the concept of jihad in Islam is very existent, and a

5  Muslim needs -- if it's true that a Muslim needs to be in one of

6  the two stages, then I'll pick jihad, and I'll pick that of taking

7  care of my parents.

8  Q.  As opposed to actually fighting?

9  A.  Yes, sir.

10  Q.  Now, during that conversation with Royer at the park, what,

11  if anything, did he say about the effect of paying taxes here in

12  the United States?

13  A.  He mentioned that, that by you not leaving, do you understand

14  that you're paying taxes here and it's contributing to that

15  foreign policy, that foreign policy that America has, which is

16  anti-Islamic?

17  Q.  And had you ever heard this type of rhetoric before about the

18  effect that staying in this country and paying taxes has on Islam?

19  A.  Yeah.  I mean, it's -- the concept is familiar amongst --

20  it's been discussed by several people before.  I can't recall them

21  all.

22         One time it was discussed at Dar al-Arqam during the

23  Buddhist statues conversation.  Somebody in the crowd asked

24  Dr. Ali -- well, he didn't even ask Dr. Ali.  He made his own

25  comment, saying that everybody should stop drinking Coca-Cola

1  because it contributes to either the U.S. or it contributes to

2  Israel, and by you buying that, you contribute to that.

3         And Dr. Ali addressed it, saying that that was in a

4  sense illogical, because if you're paying taxes, your taxes are

5  contributing far more than a soda can.  So if that was your

6  theory, then leaving the country is your best bet.

7  Q.   And this was in the -- again, I think you referred to it

8  earlier, but it's the Buddhist statues lecture referring to the

9  destruction of the Buddhist statues in Afghanistan by the Taliban?

10 A.   Yes, sir.

11 Q.   And that was one of Timimi's lectures that was actually on

12 sale at Dar al-Arqam, correct?

13 A.   Yes, sir.

14 Q.   Now, after that conversation with Ismail Royer in the park,

15 what did you ultimately do?

16 A.   I'm sorry, after the conversation between me -- I drew a

17 blank.  After the conversation me and Ismail Royer had, what did I

18 do?

19 Q.   Right?

20 A.   Nothing.

21 Q.   You didn't do hijra, right?

22 A.   Oh, no, sir.

23 Q.   And you didn't go to a training camp, right?

24 A.   No, sir.

25 Q.   You stayed here in the United States?

1  A.  Yes, sir.

2  Q.  Now, did you ever discuss with Timimi the things that Royer

3  told you that day in the park?

4  A.  No, sir.

5  Q.  And did your contacts with Timimi after that period diminish?

6  A.  Yes, sir.

7  Q.  Is it fair to say you pretty much lost contact with him?

8  A.  Yes, sir.

9        MR. GIBBS:  Okay.  If I could just have a moment, Your

10  Honor?

11        THE COURT:  All right.

12  BY MR. GIBBS:

13  Q.  Now, just going back briefly, when you had that conversation

14  in the park with Royer, you said that your response to him was

15  that you wanted to take care of your parents, correct?

16  A.  Yes, sir.

17  Q.  And Royer had been talking about the option of going to a

18  training camp, correct?

19  A.  Yes, sir.

20  Q.  All right.  In your mind, were those two options

21  inconsistent?

22  A.  I'm sorry, I don't understand the question.

23  Q.  Well, did you feel like there was some inconsistency between

24  staying here and taking care of your parents and going to a

25  training camp?

1  A.   Did I feel it was inconsistent?  I'm sorry, I'm just not

2  understanding the question.

3  Q.   It's not worded very well.  Let me try another approach.

4       Why was it that you decided to tell Royer that your

5  jihad would be to stay here and take care of your parents, as

6  opposed to going to a training camp?

7  A.   I felt that that was the biggest state of jihad.

8  Q.   And what was it about going to a training camp that might

9  impede you from taking care of your parents?

10 A.   I didn't feel it was an obligation on me to, to be in a

11 physical state of jihad combat.  I felt it was an obligation on me

12 to take care of my family and take care of myself and my family.

13 Q.   And is it fair to say that if you had -- yeah, why couldn't

14 you do both?

15 A.   I made it clear to -- and the guys can attest to this, the

16 guys that I went paintballing with, Ismail Royer mainly -- that I

17 was just not going to go overseas for any camp.

18 Q.   And, you know, you talked about the training was combat, you

19 know, leads up to combat.  Was it a concern that if you went and

20 did that and were killed or injured badly, you couldn't take care

21 of your parents?

22 A.   Yes, sir.

23      MR. GIBBS:  Thank you.  Mr. Gharbieh, I want to thank

24 you.  I believe that, that concludes my questions.

25      Thank you, Judge.

1          THE COURT:  All right.  Mr. MacMahon?

2                    CROSS EXAMINATION

3    BY MR. MAC MAHON:

4    Q.   Good afternoon, Mr. Gharbieh.  My name is Edward MacMahon.

5    We've never met, have we, sir?

6    A.   No, sir.

7              Yes, sir, we have actually.  Over the phone one time.

8    Q.   Over the phone.

9    A.   Yeah.

10   Q.   Of all the people you discussed in your paintball group, you

11   were the person that knew Dr. Ali Al-Timimi the best, weren't you?

12   A.   Myself and Ismail Royer, yes, sir.

13   Q.   Okay.  And how long had you known him?

14   A.   No more than -- on a close relationship, three-four years.

15   Q.   Okay.  And in that whole three- or four-year time, isn't it a

16   fact, sir, that what he advised you to do was to go get an

17   education?

18   A.   One time he advised me to go make hajj, pilgrimage.

19   Q.   Okay.  And is that something that all Muslims are supposed to

20   do?

21   A.   Yes, sir.

22   Q.   Okay.  Did he ever advise you to continue on your education?

23   A.   I can't recall that, sir.

24   Q.   Did you ever talk to him about your marriage --

25   A.   Yes, sir.

1  Q.   -- or your desire to get married?

2  A.   Yes, sir.

3  Q.   And what kind of discussions did you have with Dr. Al-Timimi

4  about getting married?

5  A.   I don't know.  I mean, discussions in regards to -- I don't

6  know, sir.  I don't know how to answer that question.  I mean,

7  just regular I'm looking for a spouse to get married to and any

8  advice he could offer.

9  Q.   He told you to try to get married and build a family, didn't

10 he, sir?

11 A.   Yes, sir.

12 Q.   And he told you to worry about your grades and how you were

13 employed and other issues in your life, didn't he?

14 A.   Yes, sir.  I can't recall the education conversation.  I'm

15 not saying it didn't happen.  I just can't recall it.

16 Q.   Okay.  Now, something that he never told you to do was to go

17 to a jihad training camp, isn't it?

18 A.   No, sir, he didn't.

19 Q.   He never once mentioned to you ever going to a jihad training

20 camp, did he?

21 A.   Mentioned to me to go to --

22 Q.   Yes.

23 A.   No, sir.

24 Q.   In fact, he never discussed with you in any way, shape, or

25 form jihad overseas, correct?

1   A.   You're correct, sir. I need a second to, to think, but I

2   don't recall to the best of my knowledge him ever telling me that

3   that's something I needed to do or advised me to do, so no.

4   Q.   Now, we looked at the "Russian Hell 2000" video earlier.

5   That's -- you never watched that video with Dr. Al-Timimi, did

6   you?

7   A.   No, sir, I haven't.

8   Q.   And you never even told him you had it, did you?

9   A.   No, sir, I haven't.

10   Q.   You never showed it to him?

11   A.   No, sir.

12   Q.   Did you ever indicate to him that you had a collection of

13   videos, violent jihad videos from overseas?

14   A.   I don't believe I ever mentioned anything like that to him,

15   sir.

16   Q.   All right. And the reason you didn't tell him that was

17   because you knew he had absolutely no interest in the topic; isn't

18   that correct?

19   A.   I'm sorry, sir, I just don't -- I think the answer to that

20   question is I just never felt an obligation to tell him about it.

21   Q.   You never felt any need to tell him, either, did you?

22   A.   Correct.

23   Q.   Okay. And you never saw him at your paintball field, did

24   you?

25   A.   No, sir.

1  Q.   And you never once had him give you any advice of how to run

2  the paintball, did you?

3  A.   No, sir.

4  Q.   Okay.  And Mr. Gibbs asked you before about your personal

5  jihad training.  By that, do you mean training to go overseas and

6  fight, sir?

7  A.   I meant by that, sir, personal jihad training.

8  Q.   Okay.  And tell the jury, if you would, what you mean as a

9  Muslim by personal jihad training.

10 A.   That every Muslim is obligated to be in a state of jihad and

11 that the biggest state of jihad, which from my understanding of

12 the scholars that have written is that jihad of your soul, to ward

13 off whisperings of the devil, as, for example, to go steal as

14 opposed to go earn honest income, and the biggest state of jihad

15 is to earn the honest state of income.

16 Q.   So if you went to a lecture and you heard Dr. Ali Al-Timimi

17 talk about jihad, that's the kind of jihad that he was talking

18 about; isn't that right, Mr. Gharbieh?

19 A.   I think generally when anybody speaks about jihad, they

20 generally are just assuming the broad range of jihad.  I don't

21 think that somebody meant physical combat.  I just know when the

22 topic of jihad is brought up Islamically, it means all forms:  the

23 combat, the personal struggle, any type of jihad a person is

24 involved in.

25 Q.   Now, you never once talked about personal, I mean, personal

1   jihad meaning that you would try to take up arms against anyone

2   with Ali Al-Timimi; isn't that correct?

3   A.   No, sir.  You're correct, sir.

4   Q.   I'm entirely correct about that, aren't I, Mr. Gharbieh?

5   A.   Can you please restate that?

6   Q.   You never once spoke about any form of violent jihad at any

7   time with Dr. Ali Al-Timimi?

8   A.   In regards to implementing, no, sir.  The only times we

9   talked about violent states of combat is either in his lecture or

10  the book 40 Hadeeths on Jihad, like that.  But if you're asking me

11  has he talked about implementing a physical combat against

12  somebody or a country or a government, I don't recall him ever

13  saying something like that.

14  Q.   All of the discussions you had with Dr. Ali Al-Timimi that

15  related to jihad were all discussions of theology, weren't they?

16  A.   Yes, sir.

17  Q.   They were discussions about how to read the Koran; isn't that

18  correct?

19  A.   Mostly, sir.

20  Q.   Right.  And when -- the book that you say you read on the

21  trip back from Delaware is actually a book of -- to a Christian, I

22  would call it a book of scripture, wasn't it?

23  A.   I can't relate the two; I'm sorry.

24  Q.   Well, you say it was the -- the book was called the Riyad

25  Salaheen; is that correct?

1  A.   No, sir.  It was actually -- I know the book <u>Riyad Salaheen</u>.

2  It was actually a small, green paperback book called <u>The 40</u>

3  <u>Hadeeths on Jihad</u>.

4  Q.   Okay.  But nothing in that book ever encouraged you to go

5  overseas and train for jihad, did it?

6  A.   I never went overseas and trained for jihad.

7  Q.   And nothing about hearing Dr. Al-Timimi read a book, a

8  publicly available book, ever encouraged you in any way to go

9  overseas and make jihad, either, did it?

10  A.   I don't recall Dr. Ali advising me or encouraging me to go.

11  My -- the encouragement mostly came from people in the paintball

12  group.

13  Q.   What is, what is a hadeeth, sir?

14  A.   A tradition of the Prophet Muhammad that -- it's either a

15  saying that he said or an action he did or did not do.

16  Q.   Okay.  And is that something that, that as a Muslim, you

17  would study?

18  A.   Yes, sir.

19  Q.   Is that part of the study of Islam for all Muslims?

20  A.   Yes, sir.

21  Q.   Okay.  And what you're saying is that what Dr. Al-Timimi was

22  reading in the book coming back from Delaware were actually

23  hadeeths, weren't they?

24  A.   Yes, sir.

25  Q.   And there are hadeeths dealing with literally every aspect of

1  your life, aren't there, sir?

2  A.  That book was geared more towards jihad, sir.

3  Q.  All right.  But there are other books of hadeeths?

4  A.  Oh, of course, sir.  Yeah.

5  Q.  About how to wash?

6  A.  Oh, yes, sir.

7  Q.  About how to pray?

8  A.  Yes, sir.

9  Q.  And even the, the jihad book that you were talking about, it

10  didn't, it didn't bear with it any indication of traveling

11  overseas or buying weapons or anything, did it, sir?

12  A.  Oh, no, sir.

13  Q.  Now, you say that you were one of the founders of the Dar

14  al-Arqam; isn't that correct?

15  A.  To an extent, yes, sir.  I was one of the people that, that

16  was there when the discussions of it forming, I was there, and the

17  finding the name and idea, yes, sir.

18  Q.  Okay.  And the Dar al-Arqam was a mainstream Muslim place of

19  learning, wasn't it?

20  A.  To my understanding, yes, sir.

21  Q.  And that's what you told the FBI, too, isn't it, sir?

22  A.  Yes, sir.

23  Q.  And that's true, isn't it?

24  A.  Yes, sir.

25  Q.  And there's never been -- as long as you've been -- let me

1  ask you this: Didn't you tape Dr. Ali Al-Timimi's speeches at Dar

2  al-Arqam?

3  A.   Yes, sir, I did.

4  Q.   And how many of those did you tape?

5  A.   At least half.

6  Q.   All right.  How many would that be?  Tell the jury how many

7  that would be.

8  A.   I guess if we take Dar al-Arqam for about a year, with him

9  lecturing every Friday night, give or take some, that would make,

10 I guess, at least 20.

11 Q.   Okay.  And you heard almost every other lecture that was

12 given at Dar al-Arqam as well, right?

13 A.   Yes, sir.

14 Q.   And in not one of those lectures did you hear anyone advocate

15 the use of violence against anyone, did you?

16 A.   No, sir.

17 Q.   Not at any time?

18 A.   No, sir.

19 Q.   And you never --

20 A.   No, sir.  At Dar al-Arqam, no, sir.

21 Q.   And you never heard Dr. Ali Al-Timimi advocate the use of

22 violence against anyone in any of the question-and-answer periods

23 that followed, either, did you?

24 A.   To answer your question, to advocate violence, no, sir.  If

25 you're asking me -- I'm sorry, go ahead.

1        The topics of jihad were discussed, but did Dr. Ali

2  advocate the encouragement of people to go out publicly and -- no,

3  sir.

4  Q.    Okay.  And he never advocated that anyone violate a law of

5  the United States of America, either, did he?

6  A.    No, sir.

7  Q.    Okay.  In the lectures at Dar al-Arqam, isn't there a special

8  place where the ladies sit?

9  A.    In the back.

10  Q.    Right.  And you would say that's where the sisters are,

11  correct?

12  A.    Yes, sir.

13  Q.    Okay.  And do they participate as well in the lectures?

14  A.    Sometimes.

15  Q.    Okay.  And if a sister in the back wants to ask a question of

16  the speaker, whoever that may be, what is the procedure?

17  A.    She can either knock on the wall or indicate that she has a

18  question.

19  Q.    Can she write it on a piece of paper?

20  A.    She can write it on a piece of paper.

21  Q.    And at one of these normal lectures at the Dar al-Arqam,

22  there would be lots of pieces of paper handed up by the sisters,

23  wouldn't there?

24  A.    Yes, sir.

25  Q.    And sometimes those questions were answered, and sometimes

1  they weren't, weren't they?

2  A.  Yes, sir.

3  Q.  Now, there were other speakers at Dar al-Arqam as well,

4  weren't there?  Yousuf Idris?

5  A.  Yes, sir.

6  Q.  And he was a very respected member of your community, isn't

7  he?

8  A.  Yes, sir.

9  Q.  The kind of person that a young Muslim might go to for

10  advice?

11  A.  Yes, sir.

12  Q.  Has Mahmood Hasan ever told you that Yousuf Idris told him

13  not to go to Pakistan in September of 2001?

14       MR. GIBBS:  Judge, I'd object.  That's double hearsay.

15       THE COURT:  Sustained.

16  BY MR. MAC MAHON:

17  Q.  Now, there were -- you say there were speeches at Sheikh

18  Jaafar's house before Dar al-Arqam as well, right?

19  A.  Yes, sir.

20  Q.  Okay.  And in none of those speeches did you hear

21  Dr. Al-Timimi or anyone else advocate the use of violence at all,

22  right?

23  A.  No, sir.

24  Q.  Okay.  And all those speeches again were about theological

25  issues and questions about how to live your life as a good Muslim,

1   weren't they?

2   A.   Predominantly, yes, sir.

3   Q.   And there were lots of people at these lectures, correct?

4   A.   Yes, sir.

5   Q.   It wasn't just Yong Kwon and Mahmood Hasan and Randall Royer

6   sitting there listening, right?

7   A.   No, sir.

8   Q.   In fact, Randall Royer hardly ever went to the Dar al-Arqam,

9   did he?

10   A.   Yes, sir.

11   Q.   That's correct?

12   A.   That's correct.

13   Q.   In fact, the main place these people hung out was the Dar

14   al-Hijrah, wasn't it?

15   A.   Yong Kwon, Caliph Idris, and myself and Abdullah

16   Zikria were regular attendees of Dar al-Arqam on Fridays.  I would

17   say the other guys would be at Dar al-Hijrah, yes, sir.

18   Q.   Okay.  And tell the jury what Dar al-Hijrah is, please.

19   A.   It's a mosque in Falls Church.

20   Q.   Okay.  And how often is that mosque open?

21   A.   24 -- well, not 24 hours.  From about 5:00 to 6 a.m. until

22   about 9 p.m.

23   Q.   Seven days a week, right?

24   A.   Seven days a week.

25   Q.   Okay.  And that's where Mr. Royer and Mr. Kwon and Mr. Hasan

1  and Mr. Surratt, that's where they all spent most of their time

2  when they were mingling with other Muslims; isn't that correct,

3  sir?

4  A.    During the week, yes, sir.

5  Q.    Okay.  And just one night a week, after the last prayer was

6  when they might go down to Dar al-Arqam and hear a speech by some

7  Muslim person of knowledge, correct?

8  A.    Correct.

9  Q.    So the Dar al-Arqam was the least attended place where all

10 these people actually got together; isn't it?

11 A.    Yes, sir.

12 Q.    Okay.  And Dr. Ali Al-Timimi was, in fact, not the imam of

13 the mosque at Dar al-Hijrah, was he?

14 A.    No, sir.

15 Q.    In fact, he never spoke there, did he?

16 A.    Not to the best of my knowledge, no, sir.

17 Q.    Mr. Royer lived next door to the Dar al-Hijrah, didn't he?

18 A.    Yes, sir.

19 Q.    So when you're talking about your paintball crowd in Dar

20 al-Arqam, that paintball crowd is a very small portion of all the

21 people that on Friday nights would go to Dar al-Arqam, correct?

22 A.    Correct.

23 Q.    And how many people generally were at the Dar al-Arqam on a

24 Friday night?

25 A.    Minimum of 50.

1    Q.   So you were four or five maybe out of fifty was your

2    paintball crowd, right?

3    A.   Yes, sir.

4    Q.   All right.  And the paintball crowd was actually much larger

5    than just the group that you're talking about now, isn't it?

6    A.   Yes, sir.

7    Q.   Okay.  And on an average -- in fact, the paintball was open

8    to the public for most of the time, wasn't it?

9    A.   Yes, sir -- well, we did have a -- no, sir.

10   Q.   At the beginning, anybody who wanted to come to paintball

11   could come; isn't that correct?

12   A.   In the beginning, yes, sir.

13   Q.   All right.  And that was because you had had paintball at the

14   Muslim Student Association at George Mason before that, correct?

15   A.   Not me, but yes, sir.

16   Q.   You were aware of that, weren't you?

17   A.   Yes, sir.

18   Q.   And it was perfectly legal to have the paintball training

19   session, wasn't it?

20   A.   Yes, sir.

21   Q.   And you competed against other paintball teams, didn't you?

22   A.   Other mosques, yes, sir.

23   Q.   And how many other, how many other mosques did you compete

24   against in paintball training?

25   A.   One in North Carolina, and they had around 40 guys with them.

1  Q.  And where, where did that event take place?

2  A.  At the paintball field that we were -- that we did

3  predominantly our paintball at -- our paintball training at.

4  Q.  Okay.  And how was that arranged?

5  A.  I don't recall how that was arranged.  Somebody knew one of

6  their contacts, and they organized it.

7  Q.  Well, there was nothing secretive about your paintball

8  training if you were competing in a league, was there, sir?

9  A.  No, sir.  It wasn't a league, but no, sir.

10       MR. GIBBS:  Judge, I'd like to get a time frame on this.

11       THE COURT:  All right.

12       MR. MAC MAHON:  Okay.

13  Q.  When was that match?

14  A.  Pre-September 11.  When it first started, which was either

15  '99 or 2000.·

16  Q.  Okay.  And so when you're talking about -- when Mr. Gibbs

17  asked you about your -- this group of people involved in personal

18  jihad training, you're talking about a very small portion of the

19  people even that played paintball, correct?

20  A.  I'm sorry, can you repeat that question?

21  Q.  When Mr. Gibbs asked you about this group that was interested

22  in going overseas and fighting and getting jihad training, that

23  was actually a very small portion of all of the people that played

24  paintball; isn't that correct?

25  A.  Yes, sir.

1  Q.    Okay.  And the vast majority of the people involved in

2  paintball didn't have anything to do with watching these jihad

3  videos, did they?

4  A.    No, sir.

5  Q.    That was just a small group led by Mr. Kwon and Mr. Royer and

6  yourself that liked to watch those videos; isn't that correct?

7  A.    Correct.

8  Q.    And how many times do you think you watched that -- the

9  Russian Hell video, Mr. Nabil -- or Gharbieh, excuse me?

10 A.    Once, because I lent it out.

11 Q.    You only watched it one time?

12 A.    Probably, sir, but I've seen it on the Internet maybe once or

13 twice after.  I mean, when it first came out, it was very popular.

14 I mean, it was -- the concept of having something like that

15 captured was big at the time, so --

16 Q.    Okay.  And it's safe to say that you never told Ali Al-Timimi

17 that you were watching a video in which a Chechen rebel of some

18 name executed a Russian soldier; isn't that correct?

19 A.    Correct, sir.  I don't ever recall having a conversation like

20 that with him.

21 Q.    And it's something that you knew he would have absolutely no

22 interest in whatsoever; isn't that right, sir?

23             MR. GIBBS:  Judge, that calls for speculation.

24             THE COURT:  I don't know -- unless you have a basis of

25 knowledge, not just a surmise or a guess, you can't answer that

1  question.

2             MR. MAC MAHON:  I'll rephrase the question.

3             THE COURT:  All right.

4  BY MR. MAC MAHON:

5  Q.   Mr. Gharbieh, the topics of conversation that you had on a

6  regular basis with Dr. Ali Al-Timimi, the discussion of you

7  watching Chechen execution tapes is not something that you would

8  have discussed with him; isn't that correct?

9  A.   I wouldn't have discussed that with him, no, sir.

10 Q.   That's because you know he wouldn't have approved of it;

11 isn't that right, sir?

12            MR. GIBBS:  Judge, again calls for speculation.

13            THE COURT:  I'm going to sustain that objection.

14 BY MR. MAC MAHON:

15 Q.   Now, you testified earlier that you learned about the LET

16 creed -- or that Dr. Al-Timimi actually said something about the

17 LET creed to you.  Do you remember that testimony?

18 A.   Yes, sir, I do.

19 Q.   Okay.  And, in fact, sir, you actually learned about the LET

20 creed because you got an e-mail from one of the paintball people

21 telling you to click on a website; isn't that correct?

22 A.   I don't recall that, sir.

23 Q.   Sir, do you remember testifying under oath -- and I don't

24 have the exact day, Your Honor -- in the prior trial?

25 A.   I'm not saying it didn't happen, sir.  I'm just saying I

1  don't, I don't recall. I remember being informed about LET by

2  Ibrahim Al-Hamdi. I don't remember that there was an LET website.

3  I learned later that there was. I didn't know if it was if I did

4  click on it.

5  If I did mention that in my last testimony, I'm not

6  going to say that it's not true. I don't recall, but I don't

7  recall, to answer your question, I got an e-mail and that's how I

8  learned about LET, and it said, "Click here," and I clicked, and

9  it ended up on the LET, that's not how I learned about them, sir.

10 Q.  Okay. There was no conversation you ever had with Ali

11 Al-Timimi in which he said that he approved of any group anywhere

12 in the world at all killing innocent civilians; isn't that

13 correct?

14 A.  Killing innocent civilians, no, sir.

15 Q.  All right. And that's -- no one even in your group thought

16 that the 9/11 attacks were justified from an Islamic perspective,

17 right?

18 A.  That's correct, sir.

19 Q.  All right. And you never heard Dr. Al-Timimi voice any

20 support for Al-Qaeda in any way, shape, or form, correct?

21 A.  No, sir.

22 Q.  In fact, he was opposed to it, wasn't he?

23 A.  To their creed, yes, sir.

24 Q.  And he was opposed to the Taliban in many respects as well,

25 too, wasn't he?

1  A.   I remember there was this -- a time when he was asked about

2  them, and he -- asked about the Taliban, if they were an

3  Islamically legitimate group, and he says he doesn't know enough

4  about them or their creed to answer that question.

5  Q.   All right.  And he never told you that you, Nabil Gharbieh,

6  have an obligation as a young Muslim to go overseas and fight and

7  help the Taliban, did he?

8  A.   No, sir.

9  Q.   Now, the Russian Hell video that we saw there, you actually

10 had some discussions with your paintball friends about that video,

11 didn't you?

12 A.   Yes, sir.

13 Q.   And you-all were concerned.  You didn't know whether or not

14 that was an Islamically permissible act for that Muslim in

15 Chechnya to kill that innocent soldier, right?

16 A.   It was shocking, and -- yes, sir.

17 Q.   And so what you decided to do was to find out from some

18 source what Islam would say about the execution of a helpless

19 prisoner, right?

20 A.   Yes, sir.

21 Q.   And you didn't go ask Ali Al-Timimi, did you?

22 A.   I don't recall asking him that question, sir.

23 Q.   You went to a website, didn't you, Mr. Gharbieh, called

24 fatwa.com to ask that question, didn't you?

25 A.   No, sir.

1  Q.   You didn't go to azzam.com to ask somebody a question about

2  whether that was permissible?

3  A.   Not to my recollection, sir.

4  Q.   Did Yong Kwon ever do that?

5  A.   I think he -- I'm sorry, I would be alluding if I answered

6  that question.

7  Q.   Was it reported back to you by your friends in the paintball

8  group that they had gone on a website and found out some fatwa

9  dealing with the execution of prisoners?

10  A.   I'm sorry, sir, if that happened, I don't remember it.

11  Q.   But you are certain that you never asked Dr. Ali Al-Timimi

12  about that in any way?

13  A.   To the best of my recollection.

14  Q.   Okay.  And you had lots of jihad tapes, didn't you?

15  A.   There was, there was tapes that Idris Surratt brought over

16  from Saudi Arabia that he -- that I held and then got rid of them,

17  yes, sir.

18  Q.   Were you invited on the -- by Mr. Royer on the February-March

19  2001 trip to Saudi Arabia?

20  A.   No, sir.  I'm sorry?

21  Q.   Were you invited by Mr. Royer to go on hajj in 2001?

22  A.   I made hajj in 2001, if I'm not mistaken, sir, but I don't

23  think it was an invite from Ismail Royer.

24  Q.   Did you know that Mr. Royer was organizing a group to go over

25  there?

1   A.   No, sir.

2   Q.   Did you know that Mr. Royer had prearranged a meeting with

3   any LET officials, Lashkar-e-Taiba officials in Mecca?

4   A.   Sir, I did not go to hajj on that date; I apologize.  It was

5   Idris and those guys.  I went the year before that.

6   Q.   When Mr. Royer came back --

7   A.   Yes.

8   Q.   -- from hajj in 2001, he told you that he had met the head of

9   LET in Saudi Arabia on the hajj in Mecca, didn't he?

10  A.   I'm sorry, I don't remember him telling me that.

11  Q.   Did Mr. Surratt tell you that?

12  A.   No, sir.  The only thing that happened is Idris brought back

13  some jihad tapes.  The only time somebody mentioned that they met

14  somebody from LET was Ibrahim Al-Hamdi.

15  Q.   And that was in the year 2000, right?

16  A.   Yes.

17  Q.   Okay.  And Mr. Al-Hamdi told you that it was Randall Royer

18  that arranged for his travel over to LET; isn't that correct?

19  A.   I don't recall those details, sir.

20  Q.   Did Mr. Chapman ever tell you how it was that he made it to

21  the LET camp?

22  A.   No, sir.

23  Q.   When Mr. Hasan came back from Pakistan in 2001, he told you

24  he'd been to a wedding, didn't he?

25  A.   No, sir.  He told me he was just visiting Pakistan.

## Gharbieh - cross

1  Q.   And he never told you he went to any training camp at all,

2  did he?

3  A.   No.  He said he was just visiting.

4  Q.   You didn't tell the FBI that Mr. Hasan told you he'd gone to

5  a wedding in Pakistan, sir?

6  A.   I will not affirm that statement, sir.

7  Q.   At the -- just a second, Your Honor.  Excuse me.

8        Now, you say there came a time when you talked to

9  Dr. Al-Timimi about the paintball, correct?

10 A.   Yes, sir.

11 Q.   Okay.  And what -- the first question he asked you was, "Are

12 you guys doing anything illegal?"  Correct?

13 A.   More or less, sir.  He said that we weren't doing anything

14 illegal, so there's nothing to worry about.  And actually, yes,

15· you're right, he did ask if we were doing anything illegal, and we

16 said to the best of our knowledge, no.

17 Q.   And that was true, wasn't it, sir?  You weren't doing

18 anything illegal out there, were you?

19 A.   I don't think I would have done it if I had known it was

20 illegal, sir.

21 Q.   And you haven't been charged with any crime, have you?

22 A.   No, sir.

23 Q.   Now, at the time that Dr. Al-Timimi asked you this question,

24 weren't you already getting concerned about people going overseas?

25 A.   Yes, sir.

1  Q.  Okay.  But you didn't tell him that you were worried about
2  people going overseas to fight, did you?

3  A.  No, sir.

4  Q.  You didn't tell him that Ibrahim Al-Hamdi had gone to
5  Pakistan to fight for LET?

6  A.  No, sir.

7  Q.  And you didn't tell him that Randall Royer was recruiting
8  people to go overseas to fight, either, did you?

9  A.  I don't think I recall Randall recruiting people to go
10  overseas other than a time that he approached me at the park.

11  Q.  Okay.  Well, who else were you concerned about?  You told us
12  that you were concerned about the appearance of you going
13  overseas -- excuse me, the appearance of your paintball group,
14  because people were beginning to put what you believed was
15  hypothetical into action, correct?

16  A.  Yes, sir.

17  Q.  Okay.  Other than Mr. Al-Hamdi, who were you concerned about?

18  A.  I wasn't concerned about the guys itself.  I was -- in
19  respect to themselves.  I was concerned about just generally the
20  concept of going to camps.  It was something that I thought it was
21  too much trouble and wasn't for me.

22  Q.  Okay.  And you never at that time or anytime when you talked
23  to Dr. Ali Al-Timimi told him of the specifics of your concerns
24  about what was happening at paintball, correct?

25  A.  No, sir.

1   Q.   So when he told you that it was okay to continue playing

2   paintball, he didn't know that you were worried that these people

3   were going overseas at all, did he?

4   A.   No, sir.

5   Q.   And to your knowledge, no one else ever told him any of that

6   information, either, did they?

7   A.   I can't answer that question, sir.

8   Q.   And why didn't you just go play soccer when he gave you that

9   advice?

10   A.   I don't know, sir.  At that point, I was leaving the group

11   anyway, and they were still going paintballing.

12   Q.   All right.  Well, you were the amir of paintball, weren't

13   you?

14   A.   At one point, but then it was -- "amir" meaning the leader of

15   the group, yes, sir, in the beginning, and then it was handed over

16   to Seif Chapman and Yong Kwon.

17   Q.   Okay.  How was that handed over?

18   A.   By voting.

19   Q.   Okay.  Did Dr. Al-Timimi have any vote in who was the amir of

20   paintball?

21   A.   No, sir.

22   Q.   Because he didn't know anything about it, did he, sir?

23   A.   About paintballing?

24   Q.   Yes, sir.

25   A.   He knew about the paintballing.

1   Q.   But he didn't know anything about what you were doing out

2   there, did he?

3   A.   Oh, no, sir.

4   Q.   Now, was there any discussion with Mr. Royer between you

5   about taking Ali's advice, Dr. Al-Timimi's advice and starting to

6   play soccer so that you could get physically fit?

7   A.   No, sir.

8   Q.   Did you pass that on to your friends who were interested in

9   going overseas, that Dr. Ali Al-Timimi suggested soccer instead?

10  A.   Yes.

11  Q.   Well, soccer certainly wouldn't help you learn how to get

12  military training, would it?

13  A.   No, not military training.

14  Q.   And so there was never any, any reason for your group, which

15  was only interested in military training, to take his advice and

16  play soccer; isn't that correct?

17  A.   I guess.  But most of the guys were converts, American

18  converts who grew up -- they didn't play soccer, so the concept of

19  soccer, period, was not, was not accepted.

20  Q.   Did you ever see Mohammed Aatique at Dar al-Arqam?

21  A.   Yes, sir.

22  Q.   How many times?

23  A.   Not too many times.

24  Q.   Okay.  So he -- as far as you know, he had no personal

25  relationship whatsoever with Dr. Al-Timimi, correct?

1   A.   No, sir.

2   Q.   And the same with Masaud Khan, correct?

3   A.   I'm sorry?

4   Q.   How many times did you see Masaud Khan at Dar al-Arqam?

5   A.   At Dar al-Arqam?  Not many times.

6   Q.   And he has a twin brother, too, doesn't he?

7   A.   Yeah.  A brother, yes, sir.

8   Q.   And people have trouble telling them apart, don't they?

9   A.   I didn't have that problem.  I don't know.

10  Q.   Okay.  You know --

11  A.   He has a brother that --

12  Q.   -- to your knowledge that Dr. Al-Timimi had no personal

13  relationship with Masaud Khan, correct?

14       MR. GIBBS:  Judge, I object.  Again, there's no

15  foundation for that.

16       MR. MAC MAHON:  From his own personal knowledge I asked

17  him.

18       THE COURT:  From your own knowledge, do you know whether

19  the defendant had any relationship with Mr. Khan?

20       THE WITNESS:  I only knew that Dr. Ali Timimi knew

21  Masaud Khan and his brothers, that they knew -- that they knew

22  each other and that they respected him.

23  BY MR. MAC MAHON:

24  Q.   They knew who he was, correct?

25  A.   And he knew who --

1 Q. Muslims all over the area know who Dr. Al-Timimi is, right?

2 A. Right. And he, and he knew them.

3 Q. Okay. And how about Caliph Basha?

4 A. Same thing.

5 Q. Did he have a personal relationship with Dr. Al-Timimi?

6 A. I can't say personal, no.

7 Q. Okay. And Yong Kwon, he had on two occasions to your

8 knowledge, had actually been the driver who took Dr. Al-Timimi to

9 the lectures, correct?

10 A. That would be a fair statement.

11 Q. All right. And you saw them together one other time at a

12 luncheon, correct?

13 A. Maybe at a wedding as well.

14 Q. All right. And that was it, right?

15 A. Yes, sir.

16 Q. Now, Mr. Gibbs with some flourish showed you this weapon that

17 you had there, sir. That's your gun, isn't it?

18 A. Yes, sir.

19 Q. You've never ever in your life told Dr. Ali Al-Timimi that

20 you owned that weapon, did you?

21 A. I don't know, sir.

22 Q. You knew, sir, from attending lectures that it was his

23 position that no Muslim in America should own a gun because you

24 were just setting yourself up for trouble; isn't that correct?

25 A. I don't know that, sir.

1  Q.  You never heard him say that?

2  A.  I don't recall that, sir.

3  Q.  Do you remember ever telling him that you had a gun?

4  A.  No, sir.

5  Q.  Did you ever see Ali Al-Timimi with a gun?

6  A.  He had a little handgun one time when we were moving, but

7  that was, like, in 2000, and that was for protection of his house.

8  Q.  That was an antique firearm of some sort or a useful gun?

9  A.  I remember it was small, very small.  That's all I remember.

10 Q.  It was a decorative item, wasn't it, sir?

11 A.  I'm sorry?

12 Q.  It was a decorative gun, wasn't it?

13 A.  I don't know, sir.  We were moving, so he wasn't --

14 Q.  There came a time when you helped him move into his house,

15 right?

16 A.  Yes, sir.

17 Q.  And everyone at the center helped him move, right?

18 A.  Correct, sir.

19 Q.  And that's because he had so many boxes and so many books

20 that a call was made on a Friday night, any brother with time,

21 please come help Dr. Timimi move, right?

22 A.  Correct.

23 Q.  And that's where you say you saw this, this gun at his house?

24 A.  Yes, sir.

25 Q.  Did you ever see him at a firing range?

1  A.   No, sir.

2  Q.   He didn't go with you when you went and bought a gun, did he?

3  A.   No, sir.

4  Q.   Okay.  And tell the jury who it was that went with you to the

5  gun show when you went and bought that weapon, sir.

6  A.   Masaud Khan, Yong Kwon, Ibrahim Hamdi, Ismail Royer.

7  Q.   And of that crowd, you're the only one who didn't go overseas

8  to a training camp; isn't that correct?

9  A.   It is, sir.

10  Q.   You didn't invite Ali Al-Timimi to go to the gun show with

11  you?

12  A.   No, sir.

13  Q.   Now, the dinner on September 11 at the Dar al-Arqam, what --

14  you testified -- let me back up.

15        On -- who told you to buy that weapon, sir?

16  A.   Nobody.  Everybody was just talking about going target

17  shooting, and we were talking about guns, and they were going to a

18  gun show, and I had interest in buying one.

19  Q.   All right.

20  A.   There was no one person that motivated me over another.

21  Q.   But there isn't any question, is there, sir, that Mr. Royer

22  was one of the people that encouraged you to buy that gun?

23  A.   He may have had something to do with it.

24  Q.   Right.  And he had told you on many occasions about his

25  experiences in combat in Bosnia, hadn't he?

1  A.    Yes, sir.

2  Q.    What did he tell you that he'd done in Bosnia?

3  A.    Get involved in combat.

4  Q.    Did he tell you any details?

5  A.    Not really.

6  Q.    Did he tell you a grenade landed next to him and didn't

7  explode?

8  A.    Oh, yes, sir.  Yes, sir.

9  Q.    You remember that?

10 A.    Yes, sir.

11 Q.    Do you remember him telling you of the experiences of combat

12 in Pakistan as well?

13 A.    Not right now, no, sir.

14 Q.    You don't remember him telling you that he had this exciting

15 time where he got to shoot a gun?

16 A.    Oh, yes, sir.  Yes, sir.

17 Q.    What did he tell you?

18 A.    Over the mountains in Pakistan, they were, they were yelling

19 against people, I guess, from India.  They were yelling at each

20 other at night, and then in the morning, they had combat.

21 Q.    Okay.  And why was Mr. Royer telling you these things?  Did

22 you ever ask him?

23         MR. GIBBS:  Judge, again, that calls for speculation,

24 and this whole line of questioning is hearsay, Judge.

25         THE COURT:  Well, I allowed you to get into this sort of

1  line of questioning as well, so that objection is overruled,

2  but --

3         MR. MAC MAHON:  I'll ask it a different way, Your Honor.

4         THE COURT:  All right, go ahead.

5         MR. MAC MAHON:  I apologize.

6  Q.  Did Mr. Royer ever tell you or indicate to you that, that he

7  wanted to tell you about his experiences overseas because they

8  were cool?

9  A.  I would say something along those lines.

10 Q.  He used that exact word, didn't he?

11 A.  I don't recall that.

12 Q.  Didn't he tell you that he felt like he was Superman when he

13 was overseas?

14 A.  No, sir.

15 Q.  You didn't tell the FBI that he said that?

16 A.  I can't remember what I told the FBI, sir.

17 Q.  Royer didn't tell you that being Superman is great?

18 A.  I'm sorry, sir, if I said that, I don't recall it.

19 Q.  And you also know that it was actually Mr. Royer who was

20 trying to pull you to go overseas and fight, correct?

21 A.  Yes, sir.

22 Q.  All right.  And that happened on many occasions, didn't it?

23 A.  Not as deliberate as the time at the park.

24 Q.  Okay.  But before that, he was, he was hinting with you that

25 that's what he thought you should do; isn't that right?

1  A.    Yes, sir.

2  Q.    In fact, one time he told you you would be looked on as a

3  sinner to Allah if you didn't go overseas and fight with him;

4  isn't that correct?

5  A.    Yes, sir.

6  Q.    And you never had Ali Al-Timimi tell you anything like that,

7  did you?

8  A.    I can't recall him saying something like that, sir.

9  Q.    You would remember that, wouldn't you, sir?

10  A.    No, I wouldn't, sir.  I mean --

11  Q.    You would remember if he said that to you?

12  A.    I think if he said it in those words, I probably would have

13  remembered it.

14  Q.    Okay.  Now, on the evening of September 11, what you heard

15  Ali Al-Timimi say at, at this dinner was a statement about his

16  view of America's foreign policy as it affects Muslims; isn't that

17  correct?

18  A.    I only caught the last part; I apologize, sir.

19  Q.    Okay.  What you heard him say on September 11 at the Dar

20  al-Arqam dinner was his view of how American foreign policy

21  affects Muslims in the world; isn't that correct?

22  A.    Correct.

23  Q.    And in your -- at the Dar al-Arqam, there was lots of

24  conversation in this time frame about the effect of sanctions on

25  the children of Iraq, correct?

1  A.    Correct.

2  Q.    And the Muslims at the Dar al-Arqam thought that American

3  policy in Iraq was leading to the death of children in Iraq; isn't

4  that correct?

5  A.    Yes, sir.

6  Q.    And the Muslims at the Dar al-Arqam Center thought that the

7  Palestinian children killed by Israelis were being assisted by

8  American financial and military assistance as well, correct?

9  A.    Correct.

10  Q.    So in, in your group and at the Dar al-Arqam Center, there

11  was a lot of anxiety or anger at the United States for its foreign

12  policy; isn't that correct?

13  A.    Yes, sir.

14  Q.    And none of that had anything to do with anybody thinking

15  that the 9/11 attacks were a good thing; isn't that correct?

16  A.    That's correct, sir.

17  Q.    Right.  Because what Dr. Al-Timimi told you was that in the

18  aftermath of 9/11, it was going to be very difficult for Muslims

19  to live in this country and practice their religion; isn't that

20  correct?

21  A.    I don't remember that statement, sir.

22  Q.    You don't remember him saying anything else at Dar al-Arqam

23  that evening about the fact that Muslims may be threatened in this

24  country?

25  A.    Actually, yes, sir.

1    Q.    Okay.  And what did he say?

2    A.    Exactly what you said, sir.

3    Q.    And he advised those in attendance that if the sisters were

4    veiled, that they should stay inside and be safe, right?

5    A.    I'm sorry, I don't recall that.

6    Q.    Do you recall him saying that Muslims should go out of their

7    way not to be conspicuous but that that would pass eventually?

8    A.    I don't recall that, sir.  It would only be an assumption,

9    sir.

10    Q.    The "New World Order" tape that Mr. Gibbs held up, could you

11    hold that up again, please, sir?

12                              (Witness complying.)

13    BY MR. GIBBS:

14    Q.    Dr. Timimi had absolutely nothing to do with the cover on

15    that tape, did he?

16    A.    Nobody at Dar al-Arqam did, sir.

17    Q.    Right.  It was done in Australia 12 years ago, right?

18    A.    I don't know, sir.

19    Q.    And nobody at the Dar al-Arqam ever thought it was

20    appropriate after 9/11 to have that image on the tape of any sort,

21    right?

22    A.    Nobody thought it was appropriate.

23    Q.    Including Dr. Timimi, isn't that correct?

24    A.    I don't recall him -- it was just Haytham and Mohammad

25    Al-Qahtani who asked us to rip it up.  That's the only discussion

1  I ever recall about this cover.

2  Q.  And how old is that tape?

3  A.  The tape is old, sir.

4  Q.  Do you know how old?

5  A.  I think I mentioned earlier it was either in the early '90s

6  or possibly late '80s.

7  Q.  Okay.  And it contains anti-terrorism statements, doesn't it?

8  A.  I didn't hear it all, sir.  I only heard maybe, like, one or

9  two, the first two tapes maybe.

10  Q.  Do you remember any -- you haven't even listened to the whole

11  thing?

12  A.  No, sir.

13  Q.  Do you remember any statement in there about him saying you

14  need to be a soldier in the Army but not in the means of holding a

15  gun but just having a purpose in your life?

16  A.  I'm sorry, sir, I don't recall that statement at all.

17  Q.  Have you ever heard him say otherwise?

18  A.  No, sir.

19  Q.  How many other Islamic speakers' tapes are sold at Dar

20  al-Arqam?

21  A.  No more than ten.

22  Q.  Okay.  And how many of Dr. Al-Timimi's speeches can be

23  purchased there?

24  A.  How many of Dr. -- all of them can be purchased there.  Not

25  all of his speeches but all the tapes that were there for sale can

1  be purchased.

2  Q.   Just tell the jury, how many are we talking about of things

3  he has said publicly about Islam can be purchased and listened to?

4  A.   At least ten different lectures, either if they were sets or

5  personal cassettes.  Actually, more than that because he did a

6  series on Purification of the Soul, which is about 15 tapes in and

7  of itself, so several.

8  Q.   And these are all tapes on theology, right?

9  A.   Yes.

10  Q.   On how to live your life as a good Muslim?

11  A.   Yes, sir.

12  Q.   Teachings of the Koran?

13  A.   Yes, sir.

14  Q.   All right.  Have you listened to many of those tapes?

15  A.   Many of them, yes, sir.

16  Q.   And did anything in any of those tapes inspire you to commit

17  any criminal acts, sir?

18  A.   Nothing inspired me at any point to do a criminal act.

19  Q.   Now, you said that when you went to Yong Kwon's house, he

20  told you on -- this is the dinner on September 16 -- that he told

21  you that there was going to be a discussion from Dr. Al-Timimi; is

22  that correct?

23  A.   Yes, sir.

24  Q.   Okay.  Now, didn't you -- do you know when it was when you

25  first heard from him?

1   A.   No, sir.

2   Q.   Now -- just a second, Your Honor.

3           Didn't Mr. Kwon tell you that the discussion was going

4   to be about general Islamic issues?

5   A.   He just said Sheikh Ali was having a, a speech at his house,

6   to come over and attend.

7   Q.   Excuse me?  I didn't hear, I'm sorry.

8   A.   Yong Kwon --

9   Q.   Right.

10  A.   -- called me and told me that Sheikh Ali was giving a speech

11  at his house and to come over to attend.

12  Q.   Okay.  And you were in your car when your cell phone rang

13  when that happened, right?

14  A.   I believe so.

15  Q.   And you were with your friend, Sherdil?  Is that how you say

16  that?

17  A.   "Sherdil."

18  Q.   "Sherdil."

19          And then you came straight over there?

20  A.   Right.

21  Q.   It wasn't a phone call that you got in the middle of the

22  afternoon when Yong Kwon told you that Dr. Al-Timimi was coming,

23  right?

24  A.   I'm sorry, sir, I think the question is -- the answer to that

25  question is I got a call on my cell phone from Yong Kwon that

1  Dr. Ali Timimi would be there giving a lecture and to come over

2  and attend. At that point, I called Sherdil and told him the same

3  thing, and he said that he wanted to go with me, and I picked him

4  up, and we went to Yong Kwon's house.

5  Q.   You went straight there?

6  A.   Yes, sir.

7  Q.   Okay.  Do you know what time it was when you arrived?

8  A.   It was in the daytime, sir.

9  Q.   It was in the daytime.  What time?

10 A.   Midafternoon.

11 Q.   Midafternoon?  Do you remember because it was light out?

12 A.   Yes, sir.

13 Q.   Okay.  And what floor is Mr. Kwon's apartment on?

14 A.   Second.

15 Q.   Did you notice all the shades drawn when you walked up?

16 A.   No, sir.

17 Q.   Did anybody ask you to turn off your cell phone when you

18 walked in the door?

19 A.   No, sir.

20 Q.   Did anybody tell you that what was happening there was a big

21 secret, sir?

22 A.   No, sir.

23 Q.   And when you walked in, you say Dr. Timimi was finishing his

24 talk, correct?

25 A.   Yes, sir.

1  Q.   And you heard him say that things would be okay, everything

2  would be okay in the end, correct?

3  A.   Yes, sir.

4  Q.   Right.  And you didn't hear what he said before that,

5  obviously.

6  A.   No, sir.

7  Q.   And you never heard him speak about it again, correct?

8  A.   You're correct, sir.

9  Q.   And Dr. Al-Timimi didn't haul you to the side and ask you,

10 "Why did you bring this guy here?," did he?

11 A.   No,  sir.

12 Q.   Who was that?

13 A.   Ismail Royer.

14 Q.   Okay.  And it was Royer who told you that you had to leave

15 and come back, not Ali Al-Timimi, right?

16 A.   Correct.

17 Q.   Now, you've said that the -- within the next day -- did

18 Mr. Royer tell you that he had made some solemn Islamic pledge

19 never to repeat what he'd heard at that meeting?

20 A.   No, sir.

21 Q.   Okay.  Because in fact, he called you the next day to try to

22 tell you what had happened, right?

23 A.   No, sir.

24 Q.   He called you many times in the next few days, didn't he?

25 A.   Perhaps, but I don't -- there was nothing that I ever recall

# Gharbieh - cross

1  about the meeting.

2  Q.   Okay.  What he -- fine.

3        But what he told you was that, that Ali Al-Timimi -- let

4  me strike that.

5        At this point in time after the meeting at Kwon's house,

6  you know that Royer is working as hard as he can to try to get you

7  to go overseas, right?

8  A.   I'm sorry, sir, I don't think he was working as hard as he

9  could, but he brought it up to me.

10 Q.   Do you know how many times he called you?

11 A.   No, sir.

12 Q.   Didn't you tell the FBI that you kept seeing his phone number

13 appear on your cell phone and you didn't even want to answer it?

14 A.   Yes, sir.

15 Q.   Okay.  So he was pestering you, wasn't he?

16 A.   Sir, I don't know if he was pestering me or not.  I didn't

17 give him the chance.

18 Q.   Okay.  But there finally came a time when you met with him,

19 right?

20 A.   Yes, sir.

21 Q.   Right.  And he told you that it was Ali's opinion that you

22 should make hijra or go to a camp, right?

23 A.   Yes, sir.

24 Q.   Okay.  He never told you that Ali -- did you believe him when

25 he said that?

1  A.   Yes, sir.

2  Q.   Had you ever heard Ali before say somebody should go to a

3  camp?

4  A.   Can I ever recall Dr. Ali specifically saying that you should

5  go to a camp?  I don't recall a time that he explicitly said it,

6  no, sir.

7  Q.   And Mr. Royer never mentioned going to Afghanistan to fight

8  against Americans, did he?

9  A.   Not to me, sir.

10  Q.   Right.  And he never mentioned going to Chechnya to fight

11  against the Russian soldiers, right?

12  A.   Not to me.

13  Q.   He wanted you to go to Lashkar-e-Taiba because he thought

14  that was a legal place for American citizens to go, right?

15  A.   Ismail Royer?

16  Q.   Yes.

17  A.   I don't know if that's where he wanted me to go and why.

18  Q.   Didn't he tell you that he could help you get to Pakistan?

19  A.   Yes, sir.

20  Q.   And he told you he could help you get to the Lashkar-e-Taiba

21  camp, didn't he?

22  A.   I'm not that familiar with Lashkar-e-Taiba, sir.

23  Q.   But you testified earlier that in your mind, it was legal to

24  go over to these camps, right?

25  A.   Yes, sir.

1  Q.   And that's because Lashkar-e-Taiba was not designated as a

2  terrorist organization by our government at that time, was it?

3  A.   From my understanding, they were not.

4  Q.   Right.  And the source of your understanding was Royer,

5  right?

6  A.   And Ibrahim Al-Hamdi.

7  Q.   And Ibrahim Al-Hamdi.

8         Two people that had actually been there, correct?

9  A.   Yes, sir.

10  Q.   And Ali Al-Timimi never told you that LET is not listed as a

11  terrorist organization; it's a place you can legally go, right?

12  A.   No, he's never told me that.

13  Q.   And the thing about Royer talking about U.S. taxes, that's

14  something that Mr. Royer said to you, correct?

15  A.   Yes, sir.

16  Q.   Right.  That's not something that Mr. Ali Al-Timimi ever said

17  to you, is it?

18  A.   At the Buddhist statue lecture.

19  Q.   Right.  He answered somebody's question about paying taxes,

20  and if I understand your testimony, somebody asked him a question

21  that if they didn't want to pay taxes, is that okay, and he said

22  that was fine if that's how they felt, right?

23  A.   No, sir.

24  Q.   He said specifically they shouldn't pay taxes to the United

25  States?

1  A.   No, sir.

2  Q.   What did he say?

3  A.   I mentioned in this testimony, sir, and in previous testimony

4  that somebody asked him about the Coca-Cola product and saying

5  that they should not buy Coca-Cola in order not to support the

6  government, and Dr. Ali said, "If that's your theory, then it's

7  pointless, because you're paying taxes, and your taxes equate to

8  how many thousands of dollars a year as opposed to the price of a

9  can of Coke.  So if that was your theory, then leaving the country

10  would be your best bet."

11  Q.   But Dr. Al-Timimi even in that discussion never adopted that

12  theory as his own, did he?

13  A.   No, sir.

14       MR. MAC MAHON:  Just a second, Your Honor?

15       THE COURT:  Yes, sir.

16       MR. MAC MAHON:  Nothing further, Your Honor.  Thank you.

17       THE COURT:  All right.  Mr. Gibbs, any redirect?

18       MR. GIBBS:  A little bit, Judge.  Thank you.

19                  REDIRECT EXAMINATION

20  BY MR. GIBBS:

21  Q.   Mr. Gharbieh, you were asked on cross examination about the

22  trip to Delaware where Ali Timimi read you the 40 Hadeeths of

23  Jihad.  Do you recall that?

24  A.   Yes, sir, I do.

25  Q.   And Mr. MacMahon asked about what hadeeths are and how some

1 hadeeths can talk about how you should wash, correct?

2 A.   Correct.

3 Q.   And how some hadeeths talk about how you can pray, right?

4 A.   Yes, sir.

5 Q.   But when Ali Timimi read you those hadeeths that day, he

6 didn't read any about how you can wash, did he?

7 A.   No, sir.

8 Q.   And he didn't read any about how you can pray, did he?

9 A.   No, sir.

10 Q.   What were the hadeeths that he read you that day focused on?

11 A.   Combat jihad, sir.

12 Q.   Now, you were also asked on cross examination about the Dar

13 al-Arqam Islamic Center, and Mr. MacMahon asked you if it was a

14 mainstream place of learning, and you said that was correct,

15 didn't you?

16 A.   Yes, sir.

17 Q.   And that is true, right?

18 A.   Yes, sir.

19 Q.   And in fact, Ali Timimi was a regular lecturer at the

20 mainstream place of Islamic learning until his comments of

21 September 11, right?

22 A.   Correct.

23 Q.   And after that time, did he ever speak again at that

24 mainstream place of Islamic learning?

25 A.   No, sir.

1  Q.   Now, you were asked about the paintball training a little bit

2  and how it started and whether in the beginning anyone could come

3  participate, and I think you said yes to that question.  Do you

4  recall that?

5  A.   In the beginning, yes, sir.

6  Q.   All right.  Now, it looked like -- that's right, you said in

7  the beginning.

8       Now, ultimately, did that change in some way?

9  A.   Yes, sir.

10 Q.   And how did that change?

11 A.   It became a secret.

12 Q.   How did that come about?

13 A.   In a discussion with Ibrahim Al-Hamdi and Yong Kwon and

14 Ismail Royer and Hammad and Idris and them, it was feared that

15 although we were doing it publicly, that we would be associated

16 with some type of, you know, jihad training camp by the FBI or by

17 any, any police or official and that we'd be mistaken for that, so

18 we wanted to avoid that and said we just won't tell anybody about

19 it, and then it became a secret, and to bring a person to

20 paintball at that point, you needed two people amongst the group

21 that has already been paintballing to testify that they know this

22 person as a person who wouldn't go around blabbing their mouth

23 about the, the training.

24 Q.   All right.  And this conversation where it was determined

25 that the training would be secret, did this conversation take

1  place before or after you spoke to Ali Timimi about Seif Chapman

2  having been approached by the FBI?

3  A.    It was a secret before that, sir.

4  Q.    Now, you were also asked about the paint- -- the participants

5  in this training, and Mr. MacMahon asked you if it wasn't true

6  that a very small portion of the total number of paintball players

7  were sort of part of that original personal jihad training group.

8  Do you recall that?

9  A.    Yes, sir.

10 Q.    And you said it was a fairly small number of people, correct?

11 A.    Yes, sir.

12 Q.    But out of that fairly small number of people, weren't they

13 very well represented at the meeting at Kwon's house on September

14 16?

15 A.    Yes, sir.

16 Q.    In fact, it was most of them, wasn't it?

17 A.    Yes, sir.

18 Q.    And you were asked about Masaud Khan, and you said that he

19 was -- he did go to Dar al-Arqam infrequently, right?

20 A.    Infrequently, sir.

21 Q.    Infrequently, correct.

22 A.    Yes, sir.

23 Q.    And you testified that Ali Timimi did know Masaud Khan, and,

24 in fact, Masaud Khan was at Kwon's house on 9/16 when Timimi was

25 speaking, right?

1   A.   Yes, sir.

2   Q.   Now, you were also asked about the meeting at the park with

3   Randall Royer, and you testified that he said that you'd be a

4   sinner to Allah if you didn't go overseas.  Do you recall that?

5   A.   Yes, sir.

6   Q.   Is that one of the things Royer told you at the park?

7   A.   Yes, sir.

8   Q.   And didn't he preface all of his remarks there at the park by

9   saying, "You know what Ali Timimi says"?

10  A.   Yes, sir.

11  Q.   That's how he started, correct?

12  A.   "You know the opinion of the scholars and Sheikh Ali."

13  Q.   Thank you.

14        Now, you were also asked about some of the prevailing

15  political views at the Dàr al-Arqam.  Mr. MacMahon asked you

16  wasn't it true that there were people at Dar al-Arqam upset about

17  American sanctions in Iraq, correct?

18  A.   Yes, sir.

19  Q.   And that's true, right?

20  A.   Yes, sir.

21  Q.   And you also testified that there were people at Dar al-Arqam

22  that would be upset when Palestinian children would be killed by

23  Israelis, correct?

24  A.   Yes, sir.

25  Q.   But on September 11, when Ali Timimi spoke at the Dar

1    al-Arqam, he didn't talk about the sanctions in Iraq, did he?

2    A.    No, sir.

3    Q.    And he didn't talk about Palestinian children being killed in

4    Israel, did he?

5    A.    I want to go back, sir, if you don't mind, not to the

6    question, but when was this that you're asking me about?

7    Q.    The -- it was on September 11 at the Dar al-Arqam.

8    A.    All right.

9    Q.    When the 9/11 attacks were discussed.

10   A.    No children were mentioned, sir.

11   Q.    All right.  And, in fact, what he said was that in regards to

12   the attacks, America had it coming, correct?

13   A.    Yes, sir.

14   Q.    Now, you were also asked about the meeting at Kwon's house a

15   few days after 9/11 where Ali Timimi spoke, correct?

16   A.    Correct.

17   Q.    And you testified on cross examination that one of the things

18   Timimi said was that things would be okay in the end.  Do you

19   recall saying that?

20   A.    I do recall it.

21   Q.    And he said things would be okay in the end, but what did he

22   say would be the -- what the end would be after?

23   A.    I'm sorry I'm drawing all these blanks.  In regards to the

24   comment at Yong Kwon's house, he mentioned something to the extent

25   of everything would be okay at the end, and it would be after a

1  long period of struggle, but eventually, everybody would have --
2  Muslims as well would have peace on earth.  Something along those
3  lines, I'm sorry.
4  Q.   No, that's fine.
5           So the thing that would be okay at the end was something
6  occurring after a long period of struggle?
7  A.   Oh, yes, sir.
8  Q.   Now, you were asked about ultimately after the meeting at
9  Kwon's house, that you were re-contacted by Randall Royer.  Do you
10  recall that?
11  A.   I do.
12  Q.   And you testified on cross examination that he got you on
13  your cell phone and you weren't real excited to talk with him.  Do
14  you recall saying that?
15  A.   Yes, sir.
16  Q.   And why was it that you didn't want to talk to Royer after
17  the meeting at Kwon's house?
18  A.   I had a hunch that he wanted to talk about jihad or anything
19  related to it.
20  Q.   And you also testified on cross examination, Mr. MacMahon
21  asked you about what Royer claimed Ali Timimi had said, that you
22  either needed to do hijra or go to a camp.  Do you recall saying
23  that?
24  A.   I do.
25  Q.   And you testified that you believed Royer when he said that

1  Ali Timimi had said those things?

2  A.    I did.

3  Q.    Why was it that you believed Royer when he said that?

4  A.    It wasn't a far-fetched opinion that I believe Dr. Ali would

5  have had.

6  Q.    That you needed to make hijra or go to a camp?

7  A.    Right.

8  Q.    And do you know any reason why Randall Royer would have to

9  claim that Ali Timimi had said something that he hadn't said?

10          MR. MAC MAHON:  Your Honor, that calls for speculation.

11          THE COURT:  I'm going to sustain that objection.

12          MR. GIBBS:  Okay.  If I could have just a moment, Judge?

13          THE COURT:  Yes, sir.

14          MR. GIBBS:  Mr. Gharbieh, thank you.  That's all I have.

15          Thank you, Your Honor.

16          THE COURT:  Is there any recross, Mr. MacMahon?

17          MR. MAC MAHON:  Just a few, Your Honor.

18                    RECROSS EXAMINATION

19  BY MR. MAC MAHON:

20  Q.    Sir, with respect to the secret rules of paintball that you

21  told Mr. Gibbs about, Ali Al-Timimi had nothing to do with

22  changing the rules of paintball to make it secret, either, did he?

23  A.    Not to my knowledge.  He didn't have anything to do with

24  that.

25  Q.    Well, he wasn't there for the meeting when you talked about

1  it, was he?

2  A.   No.

3  Q.   And he never referred anybody to paintball, did he?

4  A.   No.

5  Q.   He never asked you to let somebody come into the paintball

6  group at all, right?

7  A.   No.

8  Q.   And you never once called Ali Timimi after you met with Royer

9  to ask him if he had ever actually had such a discussion with

10 Randall Royer about you going to a camp, correct?

11 A.   No, sir.

12 Q.   And you had never once in your life heard Ali Al-Timimi tell

13 anyone to go to a camp, right?

14 A.   No, sir.

15          MR. MAC MAHON:  That's all, Your Honor.

16          THE COURT:  All right.  Does anybody anticipate calling

17 this witness again during the trial?

18          MR. GIBBS:  The government does not, Judge.

19          THE COURT:  How about the defense?

20          MR. MAC MAHON:  No, Your Honor.

21          THE COURT:  All right, Mr. Gharbieh, then you're

22 released as a witness.  That means you can come into the courtroom

23 and watch the trial, or you may leave, but you're not to discuss

24 your testimony or anything you might see or hear in the courtroom

25 with any witness who has not yet testified.  Do you understand?

1          THE WITNESS:  I understand that, Your Honor.

2          THE COURT:  Thank you.  You're free to go.

3                         (Witness excused.)

4          THE COURT:  The next witness, is that going to be a long

5  witness or --

6          MR. KROMBERG:  Yes, Your Honor.

7          THE COURT:  Well, why don't we take the afternoon break

8  at this point, let the jury stretch their legs, and we'll

9  reconvene at 10 of.

10                    (Recess from 3:35 p.m., until 3:51 p.m.)

11                         (Defendant and Jury present.)

12          THE COURT:  Mr. Kromberg, your next witness?

13          MR. KROMBERG:  Your Honor, the government calls Muhammad

14  Aatique.

15          MUHAMMAD AATIQUE, GOVERNMENT'S WITNESS, AFFIRMED

16                    DIRECT EXAMINATION

17  BY MR. KROMBERG:

18  Q.    Good afternoon, Mr. Aatique.  Would you please state your

19  name and spell it for the record?

20  A.    My name is Muhammad Aatique, and it's spelled M-u-h-a-m-m-a-d

21  A-a-t-i-q-u-e.

22  Q.    Mr. Aatique, when were you born?

23  A.    I was born on November 3, '72.

24  Q.    Where were you born?

25  A.    Karachi, Pakistan.

1  Q.  When did you first arrive in the United States?

2  A.  Second week of January '96.

3  Q.  Have you lived in the U.S. since that time?

4  A.  Mostly -- I mean, I've been traveling, but I've been living

5  here since that time.

6  Q.  What was your status when you got here in 1996?

7  A.  I came on a student visa, an F-1 visa, and --

8  Q.  F-1, that's a class of student visa?

9  A.  That's correct.  And I was on that visa type until about '98,

10 when I got switched to H-1 visa, which is a work visa.

11 Q.  H-1 is a work visa?

12 A.  That's correct.  And --

13 Q.  Well, let me stop you there for just a second.  When you were

14 here on a student visa, where were you studying?

15 A.  I came to Virginia Tech.

16 Q.  And what were you studying?

17 A.  Electrical engineering.

18 Q.  What is your immigration status now?

19 A.  Well, right now, I'm a federal prisoner, but until, until --

20 well, when I was arrested, I was still an H-1 visa.

21 Q.  Okay.  And that was for you to work.  Where were you working

22 at the time?

23 A.  I had been working in different companies, but when I was

24 arrested in 2003, I was working for a company in Pennsylvania, in

25 King of Prussia.  It's called TruePosition.

1  Q.  And what did you do for them?

2  A.  They work in -- working on tracking technologies for cell

3  phones.

4  Q.  Tracking technologies?

5  A.  Yeah, like 911 locations, stuff like that.

6  Q.  Mr. Aatique, what languages do you speak?

7  A.  Basically, I speak English and Urdu and a little bit of

8  Arabic.

9  Q.  Urdu, is Urdu the language of Pakistan?

10  A.  That's correct.

11  Q.  And you say you speak a little Arabic?

12  A.  I mean a little.  I can get by, but I'm not fluent.

13  Q.  Okay.  Now, you said you're obviously a federal prisoner.

14  What did you plead guilty to?

15  A.  I pled guilty to two charges.  One was an aiding and abetting

16  for the violation of Neutrality Act, and another was a gun charge.

17  Q.  A gun charge?

18  A.  Yes.

19  Q.  All right.  And the Neutrality Act is what?  Going to attack

20  another country?

21  A.  Another country that was at peace with the United States,

22  aiding and abetting in its violation.

23  Q.  Okay.  What is your obligation under your plea agreement

24  regarding telling the truth when you're called as a witness?

25  A.  I have to be truthful in, in whatever I tell the government,

1   and I'm required to testify in any end-resulting investigations or

2   trials that may result from this investigation.

3           MR. KROMBERG:  Could you bring up 7H12?

4           THE COURT:  Before we put these on the screen, we really

5   have to make sure defense do not have an objection.  Is there an

6   objection to 7H12?

7           MR. YAMAMOTO:  No, Your Honor.

8           THE COURT:  All right, then it's in.  Go ahead.

9           (Government's Exhibit No. 7H12 was received in

10  evidence.)

11          MR. KROMBERG:  Thank you, Your Honor.

12  Q.   I just wanted you to say that that was your -- want to ask

13  you if that was your plea agreement.

14  A.   Say it again, please?

15  Q.   Is what's in front of you, the first page marked 7H12, is

16  that the first page of your plea agreement?

17  A.   Yeah, that look like so.

18  Q.   Okay.  And the actual full thing is in the binders, but we

19  don't have to look at it now.

20          What sentence are you serving?

21  A.   I was sentenced in December 2003 to a sentence of 126 months.

22  Q.   How much of that will you serve?

23  A.   Right now, my release date is around August 2012, something

24  like that.

25  Q.   But has there been a motion by the government filed to reduce

1  your sentence?

2  A.    Yes.  A motion has been filed with Judge Brinkema to -- so

3  that later on the government can -- I mean, this motion is for a

4  Rule 35(b) hearing.

5  Q.    Rule 35 is for -- is what to your understanding?

6  A.    Rule 35(b) is, is a rule by which the government can file a

7  motion to request a reduction in the sentence based on any

8  cooperation that the defendant provides.

9  Q.    Do you know how much your sentence is going to be reduced by

10  Judge Brinkema?

11  A.    No, I don't know.

12  Q.    In your view, what are the factors that Judge Brinkema is

13  going to use to reduce your sentence?

14  A.    Basically, my truthfulness and the value of my cooperation.

15  Q.    Are you familiar with Dar al-Arqam?

16  A.    It was a gathering place, a lecture gathering place in

17  Northern Virginia where different personalities, Islamic

18  personalities used to come to give lectures and people of the --

19  Muslims of the area used to attend.

20  Q.    Let me go back just a second.  You attended Virginia Tech,

21  and where did you move to after you left Virginia Tech?

22  A.    I finished my master's in September of '97, and from there I

23  moved to San Diego, California.  I got a job immediately, and I

24  was working there until February of '99, and that's when I moved,

25  moved to Reston, Virginia, here, Northern Virginia.

1  Q.   And when did -- when was your first contact with Dar

2  al-Arqam?

3  A.   Sometime later that year, either fall or winter of '99.  I

4  mean, it was -- when I say I had the contact at that time, I don't

5  mean the place.  The place started in 2000 -- I mean, the lecture

6  gathering.  That's what I start attending in late '99.

7  Q.   And where were you attending the lectures at that point?

8  A.   The first place I went to was in the campus of AOU, American

9  Open University.

10  Q.   American Open University.  What's the campus like of AOU at

11  the time?

12  A.   I don't know how big it is.  The only portion I saw was a

13  very small place near Falls Church.  It was just an upper floor

14  room where we used to gather.

15  Q.   An upper floor room in an office building?

16  A.   Sort of, yeah.

17  Q.   What was American Open University?

18  A.   It's a, it's a distant learning -- distance learning place

19  for people.  I mean, they don't have -- to the best of my

20  knowledge, they don't have classes anywhere.  I mean, you can --

21  you do correspondence courses in mostly Islamic topics, Arabic

22  language, Islamic topics.

23  Q.   Okay.  Who did you meet through attending those lectures

24  at -- and courses at American Open University?

25  A.   I met a lot of people.  I mean, do you want me to name them?

1 Q. Well, we've heard about a group -- well, in fact, would you

2 put up 1J7, please?

3       Okay. Do you recognize that person?

4 A. Yeah, that's the picture of Yong Kwon.

5 Q. Okay. How did you meet Yong Kwon?

6 A. Well, I knew Yong Kwon from Virginia Tech because I came to

7 know him in '96-'97, when I was there.

8 Q. All right. And then when you moved to Virginia, to Reston,

9 did you reestablish contact with him?

10 A. Yeah. Actually, even in the, in the -- in the duration in

11 the meanwhile, I was in sort of phone contact with him. I saw him

12 a couple of times maybe, but when I came back, I was seeing him on

13 a regular, regular basis.

14 Q. Is -- was it Mr. Kwon who introduced you to American Open

15 University?

16 A. I came to Dar al-Arqam through him when I came here.

17 Q. Okay. How about 1J3?

18 A. That's Masaud Khan.

19 Q. And how did you know him?

20 A. He's the brother of Omer Khan, and Omer Khan was actually one

21 of the people I met in Virginia Tech, also. Actually, I met Yong

22 Kwon through Omer Khan in Virginia Tech, and he's the older

23 brother of Omer Khan. So actually, the first time I met -- met

24 him also in Blacksburg, which is where Virginia Tech is.

25 Q. 1J8?

1  A.    That's Mahmood Hasan.  I also met him in Dar al-Arqam for the

2  first time.

3  Q.    And how about 1J1?

4  A.    That's Ismail Royer, and I think I also met him the first

5  time through the Dar al-Arqam lecture place.

6  Q.    1J6?

7  A.    That's Calipha, and I also met him through Dar al-Arqam.

8  Q.    1J10?

9  A.    Idris Surratt, same thing.

10  Q.    And 1J5?

11  A.    Hammad, I also met him through Dar al-Arqam.

12  Q.    1J2?

13  A.    This is Ibrahim Al-Hamdi.  Also I met him through Dar

14  al-Arqam.

15  Q.    And 1J4?

16  A.    That's Seif Chapman.  I also saw him for the first time at

17  Dar al-Arqam.

18  Q.    And 1J13?

19  A.    Ali Chandia.  I also met him through Dar al-Arqam.

20  Q.    Of the group of people we just saw the pictures of, what

21  activities did you engage in, if any, with them?

22  A.    Except for Masaud Khan, who just came once or twice, almost

23  all of these people were regular attendees of paintball group,

24  where we used to play paintball.

25  Q.    You said except Masaud Khan.  How about Chandia?

1 A.   No, Chandia never -- I don't remember him being there, also.

2 Q.   All right.  What was the point to you of engaging in

3 paintball activities?

4 A.   When, when I joined for the first time, I was told that the

5 purpose of paintball is basically to train for jihad, and also it

6 was a recreation also for us.  So that was -- these two were the

7 purposes for paintball.

8 Q.   When you mention it was preparation for a jihad, what does

9 "jihad" mean in that sense?

10 A.   Physical fighting.

11 Q.   Who provided the training during that training?

12 A.   Mostly --

13 Q.   Who provided the training during the paintball sessions?

14 A.   Mostly people with formal military training, like Hammad or

15 Seif and Idris.

16 Q.   Seif is Seif Chapman, and Idris is Idris Surratt?

17 A.   That's correct.

18 Q.   Did you know Ali Timimi?

19 A.   Yeah.  He was one of the regular lecturers at Dar al-Arqam.

20 Q.   You never saw him playing paintball or anything, right?

21 A.   No.

22 Q.   How did you know -- how did you first meet him?

23 A.   Well, I knew him from before, also.  First time I saw him was

24 in a conference in December '96, in an IANA conference.

25 Q.   IANA is Islamic Assembly of North America?

1   A.   That's correct.

2   Q.   Was he a speaker?

3   A.   Yes.

4   Q.   Okay.  And when next did you see him?

5   A.   Next time I saw him, I think the next year's conference in

6   December '97, I'm not sure, I think I did see him, but that was

7   the second time.  And then I saw him regularly when I came to

8   Virginia at Dar al-Arqam.

9   Q.   What was your relationship with him?  Were you equals or

10  peers?

11  A.   No.  I was one of the attendees, and he was, he was the most

12  regular lecturer of that place.

13  Q.   How often did you attend his lectures at Dar al-Arqam?

14  A.   I used to attend lectures at Dar al-Arqam almost every

15  Friday.

16  Q.   Before September 11, 2001, during the time that you attended

17  the lectures, in what kind of a regard did you hold Ali Timimi?

18  A.   I hold him in a respectful regard.

19  Q.   Why?

20  A.   He was one of the regular lecturers there, and I was

21  listening to his tapes for many years, and I looked up to him in

22  this sense.

23  Q.   Had you ever socialized with him?

24  A.   No.  I mean, I had -- maybe I had dinners with him a couple

25  of times but not really socialization, I would say.

1 | Q. When you say "dinners with him," was it just the two of you?

2 | A. No.

3 | Q. What kind of dinners are you referring to?

4 | A. Like, sometimes we'd go to some place after a lecture,

5 | somebody might invite us at their home or, or at some restaurant.

6 | Not a whole lot of times.

7 | Q. Okay. Had you ever been to his house?

8 | A. No.

9 | Q. Had he ever been to your house?

10 | A. No.

11 | Q. In 2000 and 2001, before September 11, during the time that

12 | you were attending the lectures at Dar al-Arqam -- well, in fact,

13 | let me stop there and go back a second.

14 |        Did you live in Virginia throughout 2001?

15 | A. No. As I said, I came to Virginia in the last week of '99,

16 | and I moved out of Virginia first week of July 2001.

17 | Q. And where did you move to?

18 | A. Pennsylvania.

19 | Q. Now, in 2000 and 2001 but before 9/11, what was your attitude

20 | during that period with respect to the concept of jihad? And when

21 | I say "jihad," I'm talking about physical fighting.

22 | A. I looked -- I mean, I thought of it as one of the, I mean,

23 | one of the aspects of Islam, that you have to be ready for

24 | physical fighting and you might have to do it if time comes.

25 | Q. What factors caused you to have that attitude?

1  A.    I mean, all of my -- I mean, my religious knowledge, which I

2  have been acquiring since I was little and, of course, living

3  here, and, of course, going to Dar al-Arqam, also.

4  Q.    What impact did Ali Timimi's lectures have on you?

5  A.    I would say it's considerable impact.

6  Q.    What settings were -- did you hear his lectures being given

7  in?

8  A.    Say it again?

9  Q.    In what -- where did you hear these -- where did you hear

10  what Ali Timimi would say?

11  A.    Almost all the time, I mean -- I mean, his lectures were not

12  directly to jihad as such.  I mean, lot of different topics,

13  although the topic of jihad might come in.  In Dar al-Arqam most

14  of the times live but lot of times his tapes, also.

15  Q.    Were there any other settings where you heard him talk?

16  A.    Other than tapes and Dar al-Arqam?

17  Q.    Right.  You were talking before about dinners.

18  A.    Yeah.  I mean, yeah, the very few dinners that I attend with

19  him, he -- yeah, he talk on that topic.

20  Q.    He talked on what topic?

21  A.    I mean, different topics.

22  Q.    Okay.  Did -- was there a particular setting where he talked

23  about jihad differently than he did at Dar al-Arqam?

24  A.    As far as being highly encouraging of it, we had a dinner

25  just after 9/11 at Yong Kwon's home.

1  Q.   Well, before I get to that, were his positions that he --

2  that you heard him say in the public lectures any different from

3  what he said in private before September 16, 2001?

4  A.   I don't remember any --

5         MR. YAMAMOTO:  Objection, Your Honor.  Foundation has

6  not been laid for this.

7         THE COURT:  Well, this can only be based upon your

8  personal experience with the defendant as a speaker.  So the

9  question is based on when you were hearing him speak, did you

10 detect any difference in how he spoke about that topic depending

11 upon the location of where he was speaking?

12        I think that's the question.

13        MR. KROMBERG:  Thank you, Your Honor.

14        THE WITNESS:  I won't say there was any considerable

15 difference.  I mean, it might be that the -- that he was more

16 relaxed in a private setting among a closer group, but I won't say

17 a considerable difference.

18 BY MR. KROMBERG:

19 Q.   Was there -- okay.

20        Before -- let's talk about before 9/11, what was your

21 intent with regard to engaging in violent jihad?

22 A.   I never really had any plans.

23 Q.   What is to your knowledge -- again, what -- back in 2001,

24 before 9/11, what did you know about Lashkar-e-Taiba?

25 A.   I'm from Pakistan, so I'm aware of, I mean, because I read

1  the newspapers from there, I used to read them on a regular basis

2  through the Internet, so I used to be aware of what's going on in

3  Kashmir region, which is a disputed territory between Pakistan and

4  India, and there are many groups -- guerilla groups that are

5  fighting the Indian soldiers in the Indian-occupied territory of

6  Kashmir, and LET was one of the groups fighting them.  So that's

7  how I was generally aware of them.

8  Q.   What, if anything, had you ever heard Timimi say about LET?

9  A.   I don't -- I can't put an exact time, but maybe sometime

10 around 2001 or late 2000, I -- I mean, sometime around 2001 or

11 late 2000 maybe, I, I have an -- I have an impression that he

12 said, I mean, as them being one of the --

13        MR. YAMAMOTO:  Objection to impression.

14        THE COURT:  Wait, wait, wait.  It has to be more exact

15 than an impression. ·You have to have a clear memory, or you

16 shouldn't be testifying about it.

17        THE WITNESS:  I remember him saying something along the

18 lines that LET is -- are the good folks in Pakistan, to simplify

19 it, I mean, that they are the best people in Pakistan.  I don't, I

20 don't know exactly when he said that, but I think he said that

21 before 9/11, also, sometime.

22 BY MR. KROMBERG:

23 Q.   What other groups, jihad groups did Timimi speak about before

24 9/11?

25 A.   I think sometimes he talked about people fighting in

# Aatique - direct

1  Chechnya.  I don't, I don't recall any particular group

2  designation but --

3  Q.  I'd like to show you 10G4.

4        THE COURT:  Any objection to 10G --

5        MR. KROMBERG:  It's already in, Judge.

6        THE COURT:  Yes.

7  BY MR. KROMBERG:

8  Q.  Do you recognize this photo?

9  A.  This is a photo of Ibn Khatab, who's one of the commanders of

10  the mujahideen in Chechnya.

11  Q.  Did Timimi speak about Ibn Khatab?

12  A.  I remember once in Dar al-Arqam, he said something like which

13  can -- like, something like nobody can be a great commander like

14  him or like Shamil -- I'm not sure if he said Shamil Bashaev, but

15  I remember him talking about Ibn Khatab.

16        MR. YAMAMOTO:  Your Honor, I'd like a clarification of

17  what he knows that he said as opposed to what he's thinking he

18  said.

19        THE COURT:  I'm going to sustain that objection.  You

20  need to rephrase that question.

21  BY MR. KROMBERG:

22  Q.  Do you recall Timimi talking about Ibn Khatab?

23  A.  Yes.

24  Q.  What do, what do you recall Timimi saying about Ibn Khatab?

25  A.  It was something along the lines of that nobody, nobody can

1  get this honor of being, being such a high, well-known commander,

2  something like that.

3          MR. YAMAMOTO:  I'm still not sure I understand what the

4  answer is, Your Honor.

5          THE COURT:  Can you speak -- express your answer a

6  little bit more slowly?  And be as exact as you can.

7          THE WITNESS:  Okay.

8          THE COURT:  All right?

9          THE WITNESS:  The topic was something like of if we go

10 abroad and fight and join the mujahideen.  I don't know how it

11 came up, but it was hypothetically he answered that not everybody

12 can go and become a great, great commander like him, Ibn Khatab.

13 I don't remember if he said any other name, but that was what was

14 said.

15          THE COURT: ˙ All right.

16 BY MR. KROMBERG:

17 Q.   You don't -- that not everybody who goes overseas to be a

18 mujahideen can be a great commander like Khatab?

19 A.   Something like that, yeah.

20 Q.   You mentioned the name Bashaev.  Who is Bashaev?

21 A.   He's another of the commanders in Chechnya.

22 Q.   What's the ethnic background of Khatab, if you know?

23 A.   From what I knew, he was an Arab.

24 Q.   And how about Bashaev?

25 A.   He's a Chechen.

1  Q.   Was there a difference or -- between the Chechen rebels who

2  were -- were there any differences among the Chechen rebels

3  fighting the Russians between Arabs and Chechens?

4       MR. YAMAMOTO: If he knows. This sounds like a

5  hypothetical question.

6       THE COURT: Well, this almost sounds like an expert

7  question, too. I mean, I don't want you to guess. If you know,

8  you need to first tell us how you know, and then we'll hear your

9  answer, and if you don't know, the answer is you don't know.

10      THE WITNESS: I knew through websites, the different

11 jihad websites that kept track of what was happening there through

12 those websites, that Shamil Bashaev was a commander of the Chechen

13 mujahideen and Ibn Khatab was the commander of foreign mujahideen.

14      THE COURT: All right.

15 BY MR. KROMBERG:

16 Q.   Is Khatab still alive?

17 A.   No.

18 Q.   Bashaev still alive?

19 A.   Probably, yes. I'm not sure. I'm not keeping track of news.

20 Q.   I suppose not.

21      Who was the first person to tell you about his own

22 personal experience at Lashkar-e-Taiba?

23 A.   Ibrahim Al-Hamdi.

24 Q.   After you -- what did he tell you, do you recall?

25 A.   That was after he came back from his own training there,

1  maybe very late 2000, and he described some of his experiences
2  there.
3  Q.   After you heard about Lashkar from Hamdi, what did you do for
4  more information?
5  A.   Before he described his experience to me, I, I mean, LET
6  wasn't a very remarkable group for me as compared to a lot of
7  other groups that were fighting there, but after Hamdi came back
8  and for the next, I'd say, six-eight months, I start keeping more
9  an eye on them in the news.
10 Q.   Did you find their website?
11 A.   Yes.
12 Q.   Which was what, do you remember?
13 A.   Initially, it used to be something like lashkardawah.com.
14 Q.   Lashkardawa -- d-a-w-a -- .com?
15 A.   That was the spelling that was used, yeah.
16 Q.   And later?
17 A.   Later, jamadawah.com, something like that.
18 Q.   I'd like you to look at 1F1.
19           THE COURT:  Any objection?
20           MR. KROMBERG:  Your Honor, these are ones that we
21 already resolved, I think, before --
22           MR. YAMAMOTO:  I think we object to them.  I think the
23 Court has --
24           THE COURT:  -- overruled the objection, all right.
25           Then it's in.

1    (Government's Exhibit No. 1F1 was received in evidence.)

2  BY MR. KROMBERG:

3  Q.   Take a look at 1F1.  Do you recall -- do you recognize this?

4  A.   It seems like one of the LET posters along the lines

5  that I -- because when Ibrahim Hamdi came back and I went to his

6  home once, he brought out lot of posters, color posters that he

7  brought with him back from LET, and so I saw -- I remember seeing

8  those posters.

9         And also, when I myself went abroad to one of those

10 camps later in 2001, I saw something similar along these lines.

11 Q.   Well, let me ask you, can you read what is written on

12 these -- on this poster and translate it for us into English?

13 A.   It's -- this poster is almost all in Urdu.  The big, the big

14 yellow thing, it says literally, it means American world order at

15 the tip of my shoe.

16         THE COURT:  I'm sorry, it means what?

17         THE WITNESS:  America world order at the tip of my shoe.

18 BY MR. KROMBERG:

19 Q.   And literally, what would that -- could you translate more to

20 idiomatic English?

21 A.   It's something like hell with American world order or I give

22 two boots to American world order, something like that.

23 Q.   Okay.  How about the language at the upper left?

24 A.   That's a piece of poetry.  The first line says, "Go light or

25 go heavy."  And the second line says, "Whatever your preparation,

1  go." /

2  Q.  Now, circling -- do you recognize what I'm circling?

3  A.  It looks like an AK-47.

4  Q.  Is that a symbol of the group?

5  A.  I recall the symbol being similar.  I don't know if this is

6  exactly the symbol.

7          MR. KROMBERG:  Can we look at 1F2, please?

8  Q.  Do you recognize that one?

9  A.  Yeah, that's a similar poster.

10 Q.  Okay.  First, what does that say in red near the top?

11 A.  The thing on the right, which is short two lines, it says

12 "Red Fort, Delhi, and Srinagar Airport."

13 Q.  Now, the Red Fort what?

14 A.  The "Red Fort, Delhi," which is the capital of India, and

15 just below it in a smaller font, it says "and Srinagar Airport."

16 And then it says in the front, in the center, until the end, it

17 says, "A martyrdom attack by the mujahideen of Lashkar-e-Taiba."

18          MR. YAMAMOTO:  Your Honor, can we get a clarification as

19 to where these items are coming from?

20          THE COURT:  I think you're going to need to probe that

21 down the road unless this witness knows.

22          Ask this witness.

23 BY MR. KROMBERG:

24 Q.  Well, do you know where this particular exhibit came from?

25 A.  No.

1  Q.   Have you seen a poster like this at either Ibrahim Hamdi's

2  house or in your travels in Pakistan?

3  A.   I'm not sure if I've seen this exact poster, but I've seen

4  posters similar in nature at Ibrahim's home and when I traveled

5  abroad.  When I traveled abroad, it wasn't exactly a poster.  What

6  I saw was something similar in nature but not, not a poster.

7              MR. KROMBERG:  Judge, we're going to have another

8  witness actually tell us --

9              THE COURT:  All right.

10             MR. KROMBERG:  -- where this particular one came from.

11             THE COURT:  All right, we'll leave this open for now.

12             MR. KROMBERG:  Okay.

13  Q.   Now, I'm circling the flag on the upper left.  Do you

14  recognize that?

15  A.   That looks like an LET flag.

16  Q.   Okay.  And the building that's depicted there, do you

17  recognize that building?

18  A.   That's the Red Fort, a historical building in India, Delhi --

19  at New Delhi.

20  Q.   What significance does the Red Fort have for the

21  Lashkar-e-Taiba?

22  A.   It's, it's one of the biggest buildings constructed by Mogul

23  emperors, who were the historical rulers of India, and so a lot of

24  times, India government does, they'll, like, show a stage, like,

25  big Independence Day event there, and there's also people say

1   there's some -- because there's a similar fort in Pakistan, also,

2   and they also have underground cells or something, and some people

3   say that a part of it is a military complex, also.

4   Q.   Was there any military action involving the Red Fort and

5   Lashkar-e-Taiba?

6   A.   Sometime, I don't remember the year, maybe 2000 or '99, they

7   staged an attack on this building.  That's, that's probably what

8   the poster refers to.

9   Q.   And on the bottom right, what I've just circled, can you make

10  that out, what that is?

11  A.   It's like a MiG plane in flames or fire, something like that.

12  Q.   Is that a picture that's described about the airport that you

13  talked about in Srinagar?

14  A.   Yes.

15  Q.   What was the attack on the airport in Srinagar?  Who did

16  that?

17  A.   That was also one of the LET operations.

18  Q.   Okay.  Now, the Red Fort is called a fort.  How old is it?

19  A.   Many centuries.

20  Q.   Is it a -- do people visit it as a landmark?

21  A.   Yes.

22  Q.   Take a look, if you would, at 1F3.  On the upper left, is

23  that the LET flag?

24  A.   That's correct.

25  Q.   What I've just circled, some writing, can you translate that?

1  A.   It says "Mujahideen of Lashkar-e-Taiba."

2  Q.   Is that in Arabic or in Urdu?

3  A.   It seems to be in Urdu, although Arabic would be very similar

4  probably.

5  Q.   Okay.  And what does it say on the bottom right?

6  A.   The first line says that we saw Russia disintegrating

7  yesterday, and now we'll see India break up.  And the next line

8  says, "Then by the flames of the bolt of jihad, we'll see America

9  and Israel burning."

10 Q.   America and Israel burn?

11 A.   That's correct.

12 Q.   Let's go to 1F4.  Upper left, Lashkar flag?

13 A.   Yes.

14 Q.   Okay.  Can you read what's written on the left side?

15 A.   It says, "Mujahideen of Lashkar-e-Taiba."

16 Q.   And on the upper right?

17 A.   It says, "All you who believe, don't take Jews and Christians

18 as friends."

19 Q.   And in the center, by the boot on the flag?

20 A.   It's again a piece of poetry.  The line first says, "We, the

21 sons of Ghauri and Ghaznawi, will keep on moving forward," and the

22 next line says -- literally it says, "We'll bang brick with brick

23 of American criminals" or "American thugs," something like that.

24 Q.   Brick by brick what?

25 A.   "We'll bang the brick with brick of American criminals" or

1  "American thugs," something like that.

2  Q.   American criminals and American terrorists?

3  A.   Criminals or thugs, something like that.

4        THE COURT:   Thugs, thugs.

5        MR. KROMBERG:   Thugs, I'm sorry.   Thank you.

6  Q.   1F5?   Can you read for us the writing on the left I've just

7  circled?

8  A.   "Mujahideen of Lashkar-e-Taiba."

9  Q.   And on the bottom?

10 A.   It says, "Holding the flag of Dawah" -- which means call to

11 Islam -- "and jihad."   The second line says, "We are awake.   We

12 are ready."

13 Q.   And Dawah, D-a-w-a --

14 A.   "H" you can put

15 Q.   -- is Dawah?

16 A.   Yes.

17 Q.   Call to Islam?

18 A.   Call to righteousness or call to Islam.

19 Q.   Okay.   And could you read what's on the upper right?

20 A.   The top right says, "Bis millah e rehman e rahim," which

21 means in the name of God.   God is most beneficent and most

22 merciful, and the yellow is a verse of Koran, and the red seems to

23 be a translation in Urdu.

24 Q.   And what is the verse of the Koran?

25 A.   It's something along the lines, I mean, I can't really make

1   out the Urdu, but it's -- this verse says -- and that's my own

2   rough translation -- it says, "Oh, Prophet, encourage the

3   believers for fighting."

4   Q.   And just the main flag there, is that the same Lashkar flag?

5   A.   Yes.

6   Q.   What I'm circling, is that a knife there?

7   A.   Looks like so, yeah.

8   Q.   What do you see, a grenade?

9   A.   Probably.  I can't make it out here.

10  Q.   All right.  Let's go to 1F6, please.

11       Lashkar flag?

12  A.   That's correct.

13  Q.   Can you read what I've just circled?

14  A.   This is again a verse of Koran, and the big red in the bottom

15  is Urdu translation.  It's something along the lines that such is

16  the cure of disbelievers or this is the cure of disbelievers,

17  something like that.

18  Q.   And it's obviously an American flag.  Below the American

19  flag -- for some reason, I -- oh, there we go -- what flag is that

20  that's burning between the burning American flag and the burning

21  Israeli flag?

22  A.   It's an Indian flag.

23  Q.   Indian flag.

24       On the very far left, do you recognize that patch?

25  A.   It seems to be LET logo in the arm of the person depicted

1  here.

2  Q.  Okay.  Thank you.

3       Now, I'd like you to, I'd like you to look at 7F3 --

4  7F3a.

5       THE COURT:  Hold on a second.  Has that one been --

6       MR. KROMBERG:  It's a newspaper article.  I think we've

7  agreed that it's -- 7F3a.

8       Judge, I think we have to approach on it.

9       THE COURT:  All right.

10      (Bench conference on the record.)

11      THE COURT:  Mr. Yamamoto, we're going to get all mixed

12  up.  The defense needs to come around this way.  All right.

13      MR. KROMBERG:  Judge, what this is is a printout from

14  the ABC News website.  We have the video, but I wasn't going to

15  play the video because I felt that was the wrong time to play the

16  video.

17      THE COURT:  Is this the one we saw in the other case?

18      MR. KROMBERG:  Correct.  But the only thing I wanted was

19  for the line on there that says, "Yesterday we broke the Soviets.

20  Today we break the Americans."  I might have gone over that.  But

21  I wanted to ask the witness whether he had seen that particular

22  slogan during his time at Lashkar.

23      THE COURT:  Any objection to that?

24      MR. YAMAMOTO:  Well, he doesn't need the, the exhibit

25  for that.  He can just ask him.

1              THE COURT:  Just ask him it that way.

2              MR. KROMBERG:  Okay.  Then I have to go get the

3    exhibit --

4              THE COURT:  All right.

5              MR. KROMBERG:  -- myself.

6              THE COURT:  All right.

7              (End of bench conference.)

8              MR. YAMAMOTO:  Your Honor, while the government is doing

9    that, I'd like to ask a question with regard to the posters, the

10   number of posters we just saw.  It's my understanding that the

11   government is going to have somebody testify as to the source of

12   those posters.  Is that right?

13             THE COURT:  Is that correct, Mr. Kromberg?

14             MR. KROMBERG:  Correct.

15             THE COURT:  All right.

16             MR. YAMAMOTO:  And the source being something other than

17   Dr. Al-Timimi's house?

18             MR. KROMBERG:  We agree that none of this came from --

19   that this did not come from Dr. Al-Timimi's house.

20             MR. YAMAMOTO:  Thank you.  I appreciate that.

21             THE COURT:  All right.

22   BY MR. KROMBERG:

23   Q.   Mr. Aatique, during your time in Pakistan at the LET camp,

24   which we'll talk more about, did you come across the slogan of LET

25   that yesterday we broke the Soviets; tomorrow we break America?

1 | A.    I don't remember seeing it there.

2 |        THE COURT:  I'm sorry, you do or do not?

3 |        THE WITNESS:  I do not.

4 |        THE COURT:  Do not, all right.

5 | BY MR. KROMBERG:

6 | Q.    Do you recall -- well, if I might have just a moment?

7 |        THE COURT:  Yes.

8 |        While they're talking, remember what I told you at the

9 | beginning of the trial, Ladies and Gentlemen.  If a lawyer makes a

10 | statement in a question, if the witness says, "I don't recall,"

11 | then you erase the question from your mind, because the question

12 | is not in any respect evidence unless a witness says, "Yes, that's

13 | what happened," or, "No, that's not what happened."  But, I mean,

14 | be careful to keep that distinction.

15 |        All right.

16 |        MR. KROMBERG:  Judge, there are two more posters I want

17 | to show that are at 7F9a, and I'd like to bring them up before the

18 | witness so that the witness can explain to us what they say.

19 |        MR. YAMAMOTO:  Again, I'd like the source of the

20 | posters.  I think these posters are not from Dr. Timimi, but

21 | they're from sources that the government has found.

22 |        MR. KROMBERG:  This one is from the New York Times in

23 | October 2000, Judge.

24 |        THE COURT:  Well, again, I don't want you testifying,

25 | but the point is neither of these two documents came from the

1  defendant; is that correct?

2         MR. KROMBERG: Correct. And the New York Times part,

3  though, the government -- we've stipulated that's an authentic

4  copy of the New York Times, which is a self-authenticating

5  document under Federal Rule of Evidence 902 maybe.

6         MR. YAMAMOTO: I think what the government has is some

7  posters with some Urdu writing that Mr. Aatique is able to read,

8  and so they want that translated to give the jury a flavor of the

9  LET propaganda and what LET is --

10        THE COURT: All right. And there's no objection to

11  that, is there?

12        MR. YAMAMOTO: I don't object at this point, Your Honor.

13        THE COURT: All right.

14        MR. KROMBERG: Your Honor, we're not putting the article

15  in for the truth of what's in the article. We're putting it in

16  for the fact that these posters were there in the New York Times

17  on a particular day reflecting the following things.

18        THE COURT: All right, we can always redact the exhibit

19  since the text would not appear to be at least at this point

20  necessary.

21        MR. KROMBERG: Correct, Judge.

22        THE COURT: But the masthead for the date of the article

23  and the particular photographs would be apparently what is

24  relevant --

25        MR. KROMBERG: Thank you, Your Honor.

1          THE COURT:  -- and so I'll have you redact that exhibit.

2     That's 7F9a?

3          MR. KROMBERG:  Correct, Judge.

4          THE COURT:  All right.

5          MR. KROMBERG:  Can you bring up 7F9a?

6          THE COURT:  In other words, when this goes to the

7     jury -- it's going to be shown now because the text isn't

8     critical.  Ladies and Gentlemen, don't worry about reading it.

9     We're just going to look at the picture and the date of the

10    article.  That's all that's relevant.

11         MR. YAMAMOTO:  The article itself is outside of the time

12    frame of the conspiracy.  It predates the conspiracy by

13    approximately a year.

14         THE COURT:  Well, but in any case, we'll look at the

15    photograph only.  The text will not go to the jury when the jury

16    goes to deliberate, and they're not going to pay attention to it

17    now, all right?

18         MR. KROMBERG:  Thank you, Your Honor.

19         THE COURT:  All right.

20         MR. KROMBERG:  Can you enlarge the photo -- I mean,

21    the --

22         THE COURT:  There's no dispute about the date.  What's

23    the date of this article?  Do we have it?

24         MR. KROMBERG:  October 10, 2000, Judge.

25         THE COURT:  All right.

1  BY MR. KROMBERG:

2  Q.  Mr. Aatique, can you tell us what the, what the writing is on

3  that LET poster?

4  A.  That's an Urdu piece of poetry.  It says, the first line

5  says, "Don't negotiate.  Attack."  And the second line says, "Rip

6  the chest open of disbelief," something like that.

7  Q.  "Rip the chest open of disbelief"?

8  A.  Yeah, "Cut open the chest," something like that.

9  Q.  Okay.  Can you see what the one on the right says, or is that

10 too, too faded?

11 A.  I can sort of see.  On the top or on the bottom?

12 Q.  Either one.  You tell us.

13 A.  The top is again, like, a poetic two phrases.  The first line

14 says, "Yesterday, Pakistan was born," and something like, "and the

15 map of India changed."  And the second line says, "How many new

16 Pakistans will we see arise?"

17 Q.  Okay.  Thank you.

18         In the -- we'll leave the posters for a bit.  You can

19 take it off.

20         In the summer of 2001, what was your attitude regarding

21 LET?

22 A.  In the, in the summer, I started thinking about going there

23 for getting training myself.

24 Q.  Why did you -- why were you thinking about going to LET to

25 get training yourself?

1 A.   The fact that Ibrahim Al-Hamdi came back and described what

2 he saw and his training had a great impact on me, and I decided I

3 should also go there.

4 Q.   How did you arrange to get to LET?

5 A.   Ibrahim told me that he has been authorized to act as a

6 reference if more people want to go through him, so I think I was

7 talking to Yong Kwon about that, and he said, "Well, why don't you

8 talk to Ismail Royer?  He's the main guy," something like that.

9 Q.   So what did you do?

10 A.   So I contacted Ismail, and he said, "Yes, I can give you the

11 reference and the means to contact them."

12 Q.   What did, what did Royer do then?

13 A.   After having this conversation with him, he invited me to a

14 dinner at his home, I think, in August of 2001, and when I was

· 15 there, he, he wrote up a sort of reference letter for me, and he

16 also called the group to, to let them know about me and when I

17 might be there, and he also gave me a phone number to contact them

18 once I was in Pakistan.

19 Q.   Whatever happened to that letter?

20 A.   Oh, I destroyed that before I left America in the third week

21 of September.

22 Q.   When did you arrange -- when did you make your plans to, to

23 actually leave?

24 A.   Well, my plans were, like, in the making in late July and

25 August, and that's how I could tell him the dates so that he could

1  tell those people on the phone when to expect me, but as far as

2  actually buying the tickets, first week of September.

3  Q.  What was the date that you had planned in the summer of 2001

4  to actually be there at Lashkar camps in Pakistan?

5  A.  To be there at the camps, something around on the 20th of

6  September.  I was supposed to fly out of here on the 19th of

7  September, and after few days with my family, I was thinking of

8  being there, like, a week or so.

9  Q.  On September 11, what was your emotional state?

10  A.  My first impulse was a fear and caution about myself.

11  Q.  Why?

12  A.  Because I saw what was happening, and I saw people already,

13  like, agitated and shocked, and so I was thinking of that, that, I

14  mean, since I look like a Muslim and people know me to be, so it

15  might be that somebody may do something, something stupid.

16  Q.  On 9/11, what did you think about your plans to leave in

17  approximately a week to go to Lashkar-e-Taiba?

18  A.  I became sort of dicey about -- because the news focused so

19  much on that area and what was happening there and all these type

20  of groups operating in Afghanistan and Pakistan, that I became, I

21  became shaky whether when I go to -- because I have to go to

22  Pakistan anyway because I was going there to get my family back

23  with me.  My family was there since -- my wife and children were

24  there since two or three months in the summer, and I also had to

25  attend my brother-in-law's wedding.  So I was thinking when I go

1  there, should I go to the camp, or should I skip the camp

2  excursion and just go to my family and go back with them.

3  Q.   How did it happen -- okay.  Strike that.

4          Who, if anyone, among your Dar al-Arqam friends did you

5  speak to after 9/11?

6  A.   There was one weekend between 9/11 and the day I was going,

7  so I called Ismail Royer, I think.  I'm not sure if I called

8  Ismail Royer or Yong Kwon.  I think I called Ismail Royer and

9  ended up talking to him, and I wanted to get an idea of what he

10  might advise, but instead of advising me of anything, he just

11  asked me to drive down to Virginia and come to Yong Kwon's home.

12  Q.   Why did you agree to drive from Philadelphia to Virginia to

13  go to the meeting at Yong Kwon's house?

14  A.   I wasn't exactly living in Philadelphia.  It's a place

15  slightly northwest of it, maybe 20 more miles.

16          So he was being slightly forceful without saying it, and

17  also, since I was alone, I mean, my family wasn't there, so it

18  wasn't a big deal for me, so I just hopped in my car and drove up.

19  Q.   What were you hoping to accomplish by coming to the meeting?

20  A.   I really had no idea because he just said, "Do you want to

21  come down?  It's better if you come down," something like that.

22  Q.   At that time when you're driving down, what were your plans

23  about going to the Lashkar camp?

24  A.   I was thinking that I'll be able to talk to him more in

25  detail about what he advises, does he advise me to skip going

1  there or what does he say, that should I keep on going.

2  Q.   What day of the week was this meeting?

3  A.   It was the weekend -- my recollection is that it was probably

4  Sunday.

5  Q.   Why do you say it was Sunday?

6  A.   That's because after the meeting, when I was driving back

7  late in the night, I had this feeling that I'll have a tough time

8  going to work tomorrow.  It was, like, one or two when I was

9  driving back.

10  Q.   When you got to Kwon's house, who came -- who was there at

11  that meeting?

12  A.   When I reached there, either at that time and also shortly

13  thereafter, a lot of people came, like, most of them were the

14  regular paintball players.

15  Q.   Such as who?

16  A.   I remember Yong Kwon himself, Ismail Royer, Masaud Khan,

17  Hammad Calipha, and I think Hasan.

18  Q.   How about Ali Timimi?

19  A.   He showed up later, maybe an hour later, something like that.

20  Yong Kwon came and came back with him.

21  Q.   When you say Yong Kwon came and came back with him --

22  A.   No, I meant after we were there, he left, and after a while,

23  he came back with him.

24  Q.   How about Nabil Gharbieh?

25  A.   Nabil showed up a bit later with somebody we did not know,

1  and he just left after two minutes.

2  Q.  How would you characterize the emotional state of the

3  individuals at that meeting on September 16?

4  A.  Most of the people were quiet and, like, I would say, tense

5  and, I mean, that's before he spoke.

6  Q.  Right.  When he spoke --

7          THE COURT:  Let's not use pronouns.  Who are we speaking

8  about?

9          MR. KROMBERG:  Sorry.  Thank you, Your Honor.

10  Q.  What, if anything, was done regarding the curtains that

11  night?

12  A.  Before he spoke, he had the curtains --

13  Q.  Before who spoke?

14  A.  Before Ali Timimi spoke, he had the curtains closed and the

15  phone cords pulled out.

16  Q.  Why did you unplug -- why were the phone cords unplugged?

17  A.  As I understood it, so that it cannot be electronically

18  monitored, if somehow the phone can be used for this purpose.

19  Q.  What, if anything, did Timimi say about whether you should

20  repeat outside of the group what was said that evening?

21  A.  He said that a meeting is an amana, which is one of the

22  sayings of the Prophet, which means that, I mean, something like

23  that a meeting is a trust, which is that it's not supposed to be

24  spoken outside unless it's meant for, meant for this purpose.

25  Q.  What did Timimi say at the meeting -- and I want to divide

1 this up, if I could, to before Nabil Gharbieh came, when Nabil

2 Gharbieh got there, and after Nabil Gharbieh left. So what did he

3 say to start off, do you remember?

4 A.   Nabil came in the very beginning, and I'm not exactly sure I

5 can recall what was said before and after him. While he was

6 there -- I don't know what was said before, but while he was

7 there -- I can't place exactly when he came. I remember quite a

8 bit of the discussion but not the -- I know he came in the

9 beginning, but I'm not sure exactly what was said before or what

10 was said after him.

11 Q.   What did Timimi do when Nabil came in with a guy that you

12 didn't know?

13 A.   He kept on talking, but the nature of his talk was different

14 from what he said afterwards, when he had left.

15 Q.   And how so?

16 A.   After Nabil had gone, he talked about 9/11 and its legitimacy

17 and what we should be doing as Muslims.

18 Q.   Okay. What did he say -- without regard to whether it was

19 before Nabil was there or after Nabil was there, what did Timimi

20 say to you at that meeting?

21 A.   In general, he said that these -- I mean, of course, people

22 asked questions and something like that happened, but in general,

23 he said that these attacks are Islamically legitimate and that

24 Muslims -- I mean, he encouraged us to go and, and participate in

25 the coming, coming fighting and coming jihads.

1  Q.   What did he say was the reason why the attacks were

2  legitimate?

3  A.   He said something along the lines -- because this question

4  was asked, I think I had asked this question, because the way it

5  happened initially, everybody asked one question.  He asked

6  everybody to ask one question, and then he was going to answer

7  them when we were sitting in the form of a circle, and I had asked

8  this question: "How can this be justified?"

9           And he had, he had said that, that since U.S.

10 civilians -- either he said -- since the taxpayers fund the U.S.

11 government and the U.S. government is at war with Islam and

12 Muslims, or something like that, the U.S. civilians elect and

13 support the government.  I'm not sure exactly what he said.  It

14 was one of the two things, but he said something along those

15 lines, so that's why they're legitimate targets.

16           MR. YAMAMOTO:  I'm not sure he's answering the question.

17 He's not sure of what he said so --

18           THE COURT:  Well, I think he's giving people the gist of

19 what was said, but you can probe that on cross examination.  So

20 everyone knows this is not verbatim.  This is -- can you quote

21 what was said that night?

22           THE WITNESS:  I'll quote when I can.

23           THE COURT:  All right.  So I'm not going to sustain the

24 objection.  Go ahead.

25           MR. KROMBERG:  Thank you, Your Honor.

1  Q.   So you asked him a question, "Can this be justified?," and he

2  said it could be justified for the reason about either taxpayers

3  or civilians?

4  A.   Yeah.  He just said that it is right because these people are

5  combatants, and then -- because they are not civilians; they're

6  combatants, and he said that -- probably he said that this is

7  because they fund the government, which is at war with Muslims and

8  Islam, and -- or he said that they are the support -- elect and

9  support the government, something like these two things.

10 Q.   Did you challenge that answer?

11 A.   No.

12 Q.   Why not?

13 A.   At that time, I accepted what he was saying, and nobody else

14 did -- nobody, nobody else challenged.

15 Q.   Did you ask him more than one question?

16 A.   The way the meeting progressed was that when he came, people

17 start talking, something like that, and he said, "Okay.  I mean,

18 everybody ask one question.  Then I'll start speaking."

19       So people were sitting in the form of a circle.  So

20 everybody asked one question.  Then he talked for a while, and

21 then there was -- I think there was general discussion later on.

22 Q.   Do you recall what his first words were after everybody got

23 their one question?

24 A.   He said -- and that I can almost recall verbatim -- he said,

25 like, "Now you're going to see the signs and the promises come

# Aatique - direct

1  true," something like that.

2  Q.  What promises and signs?

3  A.  My understanding was in the context of what he had been

4  saying before, like, before that day, for about a year, he had

5  taught a course in Dar al-Arqam which was about The Signs of the

6  End of Times, which was the title of the course.

7          And also, I had a lecture tape from him from before,

8  much before, which was "The New World Order" tape, and I

9  understood what he was saying in the context of those two things,

10  that the signs and the promises means that this is the -- that we

11  are approaching the end of time and the battles near the end of

12  time and the promise for the truth.

13  Q.  Who was going to lose the battle?

14  A.  People fighting Muslims.

15  Q.  Did -- how were they -- how did he, Al-Timimi,

16  characterize -- what words did he use to characterize the people

17  fighting the Muslims?

18  A.  Kufar, disbelievers.

19  Q.  Kufar is K-u-f-f-a-r?

20  A.  That's how you can approximate that in Arabic -- in English,

21  I mean.

22  Q.  And the disbelievers include who?

23  A.  Anybody who's not a Muslim.

24  Q.  What, if anything, did Al-Timimi say about a coming battle?

25  A.  He, he was speaking that the battle in Afghanistan is

1   imminent and that the Americans are going to attack, and next
2   thing which I'm saying, I can't recall him verbatim, but I got the
3   impression as he was saying about the signs and promises being
4   true, that this will be a start of the end of time battles, a
5   conflict global in nature.
6           And another thing he had said along these lines was that
7   he said the battle would be centered around three places mostly.
8   He said Palestine, Arabia, and the south Asian region.
9   Q.   What had Timimi previously said before 9/11 to your knowledge
10  regarding the Taliban?
11  A.   Two instances I remember.  One was a lecture he gave about
12  the, when the event happened about the statues being destroyed.  I
13  think that was early 2000 probably.
14  Q.   The giant statues of Buddha in Afghanistan?
15  A.   Yes.
16  Q.   Okay.  And what did Al-Timimi say about that?
17  A.   He had given a lecture in Dar al-Arqam, and he was saying
18  that because there was, there was some controversy among Muslims
19  about what they did was right or wrong, and he had supported their
20  action in his lecture.
21          MR. KROMBERG:  Could we bring up Government 10J7,
22  please?
23          THE COURT:  Is there any objection to 10J7?  No
24  objection?
25          MR. YAMAMOTO:  No, Your Honor.

1        THE COURT:  All right.

2   BY MR. KROMBERG:

3   Q.   Okay.  Can you focus --

4        THE COURT:  For the record, 10J7, you're moving it in?

5        MR. KROMBERG:  Yes, Judge.

6        THE COURT:  I mean, you're showing it to the jury, so --

7        MR. KROMBERG:  Yes, Judge.

8        THE COURT:  All right.

9        (Government's Exhibit No. 10J7 was received in

10  evidence.)

11       MR. KROMBERG:  Move it up so you only focus on the first

12  couple paragraphs.

13  Q.   Now, Mr. Aatique, you can actually look at the hard copy.  It

14  might be easier for you to look at, look at that to read it.

15  A.   Yes, I have it.

16  Q.   Do you recognize that?

17  A.   I did not see it before I got arrested, this paper.

18  Q.   Right.  But you read it, correct?

19  A.   Yeah, I read it.

20  Q.   Is it consistent with what you recall Ali Timimi saying at

21  his lecture on the Taliban and the statues?

22  A.   Yes, some of it is similar to what he was saying.

23  Q.   Now, I want to point you to the second paragraph, where I'm

24  going to circle on the screen, where it says, "In general, my

25  response when asked is that while I do not have all the facts to

1 say unequivocally that the Taliban represent THE Islamic state of

2 our time and their emir THE emir of the Muslims -- for to do so

3 has its implications on bay'a, hijra, nusra, etc. -- we can say

4 the following: We are obliged to support all that they do which

5 is in agreement with Islam."

6          Is that consistent with what you heard Ali Timimi say

7 before September 11, 2001?

8 A.   That's correct.

9 Q.   Now, can you explain, if you can, what is -- when Ali Timimi

10 writes that the Taliban represents the Islamic state of our time,

11 what does it mean to be the Islamic state?

12          MR. YAMAMOTO: I think he's asking for his opinion at

13 this point.

14          THE COURT: You can only answer that if you've heard the

15 defendant in other lectures talk about "the Islamic state of our

16 time." If he's used that expression before, you've heard him do

17 it, you can explain what has been said, but we don't want your

18 opinion what that means.

19          THE WITNESS: I did not myself hear him talking on this

20 topic, but I came to know indirectly through Yong Kwon that there

21 was a meeting --

22          THE COURT: Wait, wait, wait, wait. I'm going to

23 sustain the objection then. This has to come in in a better

24 format.

25          MR. KROMBERG: Judge --

1          THE COURT:  No.  I've ruled on it, Mr. Kromberg, all

2  right?

3  BY MR. KROMBERG:

4  Q.   What as a Muslim -- how long have you been a Muslim?

5  A.   I was born a Muslim.

6  Q.   What is the amir of the Muslims?

7  A.   Say it again?

8  Q.   What is the amir of the Muslims?

9          THE COURT:  Wait.

10          MR. YAMAMOTO:  If he knows.

11          THE COURT:  Have you ever heard the expression "the amir

12  of the Muslims"?

13          THE WITNESS:  Yes.

14          THE COURT:  All right, what does the word "amir" mean

15  first of all?

16          THE WITNESS:  "Amir" literally means leader, or the one

17  who is in charge.  Historically, the term used to refer to the

18  leader of the Muslims from the times of the Prophet until whenever

19  there was a unified or even a symbolic Muslim leader, to refer to

20  it as the global leader of the Muslims.

21          THE COURT:  A global leader of the Muslims, all right.

22  BY MR. KROMBERG:

23  Q.   So you were at this -- you were at the lecture when

24  Mr. Timimi was speaking about this topic, correct?

25  A.   About the Buddha statues, yes.

1  Q.   And were you there when he was saying that he doesn't have
2  the facts to say unequivocally that the Taliban represent the
3  Islamic state of our time?
4  A.   I don't remember exactly this, this thing being discussed at
5  that lecture.  That lecture was more focused on the Buddha
6  statues.
7  Q.   Okay.  But the statement, "We are obliged to support all that
8  they do which is in agreement with Islam" --
9          MR. YAMAMOTO:  Your Honor, the statement stands for
10 itself.  He's asking him to interpret a statement that he's never
11 seen before.
12         THE COURT:  I agree.  I'm going to sustain that
13 objection.
14         MR. KROMBERG:  Okay.  You can take off 10J7.
15 Q.   Was Bin Laden mentioned at the meeting at Yong Kwon's house
16 on the 16th?
17 A.   Bin Laden?  I don't remember.
18 Q.   How about Al-Qaeda?
19 A.   I am not sure.
20 Q.   Was there any discussion at that meeting about why support
21 the Taliban if the Taliban can avoid getting attacked by turning
22 over Bin Laden?
23         MR. YAMAMOTO:  Is this Dr. Al-Timimi speaking, or is
24 this in general?
25         THE COURT:  I think you need to make the question more

1  precise.

2  BY MR. KROMBERG:

3  Q.  Was there any discussion at that meeting at Kwon's house

4  about why you should risk your life or consider risking your life

5  to protect the Taliban if the Taliban could avoid the war by

6  turning over Bin Laden?

7  A.  He said -- and I'm quite sure about even the words that he

8  used -- something along the lines that although they have problems

9  in how they interpret and implement Islam, but we are Muslims, and

10  they need help, so we should help them.

11  Q.  So when you say "he," "he" is Ali Timimi?

12  A.  Yes.

13  Q.  What had you heard, if anything, Ali Timimi say about Bin

14  Laden before that meeting?

15  A.  That was again, I came to know through Yong Kwon --

16          THE COURT:  No, no, no.  Only -- I'm going to sustain

17  the objection which is about to be made.  Only things that you

18  directly heard the defendant say, not what somebody said the

19  defendant said.

20          THE WITNESS:  Okay.

21          THE COURT:  All right?

22  BY MR. KROMBERG:

23  Q.  Are you familiar with the concept of the Amir ul-Mumineem?

24  A.  I mean, we just talked about it a couple of minutes ago.  The

25  translation is amir of the believers, which is chief of the

1  believers, leader of the believers.

2  Q.  How was the Taliban related to the issue of the concept of

3  the Amir ul-Mumineem, or amir of the believers?

4          THE COURT:  Go ahead.

5          MR. YAMAMOTO:  Again, I'm not sure what -- he's asking

6  for an opinion from this individual.

7          MR. KROMBERG:  Judge, if I can respond, these people are

8  at a meeting listening to --

9          THE COURT:  Well, wait, I don't want a speech in front

10  of the jury.  Look, you can ask the question what did this

11  defendant himself say or ask at the meeting, what did he hear

12  other people say or ask at the meeting, and what he heard the

13  defendant say or respond at the meeting.  That's proper.

14          You can also ask him what he himself has heard

15  Dr. Al-Timimi say at the center or a mosque or any other place.

16  That's proper questions, but none of this other stuff.  You can

17  try to be a little more specific.  If you get an objection about

18  leading, I'll rule on it at that point, but that's the right line

19  of questioning.

20          MR. KROMBERG:  Okay.  Thank you, Your Honor.

21  Q.  The reason that people at the meeting had an obligation to

22  support the Taliban --

23          THE COURT:  No, no, no, no.  I already can tell from the

24  form of that question that's not proper.

25          MR. KROMBERG:  I was trying to lead, Judge.

# Aatique - direct

1          THE COURT: No, but that's not proper. I didn't
2   encourage you to lead.

3          What, if anything, did you hear discussed about the
4   Taliban at that meeting?

5          THE WITNESS: It was clearly discussed that, that the
6   American attack on Taliban was imminent, and it was said that
7   since the -- I mean, it was previously said, that's how the
8   discussion started was since the attacks were justified, so as a
9   result, this attack on the Muslims was unjustified.

10         THE COURT: You've got to slow down just a little bit.
11  It's hard to understand you. Slow down, say that again.

12         THE WITNESS: Okay. It was mentioned that these attacks
13  of 9/11 were Islamically justified and were the correct thing to
14  do because of America being at war with Islam and Muslims, and --

15         THE COURT: Who said that?

16         THE WITNESS: I think I just mentioned a short while ago
17  that Ali Timimi had said that America is at war with Islam and
18  Muslims, so these attacks -- I mean, they are a people which can
19  be classified as combatants.

20         THE COURT: All right.

21         MR. KROMBERG: Maybe I can try a different -- get this a
22  different way, Judge.

23  Q.   What was different about the attacks that were expected to
24  come on Afghanistan after 9/11 versus the wars that were going on
25  in Chechnya or Kashmir before 9/11? Was there anything special

1  about the Taliban within the group that you were in that listened

2  to Timimi's lectures?

3          THE COURT:  Mr. Yamamoto?

4          MR. YAMAMOTO:  That's sort of complicated, and I'm not

5  sure that --

6          THE COURT:  It was incomprehensible.  You're being kind.

7  Let's try it again.

8          MR. KROMBERG:  Thank you, Judge.

9  Q.  What was different about the Taliban -- about support for the

10 Taliban as opposed to support for Lashkar-e-Taiba or support for

11 Khatab in Chechnya in the view of you after 9/11?

12 A.  I would say after that meeting, because the way Ali Timimi

13 had described the events of what had happened and what was about

14 to happen, and he was saying that, I mean, they're being attacked

15 because they are Muslims, and this would be the start -- he said

16 the signs and the promises are going to come true, that this would

17 be the start of a large-scale global conflict.  So he said this is

18 a global-scale thing that is coming.

19          So it's not just Taliban.  It's every Muslim.

20 Q.  Was it a topic of discussion among the folks that you knew

21 from Dar al-Arqam that Khatab was the amir of the believers?

22 A.  Khatab was the amir of the believers?  No, it was never

23 discussed.

24 Q.  How about Hafiz Saeed, the leader of the LET?  Was it a topic

25 of discussion whether he was the amir of the believers?

# Aatique - direct

1  A.  No, it was never discussed.

2  Q.  Was it discussed whether Mullah Omar was amir of the

3  believers?

4  A.   I came to know that it was discussed.

5  Q.  What was the difference between Mullah Omar, Khatab, and

6  Hafiz Saeed about why was Mullah Omar that was discussed as the

7  amir of the believers?

8          THE COURT:  Mr. Yamamoto?

9          MR. YAMAMOTO:  Objection to all that, Your Honor.  He is

10  again --

11          THE COURT:  Yes, the form of the question is simply not

12  proper.  I'm sustaining the objection.

13  BY MR. KROMBERG:

14  Q.  What was different about Mullah Omar that caused him to be

15  considered by some as the amir of the believers but not Khatab or

16  Hafiz Saeed?

17  A.  That's because sometime, I can't put a date on that, maybe

18  2000 or early 2001, there was this meeting in Kabul of all the

19  religious representatives of Afghanistan, different provinces or

20  places, and they elected him as the amir of the believers.

21          THE COURT:  How do you know that?

22          THE WITNESS:  It was all over the news.  I don't know

23  about here, but it was, it was reported in the news.

24          THE COURT:  All right.

25  BY MR. KROMBERG:

1  Q.   Was the fact that it was reported in the news discussed by

2  you with anyone at Dar al-Arqam?

3  A.   Yeah.  I discussed it with Yong Kwon.

4  Q.   What did Timimi say with respect to whether Mullah Omar was

5  the amir of the believers before 9/11?

6  A.   When I -- when this topic came up with Yong Kwon, he told me

7  that he attended a meeting in which --

8         THE COURT:  Wait, wait, wait, wait.  Here we go again.

9  Not what Kwon told you.  Did you ever hear before September 11,

10 did you ever hear Dr. Al-Timimi talk about Omar as the amir of the

11 believers?

12        THE WITNESS:  No.

13        THE COURT:  All right.

14        THE WITNESS:  Not myself directly.

15 BY MR. KROMBERG:

16 Q.   Had you asked Timimi whether you were obligated to obey

17 Mullah Omar because he had declared himself the amir of the

18 believers?

19 A.   No, I did not ask him.

20 Q.   Do you know if any of your fellows asked?

21 A.   Yes.  That's along the same lines, the answer.

22 Q.   That you know that Kwon asked Timimi that?

23 A.   I don't know if he himself asked.

24 Q.   Okay.  So what do you know?

25 A.   I came to know through him that, that other people asked this

1  question.

2  Q.  Okay.  Without going into the answer of what Timimi said, you

3  know the question was asked whether we -- whether you guys were

4  obligated to obey Mullah Omar, correct?

5  A.  Yes.  The --

6          MR. YAMAMOTO:  He didn't hear the answer.  I think he

7  heard this through somebody else.

8          THE COURT:  Right.  That's all he can say, yes.

9          MR. KROMBERG:  He knew the question was asked.

10          THE WITNESS:  Yes.

11  BY MR. KROMBERG:

12  Q.  On the basis of what you heard, did you act differently

13  towards Mullah Omar?

14  A.  I can't say about me in person before 9/11 -- you're talking

15  about before 9/11, right?

16  Q.  Right.

17  A.  I mean, I always, I mean, because I'm from that region and I

18  used to keep up with the news all the time, so I used to, I used

19  to keep an eye out for the news more than you can say any other

20  person, you can say, but as far as my personal attitude towards

21  him, I won't say it made any difference about when I -- I won't

22  say it made any difference when I came to know about that other

23  people asked him this question.

24  Q.  Okay.  We've heard -- can you tell what the term "fatwa"

25  means?

1  A.   It can roughly be translated as a religious ruling in the

2  case where some clarification is needed or some decision is

3  required on the basis of religion.

4  Q.   On September 16, at Kwon's house, did Mr. Timimi speak about

5  a fatwa?

6  A.   Yeah.  He mentioned a fatwa given by a Saudi scholar, Sheikh

7  Al-Uqla.

8  Q.   A Saudi scholar, Sheikh al-Uqla?

9  A.   That's correct.

10  Q.   Is that U-q-l-a?

11  A.   It can be approximately like that in English.

12  Q.   Okay.  What did Ali Timimi say about the, what I'm going to

13  refer to as the Uqla fatwa?

14  A.   He quoted that as an, as an evidence for his position that he

15  was saying that these people are not innocent civilians; these are

16  combatants.

17  Q.   When you say "these people are not" --

18  A.   The people who got killed in the attacks of 9/11.

19  Q.   I'd like you to look at 10J1, and it might be easier to just

20  look at it in the book before you look at it on the screen.

21       MR. KROMBERG:  Actually, before you go to 10J1, go to

22  7A19, if I could.

23       MR. YAMAMOTO:  Which one?  I'm sorry.

24       MR. KROMBERG:  7A19.

25       MR. YAMAMOTO:  Thank you.

1          MR. KROMBERG:  I'm going to ask the witness to look at

2    10J2 as well.

3          THE COURT:  Well, wait.  Was there a question about

4    7A19?

5          MR. KROMBERG:  Not yet, but I just want to give the

6    witness an opportunity to get both documents before him.

7          MR. YAMAMOTO:  Your Honor, we would object to the

8    admission of this document.

9          THE COURT:  Which one?  Because I'm looking at three

10    right now.  7A19 or 10J1 or 10J2?

11          MR. YAMAMOTO:  I'm looking at 7A19.

12          THE COURT:  All right.  And the basis for the objection?

13          MR. YAMAMOTO:  Well, he says he's not moving it in at

14    this point, so --

15          MR. KROMBERG:  I just want the -- I want the witness to

16    look at it and say if it has things in it like what Ali Timimi

17    talked about on that day, in which case then I will move it in.

18    But I agree it's premature at this point.

19          THE COURT:  Well, let's let the witness look at it

20    first.

21          MR. YAMAMOTO:  The document that Dr. Al-Timimi had was

22    in Arabic.  This is an English translation of that document.

23          MR. KROMBERG:  And that's 10J2 is the Arabic, Judge.

24          THE COURT:  I understand that.

25          Well, are you able to look at the Arabic in 10J2 and --

1            THE WITNESS:  I can make out some of it, but I can't --
2   I'm not sure I can read everything.

3            THE COURT:  All right.  But does it appear to be similar
4   to what -- the English translation is supposedly what, 10J1?

5            MR. KROMBERG:  No, no, I'm sorry, Judge.  The English
6   translation is 7A19 --

7            THE COURT:  All right.

8            MR. KROMBERG:  -- and the Arabic is 10J2, and I'd like
9   the witness to look at them.

10           THE COURT:  Yes, but 10J1 is almost the same thing.

11           MR. KROMBERG:  Defense objected to 10J1 on the grounds
12  that it has --

13           THE COURT:  Well, wait, I don't need to hear all of that
14  right now.

15           MR. KROMBERG:  Well, we're not using 10J1 because we
16  replaced it with 7A19 because of an objection.

17           THE COURT:  All right.  So we'd like you to look at 7A19
18  and 10J2.  So the first thing is does the English appear to be a
19  translation of the Arabic?

20           THE WITNESS:  The first three lines seems to be the
21  translation of the Arabic text.  The English seems to be the
22  translation of the Arabic text.

23           THE COURT:  All right.

24  BY MR. KROMBERG:

25  Q.   Now, looking at the English, does the English text reflect --

1  is that consistent with what Ali Timimi talked about when he

2  talked about the Uqla fatwa on September 16?

3  A.    Yes.    The, the first paragraph of the answer has things along

4  the lines which are, which are according to what he spoke that

5  day.

6  Q.    Okay.    Did you actually see on September 16 the Uqla fatwa

7  that Ali Timimi had?

8  A.    No, I did not see that.

9  Q.    So you don't know if either of the two documents before you

10 were what he had?

11 A.    I can't be 100 percent certain, but I had come to know about

12 that fatwa through that day and also through the news, so I knew

13 the general idea of what Sheikh Uqla had talked about.

14 Q.    Okay.    Does 7A19, the English version, appear to be the Uqla

15 fatwa that you came to know that Sheikh Uqla issued?

16 A.    It seems along those lines about that second fatwa.    I mean,

17 I was aware of two of his fatwas.    One he gave, I think, before

18 9/11 and one which was during those days just after 9/11.    It

19 seems to be the one given just after 9/11.    I can't be 100 percent

20 sure because I did not read it then, but it seems to be along

21 those lines.

22         MR. KROMBERG:    Okay.    Judge, at this point, we'd move in

23 7A19.

24         MR. YAMAMOTO:    We would object to 7A19 and to 10J2.

25 He's not sure.

 1          THE COURT:  I'm sustaining that objection.  There's not
 2  enough foundation for these to go in, not like this.
 3          MR. KROMBERG:  Okay.
 4  Q.  At the time on September 16, what did Timimi do with the
 5  document that he said was the Uqla fatwa?
 6  A.  I don't --
 7          MR. YAMAMOTO:  Objection to him saying it was the Uqla
 8  fatwa.  I don't think he ever said that.
 9          THE COURT:  All right, go back over that.  Lay a
10  foundation.
11          MR. KROMBERG:  Was -- thank you.
12  Q.  On September 16, was Timimi speaking about the fatwa he
13  called an Uqla fatwa?
14          MR. YAMAMOTO:  Objection.  He didn't call it an Uqla
15  fatwa.
16          THE COURT:  Well, wait, wait, wait, wait, wait.  To your
17  knowledge, was the defendant reading from or holding any documents
18  when he spoke that evening?
19          THE WITNESS:  That's correct.  When he was talking, I
20  don't recall the exact time line, but either later or during the
21  meeting, he was holding the Uqla fatwa.  He took it out from his
22  carry bag or briefcase or whatever it was, and he was mentioning
23  that.  I remember him holding, holding those pages.
24          THE COURT:  Did you actually see the papers yourself?
25          THE WITNESS:  No, not then.

1          THE COURT: But that's how they were referred to?

2          THE WITNESS: Yes. Being the Sheikh Uqla fatwa on these

3   events, this topic.

4          THE COURT: All right.

5          MR. KROMBERG: Thank you.

6   Q.   What happened to -- what did you see happen, if anything, to

7   that piece of paper that you understood to be a copy of the Uqla

8   fatwa?

9   A.   You mean where they went?

10  Q.   Yes, on September 16.

11  A.   I'm not sure if he took it back or he gave it to somebody.

12  I'm not sure.

13  Q.   Okay. Now, when Nabil Gharbieh arrived to that meeting on

14  the 16th, Timimi finished his lecture, correct?

15  A.   I don't think he had really started by that time. It was

16  maybe in the beginning because most of the talk was after he had

17  gone, but when he came, he just finished it off in general words,

18  without talking in specifics.

19  Q.   And then he started up again after Nabil left?

20  A.   Yes.

21  Q.   Okay. Had you ever seen Timimi wrap up a lecture so abruptly

22  as you did that night when Nabil came in?

23          MR. YAMAMOTO: Objection.

24          THE COURT: Sustained.

25  BY MR. KROMBERG:

1  Q.    Have you ever seen Timimi wrap up his lecture when someone

2  walked in and then restart it when someone -- when that person

3  left?

4            MR. YAMAMOTO:  Objection.

5            THE COURT:  No, that's all right now.  There's no

6  editorial comment.

7            THE WITNESS:  No.  That was -- it was obvious the way it

8  happened, especially when he started speaking later on, that it

9  was aborted because of Nabil bringing someone we did not know.

10 Q.    What, if anything, did Timimi say about Nabil bringing

11 somebody you did not know after Nabil left?

12 A.    Something about the brothers need to be more intelligent,

13 something like that.

14 Q.    Where did Timimi say his listeners should go -- at that

15 meeting on September 16, where did he say you should go?

16 A.    He -- the gist or the -- the gist of his recommendation on

17 that day was he, he encouraged the people to go and take part in

18 the fighting, or he also encouraged them to leave, leave America,

19 go with the Muslims, and also, if they can't go to the fighting,

20 then, then leave and live with the good Muslims anywhere -- not

21 anywhere.  He said in one of these three places that he mentioned.

22 Q.    Who are the good -- who did he refer to as the good Muslims?

23 A.    The only one I recall was -- in that discussion was about in

24 Pakistan being the LET folks.

25 Q.    At that meeting on the 16th, what did Timimi say about Mullah

1  Omar?

2  A.   I had -- I seem to remember that he has -- he had quoted out

3  of the fatwa that Mullah Omar had given a call for help and that

4  that's -- we need to help them, but I really just -- I mean, I

5  happened to read the fatwa when I was in the jail, and the

6  portions I saw did not mention Mullah Omar, so I --

7        MR. YAMAMOTO:  Objection to what he's read subsequent to

8  these events.

9        THE COURT:  Yes.  The only issue is what you remember

10 being said, not what you find out afterwards, but what you

11 remember being said.  So what did you remember being said?

12       THE WITNESS:  I had a memory that he, he had mentioned

13 the fact that Mullah Omar has called for the Muslims to help him

14 and that he was quoting it out of the fatwa.

15 BY MR. KROMBERG:

16 Q.   Is that your present recollection today?

17 A.   No.  That's what I was continuing about, that I -- because --

18 Q.   Without going into why your recollection has changed, has

19 your -- has your recollection changed?

20 A.   Yeah.  I'm not sure anymore if he did mention Mullah Omar and

21 his call specifically, just listening.

22 Q.   Do you recall what Royer said about what would happen if

23 Royer went to Afghanistan?

24 A.   Yeah.  That was during the general discussion that happened

25 after he had finished his speaking and the topic of going to

1  Afghanistan come up, and Royer had said something like, "Oh, if I

2  were to go, they might think I'm a spy."

3  Q.   Where was Ali Timimi at when Royer said, "If I go to

4  Afghanistan, they might think I'm a spy"?

5  A.   I think he was present.

6  Q.   What did Masaud Khan say at that meeting?

7  A.   One of the things, I think -- initially, when everybody was

8  asking questions, one of his questions was, "What should we be

9  doing here?"  And later on, he had said something along the lines

10  that people need to go there to Afghanistan because the cowards

11  and the weak-hearted are the first to run away.

12  Q.   What was said at the meeting about whether you could leave

13  before paying off all your debts?

14  A.   Somebody had asked Ali Timimi about the fact that -- and that

15  was, that was in context of just wrapping up and going, leaving

16  the country, going either to fight or just to live among the

17  Muslims, and the questions -- question was asked, "Well, but we

18  have student loans here."

19          So Ali Timimi responded something along the lines that

20  the matter is too big for that.

21          THE COURT:  I'm sorry, what was the answer?

22          THE WITNESS:  The matter is too big for that, which --

23          THE COURT:  The matter is too big for that?

24          THE WITNESS:  Yeah, which means that the student loan is

25  a trivial issue as compared to what we're talking about.

1  BY MR. KROMBERG:

2  Q.   What did you understand was, was different about the current

3  matter versus other matters where you would have to pay off your

4  student loans?

5  A.   He was enforcing the, the magnitude of the situation and

6  enforcing the obligation of trying to help, help the Muslims.

7  Q.   Did you understand that there was some jihadic obligations

8  that one might have that you'd have to pay off your loans first?

9  A.   This, this can be understood as being, I mean, as being a

10  personal obligation, as compared to a communal obligation.

11  Q.   What do you mean by that?

12  A.   Usually there's -- something in Islamic law is that as far as

13  saying that you have to do obligations, they can be communal, and

14  they can be obligatory.  Communal means that if some people in the

15  community perform it, then they're delivered from the point of

16  your full community.  But personal obligation, like the five daily

17  prayers, everybody has to do it.  You can't, you can't have it,

18  somebody in the community do it for whole community.

19         MR. YAMAMOTO:  Your Honor, I think he's, he's not

20  talking about what happened here.  I'm not sure where this

21  community obligation and private obligation is coming from.

22         THE COURT:  Well, I think it came in the context of the

23  obligation to pay one's debts, but you can get into that in cross

24  examination.

25         MR. YAMAMOTO:  Thank you, Your Honor.

1  BY MR. KROMBERG:

2  Q.   If -- is it correct that this was the kind of obligation that

3  it doesn't matter if other people are doing it, but you had to do

4  it, and that's why you had to do it without paying your debts?

5  A.   That's what my understanding was.

6  Q.   What was said at that meeting on the 16th at Kwon's house

7  about a need to get training before you could just go and fight?

8  A.   This topic came up during the meeting about, about getting

9  training, and I don't know if this came up before LET was

10  discussed or after LET was discussed, but --

11  Q.   LET?

12  A.   LET, Lashkar-e-Taiba.

13        And -- so it was later on agreed that, that people will

14  go to --

15        MR. YAMAMOTO:  I'd like to know if Dr. Al-Timimi was

16  there at the time of this discussion, Your Honor.

17        THE COURT:  All right.  And again, I'll ask you,

18  Mr. Aatique, to speak a little bit more slowly.  It is hard for

19  the jury to understand sometimes what you're saying, all right?

20        THE WITNESS:  Okay.

21        THE COURT:  All right.  So first of all, do you know

22  whether the defendant was present when this discussion was going

23  on?

24        THE WITNESS:  You mean the discussion about LET and

25  going to training?

1    THE COURT: Yes.

2    THE WITNESS: I remember him being present for, for this

3  discussion, although I'm sure part of it happened also after he

4  had gone.

5    THE COURT: All right. Well, the portion while he was

6  present, you can tell us what was said while he was present.

7  BY MR. KROMBERG:

8  Q.  What was said to your recollection about the need for

9  training while Mr. Timimi was present?

10  A.  After he had given his talk, this thing came up about -- he

11  was still there -- about going to LET and getting the training,

12  and at that time, I -- as I told before, I had these plans already

13  made up from before. So, so I told him, "Well, I'm already going

14  there." I just happened to have the exact travel arrangements.

15    So I remember other people also discussing this thing of

16  going there.

17  Q.  Why did you say that you were already going there? Why did

18  you tell them in that group that you, that you had already made

19  your plans?

20  A.  It just so happened that, that the whole conversation became

21  like this: Okay, we need to go to LET in Pakistan and get in

22  training, and it just so happened that in the past few weeks and

23  months, that's the exact plans I had. I mean, I even had my

24  travel tickets ready for 19th of September.

25  Q.  Had you concluded before you got to Kwon's house that day

1  that you were definitely going?

2  A.   I had my plans to go from before, but after 9/11, I had

3  become slightly shaky whether, whether I should go or not, and

4  that's one of the reasons that I contacted Ismail Royer and ended

5  up that day at Yong Kwon's home.

6  Q.   So at the time when you said to Mr. Timimi and the others

7  that you're going, had you -- were you still shaky at that point?

8  A.   No.   I mean, after the talk, I decided, okay, I'll go through

9  what I had planned.

10 Q.   Why did you change from being shaky to deciding to go through

11 with your plans?

12 A.   It was the impact of the talk that was given.

13 Q.   What was -- at the time that you were being -- the time of

14 this talk, what did you understand was the relationship between

15 the Taliban and Al-Qaeda?

16 A.   I knew whatever was in the media at that time, that Taliban

17 are giving shelter to, to these people.

18 Q.   Then why would you -- why were you willing to consider

19 fighting -- why would you be willing to consider going to prepare

20 to fight if the Taliban could avoid the war by turning over Bin

21 Laden?

22       MR. YAMAMOTO:  He's not talking anything -- he's not

23 saying anything about the Taliban.

24       THE COURT:  I don't think that -- I'm going to sustain

25 the objection to the form of the question because I think the

1  question has information in it that this witness has not testified

2  to.

3  BY MR. KROMBERG:

4  Q.   Mr. Aatique, did you understand that the United States was

5  going to, was going to go to war in Afghanistan because the

6  Taliban was sheltering Bin Laden?

7  A.   It appeared so at that time, yes.

8  Q.   Why were you willing to consider fighting for the Taliban --

9       MR. YAMAMOTO:  Objection again.

10      THE COURT:  Wait.  Were you at any point thinking of

11  fighting for the Taliban?

12      THE WITNESS:  Personally for me, I never really had any

13  crystal clear idea of, okay, I'm going to go there and fight for

14  anybody, but after the talk, I said, okay, I will definitely go to

15  training and see how events turn out, and if it turns -- if it

16  turns out to be a conflict of this magnitude, then I'll see where

17  I end up.

18      I mean, I was inclined to, to see, okay, I'll go there,

19  and I may go and fight somewhere, but I wasn't 100 percent certain

20  where I go or who I'll fight with.  That's personally for me.

21  BY MR. KROMBERG:

22  Q.   Why -- with that in mind, why would you even consider going

23  off for training to prepare to fight if the fight was about or

24  partly about whether the Taliban was protecting Bin Laden?

25      MR. YAMAMOTO:  He hasn't said he's going to fight.

1      THE COURT: Yes, he didn't say that. I'm going to

2 sustain that objection.

3      I'm not clear, though, why did you want to get training?

4 Why were you at all interested in going to LET?

5      THE WITNESS: I had these plans from before, from the

6 summer of 2001, and as I said before, I mean, personally for me, I

7 like to be militarily trained, I mean, I like military things, and

8 I like to be trained militarily, and to me, it was sort of an

9 extension of the paintball training that we were doing, and it

10 would be a better form of training with live weapons, and also,

11 when Ibrahim Al-Hamdi came back and described his experience, it

12 was very encouraging to the other people there.

13 BY MR. KROMBERG:

14 Q.   If I could follow up, are you referring to -- when you talk

15 about why you wanted to go, is that -- was the motivation the same

16 after 9/11 as before 9/11?

17 A.   After 9/11, it was -- you're talking about me in person?

18 Q.   Yes, you personally.

19 A.   There was this added factor after 9/11 of going there to get

20 in training for taking part in these great events if they

21 transpire.

22 Q.   Before 9/11, when you just answered the Court's question, was

23 there any intention on your part to actually fight anywhere?

24 A.   No.

25 Q.   After 9/11, was there any intention to fight anywhere under

1  some circumstance?

2  A.   Yes.

3  Q.   What impact did what Ali Timimi said to you have on the

4  change from your -- what you were thinking before 9/11 to what you

5  were thinking after 9/11?

6  A.   As he described in this talk and he said that this is, this

7  is a conflict or this is scale that's coming and we as Muslims

8  have to support the Muslims and this will be a start of a

9  global-scale conflict, so I personally saw that if things happen

10  the way they're being described, then I should be ready and able

11  to support Muslims.

12  Q.   How long did Ali Timimi stay at the meeting at Kwon's house?

13  A.   I'd guess maybe an hour, 45 minutes, something like that.

14  Q.   What did he say when he left regarding being overheard in

15  your conversations?

16  A.   He had said in the meeting that don't talk about these things

17  in your homes, in your cars.  Assume that they're electronically

18  monitored.

19  Q.   What was your emotional state after hearing Timimi's

20  presentation?

21  A.   I would say me and everybody in the, in the meeting was

22  excited and charged up.

23  Q.   What happened after Ali Timimi left that day, that evening?

24  A.   Yong Kwon left to drop him off, then he came back, and I

25  think for an hour and two, people mostly discussed logistics about

# Aatique - direct

1  how anybody would go to Pakistan and what to do there, how to

2  arrange tickets, how to get visa, what to carry, something like

3  that.

4  Q.   I take it you drove home that night?

5  A.   That's correct.

6  Q.   When was the next time you saw anybody from that meeting?

7  A.   I drove back home that night, and that was Sunday, probably

8  Sunday night, and my tickets were for 19th.  That was a Wednesday.

9       So I heard from, I think, on Tuesday, I, I had a phone

10  conversation with, I think with Yong Kwon, and he -- and he told

11  me that he's going to drop Masaud Khan at my home on late 18th,

12  Tuesday, because he -- what happened before was when I told people

13  in the meeting that, okay, I already happen to have arrangements

14  to go to LET and I'm traveling on Wednesday 19th, so I had said if

15  anybody can go, then I can drop them off or I can help.

16       So it was in this context that Yong Kwon called me on

17  Tuesday and said that Masaud Khan has, has tickets with the same

18  flight that you're going, and since I had offered a ride, so he

19  said -- but I said, "I can't drive down again.  Someone has to

20  drop him off to Pennsylvania."

21       So that's what he was saying, that we'll drive down

22  tonight to drop him at your home and so that he could go with you

23  tomorrow.

24  Q.   So did they -- did that, in fact, happen, and Yong Kwon drove

25  Masaud Khan to your house?

# Aatique - direct

1   A.    Yes.  Very late in the night between the night of 18th and

2   19th, Yong Kwon came with Masaud Khan and also with Mahmood Hasan,

3   and they dropped Masaud Khan at my place before they drove back

4   early next morning.

5   Q.    What was your understanding of what Masaud Khan's plans were

6   when he was getting on the plane with you to go to Pakistan?

7   A.    My understanding was that he -- after the training, he might

8   go and fight.

9   Q.    What was your understanding of what Kwon's plans were when he

10  dropped off Masaud Khan at your house?

11  A.    When they both -- when Kwon and Hasan dropped Khan off at my

12  home, they were, they were about to leave because they were

13  saying, "Oh, we have our visas due to get back from Pakistan

14  embassy Wednesday morning," because they were trying to leave very

15  early.

16         So, so I told them, I mean, it was, like, very late in

17  the night, after midnight.  So I told them to stay over and go

18  next morning, don't just drive back that late night.  So they

19  stayed over and drove back in the morning of 19th.

20         And so I understood at that point that they are also

21  traveling.

22  Q.    What did you plan to tell Customs and Immigration regarding

23  the reason for your trip if they asked?

24  A.    For me, I mean, I'm a Pakistani citizen, and I have been

25  so -- I wasn't expecting being questioned, but even if questioned,

1  I would tell that I'm going to get my family back and attend my

2  brother-in-law's wedding.

3  Q.   Who did you -- what was -- did you discuss that issue with

4  anyone, what to say to Customs or Immigration?

5  A.   Yeah.  When these guys were at my home, this was discussed,

6  that, that, like, these guys discouraged me from carrying, like, a

7  Koran, or I had some boots with camouflage color.  They

8  discouraged me from taking this so that we don't arouse any

9  suspicion.  And this topic of what to say was discussed.

10 Q.   How did you get to the airport?

11 A.   I -- well, these guys left the morning of 19th.  Then in the

12 afternoon of that day, the 19th, the Wednesday, I drove in my car,

13 and Masaud Khan was with me.  So I drove to a friend's place in

14 New Jersey, a friend from Pakistan, and I had told him the day

15 before I needed a ride to the airport.  So I reached there, and I

16 dropped my car at his place, and he dropped us off at the JFK

17 Airport in New York.

18 Q.   Okay.  I'd like you to take a look at 7C6.

19          And you can put that on the screen, 7C6.

20          THE COURT:  No objection?

21          MR. KROMBERG:  Judge, we have a stipulation.  We just

22 haven't had a chance to read it into the record yet.

23          THE COURT:  All right, that's fine.  All right, it's in.

24          (Government's Exhibit No. 7C6 was received in evidence.)

25 BY MR. KROMBERG:

1  Q.   I'm circling "Super Travel & Tours."  Is that who you got

2  your ticket from?

3  A.   Yes.  These are the people I bought my tickets from.

4  Q.   Do you recognize that as your ticket?

5  A.   Yes.

6  Q.   You got it on the 13th of September?

7  A.   Well, what happened was that they had, they had reserved a

8  seat for me first week of September, but then 9/11 happened, so

9  they printed it out and FedEx'd it after 9/11, but my reservations

10 were made first week of September.

11 Q.   Okay.  Is this your reservation sheet?  It might be easier to

12 look at it in the, in the book.

13 A.   Okay.

14 Q.   Okay.  Is that the, the original itinerary that you planned?

15 A.   Yes.  That's -- yeah.  And I followed all the flights.

16 Q.   You followed what?

17 A.   I mean, I went through this.  It wasn't just no reason, I

18 mean, originally.  I took all these planes on these dates and came

19 back.

20 Q.   Okay.  What did you do when you got to Pakistan?

21 A.   I went to my mother's place, and I stayed there

22 three-four-five days, something like that, and then I took my

23 flight to Lahore as planned.

24 Q.   Where was Masaud Khan during that time?

25 A.   When we reached Karachi, I, I mean, I went to my family, and

 1   I saw him leaving the airport, but I didn't see who he was going

 2   with, but I saw him once at a morning, we got together with his

 3   younger brother two-three days later, and that was a day or two

 4   before I was going to Lahore.

 5   Q.   How did you contact Lashkar-e-Taiba?

 6   A.   Royer had given me that letter in August of that year, which

 7   I had destroyed before traveling, and he had also given me a phone

 8   number in Lahore.  So when I reached Lahore, I used that phone

 9   number to contact the group, and eventually, I reached -- by

10   talking to them, I reached their office.

11   Q.   And that was in Lahore?

12   A.   Yes.

13         MR. KROMBERG:  Can you bring up 7F2?  The parties have

14   stipulated to this.  We haven't had a chance to read the

15   stipulation in.

16         THE COURT:  All right, it's in.  It's a map of Pakistan?

17         MR. KROMBERG:  Yes, Your Honor.

18         (Government's Exhibit No. 7F2 was received in evidence.)

19   BY MR. KROMBERG:

20   Q.   Now -- okay, Mr. Aatique.  On this map, can you tell us --

21   can you circle with your finger even where Lahore is?

22                          (Witness complying.)

23   Q.   Okay.

24   A.   This thing moved.

25   Q.   Okay.  Try it again.

1          (Witness complying.)

2   Q.   All right, thank you.

3          Now, we'll take that off for just a second.  I want to

4   put on 7F2a.

5          THE COURT:  That's also in evidence.

6          MR. KROMBERG:  Thank you, Your Honor.

7          (Government's Exhibit No. 7F2a was received in

8   evidence.)

9   BY MR. KROMBERG:

10  Q.   Can you just explain -- can you circle where Kashmir is?

11  A.   This big red seems to be the map of -- I mean, Kashmir is,

12  depends who you took to what Kashmir is.  Like, some territories

13  in the north which Kashmir has being part of Kashmir, Pakistan

14  doesn't admit them as being part of Kashmir.

15  Q.   Okay.  Where was the -- where were the LET camps that you

16  went to?

17  A.   The ones I saw were in the vicinity of Muzafrabad, which is

18  in the capital of Pakistani-controlled Kashmir.

19  Q.   All right.  Is that on the map that's in front of you now?

20  A.   It must be, but I can't make it out.

21  Q.   Okay.  Let's try it on the other map.  Can you circle where

22  Muzafrabad is on that map?

23  A.   It's not marked.

24  Q.   Right.  About where?  Just put your finger on -- yeah, that's

25  it.

1    THE COURT: So north of Islamabad?

2    THE WITNESS: North-northeast, something like that.

3    THE COURT: Northeast.

4  BY MR. KROMBERG:

5  Q.   Okay. Now, how long -- on this map, while we have it, can

6  you circle what are the disputed areas of Kashmir generally

7  speaking?

8  A.   I mean, this whole territory has been, I mean, is claimed by

9  somebody, so -- by more than one, one country, so -- not this one,

10 but, like, I'd say, this one, some of it is in China, some of it

11 is in India, some of it is in part of Pakistan.

12 Q.   Okay. Thank you.

13       So is it correct that Muzafrabad was right by the

14 disputed areas of Kashmir?

15 A.   It's itself within the disputed area. I mean, this is in the

16 part of Kashmir that Pakistan controls since 1947-'48.

17 Q.   Okay. Thank you.

18       Now, how long were you in Lahore?

19 A.   Two days -- two nights.

20 Q.   And then where did you go from there?

21 A.   They, they had a guide to accompany me to Islamabad.

22 Q.   And how far was Islamabad from Lahore?

23 A.   By bus, it took maybe, like, four hours, four or five hours.

24 Q.   Okay. We have now focused in a little bit. Is that Lahore

25 where I've just circled?

1  A.    Yes.

2  Q.    And Islamabad where I've just circled again?

3  A.    That's correct.

4  Q.    Okay.  How long did you stay in Islamabad?

5  A.    Just a few hours.  I mean, we, we left Lahore very early in

6  the morning, and we reached there by, like, maybe noon.  Then I

7  stayed in an office for, like, three hours maybe, and then another

8  guide accompanied me from there and in the bus to Muzafrabad.

9  Q.    What is Muzafrabad, a town?

10  A.    It's bigger than a town.  It's maybe a small city.

11  Q.    And what -- how long did you stay in Muzafrabad?

12  A.    Overnight.

13  Q.    And where did you go from Muzafrabad?

14  A.    The same day I reached Muzafrabad through a bus from Karachi,

15  I stayed there overnight as a, as a sort of residential camp close

16  to the city, and then next morning, the same guide, I mean, he, I

17  mean, he -- I mean, we went up in a hike into the neighboring

18  mountains from early morning.

19  Q.    And where did you go?

20  A.    A few hours later, maybe four or five hours later, we reached

21  a training camp.

22  Q.    What was that camp called?

23  A.    It was called, I think, Aqsa.

24  Q.    A-q-s-a, Aqsa?

25  A.    It can be spelled like that.

1  Q.   Okay.   What -- could you describe for the ladies and

2  gentlemen of the jury what Aqsa camp looked like?

3  A.   It had sleeping quarters, offices, mosques, training grounds,

4  lecture rooms.

5  Q.   Okay.  How long did you stay at Aqsa camp?

6  A.   A few minutes.  We just basically stopped by there, had a

7  drink or something, and then we kept on moving.

8  Q.   And how -- were you moving on foot at that point?

9  A.   Yes.

10  Q.   And where did you go from there?

11  A.   Like, in maybe half an hour to an hour later, we reached

12  another smaller camp.

13  Q.   What was that called?

14  A.   Masada.

15  Q.   Masada?  What was Masada camp like?

16  A.   It was much smaller as compared to Aqsa.  I mean, it had, I

17  would say, one or two sleeping barracks, a mosque, an office, a

18  kitchen-type structure, a couple of other rooms, toilets.  That

19  was it.

20  Q.   How long did you stay at Masada camp?

21  A.   Four or five days.  Four-and-a-half days to be exact.

22  Q.   What did you do there?

23  A.   They were conducting training there, so I got trained on some

24  rifles, some pistols.

25  Q.   When you say "some rifles," what kind of rifles were they?

1  A.    AK-47, M-16, G-3, some type of Russian machine guns, some

2  hand-held pistols.  I don't recall their names.

3  Q.    Was the AK-47 that you used there automatic or semiautomatic?

4  A.    It was automatic.

5  Q.    And what's the difference between automatic and

6  semiautomatic?

7  A.    An automatic is a weapon that can fire in bursts, and a

8  semiautomatic, which can fire one, one bullet, but it reloads

9  itself automatically.  That's why it's semiautomatic.

10  Q.    When you say that you -- well, let me go back.  During your

11  time at Masada camp when you studied these weapons, did you

12  actually fire them?

13  A.    Yes.  Except for -- one of the rifles had its rounds finished

14  off, so I don't know if it was M-16 or G-3, so I did not happen to

15  fire that one, but I fired all other weapons.

16  Q.    Did there come a time when you trained on a rocket-propelled

17  grenade?

18  A.    During my stay there, and that was after Hasan and Kwon and

19  Masaud Khan had showed up there that we actually -- half of the

20  morning, we traveled back to Aqsa camp, and there we were

21  demonstrated how an RPG works and how, I mean, some details about

22  RPG, but nobody fired that.

23  Q.    At that time, nobody fired?

24  A.    Not at that time.

25  Q.    Okay.  You mentioned you saw some of your friends from

1  Virginia. How did that come about?

2  A.  I had reached Masada camp, as I said, so I think after I had

3  spent two nights there, these guys showed up with a guide, Masaud

4  Khan, Yong Kwon, and Mahmood Hasan. Then they also started living

5  there in the Masada camp, and I left them after two days.

6  Q.  What is Camp ibn Masood?

7  A.  It turned out that my last full day there, and that was

8  before the evening that I left, the instructors took us, we hiked

9  three to four hours, and it was more a vertical hike. We hiked up

10  to another camp, a very big camp called ibn Masood.

11  Q.  Who was at these camps besides you, Kwon, Hasan, and Khan?

12  A.  Different camps were different in nature.

13  Q.  So if you could describe the Aqsa camp, who was at the Aqsa

14  camp?

15  A.  Aqsa camp was all Pakistanis, some of them very young.

16  Q.  Were they trainees or staff of Lashkar-e-Taiba?

17  A.  Every camp had a staff but also trainees, also.

18  Q.  How about at Masada?

19  A.  Masada seemed like mostly for foreigners, I mean,

20  non-Pakistanis.

21  Q.  And ibn Masood?

22  A.  Ibn Masood, I mean, it was -- I saw all kinds of people

23  there, a lot of Pakistanis, but I also met some, it seemed like

24  some foreigners there.

25  Q.  When you were there, what name did you go by?

1   A.   Abu Omar.

2           THE COURT:  I'm sorry, what?

3           THE WITNESS:  Abu Omar.

4           THE COURT:  Abu?

5           THE WITNESS:  Omar.

6           THE COURT:  Omar?

7           THE WITNESS:  Yes.

8   BY MR. KROMBERG:

9   Q.   Why did you use the name Abu Omar?

10  A.   Everybody used a kunya there.  Nobody used their names.

11  Q.   A kunya is what?

12  A.   A kunya in Arab culture is an alternate name.  It's a common

13  thing in Arab culture to use instead of your name.  I mean, you're

14  using it as a sign of respect.

15  Q.   What name did Masaud Khan go by?

16  A.   Abu Ibrahim.

17  Q.   And Kwon?

18  A.   Abu Ubayda.

19  Q.   Is that U-b-a-y-d-a-n?

20  A.   -- d-a, I would say.  I wouldn't put an "N" there.

21  Q.   Abu Ubayda.

22           And Hasan?

23  A.   Abu Qudama or Abu Qatada.  I'm uncertain.

24  Q.   I think you're going to have to spell both of those.

25  A.   Abu Q-u-d-a-m-a or Abu Q-a-t-a-d-a.

1 Q. And did you discuss with any of the LET permanent staff there
2 Royer when you were there?
3 A. They knew that I had come through Royer because when I was in
4 Lahore office, they had a talk with me because they were expecting
5 me. So I had to talk with a couple of people, and they knew, and
6 they had asked me to show them the letter, also, which I did not
7 have at that time.

8      And so when I reached Masada, they seemed to be familiar
9 with Ismail through his kunya.
10 Q. What was his kunya?
11 A. Abu Fatima.
12 Q. What languages were spoken at the camps while you were there?
13 A. Within themselves, the instructors mostly speak Urdu, but
14 they tried to run everything in Arabic because some of the
15 trainees were Arabic, also, and all of their training commands
16 are, exercise command like physical workout, that was in Arabic,
17 but they, they could also get by with broken English.
18 Q. What courses were available to take through Lashkar when you
19 were there?
20 A. When I reached there, I came to know that they have, they
21 have two type of courses, and one of them is, like, the earlier
22 one is a short course, which is, like, a 13 -day course, and
23 another one is a longer version, a 40-day course, four-zero.
24 Q. What is -- do you know what the difference was between the
25 courses other than the length?

1  A.    It was the level of training and the types of things that

2  each -- like, it seems in the shorter course basically that you

3  just familiarize with a few weapons, you fire them, and that's

4  pretty much it, but in the longer version, they teach you a lot of

5  other things.

6  Q.    What training at the Masada camp did you see Kwon, Hasan, and

7  Khan engage in?

8  A.    The two days that I spent with them there -- actually,

9  one-and-a-half days, something like that, because the last day, we

10 were at another place -- the time I spent with them at Masada,

11 they -- the first rifle they taught was AK-47s, so they got

12 started on that in front of me, and I also think they learned a

13 couple of machine guns in front of me.

14 Q.    What firing, if any, did you do at the ibn Masood camp?

15 A.    When we had -- when we were up there the last, my last full

16 day, we had a training on an antiaircraft gun and also on hand

17 grenades, and they made us fire one round in the big antiaircraft

18 gun there.

19 Q.    Where did you fire it at?

20 A.    It was -- a few thousand feet, there was another rising side

21 of a mountain, and we aimed at a tree there.

22 Q.    Did you fire an antiaircraft gun shell?

23 A.    Yes.

24 Q.    Did Kwon?

25 A.    Everybody, everybody was offered one to -- after they

1  familiarized us with the weapon, with the weapon, and everybody

2  fired except for Kwon and Hasan.  I'm not sure, one of them had a

3  bad round or something.  It was getting stuck.

4  Q.  While you were there at the Lashkar camps, what was said by

5  your trainers regarding any fighting in Afghanistan?

6          MR. YAMAMOTO:  Objection, Your Honor.  It's hearsay.

7          THE COURT:  Is it being offered for the truth of its

8  contents?  Then it would be hearsay.

9          MR. KROMBERG:  Okay.

10          THE COURT:  I'll sustain the objection.

11  BY MR. KROMBERG:

12  Q.  How long did you stay at the Lashkar camps?

13  A.  I mean, I was out from my home for seven-eight days,

14  something like that, but at the Masada camp, I basically stayed

15  four-and-a-half days.

16  Q.  And why did you leave at that point?

17  A.  My original plan always was to come back, so eventually, I

18  stayed with my plans.

19  Q.  Well, we talked earlier about how you had one plan before

20  9/11 and then your plans changed after 9/11.

21  A.  Um-hum.

22  Q.  Is it correct that you went back to your original plan?

23  A.  Yes.  Even before I left the U.S., I made up my mind that I'm

24  not going anywhere to fight; I'll come back.

25  Q.  When did you make that -- when did you reach that conclusion?

1  A.    Sometime after I came back from the meeting and before

2  Wednesday.  I mean, in the two-three intervening days.

3  Q.    Why did you reach -- why did you change your mind or change

4  your intention?

5  A.    I just thought it's not for me.

6  Q.    Did you reconsider in any way the value of what Ali Timimi

7  had said to you?

8  A.    I mean, he said a lot of things.  Are you talking about

9  anything specific?

10  Q.    The things that he said on September 16.

11  A.    To me, I mean, the thing that made most impact on me was his

12  statements about 9/11 and its justification.  So I had this thing

13  in my mind that maybe, maybe it is that these attacks are

14  justified.

15  Q.    Did that opinion in your -- did that change in you between

16  the time -- between September 16, when you heard it, and when you

17  decided to come back from Lashkar-e-Taiba?

18  A.    Say it again?

19  Q.    Did your opinion of the, of the propriety of the 9/11 attacks

20  change after you heard Ali Timimi's opinion?

21  A.    Later on, I also came to hear a lot of these conspiracy

22  theories floating on the Internet, and also, whenever I entered

23  this discussion with anybody, I could never, I could never

24  cogently put this in front of them, what Al-Timimi had said.  So I

25  would say I was, I mean, I was rather confused about this topic, I

1  mean, about the exact thing that, okay, this is right, this is not

2  wrong, I stopped entering this argument with people.

3  Q.   Did you ultimately conclude that it was right or wrong?  The

4  attacks, I mean.

5  A.   I mean, I personally believed that it wasn't right.

6  Q.   When did you reach that conclusion?

7  A.   I, I can't put a date on that.

8  Q.   Was it --

9  A.   Much, much later.  I mean, for a period of time, I would say

10  that maybe I was double-minded or confused, but --

11          MR. YAMAMOTO:  I think we're going beyond the scope of

12  this.

13          THE COURT:  I do, too.  I'm going to sustain that

14  objection.

15          MR. KROMBERG:  Okay.

16  Q.   How much had you paid for the training that you received at

17  Lashkar?

18  A.   Nothing.

19  Q.   When you got home back to the U.S. -- when did you get back

20  to the U.S.?

21  A.   7th or 8th of October, something like that.  It's on my

22  tickets.

23  Q.   What contact did you have with Ismail Royer?

24  A.   Because I was living in Pennsylvania, so that's where I came

25  back, and I had no contact with anybody in Virginia, either phone

1  contact or I -- I don't remember -- so what happened was that I

2  got -- after some weeks, I got an e-mail from, from Ismail Royer

3  that he said that I'm in Bosnia, and he said, "I had to travel

4  because the law enforcement came to my home," or, "I got

5  questioned, and that's why I came suddenly, and I couldn't even

6  carry my family with me.  My family is still in Manassas," I think

7  where he was living.

8         And I think we had a couple of exchanges, and then he

9  said that he, he was trying to get a visa to go to Pakistan, and

10 he wanted -- he said he has some money, but he wants to leave it

11 for his family, and he wanted the -- he wanted me to loan him some

12 money.

13 Q.  So what did you do?

14 A.  He had asked for $700 as his -- to be able to travel to

15 Pakistan.  So, so -- and I asked him, "I can give it to you, but

16 how?"

17        So he e-mailed me a bank account and, I mean, his bank

18 and his account number.

19 Q.  Could you take a look at Exhibit 1C3?

20        Don't put it on the screen.

21        If you can just take a look at it in the book?

22        THE COURT:  This will be the last issue because it's

23 6:00, and I want to keep to schedule.

24        MR. KROMBERG:  Yes, Your Honor.

25        THE COURT:  Any objection to this exhibit?

1       MR. YAMAMOTO:  It's his bank statement.

2       MR. KROMBERG:  Okay.  Well, if there's no objection,

3  we'll just put it on the screen.

4       THE COURT:  Just put it on the screen.

5       MR. KROMBERG:  1C3.

6       THE COURT:  It's in.

7       (Government's Exhibit No. 1C3 was received in evidence.)

8  BY MR. KROMBERG:

9  Q.  Do you recognize that?  We're going to make it a little

10 bigger.

11 A.  Yeah.  The amount and the date seems to indicate that this is

12 the amount I withdrew from my account to put in Ismail's account.

13      MR. KROMBERG:  Okay.  Thank you, Judge.  This would be

14 an appropriate time.

15      THE COURT:  All right, at this point, Ladies and

16 Gentlemen, we'll recess.  I have an unrelated matter I have to

17 take up at 9:00.  I expect to be clear by 9:30.  I'd like to start

18 promptly at 9:30.  If it's a few minutes one way or the other,

19 that's because I'm tied up downstairs, all right?

20      But if you'll report to the jury room, and leave your

21 notebooks here.  Get a good night's sleep, remember my cautions,

22 and we'll see you back here at 9:30 in the morning.  We'll recess

23 court until that time.

24      MR. KROMBERG:  Judge, could we have one moment at the

25 bench before the jury leaves?  Because I have something I think

1                    DIRECT EXAMINATION

2  BY MR. KROMBERG:

3  Q.   Good morning, Mr. Aatique.  I think the last thing we talked

4  about was your bank statement reflecting the money that you had

5  sent to Royer, right?

6  A.   That is correct.

7  Q.   Okay.

8          THE COURT:  And just so we're clear, Royer you've also

9  called Ismail; is that correct?  What's Royer's first name?

10         THE WITNESS:  Royer is his last name, and Ismail is his

11 first name, his Islamic first name.

12         THE COURT:  All right, Ismail Royer.

13 BY MR. KROMBERG:

14 Q.   And sometimes he goes by Randall Royer, correct?

15 A.   That was his birth name, I think.

16 Q.   Just to go over the people that we spoke about yesterday, the

17 people at the meeting on the 16th were Yong Kwon?

18 A.   Yes.

19 Q.   Randall Royer, also known as Ismail Royer?

20 A.   Yes.

21 Q.   Masaud Khan?

22 A.   Correct.

23 Q.   Well, I think your pronunciation is "Khan"?

24 A.   Yes, that's correct.

25 Q.   Hammad Abdur-Raheem?

1    A.    That's correct.

2    Q.    Caliph Abdur-Raheem?

3    A.    Yes.

4    Q.    Khwaja Mahmood Hasan?

5    A.    Yes.

6    Q.    Nabil Gharbieh came in later and left with someone you didn't

7 know?

8    A.    Yeah, for a very, very short while.

9        MR. KROMBERG:   How many is that?

10       MR. MAC MAHON:   Seven.

11       MR. KROMBERG:   Thank you.

12    Q.    I think you also mentioned not at that meeting Ibrahim,

13 Ibrahim Al-Hamdi, right?

14    A.    I mentioned him in the context of paintball group and also

15 that he had come from, from an LET camp after his training.

16    Q.    Okay.

17    A.    Not in that meeting.

18    Q.    That was Ibrahim Al-Hamdi?

19    A.    That's correct.

20    Q.    Did you mention Seifullah Chapman?

21    A.    Yes, but he was not in that meeting. He was also, I knew him

22 from the Dar al-Arqam and paintball group.

23    Q.    Okay. And you -- did you mention Idris Surratt?

24    A.    Yes. He was also one of the paintball players, and he was

25 not in that meeting.

1  Q.   Okay.  Was his -- did he also go by Donald Surratt?

2  A.   I think that's his birth name.  Idris is his Islamic name.

3  Q.   Thank you.

4        Okay.  I'd like to ask you about when law enforcement

5  first approached you about your travel to Lashkar-e-Taiba.  When

6  did that happen?

7  A.   8th of May, 2003.

8  Q.   What happened on May 8?

9  A.   They came to execute a search warrant at my home.

10 Q.   And this was in Pennsylvania?

11 A.   That's correct.  Norristown, Pennsylvania.

12 Q.   When they came to do the search warrant at your home, did

13 they ask you to cooperate with them?

14 A.   Yes.

15 Q.   And what did you do?

16 A.   I talked with them and informed them of what I know, all the

17 questions they asked.

18 Q.   What contact did you have with other people from that meeting

19 on September 16, 2001, as a result of your cooperation with the

20 FBI?

21 A.   The FBI came back the next day, and I agreed to make a call

22 to Masaud Khan on their behalf, and also, I came down to Virginia

23 to meet Ismail Royer.  That was, I think, June.

24 Q.   Okay.  Well, let's talk first about the call to Masaud Khan.

25        MR. YAMAMOTO:  Your Honor, this is outside the scope of

1  the conspiracy and also doesn't involve Dr. Al-Timimi.

2          THE COURT:  Well, I don't know where we're going with

3  this yet.  Let me find out if it's -- if it's extraneous, I'll

4  have it stricken, but at this point, I don't think it is.  Go

5  ahead.

6          MR. KROMBERG:  I was going to ask to play the tape of

7  the call with Masaud Khan.  Your Honor, you've heard that call,

8  and it should -- well, I don't know if you want me to say in

9  open --

10          THE COURT:  No.  Is there an objection to the call being

11 played?

12          MR. YAMAMOTO:  Yes, Your Honor.

13          THE COURT:  All right, approach the bench.

14          (Bench conference on the record.)

15          THE COURT:  All right.  Now, the basis for the objection

16 is what?

17          MR. YAMAMOTO:  It's outside the scope of the conspiracy.

18 It does not involve Dr. Al-Timimi.  It's the witness cooperating

19 with the government on behalf of other members, other individuals

20 that they want to target.

21          THE COURT:  Well, evidence of activity post the time

22 frame of the conspiracy is -- can be admissible if it relates

23 back, if it's evidence of intent, knowledge, if it corroborates

24 information of what happened during the conspiracy.

25          MR. YAMAMOTO:  It's not, it's not 801(d)(2)(E) type of

1  information because it's not within the scope of the conspiracy.

2          THE COURT:  Well, remind me as to --

3          MR. KROMBERG:  First, it happened one day after the date

4  in the conspiracy.  That's on or about May 8, and this happened

5  the next day, when Masaud Khan -- when Aatique called Khan and

6  said, remember -- "What should I say?  I'm going to -- what should

7  I say about going to the camp?"

8          And Masaud Khan says, "I don't know anything about any

9  camp."

10          And the tone of Masaud Khan's voice was as interesting

11  as the fact that he was telling -- as him telling, in essence,

12  Aatique to lie and say that he didn't -- and just tell Aatique not

13  to go to the camp itself.

14          MR. YAMAMOTO:  That's got nothing to do with

15  Dr. Al-Timimi.

16          THE COURT:  Well, it has to do with the nature of the

17  conspiracy and whether or not the members of this group understood

18  that what they were doing was against the law.

19          I agree that he's not mentioned, but in a conspiracy,

20  just because the evidence doesn't come in against every

21  coconspirator doesn't mean --

22          MR. YAMAMOTO:  This is no longer part of the conspiracy

23  because he's been arrested and now cooperating.  So it can't be in

24  furtherance of the conspiracy.

25          THE COURT:  Well, is the objection that it's hearsay?

1   What is the objection?

2           MR. YAMAMOTO:  It's hearsay, also, Your Honor.

3           THE COURT:  But this witness is here and can testify as

4   to what he said.  You've got the tape recording.  It says what it

5   says.  A hearsay problem isn't really there.  If he were just

6   recounting the conversation, you might have a problem, but if you

7   can actually hear it --

8           MR. YAMAMOTO:  Well, it still -- it does not have

9   anything to do with Dr. Al-Timimi.  He didn't counsel Khan.  He

10  didn't tell Khan to go to the camps.  He has nothing to do with

11  what Khan is saying or doing.

12          MR. KROMBERG:  Judge --

13          MR. YAMAMOTO:  Khan was not a paintballer.

14          THE COURT:  I think that's argument to be made at the

15  end of the trial, but I think this is adequately within -- it

16  certainly is relevant in my view to the conspiracy because it's

17  these two people talking about core elements of the alleged

18  conspiracy, and I think therefore that it's properly relevant, and

19  I don't think you have a hearsay problem because you've actually

20  got the tape.  So what it was that was said is not subject to the

21  problems of hearsay.

22          So I'm going to go ahead and allow it in.

23          MR. KROMBERG:  Thank you, Judge.

24          (End of bench conference.)

25          MR. KROMBERG:  Mr. Aatique, I'm going to ask you to

1  listen to the following recording, and at the end of the

2  recording, I'd like you to tell the jury whether that, in fact,

3  was a tape recording of the call that you made at the request of

4  the FBI to Masaud Khan.

5          2B2, please?

6          THE COURT:  Exhibit 2B2?

7          MR. KROMBERG:  Correct.

8          THE COURT:  All right.  It is in evidence over the

9  defendant's objection.

10          (Government's Exhibit No. 2B2 was received in evidence.)

11          (Excerpt of Government's Exhibit No. 2B2 was played as

12           follows:)

13          "MASAUD KHAN:  Yes, ah, Aatique.

14          MUHAMMAD AATIQUE:  Hey, hey, Masaud.

15          MASAUD KHAN:  How are you?

16          MUHAMMAD AATIQUE:  How, how are you?

17          MASAUD KHAN:  I'm fine.

18          MUHAMMAD AATIQUE:  Um, um, um, I got raided last day

19  yesterday.

20          MASAUD KHAN:  Yeah, so did I.

21          MUHAMMAD AATIQUE:  Um, um, um, um, they, they, they know

22  everything.

23          MASAUD KHAN:  Yeah.  And I'm sure they're listening on

24  the phone, too.

25          MUHAMMAD AATIQUE:  Ah.

```
 1          MASAUD KHAN:  And, um, and they, they should be
 2   following you around and everything.  But, ah, you know, ah, we're
 3   clean, and, ah, you know that, ah --
 4          MUHAMMAD AATIQUE:  Yeah.  I mean, I mean, ah, I, I, I,
 5   I, I, I, I told them, I mean, they, they -- I told them
 6   everything.
 7          MASAUD KHAN:  Yeah.  Like, yeah, I mean, just tell them,
 8   you know, the truth, and you should be okay.
 9          MUHAMMAD AATIQUE:  Ah, okay.
10          MASAUD KHAN:  So what did you tell them?
11          MUHAMMAD AATIQUE:  Ah, I told them about the paintball
12   and, and, and, ah, about the camp and, and, and, and how we go,
13   how we, how we, how we, how we go there.
14          MASAUD KHAN:  What camp?
15          MUHAMMAD AATIQUE:  Ah, ah, the, the camp?
16          MASAUD KHAN:  Over here?
17          MUHAMMAD AATIQUE:  Ah, there.
18          MASAUD KHAN:  I didn't go to any camp, and, ah, I don't
19   know what you're talking about, but, ah, what you want to do is
20   get a lawyer.
21          MUHAMMAD AATIQUE:  Ah, okay.  Ah --
22          MASAUD KHAN:  Yeah.  'Cause, you know, I went for my
23   legal purposes, and I don't know if you went there or not, but I
24   thought you were going there to visit your family in Pakistan,
25   Karachi.
```

1          MUHAMMAD AATIQUE:  Um, ah, okay.

2          MASAUD KHAN:  Yeah.

3          MUHAMMAD AATIQUE:  Okay.

4          MASAUD KHAN:  You -- by the way, you know, your rights

5    are you don't have to say anything to them, and you shouldn't

6    really say anything to them whatsoever, and say that I know my

7    rights and, um, my, my lawyer will contact you and, ah, you know.

8          MUHAMMAD AATIQUE:  Okay.

9          MASAUD KHAN:  Yeah.

10          MUHAMMAD AATIQUE:  Okay.  Okay, Masaud.

11          MASAUD KHAN:  You understand what I'm saying, right?

12          MUHAMMAD AATIQUE:  Yeah, yeah.  I, I, I understand.

13          MASAUD KHAN:  So what I would do is I would get yourself

14   a lawyer and, ah, and, ah, have him represent you and advise you.

15          MUHAMMAD AATIQUE:  Okay.

16          MASAUD KHAN:  Yeah.

17          MUHAMMAD AATIQUE:  Okay.

18          MASAUD KHAN:  Okay?

19          MUHAMMAD AATIQUE:  Okay.  Bye-bye."

20          (End of excerpt.)

21   BY MR. KROMBERG:

22   Q.    Was that an accurate tape recording of the phone call that

23   you made to Masaud Khan?

24   A.    Yes, it sounds so.

25   Q.    Now, you mentioned that you had contact with Royer as well.

1 What happened with Royer?

2 A.  I drove down to Virginia something, first or second week of

3 June to meet him here from Pennsylvania.

4 Q.  And what happened when you got here?

5 A.  I, I came to be set up to meet at Dar al-Hijrah mosque, which

6 is in Falls Church, and we met at the sunset prayer, after the

7 sunset prayer there.

8 Q.  And what did you do after the sunset prayer?

9 A.  We -- I mean, the agents had given me some questions to ask

10 him and get his opinion, so I talked to him and -- but I ended up

11 telling him that the FBI had sent me and that, I mean, I couldn't,

12 I couldn't do exactly what the FBI had asked me to do.

13 Q.  What questions had the FBI -- did the FBI ask you to ask

14 Royer?

15 A.  Basically just to, just to let him know that I'm cooperating

16 and what does he think, I mean, legally your situation is and show

17 him some printouts of some bulletins that he had supposedly sent

18 some time ago.

19 Q.  The Taiba Bulletins?

20 A.  Yes.  Things along these lines.

21 Q.  Why did you tell Royer that you were -- in the course of your

22 meeting with him, that you were cooperating with the FBI at the

23 time?

24 A.  When talking with him, it became very difficult for me to, to

25 act, so I ended up telling him.

1 Q.   When you listen to yourself on that phone call with Masaud

2 Khan, is that the way you typically speak?

3 A.   No.

4 Q.   Why were you stuttering when you were speaking to Masaud

5 Khan?

6 A.   I found it very difficult to, to be deceptive on the phone.

7 Q.   Now, I'd like you to look at 7A31, which if it comes up on

8 the screen, it should be the -- and, Judge, I think we have a

9 stipulation which we haven't yet read into the record, but we have

10 a stipulation that 7A31 is Mr. Aatique's passport.

11          THE COURT:   I assume there's no objection to it going

12 into evidence then.

13          MR. YAMAMOTO:   No, Your Honor.

14          THE COURT:   All right, it's in.

15          (Government's Exhibit No. 7A31 was received in

16 evidence.)

17 BY MR. KROMBERG:

18 Q.   Take a look, if you would, in the book, in your book at 7A3.

19 Mr. Aatique, look at the one that you're being given in the book,

20 if you would.

21          THE COURT SECURITY OFFICER:   7A3?

22          MR. KROMBERG:   7A3.

23          THE COURT:   No, 7A3 is a different document.   7A3 in my

24 book also is not -- is that the passport in your --

25          MR. KROMBERG:   No, no, we're done with the passport.

1          THE COURT:  I'm sorry.

2          MR. KROMBERG:  I want him to look at the document, 7A3.

3  Q.   And can you -- was that a document that you had in your house

4  in May of 2003?

5  A.   That's correct.

6  Q.   Okay.  And is that a document by Ali Al-Timimi?

7  A.   That's correct.

8          MR. KROMBERG:  Judge, we move in 7A3.

9          THE COURT:  Any objection?

10         MR. YAMAMOTO:  Your Honor, this is way outside the scope

11  of this conspiracy.  We're talking about a '94 conference.

12         THE COURT:  Well, evidence outside the time frame of the

13  conspiracy is not, is not prohibited if it's relevant and if it

14  would help the trier of fact understand some of the events that

15  occurred during the conspiracy.  I mean, is there any dispute that

16  this is a statement of the defendant?

17         MR. YAMAMOTO:  No, Your Honor, but, I mean, are we going

18  to go through all of Dr. Al-Timimi's lectures and --

19         THE COURT:  I don't know.  I don't know.  I mean, I

20  would assume that if it's not relevant, the jury will disregard it

21  when they go to their -- in their evaluation, but I think at this

22  point, there's no basis not to let it in, so I'm going to let it

23  in.

24         MR KROMBERG:  Thank you, Your Honor.

25         THE COURT:  7A3.

1          (Government's Exhibit No. 7A3 was received in evidence.)

2          MR. KROMBERG:  If we can put 7A3 on the screen now?

3  Q.  Now, this article, "Reflections," by Ali Al-Timimi, why did

4  you have that in your house?

5  A.  I had, I had taken a course in AOU, American Open University,

6  some time ago, and this article was part of the course that I

7  received.

8          THE COURT:  When did you take the course?

9          THE WITNESS:  I think fall of '98.

10          THE COURT:  And where did you take it?

11          THE WITNESS:  I was living in San Diego, California, at

12  that time, and it was a correspondence course from here, Falls

13  Church.

14  BY MR. KROMBERG:

15  Q.  Now, if you would turn in the book to page 6 of

16  "Reflections"?

17  A.  Okay.

18  Q.  Where it says "Wage jihad in the path of Allah."

19  A.  Okay.

20  Q.  Can you read the first paragraph of that as what Ali Timimi

21  said a principle of al-wala' wal-bara'?

22          MR. YAMAMOTO:  Your Honor, the government here is

23  starting to take things out of context.  If they're going to look

24  at the document, the jury should look at the entire document.

25          THE COURT:  Well, the entire document will be in

1   evidence, and the jury should certainly -- because this case does

2   involve serious allegations involving First Amendment issues,

3   you're going to have to be careful about taking things out of

4   context.  So I think that's fair, but in terms of presenting this

5   trial, we can move along in this fashion, and certainly again on

6   cross examination, you can go into more of the document.

7           Go ahead.

8           MR. KROMBERG:  Well, in fact, I'll put more context in,

9   Judge.

10  Q.   Turn to page 5.  At the top of the second column, where it

11  says, "al-Wala' wal-Bara,'" if you could read the first paragraph

12  on the second column of page 5?

13  A.   First paragraph of the second column of page 5?

14  Q.   Yes.

15  A.   It says, "It is required upon every Muslim to love and

16  support those who adhere to the testimony 'there is no god but

17  Allah and Muhammad is the Messenger of God" -- sallallahu alaihi

18  wa sallam -- "and hate and show enmity toward those who reject

19  this testimony, or al-wala' wal-bara'.  It is a consequence of our

20  testimony that 'there is no god but Allah and Muhammad" --

21  sallallahu alaihi wa sallam -- "is the Messenger of Allah."

22  Q.   Okay.  Now, if you go down to page 6 on the left-hand side,

23  I've circled a line.  If you could read that on the screen?

24  A.   It says, "The principle of al-wala' wal-bara' is manifested

25  in a number of ways."

1   Q.   Now, what is al-wala' wal-bara'?

2   A.   Roughly, al-wala' means loyalty and friendship, something

3   along these lines.

4   Q.   Wala' is loyalty and friendship, and bara'?

5   A.   To disavow.  I mean, bara', I mean, is opposite of that, I

6   mean, disavow you can say.

7   Q.   Hatred, disavowal and hatred?

8   A.   I don't know hatred, but bara' would mean disavow.

9               THE COURT:  Disavow?

10              THE WITNESS:  To disavow or opposite of being loyal or

11  being friend.

12              THE COURT:  So reject perhaps?

13              THE WITNESS:  Yes, that will do that.

14  BY MR. KROMBERG:

15  Q.   Well, go back to the top of page 5, the second column.  So

16  Ali Timimi wrote in that, well, that bara' is to hate and show

17  enmity to those who reject, not just disavow, correct?

18  A.   Yeah, that's what it says here.

19  Q.   Okay.  Now, back on page 6, "The principle of al-wala'

20  wal-bara' is manifested in a number of ways."  If you go to the

21  bottom of page 6, could you read the paragraph I've just circled?

22  A.   No. 6?

23  Q.   Yes.

24  A.   "A fifth manifestation of this principle of al-wala'

25  wal-bara' is that we, we -- when required -- wage jihad against

1   the infidels.  Allah -- ta'ala -- has said:  'Slay the idolaters

2   wherever you find them, and take them (captive), and beseige them,

3   and lie in wait for them at every place of ambush.'  (The Qur'an

4   9:5)  Fight those who believe not in Allah and the Last Day and do

5   not forbid what Allah and His Messenger have forbidden, and

6   practice not the true religion (Islam), being of those who have

7   been given the Scripture (the Jews and the Christians) -- until

8   they pay tribute readily and have been brought low. (The Qur'an

9   9:29)"

10  Q.   Okay.  Thank you.

11          I would like, Judge, at this time to read a stipulation

12  into the record.  I need to pull it out, though.

13          THE COURT:  All right.  Is this stipulation No. 2, or

14  does it have some other label?

15          MR. KROMBERG:  I have different numbers on it.

16          Never mind.  Sorry about that.

17          This would be stipulation No. 32:  The United States and

18  the defendant hereby stipulate and agree that Government

19  Exhibits -- that Government Exhibits 6A12 and 10D19 constitute

20  authentic copies of records of Yahoo!, Inc., maintained in the

21  ordinary course of business.

22          THE COURT:  All right.

23  BY MR. KROMBERG:

24  Q.   I'd like you to take a look, Mr. Aatique, on the screen at

25  10D19, which appears to be from altimimi@yahoo.

1          MR. YAMAMOTO:  Your Honor, could you give me a second?

2    I'm trying to find it.

3          THE COURT:  Yes, sir.

4          MR. KROMBERG:  Oh, I'm sorry.

5          MR. YAMAMOTO:  Your Honor, can we get some foundation

6    for this and how this witness is going to be able to identify this

7    document?

8          THE COURT:  Yes, I think that's a fair --

9          MR. KROMBERG:  I'm not asking him to identify the

10   document.  The document's been moved -- we stipulate that it's an

11   authentic record, saying it's by Ali Timimi, and I'm just going to

12   ask him about a statement by Ali Timimi on this document and ask

13   him if it's consistent with what was said at the meeting on

14   September 16, 2001.

15         MR. YAMAMOTO:  Again, we're taking a document this

16   person has never seen, taking statements here and there out of

17   context.

18         THE COURT:  For the limited purpose for which it's being

19   offered, I'm going to permit it in.  Go ahead.

20         MR. KROMBERG:  Well, first, Judge, I'd like to move in

21   Government Exhibit 10D19.  It's stipulated as it's authentic.  It

22   appears to be from altimimi@yahoo.com, and I would like to move it

23   into evidence.

24         MR. YAMAMOTO:  We would object, Your Honor.

25         THE COURT:  And the basis for the objection is what?

1    MR. YAMAMOTO:  The document is authentic.  This witness

2 has nothing to do with this document.

3    THE COURT:  Well, as I understand it, the document is

4 almost being used as a demonstrative really as to something that

5 might have been said or not said.

6    MR. KROMBERG:  Well, Judge, at this moment with this

7 witness, it's being used as a demonstrative, but I do -- it should

8 be in on its own as an authentic --

9    THE COURT:  I understand.  Let's see what the witness

10 has to say about what is contained within the document.

11 BY MR. KROMBERG:

12 Q.  Now, Mr. Aatique, if you'd turn to the bottom of the last

13 page of the document?

14 A.  Yes.

15 Q.  Can you read that last paragraph?

16 A.  "As Muslims, we are to deal with the facts.  If the Taliban

17 and Mullah Umar and the Arabs with them turn out to be the Dajjaal

18 and his army, we will deal with that then when it is apparent.

19 Until that time, they are Muslim whom we are obligate to support

20 by body, wealth, and word even if some find that distasteful."

21 Q.  That last sentence, "Until that time, they are Muslim whom we

22 are obligate to support by body, wealth, and word even if some

23 find that distasteful," how consistent is that statement by Ali

24 Timimi in this e-mail on October 21, 2001, with what you heard him

25 say to you on September 16, 2001?

1          MR. YAMAMOTO:  Objection, Your Honor.  My recollection

2    is that this witness has said after going back and forth that he

3    does not recall Dr. Al-Timimi saying anything about the amir of

4    Afghanistan asking for support.

5          THE COURT:  Well, let him answer the question.  If he

6    can answer it, he can answer it, and if you can't answer it, say

7    you can't answer it, all right?

8          THE WITNESS:  I remember him saying almost verbatim the

9    fact that, that although Taliban have problems in their

10   implementation and the way they practice Islam, but they are

11   Muslims, and we should help them.  What I wasn't sure about, the

12   Mullah Umar call, not the fact that, that we should help Taliban.

13   BY MR. KROMBERG:

14   Q.   Now, to clarify the issue that Mr. Yamamoto brought up -- and

15   as the judge instructed you before, just focus on what you recall

16   happened on September 16, not what you looked at after that made

17   you question your recollection.

18   A.   Okay.

19   Q.   What do you recall Ali Timimi said on September 16 about

20   Mullah Omar?

21          MR. YAMAMOTO:  Your Honor, he's already gone through

22   this.

23          THE COURT:  I thought he testified to that yesterday.

24          MR. KROMBERG:  Well, he did, and then Mr. Yamamoto just

25   said that that was unclear.  So I wanted him to clarify it.

1    MR. YAMAMOTO: He just -- he clarified it again just in
2  this statement.

3    THE COURT: All right. We're going to in part because
4  this witness does have a thick accent that can sometimes be
5  difficult to understand, we'll just do this one last time, and
6  then on cross, if there's something that needs to be probed, it
7  can be done. Go ahead.

8  BY MR. KROMBERG:

9  Q.  Mr. Aatique, again, not -- don't think about what you learned
10 afterward, but just what you recall from September 16, 2001, what
11 did Ali Timimi say about Mullah Omar that you recall?

12 A.  About -- just about Mullah Omar?

13 Q.  Yes.

14 A.  I had remembered him saying that -- and, and my recollection
15 was that he was reading from the fatwa that he had from Sheikh
16 al-Uqla that Mullah Omar has given a call for help and we should
17 help them, has issued a call for help from Muslims.

18 Q.  And that's still your recollection today of what happened,
19 correct?

20 A.  Yes.

21 Q.  Your confusion is because you've since seen the Uqla fatwa,
22 correct?

23 A.  That's correct.

24 Q.  And the Uqla fatwa does not say Mullah Omar called for help?

25 A.  Yes.  The portions that I read, yes, that's correct.

1          MR. KROMBERG: Okay. Thank you, Judge. Nothing further

2     for this witness at this time.

3          THE COURT: All right, Mr. Yamamoto?

4                    CROSS EXAMINATION

5     BY MR. YAMAMOTO:

6     Q.   Mr. Aatique, we're going to sort of go out of order here.

7     Let's go backwards. Do you recall talking to the FBI on a number

8     of occasions?

9     A.   That's correct.

10    Q.   Do you recall back possibly in August of 2003, telling the

11    FBI at that time you don't recall Dr. Al-Timimi saying that the

12    amir of Afghanistan, which would be Mullah Omar, had called for

13    Muslims to come help?

14    A.   I don't recall that meeting, but I read my own 302 later on

15    so --

16    Q.   And it's in there?

17    A.   Yes.

18    Q.   So though you don't recall it, that would refresh your

19    recollection that you probably had said that to them back in 2003?

20    A.   I don't have any recollection, but -- I don't have a clear

21    recollection, but, I mean, I may have said that.

22    Q.   Okay. Now -- is this loud enough? Can you hear?

23          I was told to speak into the mike.

24          THE COURT: Oh, all right.

25          MR. YAMAMOTO: I can't reach the mike.

1  Q.  You were shown Exhibit 10D19.

2  A.  Just now, yes.

3  Q.  And you were shown the last paragraph, and it was read to

4  you.

5  A.  Yes.

6  Q.  Now, the first sentence of that says, "As Muslims, we are to

7  deal with the facts.  If the Taliban and Mullah Umar and the Arabs

8  with them turn out to be the Dajjaal --

9  A.  Yes.

10 Q.  -- and his army, we will deal with that then when it is

11 apparent."

12        What is a dajjal?

13 A.  "Dajjal" literally means, I mean, literally means a master

14 deceiver, but it's equivalent to what's in Christian beliefs --

15 Q.  Anti-Christ?

16 A.  It's the anti-Christ, yeah.

17 Q.  So what it says is that he's a Muslim, and we should support

18 our brother Muslims, but if it turns out that he's not a true

19 Muslim but the anti-Christ, then we'll deal with that situation,

20 meaning you won't support him?

21 A.  Yeah.  It says if he turns out to be the anti-Christ and his

22 followers of anti-Christ, then we will deal with them when it is

23 apparent, which means we won't support them if it turns out like

24 that.

25 Q.  So this is not, not saying you have to support them; they're

1  our brothers.  It's saying right now we support them, but let's,

2  let's look and see what the situation is.  Let's see what these

3  people are about?

4  A.  Yeah.  Perhaps not exactly that.  It's saying that we are

5  going to support them right now because they are Muslims, and if

6  it turn out, if it turns out that they are different later on,

7  then we might change our position.

8  Q.  Okay.  Now, again going sort of backwards, you took this

9  correspondence course, you say, when you were in San Diego?

10 A.  That's correct.

11 Q.  What was the course?

12 A.  It was about, I think, the basics of Islamic belief.

13 Q.  And you were shown this "Reflections" document.  Were there

14 other documents involved or books?

15 A.  The course had a lot of material, and it was one of the

16 documents I kept.

17 Q.  You say there was a lot of material?

18 A.  Yeah.  I mean, that was not the only document.  There were

19 other course material, also.

20 Q.  Books?  Were you told to read certain books, also, as part of

21 the course?

22 A.  Yes.

23 Q.  And what was the course about?

24 A.  I forgot the exact title, but it was Basics of Tawheed or

25 something along those lines.

1  Q.   What's that?

2  A.   Tawheed is Islamic concept of the monotheism.

3  Q.   Can you spell that?

4  A.   T-a-w-h-e-e-d is how you spell it.

5  Q.   And can you tell me again what it is?

6  A.   It's difficult to exactly translate it.  I mean, I would put

7  it as, I mean, the Islamic monotheism, the Islamic concept of

8  monotheism.

9  Q.   Of monotheism?  And what is monotheism?

10 A.   Belief in one god, oneness of God.

11 Q.   Is this a basic course?

12 A.   Yes, I would say it's a basic course.

13 Q.   Is it a basic course on Islam?

14 A.   It can be said.

15 Q.   Is it to teach somebody who is learning Islam the tenets of

16 Islam?

17 A.   Somebody learning Islam can take it, and also, Muslims can

18 take it to learn the belief system better.

19 Q.   Why did you take it?

20 A.   I wanted to increase my knowledge of Islam.

21 Q.   And did it help you?

22 A.   Yes.

23 Q.   You were shown particular statements and asked to read them.

24 Were those statements or the context of those types of statements

25 what the course was about?  Was it about jihad and war?

1  A.   The course was about, I mean, the course was about the basics

2  of belief, but it dwells into different topics.  I mean, it's

3  difficult for me to, to just say what was in context and what was

4  not in context.

5  Q.   But it was a, it was a religious course?

6  A.   Yes.

7  Q.   And it was based on the Koran and the hadeeths?

8  A.   Yes.

9  Q.   That last phrase you read on page 6, that was a quote from

10 the Koran?

11 A.   You said page 6?

12 Q.   Page 6.

13 A.   That's correct.

14 Q.   The principle of al-wala wal-bara' -- I'm sorry if I screw

15 these up -- is an Islamic concept; is that correct?

16 A.   That's correct.

17 Q.   And it's taught in the Koran?

18 A.   Yes.

19 Q.   And the hadeeths?

20 A.   Yes.

21 Q.   Now, what is the Koran?

22 A.   Say it again?

23 Q.   What is the Koran?  Is it like the, the Christian Bible?

24 A.   It's the, it's the, I mean, not to go into exact Islamic

25 definition, it's the Islamic Holy Scripture.

1  Q.   And hadeeths, what are hadeeths?

2  A.   Hadeeths are the sayings of the Prophet Muhammad, sallallahu

3  alaihi wa sallam.

4  Q.   And the sayings of the Prophet Muhammad by his followers, his

5  companions?

6  A.   No, his own words.

7  Q.   His own words, but they are, they are written by other

8  people; is that correct?

9  A.   Yes.

10 Q.   And those other people were his companions?

11 A.   His companions and the next generations that followed him.

12 Q.   The generations that followed him?

13 A.   Yes.

14 Q.   And interpret his writings?

15 A.   Say it again?

16 Q.   The generations that followed and interpret what he said?

17 A.   A hadeeth is usually, it's verbatim.  People try to, try to

18 quote every word as he said and try to write it down the way it

19 was said.

20 Q.   So it's repeated the same thing over and over?

21 A.   Before it got written down.

22 Q.   Okay.  So this is -- this was -- the hadeeths were the verbal

23 history or the verbal teachings, is that right, of Islam?

24 A.   Of -- when you say hadeeth of the Prophet, it means what he,

25 I mean, what he said and what he approved or what he did.

1  Q.   And, and the people tried to relate that to following

2  generations verbatim so they would understand and have it?

3  A.   That's correct.

4  Q.   Eventually, it was written down?

5  A.   Yeah, within the first few generations.

6  Q.   But from what I understand what you're saying, initially, it

7  was, it was passed on verbally and not written?

8  A.   No.  Actually, it's -- it's a topic of compilation.  It was

9  written down during his life and the next generation, but then the

10  larger and larger collection were made later on.

11  Q.   Dr. Al-Timimi gave a number of lectures, and I think you

12  talked a little bit about them yesterday:  The End of Time

13  lectures and The New World Order lectures?

14  A.   The Signs of the End of Time was a very long lecture series

15  that he gave in Dar al-Arqam.  I think it lasted about one year,

16  '99 to 2000.  That was a lecture series that I attended live

17  mostly.

18         But as far as his tape set, "The New World Order," that

19  was a -- I got the tape set, and I listened to the cassettes.

20  Q.   And that was a six-cassette set?

21  A.   Something like that, yeah.

22  Q.   And again, all, all these lectures were based on the Koran

23  and hadeeths?

24  A.   To the best of my knowledge.

25  Q.   He would be going back and citing from various passages

1  and --

2  A.  Well, he would -- well, he would have to quote.  A lot of it

3  was also current events and then commentary on them.

4  Q.  Now -- right.  He would, he would take current events and use

5  the Koran to do parables about these current events?

6  A.  I don't understand, fully understand the term "parables,"

7  but --

8  Q.  He would take the current events and relate them to the

9  Koran?

10  A.  Koran and the hadeeths.

11  Q.  And the hadeeths, okay.

12       Now, the end of time is an Islamic religious concept?

13  A.  I mean, Islam has -- I mean, we all know certain events that

14  will happen at the end of time, yes.

15  Q.  Okay.  So it's, it's the Prophet Muhammad describing what's

16  going to happen before the Day of Judgment and the end of humanity

17  and Muslims going to heaven; is that correct?

18  A.  Yes.  Along these lines, that's correct.

19  Q.  Okay.  Now, the six pillars of faith are -- in Muslim --

20  Islamic religion are God, the angels, the scriptures, the

21  prophets, the Last Day, and God's decree, correct?

22  A.  That's correct.

23  Q.  And Dr. Al-Timimi taught the six pillars of faith?

24  A.  Yes, in some lectures.

25  Q.  Part of the Last Day is a belief that the signs of the Day of

1  Judgment -- I mean, are beliefs in the signs of the Day of

2  Judgment and is based on the Koran and the hadeeths?

3  A.   I can't say about the signs.  I mean, maybe it is there, but

4  I don't have the knowledge of commenting on that, but what -- as I

5  understand when we say we believe in the Last Day, which means you

6  believe in whatever we've been authentically told from the Prophet

7  about what's going to happen when a person dies is a state after

8  death, what happens in the grave, what happens on the Day of

9  Judgment or whatever the details are.

10 Q.   Do you recall Dr. Al-Timimi using the book The Signs of the

11 Last Day by Ibn Kathir?

12 A.   That's correct.

13 Q.   I'm holding a paperback volume.  Would that be the book

14 you --

15 A.   Exactly the title I remember.

16 Q.   Now, Ibn Kathir is a scholar who lived about 700 years ago?

17 A.   That's correct.

18 Q.   Now -- a Mehdi -- is that --

19 A.   Mehdi probably.

20 Q.   Okay.  Say that again?

21 A.   "Mehdi."

22 Q.   He's the righteous ruler who's going to appear before the Day

23 of Judgment?

24 A.   That's correct.

25 Q.   And he's going to unify the Muslims?

1  A.    He'll be the unified leader, yes.

2  Q.    And he will rule from Jerusalem?

3  A.    I don't know.  I don't know about that.

4  Q.    Okay.  And during his time, the Christians and the Muslims

5  are going to get together and wage war against a common enemy?

6  A.    I, I don't know about that.  I think it's different.  From

7  what I know, it's different.

8  Q.    From what you understand?  What do you understand?

9         MR. KROMBERG:  Objection, Judge.  What is the difference

10 between what Mr. Aatique understands about whether the Christians

11 and Jews are going to get together and attack the Muslims or not?

12        THE COURT:  I'm going to give the defense some leeway on

13 this cross examination.

14        But can you spell the word "Mehdi"?

15        THE WITNESS:  I mean, in English, you can approximate

16 m-e-h-d-i.

17        THE COURT:  And that's the title for a person?

18        THE WITNESS:  I think that's the title, yes.

19        THE COURT:  Go ahead, Mr. Yamamoto.

20 BY MR. YAMAMOTO:

21 Q.    What's your interpretation?

22 A.    From what little I know, I mean, he, he will come near the

23 end of time, and, and he would be the unified leader of the

24 Muslims, a khalif, and it was during his reign that Jesus, the son

25 of Mary, will come down.

1  Q.  And does the anti-Christ appear?

2  A.  Yes.  Anti-Christ appears, I think, during his time, from

3  what I know, before Jesus comes down.

4  Q.  Okay.  And there's a battle with the anti-Christ?

5  A.  At the end, yes.

6  Q.  And the Muslims defeat the anti-Christ?

7  A.  That's correct.

8  Q.  And this battle is done with swords and horses?

9  A.  That's how it's described.

10  Q.  And at that point, the world comes to an end, and Muslims go

11  to heaven?

12  A.  Not really.  I mean, there are events that are going to

13  happen after that, also.

14  Q.  Okay.  What are those events?

15  A.  I mean, do you want me to go into detail?

16  Q.  Yes, please.

17  A.  Some of the things I remember is that after, after the

18  anti-Christ is killed, that Jesus is not going to accept any other

19  legion on earth except Islam, and then he'll live for 40 years,

20  and he'll marry, have children, and die, because we believe he did

21  not die, and Muslims will pray over them, and I don't know about

22  all the other details, but that will be very close to the Day of

23  Judgment.

24  Q.  Okay.  So Muslims believe in the same god as Christians do?

25  A.  We don't believe in the Christian concept of Trinity, that

1  father and son and ghost are simultaneously God.

2  Q.  Right.  But you believe in God and Jesus?

3  A.  We believe in God, yes.

4  Q.  And Jesus?

5  A.  And Jesus is a human being; that's what we believe, prophet

6  and human being.

7  Q.  Now, during the meeting on September 16 --

8  A.  Okay.

9  Q.  -- Dr. Al-Timimi was making reference to some of these types

10  of things.

11  A.  I don't remember right now any explicit reference he made to

12  what we just talked about.

13  Q.  Well, you indicated that, that what he was saying made you

14  think about his lectures and what he was saying in his lectures.

15  A.  The first thing he said when he said, "Now you're going to

16  see the signs and the promises come true," that's what I

17  understood it to refer to, what we just talked about, but when I

18  said he did not say anything explicit, was not to go into detail.

19  Q.  And the signs he was talking about were these signs that we

20  just talked about?

21  A.  That's what I understood, yes.

22  Q.  None of those signs have -- had appeared at that point?

23  A.  Yes.

24  Q.  That's correct, right?  None had appeared?

25  A.  Yes, none of the explicit ones we had talked about.

1  Q.   So until those signs start to appear, there is no end of time
2  battle?

3  A.   That's right.

4  Q.   So he couldn't have been talking about an end of time battle
5  theologically?

6  A.   Say it again?

7  Q.   He couldn't be talking about the -- an end of time battle
8  according to the Muslim religion?

9  A.   It's difficult for me to say yes or no because even before
10  Mehdi comes, there's lot of talk in the religious text about a lot
11  of tribulations and wars and difficult times on the Muslims, and,
12  and what's happening now can be related to that.

13  Q.   Okay.  The course you took, how long was it?

14  A.   It was a semester-long course, one semester.

15  Q.·  One semester?

16       And you would, you would prepare papers and send them
17  back, or how did it --

18  A.   Yeah.  I mean, it was basically, I mean, I was given a number
19  to talk to my instructor at certain hours he was available, and I
20  was, I was in correspondence contact with him through letters, and
21  that's how I'd send my homework or exams.

22  Q.   Did you take other courses?

23  A.   During that semester, yes.

24  Q.   And at other times, did you take courses?

25  A.   No.  Actually, I -- later on in that December, I got married,

1 and I also moved to Virginia after a couple of months later, so it

2 all got dropped.

3 Q. Did -- what did that course teach you?

4 A. I remember it being a basic course about the belief system of

5 Islam. I may not be able to recall all the specifics, not like a

6 different philosophical argument about the -- and the

7 counter-arguments about, about, say, at the beginning about the

8 existence of God and how to, I mean, different arguments and

9 counter-arguments and some things along these lines.

10 Q. It wasn't, it wasn't something that made you think about

11 jihad, war, fighting, something like that? Jihad in the sense of

12 combat jihad.

13 A. Not entirely.

14 Q. Okay. You went to Virginia Tech.

15 A. That's correct.

16 Q. And you knew Kwon from Virginia Tech.

17 A. Yeah. I came to know -- Omer Khan was Masaud Khan's younger

18 brother, and Omer Khan was there doing his bachelor's in

19 something, and through him, I came to know Yong Kwon.

20 Q. Were you roommates with either one of these individuals?

21 A. No.

22 Q. Did you hang around with them at all?

23 A. Sometimes.

24 Q. Did they ever talk about terrorism, jihad, combat jihad?

25 A. We did talk about jihad, I think.

1   Q.   What kind of jihad?

2   A.   I mean, jihad means fighting like fighting that's going on in

3   Kashmir and some other places.

4   Q.   Did -- can you show him, please, 2A6a and 2A6b, Government's?

5        Were these just philosophical-type talks or talks about

6   what's going on over there?

7   A.   It was a long time back, so I can't recall any specifics, but

8   I would say, I mean, different things about what's going on there,

9   something like that.  I don't recall any specifics.

10  Q.   Muslims were interested in Chechnya and Bosnia, correct?

11  A.   Yes.

12  Q.   Because of the atrocities that were going on there?

13  A.   You're talking about that particular time in '96-'97?

14  Q.   Yes.

15  A.   Bosnia was a bit old because Bosnia was somewhat settled in

16  '93, but Chechnya, there were things going on in Chechnya back

17  then I remember, the first war.

18  Q.   Muslims were being persecuted in Chechnya?

19  A.   Yes.

20            THE COURT:  2A?

21            MR. YAMAMOTO:  2A6a and 2A6b.

22            THE COURT:  All right.  Those are not in evidence yet.

23  Are you moving them in?

24            MR. YAMAMOTO:  No.

25            THE COURT:  Okay.

1          MR. KROMBERG:  I'll move them in.

2          THE COURT:  Well --

3          MR. YAMAMOTO:  Wait.

4    Q.   Do you recognize those documents?

5    A.   2A6a?

6    Q.   Yes.

7    A.   No.

8    Q.   Do you recognize 2A6b?

9    A.   No, I've never seen that before.

10   Q.   Okay.  Flip through there.  There's two or three documents

11   attached.

12   A.   You mean 2 --

13   Q.   On the b part.  Just flip through lots of pages at a time.

14        Nothing?  You don't recognize any of that?

15   A.   No, I'm sure I've never seen that.

16   Q.   Okay.  That's all.

17        How long did you go to Virginia Tech?

18   A.   From January of '96 to September of '97, so about 18-19

19   months.

20   Q.   And you got your master's there in EE?

21   A.   That's correct.

22   Q.   Electrical engineering?

23   A.   That's correct.

24        THE COURT:  Mr. Yamamoto, if you can, keep your voice up

25   a little bit.

1    MR. YAMAMOTO: Yes, ma'am.

2    THE COURT: All right.

3  BY MR. YAMAMOTO:

4  Q.  Were there Muslim organizations at Virginia Tech?

5  A.  Yes.

6  Q.  Did you take part in them?

7  A.  Yes.

8  Q.  Did you-all raise money or do anything on behalf of Chechens?

9  A.  No.

10  Q.  And raise money or do anything on behalf of any other Muslim

11  organizations or groups around the world?

12  A.  Oh, I don't remember there being a fund-raising for any, any

13  outside cause. We had a lot of fund-raising for the mosque they

14  were trying to build there, but that's all that I remember.

15  Q.  So you were more involved with local Muslim issues?

16  A.  Yeah, you can say practically -- yes.

17  Q.  Would you talk about foreign -- things going on in foreign

18  lands with respect to Muslims?

19  A.  It must have come up. I mean, I can't recall any specifics,

20  but it must have.

21  Q.  Okay. Now, when you came to Virginia from San Diego, was the

22  Dar al-Arqam open?

23  A.  You mean Dar al-Arqam as the, as the physical place with an

24  address?

25  Q.  In the office building in Falls Church.

1  A.   360 South Washington?

2  Q.   Right.

3  A.   That -- I came in February of '99.

4  Q.   So they were still holding meetings at various locations like

5  Sheikh Jaafar's basement and things like that?

6  A.   Actually, the first meeting that I went to was very late that

7  evening, I think, sometime in the fall or winter of '99.

8  Q.   Um-hum.

9  A.   And the first meeting I went to was at the upper floor room

10  in the building of American Open University.

11  Q.   Okay.  Eventually, they started having meetings at 360 South

12  Washington?

13  A.   Yeah.  Sometime spring or summer of 2000.

14  Q.   Were you attending during this period of time at these

15  various locations, were you fairly good about going to these

16  meetings?

17  A.   I'm not 100 percent sure, but I think initially, I wasn't

18  very regular.

19  Q.   You were not?

20  A.   Initially, I wasn't very regular, yeah.

21  Q.   Did you become a regular?

22  A.   Say again?

23  Q.   Did you become a regular?

24  A.   I think when it moved to that address, I remember being there

25  almost every Friday.

1 Q.   Okay.  Now, you mentioned Dr. Al-Timimi was one of the

2 speakers.  Were there other speakers?

3 A.   Yes.

4 Q.   Lots of other speakers?

5 A.   He was the most frequent speaker, I'd say.  Then sometimes

6 Jaafar Idris -- Sheikh Jaafar Idris would speak.  His son, Yousuf

7 Idris, might speak.  A couple of times we had some, maybe once in

8 a while, somebody else came.

9 Q.   Did you have guest speakers?

10 A.   Yes.

11 Q.   And the lectures were all religious lectures on Islam?

12 A.   Yeah.  I mean, they were on different topics, but they all

13 related to Islam.  They were all religious in nature.

14 Q.   No political talks?

15 A.   No.  As far as lecture topics, I can't remember anything

16 that, that can be called political.

17 Q.   Would current events be worked into some of these themes

18 during the lectures?

19 A.   Sometimes they'd come up, yeah.

20 Q.   Most of these lectures were taped?

21 A.   Almost all of them were, I think.

22 Q.   So Dr. Al-Timimi's and Sheikh Jaafar's and Yousuf's and the

23 guest lecturers', all these lectures were taped as far as you

24 knew?

25 A.   I don't know about, like, Yousuf Idris.  By, like, Ali

1  Timimi, especially his lecture series, sometimes when Sheikh

2  Jaafar Idris would speak, they would be taped or broadcasted,

3  yeah.

4  Q.   And they would be made public?  You could purchase them or

5  get copies of these lectures?

6  A.   Later on, yes.

7  Q.   Neither Dr. Al-Timimi nor any of the lecturers during their

8  lectures advocated combat jihad, did they?

9  A.   I can't recall any specific instance, but I'd say that

10  sometimes if the topic of mujahideen or jihad came up, then it was

11  mentioned in a noble manner.

12  Q.   That these people were fighting for a noble cause?

13  A.   That's correct.

14  Q.   Now, the -- when was the End of Time lectures?

15  A.   The Signs of the End of Time?

16  Q.   The Signs of the End of Time.

17  A.   At the end of '99 to fall of 2000, something like that.

18  Q.   And "The New World Order" tapes that you had, do you recall

19  when those were initially given?

20  A.   I bought them in '96-'97, that tape set, but I did some

21  research to try to find when the lecture was given.  I think it

22  was early '94 maybe.

23  Q.   Okay.  You took part in paintball.

24  A.   That's correct.

25  Q.   Masaud Khan didn't take part in paintball.

1   A.   No.   I think he came maybe once or twice.   Maybe just once.

2   Q.   Dr. Al-Timimi never went to any of the paintball sessions?

3   A.   No.

4   Q.   You never talked to Dr. Al-Timimi about paintball?

5   A.   Not me.

6   Q.   You don't know if Dr. Al-Timimi even knew who was involved in

7   paintball?

8   A.   I think he did know.

9   Q.   You think he did know?

10   A.   Yeah.

11   Q.   How do you think he knew?

12   A.   Once what happened in, I think that was late 2000, when FBI

13   came to visit Seif Chapman, and then he -- during the next Friday,

14   when we were at the lecture place, he took some of the people out

15   and told us that he had, he had been visited and he got questioned

16   and he lost a job because of that, something like that.

17   Q.   This is Chapman saying that?

18   A.   Chapman saying that.

19          So later on, I commented to Kwon that, that we shouldn't

20   have been gathering in, in front of the Islamic Institute, where

21   we used to gather, wearing fatigues and cars, like, in open.   So

22   Kwon said Ali Timimi said the same thing.

23   Q.   You were -- you didn't go to Dr. Al-Timimi about Chapman

24   being approached; somebody else did?

25   A.   Yeah, I came to know it through somebody else.

1  Q.  And Dr. Al-Timimi didn't meet with the paintballers as they

2  met outside the Dar al-Arqam, did they -- did he?

3  A.  You mean when, when Seif Chapman told us about --

4  Q.  Right.

5  A.  No, he was not there.

6  Q.  Was it your understanding that Dr. Al-Timimi told them to go

7  play soccer instead of play paintball?

8  A.  Say it again?

9  Q.  Was it -- did you understand Dr. Al-Timimi to tell whoever

10  spoke to him about Chapman that they could go play soccer instead

11  of going to do paintball?

12  A.  No, he did not say that.  I mean, what I understood him

13  saying, the context that I got was that you -- that what he said

14  was that you've got to be more careful, something like that.

15  Q.  That's what you were told what Dr. Al-Timimi said?

16  A.  Yes.

17  Q.  Okay.  So you didn't hear anything about playing soccer?

18  A.  From him?

19  Q.  No, from whoever was talking.

20  A.  No, nothing about soccer.

21  Q.  You never talked to Dr. Al-Timimi about paintball?

22  A.  No.  Not myself, never.

23  Q.  So everything related to you or you're saying Dr. Al-Timimi

24  said is from somebody else?

25  A.  That's correct.

1   Q.   And after the Seif Chapman incident, nobody indicated that

2   Dr. Al-Timimi had said, "Go play soccer"?  That wasn't related to

3   you?

4   A.   No.

5   Q.   The only part that was related to you was, "Be careful"?

6           MR. KROMBERG:  Objection to the question.

7           MR. YAMAMOTO:  I withdraw it.

8   Q.   The only thing that you were told is what you just said

9   previously?

10  A.   Yes.

11  Q.   Okay.  The paintball group, were you in it from the

12  beginning?

13  A.   Almost.  I mean, I wasn't -- I was in it from the second or

14  the third outing.

15  Q.   And how long did you stay in it?

16  A.   I think that outing that I went for the first time, I think

17  it was in May of 2000, and then we played through the summer of

18  that year.  Then, of course, we stopped in winter.  Then we

19  restarted in the spring of 2001, and until I -- before I moved to

20  Pennsylvania in the first week of July, I went to visit Pakistan

21  in the month of June, so I may have been playing until, until

22  going there, late May or something like that.

23          And I actually, I came back down again a couple of times

24  in July and August, I think, but that wasn't the regular paintball

25  outing.  We went to a commercial paintball place in Leesburg.

1    That was one more outing of paintball.

2    Q.    Was that with these same people?

3    A.    Some, some of those same people, but we went to -- when we

4    went to that place, there were a lot of people from -- who come to

5    play paintball, so they make teams.  So we tried to be on one

6    team, but it was a chaos basically.

7    Q.    How many of you were there?

8    A.    You mean us, of the, of the group?

9    Q.    Right, at Leesburg.

10   A.    Maybe -- I'm not sure, maybe five or six.

11   Q.    Okay.  And when you say "commercial paintball," is this

12   inside or outside?

13   A.    What does that mean?

14   Q.    In a building or out, outside of a building, in an open area?

15   A.    I've heard that commercial places are of both types, whatever

16   you want to --

17   Q.    The one that you went to.

18   A.    It was outdoors, but they had cardboard structures made, like

19   cardboard towers or cardboard huts.

20   Q.    So it was set up to play these paintball games with forts --

21   A.    Yes.

22   Q.    -- and bunkers and hiding places and all that kind of stuff?

23   A.    That's correct.

24   Q.    So you could play war?

25   A.    Yes.

1  Q.  And that's essentially what paintball was, playing war?

2  A.  What paintball is or what we were doing?

3  Q.  What you were doing playing paintball.

4  A.  What we were doing was to, was to train for combat using

5  paintball and, of course, recreation.

6  Q.  Okay.  Now, you would break up into two teams, right?

7  A.  At the paintball, yes.

8  Q.  And were there different types of paintball games played or

9  just one type?

10  A.  What do you mean by "type"?

11  Q.  Well, was it two sides fighting against each other to see who

12  wins, or one side has a command center and you guys are trying to

13  attack it and take the command center --

14  A.  That's correct.

15  Q.  -- or --

16  A.  We simulated different scenarios like two sides trying to

17  finish each other off or one side has a base and they just have to

18  defend it and the one side has to get the flag or whatever.

19  Q.  So there were different types of scenarios that were used?

20  A.  Scenarios, yes.

21  Q.  When you -- was there any difference when you played

22  paintball with your group, the paintballers from the Dar al-Arqam,

23  and the commercial paintball?  Was it the same type of thing, two

24  sides fighting against each other trying to win?

25  A.  There were similarities and there were differences.

1  Q.   Okay.   What were the similarities?

2  A.   Similarities, it's a paintball game, I mean, you try to win,

3  but there were differences like people lying, people cursing in

4  the regular field, people getting hit and trying to cheat, a lot

5  of cursing going on, which was --

6  Q.   And that didn't happen in your group?

7  A.   No.

8  Q.   You didn't curse?

9  A.   No.

10 Q.   Okay.   Now, for paintball, you need a paintball gun, right?

11 A.   Yes.

12 Q.   You went and -- everybody bought their own paintball gun?

13 A.   From what I know, yeah.

14 Q.   They're about 150 bucks?

15 A.   I mean, they go in different range.   Usually the typical ones

16 we had, 100 to 200 dollars, yeah.

17 Q.   You have a helmet?

18 A.   Yeah, goggles to protect the eyes.

19 Q.   Goggles to protect your eyes.

20       And then after that, it's whatever you want to wear?

21 A.   Of course, the balls, you have to buy the paintballs

22 themselves.

23 Q.   Right, paintball balls and the air cartridges?

24 A.   Yes.   I mean, yeah, you can buy cylinders, and you have to

25 buy $CO_2$ to pressurize them every time.

 1  Q.   Now, if you're going to play paintball, everybody tried to

 2  wear camouflage or dark colors or green or black or something like

 3  that, right?

 4  A.   Almost all of us wore camouflage.

 5  Q.   And that's so when you played paintball, you wouldn't stand

 6  out and get shot?

 7  A.   Yes.  Because we are playing in the woods out there, and if

 8  you, if you are anything different, then you'll stand out from,

 9  from hundreds of yards away.

10  Q.   And that's the same whether you played commercial paintball

11  or your private paintball?

12  A.   That's what we wore when we went to commercial paintball, but

13  people were wearing there all kinds of things.

14  Q.   Some people had just come just for the first or second time,

15  so they didn't have any clothes?

16  A.   Yeah, or they were perhaps not as serious.

17  Q.   Okay.  You owned your own gun?

18  A.   You mean paintball?

19  Q.   Paintball gun.

20  A.   Yes.

21  Q.   Did you play paintball with any other groups besides the Dar

22  al-Arqam group?

23  A.   No.  I mean, that Leesburg outing was, you can say, partially

24  with outside people, but I don't remember ever playing paintball

25  with anybody else.

1  Q.   Did you play different groups, like people from D.C., North

2  Carolina, New Jersey?

3  A.   Yes.   We had, we had some Muslims we knew visit us a couple

4  of times from Maryland, I think that was from Laurel, Maryland,

5  and we also had teams coming from New Jersey, North Carolina.

6  Q.   How did you get to meet these people to set this up?

7  A.   Not me, I mean, but people -- I think the people who were

8  organizing it knew other Muslims from other areas, and when they

9  came to know that we are playing paintball, they told us, "Well,

10  we also play paintball," so we thought of having a match -- having

11  matches together.

12  Q.   I think at some point, you indicated -- withdraw that.

13       So the group wasn't secret; I mean, it was public?

14  People knew about the paintball group?  People in other states

15  knew about the paintball group because you played with them,

16  right?

17  A.   Yeah, but I wouldn't call that it was open for all because we

18  were actually especially in the later, second summer, we were

19  specifically told not to, not to mention paintball activity to

20  anybody and not --

21  Q.   Is this after Chapman was visited?

22  A.   There was something like that before, also, but it was not as

23  strictly understood as later on in the second summer.

24  Q.   Now, did you think you were doing anything wrong?

25  A.   Not at that time.

1  Q.   At any time?

2  A.   Once, once, once I was charged and I, I understood -- I did

3  not understand the conspiracy law before.

4  Q.   Okay.  So while you were playing paintball -- before you were

5  arrested in 2003, when you were playing paintball, you thought it

6  was perfectly legal?

7  A.   When I was playing paintball, yes.

8  Q.   You didn't have any ulterior motive.  You weren't a terrorist

9  organization in training?

10 A.   Personally, I had, I had no such motives.  I can't say for

11 other people.

12 Q.   Why did you join paintball?

13 A.   It was, it was described to me in, when it was about to start

14 by Yong Kwon and Ibrahim Al-Hamdi, what they were planning to do,

15 we would play paintball and we'd train for fighting this way.  So

16 it appeared very exciting to me, so I joined it.

17 Q.   The fighting part of it, did you take military training in

18 Pakistan?

19 A.   Not really.  I mean, when I was there in ROTC going into high

20 school there, they had something like, there's something like ROTC

21 here, where you just do a lot of drills and fire some weapons.

22 Q.   So it's like a class you would take in high school?

23 A.   Yeah, but that isn't any serious military training.

24 Q.   Is that everybody took the classes?

25 A.   There in Pakistan?  In those days, almost everybody used to

1  take it.

2  Q.   How about females?

3  A.   They also had -- it was slightly different, but they had a

4  counterpart for that, also.

5  Q.   Did you dress in uniforms?

6  A.   Military khakis, yeah.

7  Q.   Carry rifles and do drills, marching?

8  A.   They wouldn't give us rifles very often back then, but we

9  were, we were shown how to manage a rifle, yeah.

10  Q.   How to take a rifle apart and how to clean it?

11  A.   Basically, we were just told how to fire it at that time.

12  Q.   Did you fire it?

13  A.   Yes, in '89-'90, when I was taking that course.

14  Q.   So you would -- they would take you to a range, and everybody

15  would shoot?

16  A.   Yeah.  That program is organized by the Pakistan Army, and

17  they have their own ranges.  So they would take the -- when --

18  at -- for, I mean, it was for two years, so at the end of each

19  session and each year, they'd take us to fire some rounds.

20  Q.   So the, the classes taught by the Pakistani Army?

21  A.   Yes, regular Army people.

22  Q.   Was there encouragement to go on for further training?

23  A.   You mean in that course?

24  Q.   Yeah.

25  A.   I don't recall any.

1   Q.   Okay.   Were there classroom instructions, too, for that

2   ROTC-type class?

3   A.   Yes.

4   Q.   What was in there?

5   A.   It's a long way back, but it was, like, something about war

6   formations and military hierarchy and wartime preparedness,

7   something like that.

8   Q.   So they would teach you things like the table of organization

9   and equipment, how a military group is organized and what the

10  various groups are called and who's responsible to who, that type

11  of thing?

12  A.   Something like that, yeah.

13  Q.   They taught you some basic tactics, some military tactics?

14  A.   Very basic:   how to move or how to, like, how to carry a

15  rifle, how to crawl, different fighting positions, stuff like

16  that.

17  Q.   Did they teach you some military history?

18  A.   I don't recall.

19  Q.   What else would they teach?

20  A.   I just remember a lot of drilling.

21  Q.   A lot of drilling?

22  A.   Yeah.

23  Q.   Marching?

24  A.   Yeah.

25  Q.   With the rifle on your shoulder?

1  A.    No.  Just in heavy boots and the hot sun.

2  Q.    Marching in step together?

3  A.    Yeah.  Something like that, yeah.

4  Q.    Was it hard?

5  A.    It was not fun.

6  Q.    Why did you want to do it again if it wasn't fun then?

7  A.    I wasn't drilling this time.

8  Q.    So you'd had some experience of basic military stuff:

9  tactics --

10  A.    Very rudimentary.  I won't -- can't even call it basic.

11  Q.    When you started paintball, would you-all talk about

12  Chechnya --

13  A.    A lot.

14  Q.    -- what's going on there?

15  A.    Yes.

16  Q.    You-all were concerned about Chechnya and the Muslims in

17  Chechnya?

18  A.    That's correct.

19  Q.    The Muslims were fighting the Russian Army; is that right?

20  A.    Yes.

21  Q.    The Muslims were more like a guerilla army?

22  A.    That's correct.

23  Q.    They were outnumbered?

24  A.    That's correct.

25  Q.    So you-all looked at the Muslim fighters there

1  idealistically, like these people are fighting for the right, and

2  they're outnumbered, and they're still going at it?

3  A.    That's correct.

4  Q.    Did that inspire you?

5  A.    Yes.

6  Q.    Now, at some point, were you told about Internet sites

7  involving Chechnya?

8  A.    Yes.

9  Q.    Qoqaz and Kavkaz?

10  A.    The first one you mentioned, Qoqaz, was very commonly

11  mentioned.

12  Q.    Did you go to that site?

13  A.    During those days, almost, almost daily.

14  Q.    Almost daily?

15  A.    Yes.

16  Q.    What was on it?

17  A.    Updates about what was happening in the, in the fighting

18  there.

19  Q.    In the war in Chechnya?

20  A.    Yes.

21  Q.    Do you believe that was more accurate than, than BBC, NBC,

22  CNN?

23  A.    That was my belief, yes.

24  Q.    Were there also descriptions of the fighting and what was

25  going on with -- and videos of what was going on?

1  A.  Sometimes they would post videos.

2  Q.  Would you look at those?

3  A.  Yes.  Not on that site, but they would have links to go to

4  some other sites where they would post videos.  I did see them.

5  Q.  Were there articles on the site, also?

6  A.  Yes.

7  Q.  You'd read them?

8  A.  Yes.

9  Q.  Would you guys talk about them?

10  A.  Yes, sometimes.

11  Q.  So everybody was going to the sites, and then when you'd meet

12  up, you'd all talk about what you'd seen and read?

13  A.  I think everybody I knew was going to those sites, and

14  topics -- I won't say that every time we met, we discussed

15  everything, but those topics came up fairly regularly, I think.

16  Q.  How often did you play paintball?

17  A.  I remember initially, it was every week, but after some

18  months, it was too taxing on the people, so we make it every,

19  every other week.

20  Q.  And then did it fall off even more?

21  A.  There was a -- you can see sort of core group of 10-12-14

22  people who would show up every outing except for if somebody has

23  something important to do, and there were, like, other people who

24  would come more irregularly.

25  Q.  How often were you going?

1  A.  I missed very few outings.

2  Q.  So you went every other week?

3  A.  Almost, yeah.

4  Q.  Was there talk about -- apparently, there was -- there was

5  talk about this paintball being good training for jihad and for,

6  for joining fighting; is that right?

7  A.  I don't remember any explicit talk, but we, we tried to make

8  it as serious as possible to -- so that people could learn things,

9  and, like, if -- like trying to practice ambush or attacking a

10  military bunker.

11  Q.  These are some of the different games you played?

12  A.  Yes.

13  Q.  And you'd indicated earlier that some of these people had

14  some military background.

15  A.  Yes.

16  Q.  They gave you some training, also?

17  A.  Yes.

18  Q.  Was that the same type of training you received in classrooms

19  in Pakistan?

20  A.  Some of it.  Some of it is overlapping.

21  Q.  So what you received was sort of basic military training when

22  you played paintball?

23  A.  Yes.

24  Q.  I mean, it wasn't advanced army college tactics or anything

25  like that?

1  A.  I've never been to an army college, so I don't know.

2  Q.  But it was stuff that was fairly common sense?

3  A.  Some of it was common sense, yeah.

4  Q.  Was, was this training at every session or just sometimes?

5  A.  Initially, there was a lot of stress on training, like having

6  a training drill before you would go to a game or physical.  Like

7  initially, we had -- used to have almost three sessions:  training

8  sessions, physical training, and games.  But later on, things got

9  dropped, and it only -- only games left.

10  Q.  They stopped the physical training?

11  A.  Yes.

12  Q.  Why?

13  A.  I don't know.  Maybe it was boring.

14  Q.  Because you didn't like it, that's why, right?

15  A.  I mean, I wasn't making the decisions mostly, so -- but in

16  the end, it was just we'd make teams and play games, as many games

17  as possible.

18  Q.  How did you go from total recreation, you guys were having

19  fun, to, okay, now we're going to do this serious training?  How

20  did that come about?

21  A.  I wouldn't say there was the transition as you're describing.

22  It was, it was always serious in the sense, okay, we are doing

23  this to train for jihad.  That was our purpose.  I mean, that was

24  how it was told when I was first joining, and that's how we used

25  to discuss about it.

1   Q.   Now, training for jihad, you mean training for military

2   fighting jihad?

3   A.   Yes.

4   Q.   There are other kinds of jihad, right?

5   A.   Yes.

6   Q.   Okay. So your belief was always that it's fun, but we're

7   doing this to learn military tactics?

8   A.   Yes.

9   Q.   And is, is this really sort of part of the Islamic religion,

10   to be prepared militarily?

11   A.   Yes.

12   Q.   You're taught to be ready to fight to defend yourselves?

13   A.   Yes.

14   Q.   And that's because Muslims have always been oppressed; is

15   that right?

16   A.   Well, I won't say they've always been oppressed, but if

17   you're weak, you'll be oppressed.

18   Q.   So to keep from being oppressed, you're strong?

19   A.   Um-hum.

20   Q.   And to be strong, you need to train?

21   A.   Yes.

22   Q.   To be prepared?

23   A.   Um-hum.

24   Q.   But this doesn't mean --

25        THE COURT: I'm sorry, wait one second, Mr. Aatique.

1  Don't say "um-hum."  We can't get that down.

2           THE WITNESS:  I'm sorry.

3           THE COURT:  Yes or no.

4           THE WITNESS:  Okay.

5  BY MR. YAMAMOTO:

6  Q.   This doesn't mean you're training to go out and start a war?

7  A.   No.

8  Q.   That was never in your mind, was it?

9  A.   Never in my mind, yes.

10 Q.   It was to train to be able to protect yourself and your

11 family?

12 A.   Yeah.  I mean, my purpose was to, was to be militarily

13 trained and militarily capable in case if it's ever needed in the

14 future.

15 Q.   Also to be in shape?

16 A.   Yes, but I think one outing every two weeks is not enough for

17 that.

18 Q.   And you didn't like the physical training.

19           So you -- were you in good shape?

20 A.   No, I don't think I was in good shape back then.

21 Q.   So this didn't do much to put you in good physical shape?

22 A.   No.

23 Q.   Did it help you mentally?

24 A.   Could you, could you explain that?

25 Q.   Well, did it give you some peace of mind that yes, I'm

1  training here. I'm getting myself prepared, that if I ever have

2  to defend myself in the future, I can do it?

3  A.  I surely realized that I know more than I would have if I had

4  not done this.

5  Q.  But you didn't still -- you didn't feel totally prepared --

6  A.  No.

7  Q.  -- playing paintball?

8  A.  Yeah. Mainly because I never -- I mean, what I felt a lot of

9  times was that almost everybody else had firearms, and I never

10  owned firearms here.

11  Q.  You never owned a gun?

12  A.  Not here. A military, never.

13  Q.  Did you ever buy one?

14  A.  No.

15  Q.  Did you have one in Pakistan?

16  A.  No.

17  Q.  Did you ever fire a weapon here in the United States?

18  A.  Here?

19  Q.  Yeah.

20  A.  No.

21  Q.  Just in Pakistan?

22  A.  Yes.

23  Q.  Okay. Now, throughout all of this, Dr. Al-Timimi is not

24  involved with any of this to your knowledge, right?

25  A.  That's a very general statement. I'll say when we're going

1  to the paintball field, he was never there, and in front of me, he

2  never discussed paintball.

3  Q.    As, as time went on and you guys got serious talking about

4  Chechnya, watching the Qoqaz site, then people started leaving.

5  Al-Hamdi left at some point?

6  A.    That was the first person I came to know, although later I

7  came to know that Ismail Royer had traveled before.

8  Q.    Before Hamdi?

9  A.    Yes.

10  Q.    That -- you learned that Royer had fought in Bosnia?

11  A.    Yeah.  I knew during the paintball outings that -- I came to

12  know that he had fought in Bosnia.

13  Q.    You also learned that he went to the LET camps in Pakistan at

14  some point?

15  A.    That I came to know much later actually, 2001.

16  Q.    So the first person you'd heard about was Al-Hamdi?

17  A.    That's correct.

18  Q.    And did you go to the airport when he left?

19  A.    Yes.

20  Q.    Did you see him off?

21  A.    Yes.

22         THE COURT:  Can we get a time frame for this, please?

23         THE WITNESS:  That's September of 2000, my guess.

24  BY MR. YAMAMOTO:

25  Q.    Did you know where he was going?

1  A.   Yes.   At that time, I knew.

2  Q.   And where was he going?

3  A.   I knew that he was going to, to train with LET in Pakistan in

4  some camp.

5  Q.   And do you know what he was going to do next?

6  A.   At that time, I came to know that his intention was to go

7  fight in Kashmir and not to come back, to become a martyr.

8  Q.   So it was your understanding that Al-Hamdi wanted to train,

9  fight, and get killed in Kashmir?

10  A.   That's -- yes.

11  Q.   So he would be shaheed?

12  A.   Yes.

13  Q.   What is "shaheed"?

14  A.   "Shaheed" --

15  Q.   How do you spell "shaheed"?

16  A.   In English, we can say s-h-a-h-e-e-d.

17  Q.   Okay.   Now, what is "shaheed"?

18  A.   "Shaheed" literally means a witness, but it's an Islamic

19  term, also, and it has different meanings, sort of like the

20  word "jihad," but the most well-known use is for the people who

21  die in combat, in a just combat.

22  Q.   And what happens to them when they die?

23  A.   If -- all their sins are forgiven.

24  Q.   And they go to heaven?

25  A.   Yes.

1  Q.  Immediately?

2  A.  Yes.  I mean, that's a theological question because nobody

3  will go to heaven until the Day of Judgment, but they are in a

4  state of bliss, yeah.

5  Q.  So even if they're not in heaven, they're not sitting there

6  waiting.  They're happy?

7  A.  Yes.

8  Q.  People that are not shaheed are just waiting for the Day of

9  Judgment?

10  A.  Yeah, but in Islamic belief, you'll have an idea of what's

11  waiting for you as soon as you die.

12  Q.  Do you know while you're alive?

13  A.  Say it again?

14  Q.  You say as soon as you die.  So you don't know what's going

15  to happen to you while you're alive?

16  A.  There will be signs of, of goodness or wretchedness, but, I

17  mean, death is when you, when your deeds are closed.

18  Q.  Signs, does the Islamic faith have a lot of signs and omens?

19  A.  I don't know about the word "omens" because that might imply

20  a belief in things we don't believe in, but we -- through

21  authentic text, we are told some signs of what a good death is and

22  what a bad death is.

23  Q.  Are there signs for other things, too?

24  A.  That's a very general question.  I mean, what signs and what

25  things are you talking about?

1  Q.  Okay.  So you can't answer that generally?  That's fine if

2  you can't.

3  A.  No, I cannot.

4  Q.  Did you know how Al-Hamdi made his preparations?  Do you know

5  if anybody helped him?

6  A.  To go to prepare?

7  Q.  To go to Pakistan.

8  A.  No.  I came to know it very late, when he was going, and I

9  just saw him off at the airport.  I did not know of any details of

10  how he prepared.

11       I did come -- actually, the outing before he was

12  going --

13  Q.  Um-hum.

14  A.  -- that's when I think I knew for sure he was going.

15  Q.  Did he say he was going?

16  A.  He told everybody, and that day I was late, so I was made to

17  do some punishment, and then, then I was told that that's what he

18  just told people just before I came there.

19  Q.  So you didn't hear it from him?

20  A.  No, not then.

21  Q.  What was your punishment?

22  A.  I did 50 push-ups.

23  Q.  Did you do them?

24  A.  Yes.

25  Q.  Were they hard?

1  A.   At that time, yeah.

2  Q.   Did anybody else talk about going to LET camp or anywhere

3  else during this period of time?

4  A.   No.

5  Q.   So he was the only one?

6  A.   Of, of the people I knew, yeah.

7  Q.   Did you guys talk about it in general, getting training?

8  A.   You mean talking about going to the camp and getting trained?

9  Q.   Right.

10 A.   I don't remember.

11 Q.   Okay.  Did it surprise you that Al-Hamdi wanted to go?

12 A.   He was, he was a type of person who, I mean, he's, he's not

13 the typical run-of-the-mill people that I know who just follow

14 things the way everybody else does, so I was not very surprised.

15 Q.   You were not very surprised?

16 A.   Of course, it's not a common decision what he took, but it

17 was -- it was not very surprising to come of him, knowing him

18 from before.

19 Q.   And based on you-all watching all these videos of combat and

20 talking about combat and -- so it didn't surprise you that he took

21 it one step further and decided he was going to go train?

22 A.   It was still surprising because it was a big step, but it

23 wasn't very surprising.

24 Q.   Okay.

25         THE COURT:  All right, Mr. Yamamoto, I think the jury

```
 1  has been sitting for an hour and a half.  This is a good time to
 2  take the morning break.
 3           We'll be in recess until 11:30, Ladies and Gentlemen.
 4           (Recess from 11:15 a.m., until 11:32 a.m.)
 5                        (Defendant and Jury present.)
 6           THE COURT:  Mr. Yamamoto.
 7  BY MR. YAMAMOTO:
 8  Q.   Mr. Aatique, when you watched the videos, who did you watch
 9  them with?
10  A.   Say it again?
11  Q.   When you watched the Chechen videos, who did you watch them
12  with?
13  A.   Almost all the videos that I watched were through the
14  Internet at my home PC, so nobody was with me.
15  Q.   You were by yourself?
16  A.   Yes.
17  Q.   Did you ever watch videos with anybody?
18  A.   I don't remember.
19  Q.   Did Dr. Al-Timimi ever watch them with you?
20  A.   Not with me.
21  Q.   Do you know if he ever saw them?
22  A.   I don't know.
23  Q.   "Russian Hell 2000," did you watch that video?
24  A.   I remember watching it over the PC.
25  Q.   Did you buy the video?
```

1 A.   No.   It was, it was available as a streaming link on the

2 Internet, so I clicked it and watched it live.

3 Q.   How many times?

4 A.   It's fairly long, I think maybe half an hour if I were to

5 guess.   Maybe I watched it just once, I think.

6 Q.   Just once?

7 A.   Yeah.

8 Q.   You watched other videos like that, like the "Russian Hell"

9 video?

10 A.   Yeah, some short clips off and on sometimes.

11 Q.   All by yourself?

12 A.   Yes.

13 Q.   Did you know anybody to bring back videos?

14 A.   Say it again?

15 Q.   Did you know that Donald Surratt brought back some videos?

16 A.   I came to know much later actually that these people, when

17 they traveled overseas, they bought some of these videos.

18 Q.   Did you ever watch them?

19 A.   No.

20 Q.   Do you know if Dr. Al-Timimi ever watched them?

21 A.   I don't know.

22 Q.   The "Russian Hell 2000" video romanticizes the fight in

23 Chechnya, right?

24 A.   Can be said.

25 Q.   And it idealizes the martyrs, the people that died?

1  A.   Yes.

2  Q.   And it's to make people want to go fight, go support the

3  Chechens?

4  A.   That can be a purpose, yeah.

5  Q.   Did Dr. Al-Timimi -- did Dr. Al-Timimi ever encourage anybody

6  to go fight in Chechnya?

7  A.   In person?  I don't remember.

8  Q.   Did he ever encourage you to go fight in Chechnya?

9  A.   Not me.

10  Q.   Do you know if he encouraged anybody?

11  A.   When we were -- when the lectures were being given in AOU, I

12  remember he mentioned that there was a person who was very eager

13  to go and he left, but he did not give his name.

14  Q.   Well, he didn't say that he encouraged them?

15  A.   He --

16  Q.   This person went.

17  A.   He did not say that, yeah.

18  Q.   So as far as you know, Dr. Al-Timimi didn't encourage

19  anybody?

20  A.   Not, not that I witnessed.

21  Q.   Did you know that Ismail Royer helped Al-Hamdi make

22  preparations to go to Pakistan?

23         MR. KROMBERG:  Objection, Judge.  This would be double

24  hearsay of what Hamdi said Royer said.

25         MR. YAMAMOTO:  I asked if he knew.

1       THE COURT: I think just this question by itself is not

2  hearsay or does not ask for a hearsay answer.

3       THE WITNESS: I came to know later that after --

4       THE COURT: Wait, the question is simply did you know,

5  and the answer is either yes, you knew, or no, you didn't.

6       THE WITNESS: I came to know that he went through -- he

7  got his contact through --

8       MR. KROMBERG: Objection.

9       THE COURT: Wait.

10       MR. KROMBERG: We should at least ask if he came to know

11  it from Royer or he came to know it from Hamdi or he came to know

12  it from some third person.

13       THE COURT: The question is did you know. The answer is

14  yes or no, and if it's yes, then not what you knew but how did you

15  know, because that way, we can tell whether or not the next answer

16  will be permitted.

17       So you said you did know at some point.

18       THE WITNESS: Yes, but it was told to me by a third

19  person.

20       THE COURT: All right.

21  BY MR. YAMAMOTO:

22  Q.  It wasn't told to you by Al-Hamdi or by Royer?

23  A.  No.

24  Q.  Royer told you at some point that he'd gone to LET in Bosnia?

25  A.  Yes.

1  Q.  And when Al-Hamdi came back, were you surprised he came back?

2  A.  Yes.

3  Q.  And he started telling you about his experiences at the LET

4  camp and in Kashmir, right?

5  A.  Yes.

6  Q.  And that made you want to go?

7  A.  That was one of the reasons, yes.

8  Q.  Did Dr. Al-Timimi have anything to do with that?

9  A.  In my decision to go?

10  Q.  Right.

11  A.  Not directly.

12  Q.  Not at that time he didn't have anything to do with your

13  deciding to go.  It was listening to the stories of Al-Timimi --

14  Al-Hamdi and Royer?

15  A.  Yes.

16  Q.  Now, you were going to ask Al-Hamdi about how to go, right?

17  A.  Yes.

18  Q.  Kwon told you, "No, don't ask Al-Hamdi; Royer's the man.  Go

19  ask Royer"?

20  A.  That's correct.

21  Q.  So you went to talk to Royer?

22  A.  Yes.

23  Q.  Did Kwon talk about going?

24  A.  Not at that time.

25  Q.  And you met with Royer at his house?

1 A.    Yes.

2 Q.    And you had dinner there with Kwon and Royer and somebody

3 else?

4 A.    Yes.

5 Q.    And that's when Royer made calls for you so you could go to

6 LET camp?

7 A.    That's correct.

8 Q.    He told them -- he gave them your kunya, your alias name, and

9 told them when you would arrive?

10 A.    Yes.  And he gave me a letter to carry.

11 Q.    And this is all when, in July or August of 2001?

12 A.    It was probably August of 2001.

13 Q.    Dr. Al-Timimi doesn't know anything about this?

14 A.    No, I don't think he knew.

15 Q.    You didn't tell him?

16 A.    No.

17 Q.    Royer also gave you a letter --

18 A.    Yes.

19 Q.    -- introducing you, telling them that you were a good person.

20 A.    Yes, something along these lines, three or four lines.

21 Q.    He gave you the phone number to call when you got to Lahore?

22 A.    Yes.

23 Q.    Did you talk to the person on the phone on that day?

24 A.    Me?  No.  I myself did not talk.

25 Q.    Was Kwon interested in going at that point?  Did he talk

1   about it?

2   A.   No, I don't think so.

3   Q.   Why was Kwon there, do you know?

4   A.   It so happened that when I told -- when I had told -- talked

5   with him in person, when I had met him in July, late July

6   probably, that, okay, I want to go and this and that, so he said,

7   "Yeah, okay, I can give you a reference letter and contact for

8   that purpose."

9          And then either, either during that time when I told him

10  or sometime later, he invited me to come to a dinner at his home.

11  He was making something for us, and he invited me, and he invited

12  Kwon, also, and there was a fourth person, which I can't recall

13  who it was.

14  Q.   These people knew you were going to the camp?

15  A.   No, not at that -- actually --

16  Q.   They found out at the dinner that you were going to the camp?

17  A.   I'm not, I'm not sure because we didn't -- I mean, it was not

18  my purpose to keep it a secret because I trusted them, but, but

19  when he wrote the letter, we walked away from these people, and

20  when he called, he went to his basement, so --

21  Q.   But Kwon already knew that you were going to go.

22  A.   I'm not sure.

23  Q.   Well, Kwon told you to talk to Royer about going.

24  A.   Yes, he knew that I was -- yeah, this is correct, that he

25  told me that Royer is a person to talk to, but I'm not sure if he

```
 1  knew that my plans had become concrete and I was going.
 2  Q.   Okay.  That other person that was there was not
 3  Dr. Al-Timimi?
 4  A.   No.
 5  Q.   Now, you thought about going to train with the U.S. Army, but
 6  you were concerned about being sent overseas and fighting Muslims?
 7  A.   I never really seriously thought about it.  Actually, this
 8  question was asked to me by the agents, why didn't you train, this
 9  and that, and I told them that even if I thought about it, it
10  was -- because in most places, if you train, you have to sign some
11  commitment.
12       I know with U.S. reserves that you can be part of the
13  reserve even if you're not a citizen, but then they may call you
14  up anytime.
15  Q.   Your intention was to go to LET camp for a few days, three or
16  four or five days?
17  A.   Yes.
18       MR. KROMBERG:  Judge, can we have a time frame?  We
19  heard on direct that there were different -- intentions changed.
20       THE COURT:  All right, all right.
21  BY MR. YAMAMOTO:
22  Q.   Initially, when you thought about going and talked to Royer,
23  your plan was to go for three or four or five days?
24  A.   Up to a week initially when I talked to him.
25  Q.   Up to a week.
```

1       But ultimately, you were going to bring your family back

2   to America?

3   A.    That was my -- I mean, that was why my trip was planned in

4   the first place, because my family went there in June, June, when

5   I dropped my wife and children, I mean, there, and I came back,

6   and I was thinking I would go in September to pick them up, so

7   that's when I thought that I could, I could take a week off from a

8   vacation and travel to the camp, also.

9   Q.    So it was to go to the camp, do some training, come back, get

10  your family, come back to America, correct?

11  A.    That's correct.

12  Q.    Now, over time, you're Pakistani, and you read the Pakistani

13  newspapers; is that right?

14  A.    Yes.

15  Q.    Watch Pakistani news on TV?

16  A.    If there are -- I mean, I don't have a satellite TV here, so

17  I can't watch channels from there.

18  Q.    Okay.  LET, Lashkar-e-Taiba is a political organization in

19  Pakistan; is that right?

20  A.    No, I wouldn't call it a political organization.  It's, it's

21  a social organization in terms of the social activities they do,

22  and they have a military wing.

23  Q.    Okay.  So it's more than just a military group.  It's a much

24  larger group than that.  They have social obligations?  They run

25  schools, libraries, hospitals?

1  A.   That's correct.

2  Q.   LET offices are all over the place?

3  A.   That's what I came to know when I went there, although I

4  don't know if they're out and open, but -- or they were out and

5  open, I don't know, but when I visited there, I came to know that

6  they had offices in a lot of towns and cities all over Pakistan.

7  Q.   Now, in some towns and cities, they have more than one

8  office?

9  A.   It's got to be like that, yeah.

10 Q.   Is -- LET is not -- is it a religious organization?

11 A.   It's built on the foundation of Islamic principles as they

12 understand them, so it can be called a religious organization.

13 Q.   Are they Suni?

14 A.   Yes.

15 Q.   Are they Salafi?

16 A.   I would say yes.

17       THE COURT:  You'd better explain what that means.

18 BY MR. YAMAMOTO:

19 Q.   Spell it first.

20 A.   S-a-l-a-f-i.

21 Q.   And what does it mean?

22 A.   This term is -- people who are Salafi or not Salafi sometimes

23 use this term to reference people who -- a Salafi, the term comes

24 from the word "salaf," s-a-l-a-f, which references to the early

25 generations, the first three generations after, after the Prophet,

1 | including his generation, and ideally it refers to people whose

2 | understanding of religion and practice is based on the example of

3 | those generations.

4 | Q.   On the word of the Prophet?

5 | A.   On the, on the way he and his generation and the subsequent

6 | one or two generations understood it and implemented it.

7 | Q.   There are other Muslim organizations that follow other

8 | tenets, other -- don't follow that?

9 | A.   It's a matter of perspective, because if you talk to them,

10 | they might claim something similar, but they, they go by different

11 | names and different groups.

12 | Q.   Now, you were aware that the, the LET organization was being

13 | supported by the Pakistani government in its fight in Kashmir?

14 | A.   I never explicitly knew that, but it was sometimes in the

15 | media that, that Pakistani Army used to facilitate the fighters

16 | going in and out of Kashmir because it's -- the line of control is

17 | heavily patrolled by both sides which divides the Kashmir region,

18 | so it's difficult to go in and out.

19 |          MR. KROMBERG:  Your Honor, if I could -- we can enter a

20 | stipulation at this time, I left it in my office, but in

21 | essence -- and will bring it later -- but in essence, it is that

22 | until December 2001, at various times, various operations of

23 | Lashkar-e-Taiba were facilitated by various parts of the Pakistani

24 | government.

25 |          THE COURT:  Mr. Yamamoto, any objection to that

 1 | stipulation?

 2 |       MR. YAMAMOTO:  No, thank you.

 3 |       THE COURT:  All right, that's fine.

 4 | BY MR. YAMAMOTO:

 5 | Q.  Now, you were shown a number of LET posters.

 6 | A.  Yes.

 7 | Q.  That was the first time you'd seen those posters or you'd

 8 | maybe seen -- they'd shown them to you before, but --

 9 | A.  The first time I saw LET posters was when Ibrahim Al-Hamdi

10 | came back, at his home in Northern Virginia.

11 | Q.  At Al-Hamdi's home?

12 | A.  Yes.

13 | Q.  Okay.  Dr. Al-Timimi didn't have any LET posters, did he?

14 | A.  Not that I know of.

15 |       MR. KROMBERG:  Objection, Judge.  The witness has no

16 | knowledge of whether Dr. Al-Timimi had posters.

17 | BY MR. YAMAMOTO:

18 | Q.  To your knowledge.

19 |       THE COURT:  All right, rephrase the question.

20 | BY MR. YAMAMOTO:

21 | Q.  To your knowledge, Dr. Al-Timimi had no LET posters?

22 | A.  Not to my knowledge.

23 | Q.  To your knowledge, Dr. Al-Timimi didn't see the LET posters

24 | you saw?

25 | A.  To my knowledge -- I don't know that he saw them or not.

1  Q.   Dr. Al-Timimi doesn't speak Urdu, does he?  He speaks Arabic.

2  A.   I don't think he can speak Urdu.

3  Q.   So he wouldn't be able to read -- withdraw that.

4        You decide you want to go get some training but you're

5  not going on to fight; is that right?

6  A.   Until, until that meeting and for some time after, it was my

7  intention not to go fight except for some time after that meeting,

8  during that meeting and after the meeting on the 16th.

9  Q.   At the meeting with Royer, your intention was to go train,

10 come back?

11        MR. KROMBERG:  Objection, Judge, because Royer was at

12 more than one meeting.

13        THE COURT:  I think you need to make it specific what

14 meetings you're talking about.

15 BY MR. YAMAMOTO:

16 Q.   At the meeting at Royer's house in August, you made plans to

17 go train for up to a week, come back?

18 A.   At that time in August of 2001, it was not my intention to go

19 and fight.

20 Q.   You made plane reservations to leave in late August/early

21 September?

22 A.   Yes.

23 Q.   That plane reservation was for the 19th of September?

24 A.   That's correct.

25 Q.   Your tickets didn't come until the 10th or 12th or somewhere

1   in there, right?

2   A.   Actually, I received them after 9/11, maybe the 17th or --

3   Q.   17th?

4   A.   That's when the FedEx came.  It got disturbed because of

5   9/11.

6   Q.   But the tickets and the reservations had been made

7   previously?

8   A.   Yes.

9   Q.   Now, you intended to go by yourself, right?

10  A.   Yes.  I was planning to go alone, yeah.

11           MR. KROMBERG:  Objection, Judge.  Again, we need to know

12  intent when?

13           THE COURT:  Yes.

14           MR. YAMAMOTO:  I will ask the next question that will

15  help him, Your Honor.

16  Q.   Ultimately, Khan went with you?

17  A.   On the 19th, ultimately, he went with me, yes.

18  Q.   Now, it turns out that when you went to that meeting at

19  Kwon's on the 16th, you told people you were going to LET camp and

20  that you could -- they could go with you and you would help them

21  get ready to go.

22  A.   Yeah.  After, after Ali Timimi had left and -- actually, even

23  while he was here and during his presence and also after he had

24  gone, because I told people that I'm going anyway and I have these

25  arrangements, so I told them if anybody wants, they can go with

1  me. I can give them a ride from Pennsylvania onwards.

2  Q. That was your decision. You just told everybody, "I'm going;

3  you can come with me"?

4  A. You mean my decision to tell the people at that point?

5  Q. Right.

6  A. Yes.

7  Q. Nobody told you to tell anybody.

8  A. Nobody told me to share that with anybody, yes.

9  Q. Your actions influenced some other people to go, like Khan?

10  A. Say it again?

11  Q. Your actions, your telling them that you were going to camp

12  influenced people like Khan to go to camp?

13  A. If you ask my opinion about individuals, I'm not so sure

14  about Masaud Khan, but probably influenced more Kwon and Hasan.

15  Q. Your saying you're going influenced Kwon and Hasan you're

16  saying?

17  A. Yeah.

18  Q. You think that's why they made their arrangements to go about

19  the same time as you, to meet you up in camp?

20  A. That may be one of the reasons, although, I mean, I would say

21  that the whole atmosphere of the talk encouraged everyone to go.

22  Q. You didn't tell people you were only going to go for a week,

23  did you?

24  A. No, I stayed quiet. I mean, if, if people got the impression

25  that I was going to go and fight somewhere, I let that be at that

1 point of time. I did not, I did not tell anybody that, okay,

2 whatever, whatever he's saying, I mean, I'm going to come back. I

3 did not tell them that.

4 Q. You didn't tell them that, but that's what you intended, that

5 you were coming back?

6 A. Well, at that point of time, I was in an excited state of

7 mind, so I thought, okay, I'm going there anyway, so let me see

8 what happens. Let me go there.

9 Q. You were in an excited state of mind because Royer was

10 talking about it, other people were talking about going and

11 fighting and --

12 A. It was because basically by the talk that Al-Timimi gave.

13 He, he described the events and the way he was forcing things to

14 be. That, that was the main motivation for me to think, okay,

15 I'll see something if I go to the camp, what's going to happen

16 after that.

17 Q. "What's going to happen" meaning you wanted to see if what

18 Dr. Al-Timimi was talking about was going to come to pass, these

19 signs of the end of time?

20 A. Yeah, roughly around -- yeah.

21 Q. And that's what he was giving you, wasn't he? He was giving

22 you the lecture about the signs of the end of time. This is what

23 you're looking for. This may be the event; it may not be the

24 event. You need to look for these signs?

25 A. No, he didn't say, "Look for these signs." He said with very

1   certainty that, that now, this is the start of, I mean, now you're
2   going to see the signs and the promises come true, and so you've
3   got to be part of what's going to happen.
4   Q.   But he didn't tell you you had to go be part of the fighting
5   combat.  He also said you could go do hijra and go to another
6   country and live where you could live with good Muslim people?
7   A.   He said -- he recommended these two or three things.  None of
8   them was in exclusion to any other.  He said that go and fight,
9   encourage to be with the mujahideen wherever, and also, of course,
10  he said about that you should leave this country and be with the
11  good folks.
12  Q.   He also said if you couldn't leave the country, didn't want
13  to go fight, you should stay home and pray, and as good Muslims,
14  you would pray and repent to God?
15  A.   He may have said that, but, I mean, I don't have a memory of
16  him saying these things.  He may have said this, but I don't
17  remember.
18  Q.   He didn't tell you you had to go fight.  He didn't tell you
19  you had to go on hijra.
20  A.   He did encourage us to go and be with the mujahideen, take
21  part in these battles if we can or be with the good people or just
22  leave the country.  He gave us these two or three things to do.
23  Q.   He gave you choices?
24  A.   It can be said, yeah.
25  Q.   And for those that couldn't leave, there must have been a

1  choice for them?

2  A.  I don't remember.  I mean, I remember him very strongly

3  encouraging to leave.

4  Q.  But not necessarily leave to fight.  To leave, go hijra to

5  another country?

6  A.  Yeah.  Not necessarily to fight but, I mean, to fight or to,

7  or to leave the country or to be with the better people at other

8  places.

9  Q.  And in fact, Donald Surratt -- Idris Surratt took his family

10  and went to Egypt?

11       MR. KROMBERG:  Objection, Judge.  Donald Surratt didn't

12  come to this meeting on the 16th, as we've heard.

13       THE COURT:  All right.

14       MR. YAMAMOTO:  I'll withdraw the question, Your Honor.

15       THE COURT:  Sustained.

16  BY MR. YAMAMOTO:

17  Q.  When you went to that meeting -- let me back up before the

18  meeting.

19       When 9/11 happened --

20  A.  Yes.

21  Q.  -- you were scared?

22  A.  That was one of the feelings, yeah.

23  Q.  You were afraid of being attacked?

24  A.  Yeah, I was careful and keeping a low profile.

25  Q.  Because you were Muslim?

1  A.   Yes.

2  Q.   And you -- people could look at you and see that you were of

3  Middle Eastern descent?

4  A.   I'm not exactly from Middle East, but people here generally

5  don't know much about, I mean, don't have a good idea --

6  Q.   People would think you're of Middle Eastern descent --

7  A.   Yeah.

8  Q.   -- because of your beard and your demeanor?

9  A.   Yeah.

10  Q.   They'd think you were Muslim?

11  A.   Um-hum -- yes.

12       THE COURT:   Thank you.

13  BY MR. YAMAMOTO:

14  Q.   When you went to this meeting on the 16th, everybody felt the

15  same, didn't they?  Everybody was scared?

16  A.   Yes.  It can be said, yeah.  People were apprehensive and,

17  like, "scared" may be a strong word, but you can say people

18  were --

19  Q.   Fearful?

20  A.   Fearful, yeah.

21  Q.   What did you-all talk about before Dr. Al-Timimi came?  Is

22  this what you were talking about?

23  A.   Before he came, there was very little talk actually.  I

24  reached there, and we just -- I prayed my sunset prayer, and then

25  some minutes later, Yong Kwon left.  At that time, I did not know

1  where he was going.

2  Q.  Okay.  Now, Masaud Khan talked about he was afraid, he was

3  afraid that, that Muslims were going to be attacked in their

4  homes, have their homes burned, and the Muslims being chopped to

5  pieces like they were in India, right?

6  A.  I remember him saying something along these lines.

7  Q.  Other people said other things similar to that?

8  A.  Not perhaps in such strong words but, but I remember somebody

9  saying, "What should we do?  Should we gather our families?"  I

10  don't remember who said.  Something like that.

11  Q.  So the feeling was we're Muslims, we're in the United States,

12  we're subject to possible attack by other Americans.  What should

13  we do?

14  A.  Yes.  That's one of the subjects, yeah.

15  Q.  And when Dr. Al-Timimi, that was some of the things he was

16  asked:  "What should we do?  Should we stay?  Should we go?  What

17  should we do?  Are we in danger?"

18  A.  I think, I think somebody put a question along these lines to

19  him, yeah, what should we be doing?

20  Q.  And this was part of what he was telling you, about going on

21  hijra, going to a safe Muslim country?

22  A.  In nearly all of his recommendations answered that way, so

23  one of his three recommendations, the recommendation of hijra, of

24  course, also answers that way of if you're worried about your

25  safety here, then leave.

# Aatique - cross

1  Q.  Leave and go to a Muslim country?

2  A.  Yeah.

3  Q.  With other Muslims to be safe?

4  A.  Yes.

5  Q.  That's what he's talking about:  being safe, protecting

6  yourself and your family?

7  A.  The way he talked, the topic of discussion was more about the

8  impending attack on Afghanistan and that -- it was more along

9  these lines when he start talking.  It was not exactly about how

10  we protect ourselves here.

11  Q.  But he was talking about how you protect yourself, talking

12  about leaving the country to protect yourself?

13  A.  Yes.  I mean, that was a part of his talk, yeah.

14  Q.  Well, he's also saying some, some scholars, some people would

15  say that you should go do some other stuff, do combat?

16  A.  Say it again?

17  Q.  Withdraw it.

18        Kwon's apartment is on the second floor, isn't it?

19  A.  It's not on -- I think it's top floor of his -- it's a three-

20  or four-floor building, apartment building. '

21  Q.  Three or four --

22  A.  I think it's on the top floor.  I remember that.

23  Q.  On the third or fourth floor?

24  A.  Yeah.

25  Q.  Now, it was never your intention to go train and fight

1  against the United States?

2  A.    Not explicitly.  I mean, I never explicitly imagined any

3  place or any, any enemy that I'd fight against, but at that

4  meeting and for maybe a couple of days later, I was thinking,

5  okay, I'm going to go there, and I'll see what happens, and I may

6  go and fight somewhere.  That was my intention.

7  Q.    That you may fight somewhere but you didn't know where?

8  A.    I never imagined any specific enemy or specific place.

9  Q.    You know Nabil Gharbieh?

10 A.    Yes.

11 Q.    He came for a few minutes at that meeting?

12 A.    Yes, maybe couple of minutes.

13 Q.    He came with somebody else?

14 A.    Yes.

15 Q.    That other person came in, you were all sitting in a group,

16 he sat down with you?

17 A.    No.  He just came, and he did not sit down.  He just left

18 within a couple of minutes.

19 Q.    So they just came and were gone immediately?

20 A.    Yes.  I mean, he came, and we exchanged greetings, and what I

21 remember is that he -- I mean, it was something like people gave

22 him looks or something like that that he -- from what I recall, he

23 sort of understood that, and he just left immediately with that

24 person.

25 Q.    You're talking about -- I'm talking about not Gharbieh.  The

1 person that came with him --

2 A.   Um-hum.

3 Q.   -- came and gave greetings, and everybody greeted him?

4 A.   Yeah.  Of course, we greeted both of them, and they greeted

5 us.

6 Q.   And then a few minutes later, they just left?

7 A.   Not even few minutes.  I'd say maybe one or two minutes.

8 Q.   So they were there for a minute or two at most?

9 A.   Yes.

10 Q.   Now, the decisions you made, you made yourself.  Nobody told

11 you what to do?

12         MR. KROMBERG:  Objection, Your Honor.  That's a compound

13 question.

14         THE COURT:  I also think it's been asked and answered

15 several times now.

16         MR. YAMAMOTO:  Okay.

17         THE COURT:  I'm going to sustain the objection.

18 BY MR. YAMAMOTO:

19 Q.   You met with Randall Royer?

20 A.   Many times.

21 Q.   After you met with the FBI?

22 A.   Once, yeah.

23 Q.   They asked you to meet with him?

24 A.   Yes.

25 Q.   They gave you some Taiba Bulletins to show him?

1  A.    Yes.

2  Q.    He looked at them, and he told you that he had set up the

3  website --

4            MR. KROMBERG:  Objection, Judge.  Objection to what

5  Randall Royer said if it's introduced for the truth of what

6  Randall -- of what --

7            THE COURT:  I'm going to sustain that objection unless

8  you have --

9            MR. YAMAMOTO:  All I'm introducing it for is that

10  Randall Royer said it, not for the truth of the matter.

11            MR. KROMBERG:  Then what's the relevance of it if he

12  said it if it's not for the truth?

13            THE COURT:  I'm going to sustain that objection.

14            MR. YAMAMOTO:  Your Honor, may we approach?

15            THE COURT:  Yes, sir.

16            (Bench conference on the record.)

17            THE COURT:  Yes, Mr. Yamamoto.

18            MR. YAMAMOTO:  We've gone through this before when I

19  objected to the government introducing Royer's statements during

20  these conversations, and the Court permitted the government to go

21  into them.  Now, I'm not sure why I'm not permitted to go into

22  them at this point.

23            THE COURT:  We heard the -- what is it that Royer --

24  what do you think he is going to say on this?

25            MR. YAMAMOTO:  He is going to say that Royer set up,

1 | Royer set up the website for the Taiba Bulletin.

2 | THE COURT: That's not a -- you even said that in your
3 | opening statement.

4 | MR. KROMBERG: What's the real agenda, Judge, is they're
5 | trying to get Randall Royer in without having Randall Royer
6 | testify. We are not putting in that Randall Royer set up a Taiba
7 | Bulletin. We just want to show that Ali Timimi read the Taiba
8 | Bulletin.

9 | If they want to have Randall Royer come in and say he
10 | set up the Taiba Bulletin, they should call him as a witness.

11 | THE COURT: What's your next question? Is that the only
12 | issue you want?

13 | MR. YAMAMOTO: And the next question is, "What did
14 | Randall Royer tell you about the Taiba Bulletin?"

15 | And the response should be, because he's told the FBI
16 | this, that Randall Royer told him that the bulletins that he put
17 | on the website dealt with reconciliation with the United States.
18 | And that's it.

19 | THE COURT: The latter statement doesn't add anything to
20 | this case, and that's just too speculative.

21 | MR. YAMAMOTO: Well, the government --

22 | THE COURT: The government was allowed to play the tape
23 | with Khan because that's actually a tape. You don't have the
24 | hearsay problems of seepage there, but here you're asking this --
25 | and I think I had said earlier that if what the government was

1    trying to do with the Khan statement was to have this witness

2    characterize what Khan said to him, I would have not permitted it

3    in.

4           I did permit the tape because it's a different evidence

5    because it's more trustworthy, but here there's no way of

6    cross-examining or evaluating what Royer would have said to him,

7    and so it is not proper evidence, and it is different from my

8    ruling on Khan for those reasons.

9           So I'm sustaining the objection.

10          MR. KROMBERG:  Thank you, Your Honor.

11          (End of bench conference.)

12   BY MR. YAMAMOTO:

13   Q.    In -- before you went to LET, you looked up LET to see what

14   it was?

15   A.    Yes.

16   Q.    You saw that LET was not associated with Al-Qaeda?

17   A.    From what I knew, it wasn't.

18   Q.    You were not truthful to the FBI about your meeting with

19   Royer, were you?

20   A.    You mean immediately after I came back from the meeting?

21   Q.    Immediately afterwards.

22   A.    Yes.

23   Q.    You didn't tell them that you had told Royer what you were

24   doing?

25   A.    Immediately after when I came back from meeting Royer, I told

1  them that I, I did everything as they told me to do.

2  Q.  Right.  And that's not true.  You didn't.  You told Royer

3  what you were doing.

4  A.  Yes.

5  Q.  Subsequently, you did 'fess up?

6  A.  Next day.

7  Q.  Now, subsequently, you entered a plea.

8  A.  Yes.

9  Q.  And as part of that plea, you were told to cooperate?

10  A.  Yes.

11  Q.  In exchange for your cooperation, the government has filed a

12  motion on your behalf asking the Court to reduce your sentence?

13  A.  Yes.

14  Q.  And what you're hoping for with your cooperation is that your

15  sentence of -- 126 months, is it?

16  A.  That's correct.

17  Q.  Is going to be substantially reduced.

18  A.  Yes.

19          MR. YAMAMOTO:  Thank you.  Nothing further at this time,

20  Your Honor.

21          THE COURT:  All right.  Any redirect?

22          MR. KROMBERG:  Yes, Your Honor.

23                      REDIRECT EXAMINATION

24  BY MR. KROMBERG:

25  Q.  Mr. Aatique, I apologize in advance; I'm going to be asking

1  questions in a rather disorganized way, I'm afraid, because I just

2  wrote down notes to ask on things that Mr. Yamamoto asked you.

3         Mr. Yamamoto asked you whether "Russian Hell 2000"

4  romanticized the people who died in Chechnya; is that right?

5  A.   I mean, Russians died, and the mujahideen died, so it -- I

6  don't remember exactly if I can recall any scene, but generally,

7  those videos, they idealized the Muslim fighters who died fighting

8  Russians.

9  Q.   Not the Russians who died?

10 A.   No.

11 Q.   One of the questions was that, I think, was whether jihad is

12 always to protect Muslims who are oppressed.  Do you recall that?

13 A.   There was some questions along these lines.

14 Q.   Is jihad a -- violent jihad only used for defense?

15 A.   This is a theological question, but from what I know, defense

16 would, of course, be jihad, but it can be an offensive -- in

17 certain circumstances, it can be an offensive word, also.

18 Q.   Where did Islam start?

19 A.   We believe that Adam was the first Muslim.

20 Q.   Where did Muhammad live?

21 A.   Arabia, Mecca.  That's where he was born.

22 Q.   What relationship did offensive jihad have to the spread of

23 Islam from Arabia to elsewhere in the world, if any?

24 A.   This is, this is a historical debate, because a lot of

25 Orientalists accuse that Islam was spread by sword, but we Muslims

1  don't believe in that. There was, of course, as soon as Arabia

2  was united under Muslims, it came in contact with the powers of

3  Persia and Romans, and because Persia was close by, they

4  immediately entered war with Persia, and those regions that

5  immediately came under Muslim rule slowly became Muslims over

6  centuries.

7  Q.  How did Arabia become unified?  Excuse me, what relationship

8  did jihad by the sword have to the unification of Arabia under

9  Islamic rule?

10  A.  Most of them entered after the eighth year of hijrah, when

11  the Mecca was reconquered, because most of the Arabs were watching

12  to see who, who wins this struggle between the new Prophet and the

13  Meccan-established aristocracy, and they lost out, so most of them

14  gave their oath of allegiance to the Prophet before he died.

15  Q.  Was there a question -- do you recall a question from

16  Mr. Yamamoto about -- excuse me, do you recall an answer to a

17  question of Mr. Yamamoto's where you mentioned that mujahideen and

18  jihad was mentioned in a noble manner at lectures at Dar al-Arqam?

19  A.  That's correct.

20  Q.  Can you expand on that?  In what sense were mujahideen

21  mentioned in a noble manner at those lectures?

22  A.  One example, I think I talked about yesterday where Ibn

23  Khatab and the, and the commanders of mujahideen were referred to

24  as, as being a noble example that, I mean, not everybody,

25  everybody can achieve that status along these lines.

1  Q.  You mentioned the Salafis.  Is it Salafi or "Salafi"?

2  A.  "Salafi."

3  Q.  "Salafi."  What creed, do you know, is Al-Timimi?

4  A.  To the best of my knowledge, he, he is on the creed of

5  Salafi.

6  Q.  Do all Muslims interpret what it is to be a Muslim the same

7  way as Salafis?

8  A.  No.

9  Q.  Do all Muslims place the same emphasis on jihad as being an

10 external struggle versus an internal struggle as the Salafis do?

11 A.  No.

12 Q.  Do they -- on the range, in the spectrum of Muslims, are the

13 Salafis the ones who tend to put more emphasis on the external

14 jihad versus the internal jihad?

15 A.  I won't say external versus internal, but, but Salafis

16 generally stress jihad more than non-Salafis.

17 Q.  Are there -- is there any sect of Islam or any people who

18 call themselves Muslim who emphasize violent jihad more than

19 Salafis?

20        MR. YAMAMOTO:  Your Honor, these are all his opinions.

21        THE COURT:  Well, I'll warn the jury that this witness

22 is not an expert witness; however, he is a lifelong member of that

23 faith, and just the way a Christian or a Jew, to the extent

24 they've been a lifelong member of their faith, could explain their

25 understanding of their faith, I think he has sufficient background

1 to answer these questions, and if there are expert witnesses in

2 this case or others who disagree, that can be brought out during

3 the trial.

4          MR. KROMBERG:  Thank you, Your Honor.

5          THE COURT:  Overruled.

6 BY MR. KROMBERG:

7 Q.   On the spectrum of belief, is there any -- a group of people

8 who call themselves Muslims who are -- place more emphasis on

9 violent jihad than the Salafis?

10 A.   Among the big groups, I don't know of any.

11 Q.   Go back just a second.  When you mentioned that it was said

12 at Dar al-Arqam that Khatab was a noble example of mujahideen, who

13 said that at Dar al-Arqam?

14 A.   Ali Timimi.

15 Q.   There was -- correct me if I'm wrong:  I think you made a

16 response to Mr. Yamamoto that Timimi mentioned in a lecture

17 someone who left for Chechnya; is that correct?

18 A.   I don't exactly recall he left for Chechnya, but it was at a

19 talk at AOU, and he mentioned something like, "I just talked with

20 a person yesterday" -- or today, something like that -- "and

21 he" -- and the way he said was that he, he just, he just wanted to

22 die shaheed, and he left -- he's leaving, something like that.

23 Q.   And this was Ali Timimi saying this?

24 A.   Yes.

25 Q.   Did Ali Timimi characterize what this person was doing as

# Aatique - redirect

1  something noble or not noble?

2  A.   He mentioned that in a very praiseworthy way.

3          THE COURT:  I'm sorry, in a what?

4          THE WITNESS:  Praiseworthy.

5  BY MR. KROMBERG:

6  Q.   I think you said -- correct me if I'm wrong -- that Ali

7  Timimi had no direct impact on your initial decision to go to the

8  camp.

9  A.   Yes.

10 Q.   That that was made before 9/11.

11 A.   Yes.

12 Q.   Did he have any indirect impact?

13 A.   Well, as I testified before, after 9/11, I wasn't -- I became

14 unsure about whether this is a good idea to go there right now or

15 not, but after the talk that I listened at Kwon's home, the talk

16 firmed up my decision that, okay, I should go.

17 Q.   Mr. Yamamoto asked you whether to your knowledge, Ali Timimi

18 had any LET posters in his house.  Had you ever been to his house?

19 A.   No.

20 Q.   In response to one of Mr. Yamamoto's questions -- correct me

21 if I'm wrong -- I think you said that you do not think that you

22 influenced Masaud Khan in his decisions to go to Pakistan and LET;

23 is that right?

24 A.   Maybe not to that extent because --

25 Q.   Why do you -- my question is, first question is is that

1  correct, that that's what you said?

2  A.    Yes.

3  Q.    Okay.  The second question is why do you say that you don't

4  think you influenced Khan in his decision?

5  A.    Because in that meeting, he was -- it seemed that he was

6  enthusiastic.  I remember him being more enthusiastic than others

7  and more, more firmed up.  And I also thought that since long time

8  before, when the Russians and Communists were there, he had fought

9  there.

10       So this -- for a person who has never been to such

11  things, it will be a -- I mean, for him, it's more easy to be

12  influenced by me than a person who's there, he knows everything,

13  and he can make decisions on his own.

14  Q.    Did Masaud Khan speak Urdu?

15  A.    Yes.

16  Q.    He had family in Pakistan?

17  A.    Not immediate family.  Only his younger brother was there in

18  Karachi.

19  Q.    Did Masaud Khan look up to you as a scholar?

20  A.    No.

21  Q.    Were you -- did he look up to you at all?

22  A.    I don't know -- I really didn't hang out with him that much.

23  I met him perhaps once in Blacksburg and once or twice before

24  that, but very little contact.  I did not have a lot of contact

25  with him.

1   Q.   Did Masaud Khan appear to look up to Ali Timimi?

2   A.   Yes.

3   Q.   Why do you think that you influenced Kwon -- excuse me, in

4   what sense do you believe that you influenced Kwon and Hasan in

5   their decisions?

6   A.   That's, that's speculation on my part, but I think that when

7   I -- when the talk happened and I told, and I told everybody,

8   "Well, I'm going anyway," so they might have realized that when

9   he's going, so why should we stay behind?  Something like that.

10  Q.   Did Kwon look up to you as a scholar?

11  A.   No.

12  Q.   Did Hasan look up to you as a scholar?

13  A.   No.

14  Q.   Did they appear to look up to Ali Timimi as a scholar?

15  A.   Yes.

16  Q.   Whose -- who had more influence on them in your view, you or

17  Ali Timimi?

18  A.   Ali Timimi, of course.

19  Q.   Why do you say "of course"?

20        MR. YAMAMOTO:  Your Honor, this is all speculation at

21  this point.

22        THE COURT:  Well, you opened it on the direct -- I mean,

23  in the cross examination, so this is not inappropriate for

24  redirect.  Overruled.

25  BY MR. KROMBERG:

1  Q.   Mr. Aatique, why do you say of course Ali Timimi would have

2  more influence over them than you?

3  A.   I mean, I'm, I'm not a scholar in any way, and I've never

4  studied religion formally, and I don't think I have, I have any

5  credentials to give talks or being a lecturer or something.

6  Q.   Was your relationship to Kwon and Hasan of being a peer?

7  A.   Yes, that's more like it.

8  Q.   Was -- how was that different from their relationship with

9  Ali Timimi?

10 A.   Well, people of the Dar al-Arqam group used to look up at him

11 as a scholar, and he was one of the regular lecturers there, so

12 they looked up to him for advice and guidance.

13 Q.   Was Randall Royer considered to be a scholar?

14 A.   No.

15 Q.   Was Randall Royer considered to be a peer of you, Kwon, and

16 Hasan?

17 A.   More so.  He did have some fighting experience, but other

18 than that, he was considered one of the, one of the regular

19 attendees.

20 Q.   What impact on the change in your mind that occurred at that

21 9/16 meeting, what impact did Randall Royer have on the change in

22 your mind at that meeting?

23 A.   None, because, I mean, he, he had helped me get the contact

24 from before, but once I got the phone number and the contact from

25 him and he asked me to come to that meeting later on, I really did

1  not have any meaningful interaction with him.

2  Q.   You mentioned the Qoqaz website.  Is that also known as the

3  Kavkaz website?  Is that a related website?

4  A.   These are related websites but two different websites.

5  Q.   Are either one related to the Azzam website?

6  A.   I think they are, they're interlinked websites, but they are

7  two different websites.

8  Q.   And Azzam is A-z-z-a-m?

9  A.   Correct.

10 Q.   Was Azzam one of the websites that was well known in your

11 circles?

12 A.   It wasn't as well known as Qoqaz, but it was known.

13 Q.   At any of the lectures that you ever went to at Dar al-Arqam

14 or American Open University, did Ali Timimi ever tell people to

15 close the blinds?

16 A.   Say it again?

17 Q.   At any of the lectures you ever went to where Ali Timimi

18 spoke other than on September 16, 2001, did Ali Timimi ever tell

19 people to close the blinds?

20        MR. YAMAMOTO:  Your Honor, the witness should be asked

21 whether there were blinds at the Dar al-Arqam anyway.

22        THE COURT:  Well, that would be a follow-up question

23 that you can do on recross.

24        THE WITNESS:  No, I don't ever recall.

25 BY MR. KROMBERG:

1  Q.   Draw the curtains?

2  A.   No.

3  Q.   People should turn off their cell phones?

4  A.   No.

5  Q.   Unplug phones?

6  A.   No.

7  Q.   Unplug answering machines?

8  A.   No.

9  Q.   Did Ali Timimi at any lecture you'd ever been to other than

10 September 16, 2001, ever exhibit any concern that outsiders might

11 hear what he was saying?

12 A.   I don't remember.

13 Q.   Mr. Yamamoto was asking you about what Ali Timimi said

14 about -- on the 9/16 meeting about safety and how people should

15 plan for their safety.  What relationship on 9/16 temporally, in

16 time, what relationship was there between the questions that were

17 asked of him and the talk that he gave?

18 A.   Initially, initially, when he came, I think people started

19 asking him questions, and he had mentioned something like, okay,

20 everybody ask one question, and then I'm going to talk.

21        So we were sitting in circles.  Everybody said -- asked

22 a question, and then he talked uninterrupted for a duration, I

23 think, except when --

24 Q.   He talked --

25 A.   Uninterrupted for some duration except for a couple of

1  minutes when Nabil came.  Then at the end -- then the food was

2  served, and it was more a free-flowing discussion.  People were

3  asking questions then.

4  Q.   To your recollection, was the question about what we should

5  do to protect ourselves, was that one of the questions before the

6  talk or after the talk?

7  A.   Not exactly this question but a similar question, I think,

8  was asked by Masaud Khan, what should we be doing here, something

9  like that.

10 Q.   And was that before the main lecture, the main presentation,

11 or after?

12 A.   This question, I think, was asked, asked before.  I think

13 that was Masaud Khan's question, but something -- I don't think

14 anything similar along these lines was discussed after, later on.

15 Q.   When Ali Timimi said that each of you got one question, why

16 didn't anybody say, "No, I want more than one question"?

17          MR. YAMAMOTO:  Objection, Your Honor.

18          THE COURT:  I'm going to sustain that objection.

19 BY MR. KROMBERG:

20 Q.   Mr. Aatique, why didn't you say, "Why should we be limited to

21 only one question apiece?"

22 A.   As I understood, he wanted -- I mean, that's my

23 understanding, that the reason for that may be that he wanted to

24 talk uninterrupted for some time and -- so that he may have some

25 preconceived talk in his mind, and he --

1        MR. YAMAMOTO: This is all his --

2        THE COURT: That's speculation.

3        MR. KROMBERG: Well, Judge, I was asking why he did not

4   ask -- say he wanted to ask more than one question, and this is

5   his answer.

6        THE COURT: Did you have more than one question you

7   wanted to ask that night?

8        THE WITNESS: No. Not -- I mean, I had one basic

9   question, which I put to him.

10       THE COURT: All right, I think that's all he can answer.

11       MR. KROMBERG: Okay.

12  Q.  Has Kwon ever told you, "You can ask him one question, and

13  then he's going to talk to you"?

14  A.  Say it again?

15  Q.  Has Kwon ever told you, "You can have one question, and then

16  he's going to give you a lecture"?

17       MR. YAMAMOTO: Objection.

18       THE COURT: I'm going to sustain that objection. Move

19  on to a different line of questioning, Mr. Kromberg.

20       MR. KROMBERG: Okay.

21  Q.  In response to Mr. Yamamoto's questions, you were talking

22  about, I think, what Timimi said about leaving the country and

23  being with the good -- or being with the good people. If you're

24  leaving the country -- what's the relationship between leaving the

25  country and being with good people?

1  A.    When -- this was, I mean, this is what I understood out of

2  his talk, that --

3              MR. YAMAMOTO:  Objection as to what he understood, Your

4  Honor.

5              THE COURT:  It should only be what Dr. Al-Timimi said.

6              THE WITNESS:  That's what I'm saying, my impression of

7  him saying, was that he was recommending that you should either, I

8  think the most better of the options that you can take is to, is

9  to go and join the mujahideen, go and fight.

10             And also, when he had said that, okay, fighting might be

11  in one of these three places, so you should go there and be with

12  the good people, an example was giving of LET -- in Pakistan, the

13  example was given of the LET people.

14             And also, the topic of hijra came up, generally leaving

15  this country.  So one may also leave this country, just leave the

16  country and leave to the Muslim lands.

17  BY MR. KROMBERG:

18  Q.    Mr. Aatique, is the concept of hijra inconsistent in any way

19  with being with the good people?

20  A.    No, it's not inconsistent.

21  Q.    Is it inconsistent in any way with engaging in violent jihad?

22  A.    Hijra can be a preceding thing before you go and -- go to

23  jihad.

24  Q.    Mr. Yamamoto asked you did you ever intend to fight against

25  the United States, I think.  Who did you understand from Timimi's

1  talk on September 16 was the enemy to be fought against in

2  Afghanistan?

3          MR. YAMAMOTO:  Objection to what his understanding was

4  of enemy.

5          THE COURT:  We need to confine this, it's getting too

6  far afield, to what was said, all right?  And then in response to

7  what was said, you can ask what was done, all right?  But

8  that's -- so I'll sustain the objection to that question.

9  BY MR. KROMBERG:

10 Q.  Mr. Aatique, under your understanding of Islamic law, when an

11 esteemed scholar tells you it's obligatory to fight on behalf of a

12 group of Muslims, is it part of your religion to heed that call?

13         MR. YAMAMOTO:  Objection, Your Honor.  He's asking again

14 for his understanding.

15         MR. KROMBERG:  Judge, Mr. Yamamoto asked at length --

16         THE COURT:  Wait, wait, yes.  I think you did get a

17 great deal into through this witness his understanding of basic

18 tenets of Islam.  I've already ruled that as a practitioner of the

19 religion, he can testify about his understanding, and that can

20 certainly be probed with other witnesses or on recross.

21 Overruled.

22 BY MR. KROMBERG:

23 Q.  Mr. Aatique, in your understanding of Islamic law, when an

24 esteemed scholar tells you it's obligatory to fight on behalf of a

25 group of Muslims under attack --

1        MR. YAMAMOTO:  He's asking now a hypothetical.

2        THE COURT:  I think that it's not when; it's if.  "If"

3   is a proper way of phrasing that question.

4        MR. YAMAMOTO:  He's still asking a hypothetical.

5        THE COURT:  Well, no, because he's asking again within

6   the context of the religious understanding that this man has.  I'm

7   going to permit that.  Go ahead.

8   BY MR. KROMBERG:

9   Q.   Mr. Aatique, if an esteemed scholar tells you it's obligatory

10  to fight on behalf of a group of oppressed Muslims, what does your

11  religion say you should do?

12  A.   If, if, if it's a scholar that has correct religious beliefs

13  and understanding and right standing among such people and if it's

14  his determination that some people should be -- I mean, that

15  Muslims should go and fight on behalf of such people, then such

16  calls should be heeded.

17  Q.   In September 2001, was Ali Timimi in your view such a

18  respected scholar?

19  A.   Yes.

20  Q.   Mr. Yamamoto in a question to you asked about whether if the

21  signs of the end of time had not occurred, doesn't that mean that,

22  that the situation on 9/16 was not the time for fighting?  Is that

23  correct?

24  A.   Could you repeat that?

25  Q.   Let me try it again.  Do you recall a question being asked of

1  you about whether the signs of the end of time had already

2  occurred as of 9/16, and your response something to the effect of,

3  well, there are things that happened before the signs of the end

4  of time?

5  A.   Yeah.

6  Q.   Could you expand on that?

7  A.   Yeah.  It's been classified as major signs and minor signs.

8  Major signs is about which there is no doubt, like if --

9  Q.   Say again?

10  A.   Major signs are considered signs about which there is no

11  doubt, like the appearance of Mehdi or the coming down of Jesus,

12  son of Mary.  But the minor signs about which there can be doubt,

13  like the increase in the corruption and the increased wars and the

14  increased national calamities and the, and the decline in the

15  religious practice of the Muslims, so it's -- a lot of people

16  believe that all the minor signs have occurred.

17  Q.   That the minor signs that precede the major signs --

18  A.   Have occurred.

19  Q.   -- have occurred?

20  A.   Yes.

21  Q.   What relationship did the minor signs that you just talked

22  about have, if any, to what Ali Timimi talked about on September

23  16?

24  A.   Could you repeat that?

25  Q.   What relationship was there between the minor signs that

1  you've just described, was there to the talk that Ali Timimi gave

2  on September 16 about now you'll see the signs?

3  A.    It was all -- when he says the signs and promises are coming

4  true, I understood it to mean in the context of what he was

5  saying, what he had said before in The Signs of the End of Time

6  series, and he's now continuing on that, on that theme and saying,

7  "Now you're going to see bigger signs or major signs."

8  Q.    Was it -- is it correct that you understood what it -- the

9  war that was coming and looming in Afghanistan to be one of the

10  minor signs?

11  A.    What I understood was that -- is that he's saying that this

12  will turn out to be one of the major events or one of the major

13  signs before the end of time, because one of the signs is a big

14  battle between the, between the Muslims and the Western

15  Christians, an unparalleled battle.

16  Q.    A what battle?

17  A.    I mean, a battle which has no other battle in the history.

18  Q.    An unparalleled battle?

19  A.    Yes.

20  Q.    Between Muslims and Christians?

21  A.    Muslims and Christians, yeah.

22  Q.    In response to one of Mr. Yamamoto's questions, you mentioned

23  the khalif?

24  A.    Yes.

25  Q.    What is the khalif?

1 A.    Khalif literally means, the term is applied to a Muslim ruler

2 who's who has inherited, I mean, because Prophet Muhammad --

3 Sallallahu alaihi wa sallam -- was the last prophet, so after him,

4 there will be khalifs in the sense they inherit the right to --

5 they inherit the authority of rulership of the Muslims, and

6 usually khalif is considered one.  There can't be more than one

7 khalif.

8 Q.    When was the last khalif?

9 A.    Symbolically speaking, people used to consider the Ottoman

10 ruler and the Ottoman Empire, and he -- after -- when the Ottoman

11 Empire began and once they start controlling parts of the Arabian

12 peninsula like the cities of Mecca and Medina, after some times,

13 because there was no other khalif -- I don't recall the exact

14 history, but they assume that -- the Ottoman ruler assumed the

15 title of khalif somewhere around these middle centuries, like 15th

16 Century.

17 Q.    And so the Ottoman Empire fell after World War I?

18 A.    Yeah, 19- -- early '20s.

19 Q.    From 1920 until September 11, 2001, who, if anyone, was

20 considered the khalif?

21 A.    Nobody.

22 Q.    Okay.  Who, if anyone, in 2000 and 2001 was discussed in the

23 circle -- in Dar al-Arqam circles that you traveled in as

24 potentially the first khalif since the Ottoman Empire?

25         THE COURT:  Is there an objection?

1          MR. YAMAMOTO:  Objection, Your Honor.

2          THE COURT:  And the basis for the objection?

3          MR. YAMAMOTO:  Again, if he knows.

4          THE COURT:  Yes.  The question is if you know.  In other

5    words, when you were present at any of those meetings, was this

6    particular topic discussed?

7          THE WITNESS:  I discussed it with the other individual

8    who -- I mean, I discussed it with Yong Kwon, and he informed me

9    of some other discussion in a bigger setting where he told me that

10   Al-Timimi was there.

11         THE COURT:  Well, I'm not going to let that come in.

12   Strike that, Ladies and Gentlemen.  That's not appropriate.

13         MR. KROMBERG:  Judge, what I'm getting at, what I'm

14   trying to get at is if --

15         THE COURT:  Only if this witness was present when the

16   topic was being discussed can he properly talk about it.

17   BY MR. KROMBERG:

18   Q.  Have you seen on the websites that you've talked about before

19   discussions about who, if anyone, was the Khalif?

20         THE COURT:  Is there an objection to that question?

21         MR. YAMAMOTO:  Objection, Your Honor.

22         THE COURT:  And what is the objection?

23         MR. YAMAMOTO:  Well, now we're going outside the scope

24   of Dr. Al-Timimi.

25         THE COURT:  All right.  This is not just on any website.

1          MR. KROMBERG:  Qoqaz, Azzam, Kavkaz, Judge.

2          THE COURT:  All right.  On those three websites, did you

3    see any discussion of a khalif issue?

4          THE WITNESS:  Definitely not on Qoqaz or Kavkaz.  Maybe

5    something on azzam.com about Mullah Omar being -- "khalif" is a

6    very big term for anybody to assume.  So maybe there was some,

7    some discussion there or some news article referring to him as the

8    Chief of Believers.

9          THE COURT:  You say maybe.  Do you know or don't you?

10         THE WITNESS:  I'm not 100 percent certain if I read it

11   on azzam.com or not.

12         THE COURT:  All right.

13         THE WITNESS:  Maybe on some other websites, not on these

14   three.

15   BY MR. KROMBERG:

16   Q.   What other websites?

17   A.   There were, there were some websites some time ago which were

18   dedicated to keeping track of Taliban.  I think they were based

19   from Pakistan.

20         MR. YAMAMOTO:  These aren't the websites we're talking

21   about, Your Honor.  I move to strike all of this.

22         THE COURT:  This is getting too far afield.  I'm

23   sustaining the objection.  Let's move on.

24         MR. KROMBERG:  That will be it.  Thank you.

25         THE COURT:  All right, any recross?

RECROSS EXAMINATION

BY MR. YAMAMOTO:

Q. Did you know that Khan had ordered a coat prior to this meeting?

A. Say it again?

Q. Did you know that Khan had ordered a coat to take to the LET camps prior to this meeting?

A. I knew about Yong Kwon, not Masaud Khan. I knew about Yong Kwon, I knew that he was going to order something, and he was going to order for one or two more other people, also.

Q. That Kwon was ordering coats for people to --

A. Yeah. Something like that, yeah.

Q. -- wear at the camps prior to the meeting?

A. Yes, for high altitude, cold weather.

Q. Being a martyr is respected or looked favorably upon by the Koran and the hadeeths, isn't it?

A. Yes.

Q. Fighting in Chechnya at the time in 2000-early 2001 was looked upon as a noble cause?

A. Yes.

Q. When Kwon and Hasan brought Khan to your house the night before you left, you mentioned that Kwon told you that they were going to go get their visas and tickets the next day?

A. Yes.

Q. And they also talked to you about what to do with

1  authorities; is that right?

2  A.   I remember them advising me not to carry anything which might

3  identify me as being a religious Muslim, something like that.

4  Q.   That's right.  They told you not to take a Koran or to

5  wear -- take camouflage boots?

6  A.   Yeah.

7  Q.   Did they tell you what to do in case authorities stopped you,

8  to cry and ask for your mother?

9  A.   No.

10 Q.   Did they talk about doing anything else?

11 A.   We talked about a lot of things, but, I mean, you mean -- it

12 was -- in a religious topic, it was discussed that, what to say if

13 the authorities stopped.  Me and Masaud were immediately going the

14 next day, so we discussed this about what he was going to say and

15 what I was going to say if we got stopped.

16 Q.   You're Pakistani?

17 A.   Yes.

18 Q.   He's Pakistani?

19 A.   No, he is a U.S. citizen.

20 Q.   Okay.  So there was no problem with you going?

21 A.   Not -- I mean, that's what I was expecting, that I'm going

22 back to my country.

23 Q.   So Kwon had mentioned they were picking up their visas.  They

24 had already gone to the embassy and were picking up their visas

25 the next day?

1  A.   Yes.

2        MR. KROMBERG:  Objection, Judge.  This is beyond the

3  scope of redirect.

4        THE COURT:  It is.  I was waiting for that objection.

5  I'll sustain it.

6  BY MR. YAMAMOTO:

7  Q.   Mr. Kromberg was asking you about the end of time battles,

8  and you were trying to talk about the war between Muslims and

9  Christians.  That happens after the Mehdi comes, right?

10  A.   I don't know the same time line, but it's around the same

11  time when Mehdi is here but before Jesus comes down.

12  Q.   But this is a sign you look for, for the Mehdi to come?

13  A.   I don't know.  I don't know what's the time frame of Mehdi's

14  appearance and the battle between Muslims and the Western

15  Christians.

16  Q.   The Mehdi hasn't appeared at this point yet, has he?

17  A.   Not that I know of.

18        MR. YAMAMOTO:  Thank you.  Nothing further.

19        THE COURT:  All right.

20        MR. KROMBERG:  Just to clarify --

21        THE COURT:  No, no, no, no.  That would be the fifth

22  shot.

23        MR. KROMBERG:  If I may, Judge?

24        THE COURT:  No.

25        MR. KROMBERG:  Can we approach?