No. 20-4441
IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Appellant,

v.

ALI AL-TIMIMI,

Defendant-Appellee.

Appeal from a Judgment of the
United States District Court for the Eastern District of Virginia
The Hon. Leonie M. Brinkema, District Judge
(Dist. Ct. No. 1:04-cr-385-LMB)

APPELLEE'S SUPPLEMENTAL APPENDIX, VOLUME 2 OF 2

Thomas M. Huff                Jonathan Turley
Attorney-at-Law               The George Washington
P.O. Box 2248                   University Law School
Leesburg, VA 20177            2000 H St., N.W.
(703) 665-3756                Washington, DC 20052
                              (202) 994-7001

*Attorneys for Defendant-Appellee*

Dated: August 31, 2020

# Table Of Contents

## Volume 1 of 2

District Court's Order Denying Government's Motion to Stay,
entered August 28, 2020 (Dkt. No. 532)................. SA 1890

Exhibit A to Defendant's Opposition to Stay,
August 20, 2020 e-mail correspondence with government counsel
regarding defendant's release plan (Dkt. No. 530, Ex. A).... SA 1893

Transcript of Jury Trial proceedings before
the Hon. Leonie M. Brinkema on April 4, 2005........... SA 1897

    Testimony of <u>Nabil Gharbieh</u>:
        Direct examination by Mr. Gibbs. ................. SA 1897
        Cross examination by Mr. MacMahon. ............. SA 1959
        Redirect examination by Mr. Gibbs. ............... SA 2000
        Recross examination by Mr. MacMahon............ SA 2007

    Testimony of <u>Muhammad Aatique</u>:
        Direct examination by Mr. Kromberg.............. SA 2009

Transcript of Jury Trial proceedings before
the Hon. Leonie M. Brinkema on April 5, 2005........... SA 2096

    Testimony of <u>Muhammad Aatique</u> (resumed):
        Direct examination by Mr. Kromberg.............. SA 2096
        Cross examination by Mr. Yamamoto.............. SA 2116
        Redirect examination by Mr. Kromberg............ SA 2186
        Recross examination by Mr. Yamamoto............ SA 2207

Testimony of <u>Donald Surratt</u>:
    Direct examination by Mr. Gibbs. . . . . . . . . . . . . . . . . SA 2210
    Cross examination by Mr. MacMahon. . . . . . . . . . . . . SA 2276
    Redirect examination by Mr. Gibbs. . . . . . . . . . . . . . . SA 2291
    Recross examination by Mr. MacMahon. . . . . . . . . . . . SA 2294

Transcript of Jury Trial proceedings before
    the Hon. Leonie M. Brinkema on April 14, 2005. . . . . . . . . . SA 2296

    Testimony of <u>Luther Kennedy</u>:
    Direct examination by Mr. Yamamoto. . . . . . . . . . . . . SA 2296
    Cross examination by Mr. Kromberg. . . . . . . . . . . . . . SA 2304
    Redirect examination by Mr. Yamamoto. . . . . . . . . . . SA 2323
    Recross examination by Mr. Kromberg.. . . . . . . . . . . . SA 2328

    Testimony of <u>D. Curtis Jamison</u>:
    Direct examination by Mr. Yamamoto. . . . . . . . . . . . . SA 2332
    Cross examination by Mr. Gibbs.. . . . . . . . . . . . . . . . . SA 2349

Transcript of Jury Trial proceedings before
    the Hon. Leonie M. Brinkema on April 26, 2005. . . . . . . . . . SA 2352

Def. Exh. 57—July 23, 2003 letter from
    AUSA Gordon Kromberg to Yong Kwon's attorney. . . . . . . . SA 2358

```
 1              A F T E R N O O N   S E S S I O N
 2                    (Defendant and Jury present)
 3             THE COURT:  All right, your next witness, Mr. Gibbs?
 4             MR. GIBBS:  Judge, the government calls Donald Surratt
 5   to the stand.
 6             THE COURT:  All right.
 7             DONALD SURRATT, GOVERNMENT'S WITNESS, AFFIRMED
 8                        DIRECT EXAMINATION
 9   BY MR. GIBBS:
10   Q.   Good afternoon, sir.
11   A.   Good afternoon.
12   Q.   Sir, will you please state your name for the record and also
13   spell it for the record?
14   A.   It's Donald Surratt.  It's spelled D-o-n-a-l-d S-u-r-r-a-t-t.
15   Q.   And, Mr. Surratt, you are currently in prison; is that
16   correct?
17   A.   Yes, I am.
18   Q.   And what were you convicted of?
19   A.   Conspiracy to break the Neutrality Act and transporting
20   firearms across the state line for purpose of an illegal activity.
21   Q.   All right.  Transporting a firearm in interstate commerce?
22   A.   Something like that, yeah.
23   Q.   With intent to commit a crime, is that correct?
24   A.   Yes.
25   Q.   Where was it that you were convicted of those crimes?
```

1  A.   In this court.

2  Q.   Here in the Eastern District of Virginia?

3  A.   Yes.

4  Q.   And when you were convicted of those crimes, how much time

5  did you receive?

6  A.   Three years and ten months.

7  Q.   And you have a plea agreement in this case?

8  A.   Yes, I do.

9  Q.   And what is your obligation under your plea agreement if

10 you're called to testify as a witness?

11 A.   To tell the truth.

12 Q.   And what happens to you -- or what's your understanding of

13 what could happen to you under your plea agreement if you're found

14 to lie while you're testifying?

15 A.   They could withdraw the plea agreement.

16 Q.   Now, Mr. Surratt, do you know what a rule 35 motion is?

17 A.   Yes, I do.

18 Q.   What is a rule 35 motion?

19 A.   It's a reduction in sentence that's requested from the judge

20 or the -- I forgot who asks for it.

21 Q.   Okay.  And what's your understanding of what you have to do

22 in order to be eligible for a reduction in sentence?

23 A.   One of the reasons is substantial assistance or something

24 like that.

25 Q.   All right.  So if you are found to provide substantial

1   assistance to the government, your sentence potentially could be
2   reduced.  Is that your understanding?
3   A.   Yes.  Potentially, yes.
4   Q.   All right.  And who actually makes the final decision to
5   reduce your sentence?
6   A.   I think Judge Brinkema does.
7   Q.   And is it your desire to receive a rule 35 substantial
8   assistance motion in this case?
9   A.   Yes, it is.
10  Q.   All right.  Now, Mr. Surratt, I'd like to move on to a
11  different topic.  Are you familiar with an organization called the
12  Dar al-Arqam Islamic Center in Falls Church, Virginia?
13  A.   Yes, I am.
14  Q.   And what is the Dar al-Arqam?
15  A.   It's a place where they used to have to try to teach Muslims
16  or non-Muslims about Islam basically.
17  Q.   And was this teaching about Islam, was it primarily done in
18  English?
19  A.   Yes, it was.
20  Q.   And what sorts of things occurred at the Dar al-Arqam?
21  A.   Lectures, sometimes they would have dinners, that sort of
22  thing.
23  Q.   And in terms of the lectures, let's talk about the lectures
24  first of all.  Who were the primary lecturers at the Dar
25  al-Arqam -- well, actually, let me back up a little bit.  When did

1  you attend the Dar al-Arqam?  During what period?

2  A.   I don't know exact years that I attended.  For a long time,

3  because -- I don't know exact years.

4  Q.   Okay.  But did you attend some of these lectures even before

5  the Dar al-Arqam at 360 South Washington Street had been

6  established?

7  A.   Yes, I did.

8  Q.   So you had gone to some of the lectures at American Open

9  University?

10 A.   Yes, I did.

11 Q.   And at Sheikh Jaafar's basement?

12 A.   Yes, I did.

13 Q.   All right.  In terms of the lectures, once the Dar al-Arqam

14 had its own space there at 360 South Washington, who were the

15 primary lecturers at the Dar al-Arqam?

16 A.   The main lecturer is Sheikh Jaafar Idris, and if he's not

17 there, then it was usually Ali Timimi.

18 Q.   And who actually spent more time lecturing during the time

19 period that Dar al-Arqam was located at 360 South Washington,

20 Timimi or Sheikh Jaafar Idris?

21 A.   Ali Timimi.

22 Q.   And what's the relationship between Sheikh Jaafar and Ali

23 Timimi?

24 A.   The relationship that I know of is that from what I see, it

25 seems to me that Ali Timimi has more respect for Sheikh Jaafar as

1  a person of more knowledge and as his, more of a, I guess,

2  teacher.

3  Q.    And is Sheikh Jaafar older than Ali Timimi?

4  A.    I believe so, yes.

5  Q.    Okay.  And did -- but in your observation, did Ali Timimi and

6  Sheikh Jaafar appear to have a friendly relationship?

7  A.    Yes.

8  Q.    And were they part of the leadership there at the Dar

9  al-Arqam?

10  A.    I believe so, yes.  Both of them, yes.

11  Q.    Now, you mentioned the two of those as being some of the

12  lecturers at the Dar al-Arqam.  How about an individual by the

13  name of Yousuf Idris?  Was he also a lecturer there?

14  A.    Sometimes.  I think that's Sheikh Jaafar's son you're

15  referring to.

16  Q.    Okay.  Now, you mentioned that Timimi was the most regular

17  lecturer at the Dar al-Arqam.  What specific lectures that he's

18  given are you familiar with?

19  A.    He's given a lot of lectures, but just from memory right now,

20  I mean, Purification of the Soul was a long series we did.  He

21  talked about the events that happened with the Buddhist statues in

22  Afghanistan, when they destroyed it, and how -- there's more, but

23  I can't think of any more that I actually attended.

24  Q.    Okay.  That's fine.  Let me just put up -- pull up an exhibit

25  if I could.  This is Exhibit 10T1.  This is in evidence.  And do

1  you recognize this particular lecture by Ali Timimi?

2  A.   The New World -- The New World Order?

3  Q.   Correct.  Is that the best TV for you to look at?

4  A.   Yes.

5  Q.   Okay.  Good.

6         THE COURT:  Mr. Surratt, there's one to your left, too.

7  No, to your left.

8         THE WITNESS:  Oh, yes.

9  BY MR. GIBBS:

10 Q.   And what is 10T1?

11 A.   That's a lecture that was given by Ali Timimi.  I'm not sure

12 where it was given, but it wasn't given at Dar al-Arqam.

13 Q.   All right.  And this lecture, in fact, was for sale on

14 audiotapes at the Dar al-Arqam, correct?

15 A.   Yes, it was.

16 Q.   And did you yourself buy this particular lecture?

17 A.   Yes, I did.

18 Q.   Where did you get it from?

19 A.   From Dar al-Arqam.

20 Q.   And did you have this -- well, your house was searched by the

21 FBI in the spring of 2003, correct?

22 A.   Yes.

23 Q.   All right.  Was this particular lecture one of the items that

24 was located in your home by the FBI in the spring of 2003?

25 A.   Yes, it was.

1 Q.   Now, the lectures that Ali Timimi gave at the Dar al-Arqam,

2 were these open to the public?

3 A.   Yes, they were.

4 Q.   And how many people usually attended Ali Timimi's lectures?

5 A.   It varied.  I mean, it could be anywhere from 20 people to

6 maybe 80 people.  So it depends.

7 Q.   Okay.  Just depending on how big the crowd was and what day

8 of the week?

9 A.   Yes.

10 Q.   Were these lectures primarily on Friday nights?

11 A.   Yes, they were.

12 Q.   And you talk about the fact that you could have from 20 to 80

13 people for a particular lecture.  Would these be men and women, or

14 was it segregated?

15 A.   Men and women.

16 Q.   And did the women have to attend the lecture in a different

17 location than the men?

18 A.   Yes.  Well, not different location but in the same room, but

19 we had a little, small curtain so there would be separation

20 between the men and women.

21 Q.   Now, you mention that this particular lecture -- we can take

22 that off now, thank you -- "The New World Order," that you had

23 bought that at Dar al-Arqam.  Do you know anybody else among your

24 friends who owned any of Timimi's lectures on tape?

25 A.   I knew that Nabil, Nabil, he had some.  Hammad, a friend of

1  mine, had some.

2  Q.    Is that Hammad Abdur-Raheem?

3  A.    Yes.

4          THE COURT:  And Nabil is Nabil Gharbieh?

5          THE WITNESS:  Yes.

6          THE COURT:  Okay.

7          THE WITNESS:  Ibrahim Hamdi had some.  Caliph Basha had

8  some.

9  BY MR. GIBBS:

10 Q.    All right.  And is that Caliph Basha Ibn Abdur-Raheem?

11 A.    Yes.

12 Q.    And these are all friends of yours?

13 A.    Yes.  That's all I can remember.  There's more probably, but

14 I don't know.

15 Q.    All right.  Well, in terms of the more, how about an

16 individual named Abdullah Zikria?  Do you know him?

17 A.    Yes, I do.

18 Q.    All right.  Do you know if he owned any of Timimi's lectures

19 on tape?

20 A.    Yes, he did.

21 Q.    And did Abdullah Zikria, did he have any duties at the Dar

22 al-Arqam with regards to the lectures that were recorded there?

23 A.    As far as I know, he used to edit the tapes and stuff from

24 the lectures.

25 Q.    And was this done right there at the Dar al-Arqam?

# Surratt - direct

1  A.   I believe so, yes.

2  Q.   All right, thank you.

3        Now, Mr. Surratt, the people you just mentioned --

4  Hammad Abdur-Raheem, Caliph Basha, Ibrahim Hamdi, Nabil

5  Gharbieh -- these people were all friends of yours?

6  A.   Yes, they are.

7  Q.   And what sorts of thing did you do together with them?

8  A.   All sorts of things.  We'd eat dinner, go play basketball,

9  sometimes volleyball, and just hang out, all kind of things.

10 Q.   And did you ever watch any videos with any of these people?

11 A.   Yes, I did.

12 Q.   And what sorts of videos would you watch with some of these

13 individuals?

14 A.   Sometimes we'd watch videos of, like, conflict areas that are

15 happening, things were happening, like Chechnya or Bosnia, or

16 sometimes we'd watch the news, stuff like that.

17 Q.   All right.  And in terms -- you mentioned some of the

18 conflict areas in Chechnya.

19        If we could pull up Exhibit 3A8?  And we just need the

20 cover.  Again, that's in evidence.

21        If you'd take a look at that?  Mr. Surratt, do you

22 recognize Government Exhibit 3A8?

23 A.   Yes, I do.

24 Q.   And what is that?

25 A.   It's a tape about -- or it's actually a CD about the conflict

1  in Chechnya.

2  Q.   And did you yourself get a copy of this CD from anyone?

3  A.   Yes.   I actually got that from Nabil because he had it at his

4  house when I was there, and I saw it, and I asked him -- he

5  actually showed me a little clip of it and told me that it was

6  long, that I could take it home if I wanted to watch it later.

7  Q.   And do you remember roughly -- you know, for all these

8  questions, to the extent we can try to pin down a time frame, it's

9  helpful, but do you recall if this was before or after September

10 11, 2001?

11 A.   Before.

12 Q.   And you said that you were at his house and he showed you a

13 few clips, and the clips that he showed you, were they interesting

14 to you?

15 A.   Yes, they were interesting.

16 Q.   And at this time amongst you and your friends, was the

17 conflict in Chechnya an area of particular interest?

18 A.   It's one of the areas, yes.

19 Q.   And you say it was one of the areas.  What were some of the

20 other areas?

21 A.   Kashmir, Bosnia, Saudi Arabia, those type of places.

22 Q.   And did -- you said that Nabil -- you asked Nabil Gharbieh if

23 you could borrow it or take it; is that correct?

24 A.   Yes.

25 Q.   And he gave it to you?

1  A.   Yes.

2  Q.   And at some point later, did you then pass it on to somebody

3  else?

4  A.   Yes.  I had it for a while, and then I actually forgot that I

5  had it, and I had it in my stuff and totally forgot all about it.

6  Then later on, Ibrahim, he came and asked me if I had any videos

7  for him.  I told him I didn't know; I'd go home and look.  When I

8  went home, I realized I still had it, and I told him that I'll let

9  him use it, but it's not mine, so I let him use it, and, of

10  course, I never got it back.

11  Q.   And this is -- when you say Ibrahim, this is Ibrahim Hamdi?

12  A.   Yes.

13  Q.   All right.  And was he one of the -- a friend of yours from

14  the Dar al-Arqam?

15  A.   Yes, he is.

16  Q.   All right.  Did there -- did you ever go to Ibrahim Hamdi's

17  house when Ali Timimi was there?

18  A.   Yes.  I remember once when he was there.

19  Q.   And is that the only time that you've ever been to the home

20  of one of your friends from Dar al-Arqam when Ali Timimi was there

21  as well?

22  A.   Yes.

23  Q.   Now, Mr. Surratt, you testified a moment ago about some of

24  the conflicts around the world that were of interest to you and

25  your friends, including Kashmir.  Now, are you familiar with a

1  group in that part of the world called Lashkar-e-Taiba?

2  A.   Yes, I am.

3  Q.   What is that?

4  A.   It's a group that's involved in the problems of Kashmir from

5  the Indians who are doing a lot of atrocities there.  They're

6  trying to basically help the Muslims there.

7  Q.   And how did you first learn about Lashkar-e-Taiba?

8  A.   From Ismail Royer.

9  Q.   And after you found out about Lashkar-e-Taiba, did you ever

10  hear Ali Timimi talk about this group?

11  A.   Not specifically in a lecture or anything, but I asked him

12  about it once just to see if he knew what he could tell me about

13  it.

14  Q.   And when you said you asked him about it, was there something

15  about your relationship -- well, first of all, with Timimi, did

16  you view him as a scholar or person of knowledge?

17  A.   I did -- he doesn't view himself as a scholar as far as I

18  know, but I view him as a brilliant man, yes.

19  Q.   And what is it about him that causes you to view him as a

20  brilliant man?

21  A.   I think, to me, he has a lot of knowledge about Islam and

22  about a lot of other subjects, also.

23  Q.   And when you wanted some information about LET, specifically

24  what did you ask Timimi?

25          MR. MAC MAHON:  Your Honor, if I could object to that, a

1  time frame here, please?

2        THE COURT:  Yes, we need a time frame.

3        THE WITNESS:  Time frame that I asked him?

4  BY MR. GIBBS:

5  Q.  Yeah, asked him about Lashkar-e-Taiba.

6  A.  It was before 9/11.  I don't know besides that.

7  Q.  Okay.  I mean, do you think it was a year before, you know,

8  within a year or two years?

9  A.  I don't know.  I couldn't narrow it down.  It was just a

10  casual question.  I don't remember exactly -- I didn't think

11  anything of it at the time.

12  Q.  Okay.  But at some point prior to September 11, you asked

13  Timimi about Lashkar-e-Taiba, and what did he tell you?

14  A.  He just said they were okay, that they -- because I was

15  concerned whether, you know, what kind of organization it was.  He

16  said that they weren't the type of organization that involved

17  themselves in harming innocent people.

18  Q.  And did he talk about their belief system at all?

19  A.  No.  He just said they were okay, so I took that to mean that

20  their beliefs were okay.

21  Q.  Now, Mr. Surratt, moving forward now up to September 11,

22  2001, did you go to a gathering at the Dar al-Arqam that day?

23  A.  September 11?  Yes.

24  Q.  Yes, sir.  And what happened at the Dar al-Arqam on September

25  11?

1  A.   I don't even remember how I heard about it, but somebody told
2  me they were having a --

3         MR. MAC MAHON:  Objection, Your Honor.  "I don't
4  remember what I heard about it."

5         THE COURT:  Right.  Mr. Surratt, just answer what -- I
6  think the question was when you got there, what did you hear or
7  what was going on.  That's what you should testify to.

8         THE WITNESS:  Okay.  Well, I got there to the place, and
9  they were having a full dinner.  It was on the floor, and it was
10 us sitting around in a long, I guess you'd call it, rectangle, and
11 everybody was just talking and talking.  It wasn't like a formal
12 speech or anything.  It was kind of just dinner.

13 BY MR. GIBBS:

14 Q.   And was the -- were the attacks that had occurred that day on
15 September 11, were those being discussed?

16 A.   Amongst people, yes.

17 Q.   All right.  And what, if anything, happened with regards to
18 Ali Timimi and those discussions?

19 A.   Well, a discussion between Ali Timimi and Haytham, I don't
20 know his last name.

21 Q.   And do you know what Haytham's role at the Dar al-Arqam is?

22 A.   I have no idea.

23 Q.   Okay.  But is he, is he a part of the organization?

24         MR. MAC MAHON:  Your Honor, if he doesn't know what his
25 role is, he can't lead him into suggesting to him what it is.

1          THE COURT:  Sustained.  Sustained.

2          MR. MAC MAHON:  Thank you.

3   BY MR. GIBBS:

4   Q.   And go ahead and describe for the jury what, what took place

5   between Haytham and Ali Timimi.

6   A.   Well, there was a discussion about -- Haytham was basically

7   saying that what happened on 9/11 was a tragedy and that the

8   people who were involved in it, they committed murder, and they

9   basically also committed suicide, and it was no good.

10         Then Ali Timimi told him that, you know, he shouldn't

11  say these things, that he doesn't know what he's talking about,

12  because first of all, he doesn't know if who they say did it did

13  it, and second of all, he doesn't know that -- whether or not what

14  they did was allowable or not.  He doesn't know anything, so he

15  shouldn't open his mouth and speak bad about these Muslims who

16  they were accused of doing it.

17  Q.   And what was Haytham's reaction when Timimi said those things

18  to him?

19  A.   He became to me visibly upset, turned a little red, was mad,

20  and then he tried to say, you know, continued to argue his point.

21  Q.   And what did he say as he continued to argue his point?

22  A.   He was telling him that it's wrong to commit suicide and

23  commit murder, and they just kind of went back and forth like

24  that.  I don't know the exact words because it was too long ago.

25  Q.   And what, if anything, did Timimi say about whether the

1  events that had occurred that day were justifiable or not?

2  A.   He didn't really say if they were justifiable or not, but he

3  gave him counter-arguments to show that he didn't know whether or

4  not -- what he was talking about.   His counter-arguments were, one

5  was where he talked about, talked about where -- that they had a

6  battle during the Prophet's time, and I think a noncombatant was

7  killed by accident, it was at nighttime, and that person -- they

8  went to the Prophet and told him, look, the person was killed, it

9  was an accident, it was dark, it wasn't on purpose, and he told

10 them that, you know, they're from him, meaning that it wasn't on

11 purpose, that, you know, it was just something that happened.

12 They didn't mean to kill the person; it was an accident.

13 Q.   And you testified that this is one of the counter-arguments

14 that Timimi made to Haytham.   Is there a particular term to

15 describe the counter-argument that Timimi made?

16         MR. MAC MAHON:   Objection, Your Honor.   What Mr. Timimi

17 said, I don't know -- if that's what he used in the word, that

18 would be admissible, but --

19         THE COURT:   Well, I'm not sure where the question is

20 going, but if you think you understand that question, you can

21 answer it.   Go ahead, Mr. Surratt.

22         THE WITNESS:   It was in the form of a hadeeth.

23 BY MR. GIBBS:

24 Q.   And can you explain what a hadeeth is?

25 A.   A hadeeth is, well, roughly, it's a saying or doing or

1  approval of the Prophet, peace be upon him.

2  Q.   And what was Haytham's reaction when Timimi talked about this

3  hadeeth related to the nighttime battle and somebody, you know,

4  collateral damage occurring during that battle?

5  A.   He wasn't really listening.  He just kind of kept continuing

6  to say the same things.

7  Q.   And what was -- so Haytham continued to argue with him?

8  A.   I don't know exactly when, if he said anything afterwards,

9  because at some point during the time that Sheikh Jaafar was

10 there, and he kind of broke in and told him to, you know, said

11 something, I don't remember his exact words, but whatever it is,

12 he told him, you know, cool it.

13 Q.   All right.  So Sheikh Jaafar stepped in and told them,

14 meaning Haytham and Timimi, to cool it?

15 A.   Yeah.  Not in those words, but yes.

16 Q.   And had you ever seen Sheikh Jaafar do that with Timimi

17 before?

18 A.   No, because I've never seen him actually, you know, engage in

19 a debate, sort of argument or debate with anybody.  Usually he

20 doesn't argue.

21 Q.   And is it unusual in your experience at the Dar al-Arqam to

22 have anyone question what Timimi says when he's speaking?

23 A.   That's -- I've never seen it, no.

24 Q.   Now, when Sheikh Jaafar stepped in, and I know these weren't

25 the exact words, but in effect told Timimi and Haytham to cool it,

1  did Timimi and Haytham cool it?

2  A.   Yes, they did.

3  Q.   And did Timimi stop lecturing at the Dar al-Arqam after that

4  night?

5  A.   Yes.   I don't know if he lectured that night at all, but I

6  just came, it was a dinner, but I never seen him come after 9/11,

7  no.

8  Q.   Right.   That's what I was getting at.   So after 9/11, you

9  never saw him lecture there again?

10 A.   No.

11 Q.   And did you ever get an opportunity to ask Timimi why he

12 wasn't lecturing at Dar al-Arqam anymore?

13 A.   Yes.   I, I asked him, you know, was he not allowed to come

14 talk at Dar al-Arqam anymore, and he said that he's allowed to

15 still come, but it was just a difference of opinion, just of

16 agreement between him and some of the guys there, so he chose not

17 to come on his own.

18 Q.   And did he tell you what the disagreement or the difference

19 of opinion was?

20 A.   No.   I didn't ask.

21 Q.   And did he tell you who he was having the disagreement with?

22 A.   No, he didn't say.

23 Q.   Now, Mr. Surratt, at some point after that gathering at the

24 Dar al-Arqam on September 11, were you contacted by an individual

25 by the name of Yong Kwon?

1  A.   Yes, I was.

2  Q.   And how did that come about?

3  A.   He called me on my cell phone when I was at work, and he said

4  he wanted to meet with me, so I told him that I'll meet him --

5  I'll try to meet him at my friend Hammad's house because it's

6  close to my job, and I'll call Hammad and confirm with him, which

7  I did, and I told him that we could meet there.

8  Q.   And where were you working at that time?

9  A.   At the time, I was working at Booz Allen Hamilton.

10 Q.   And which office was that?

11 A.   It's not the McLean office.  It's the Falls Church office, I

12 believe.

13 Q.   And did -- and ultimately, did Hammad Abdur-Raheem -- this is

14 Hammad Abdur-Raheem, correct?

15 A.   Yes.

16 Q.   All right.  Did he agree that you'd come to his house and

17 meet Kwon there?

18 A.   Yes, he did.

19 Q.   And did you go to Hammad Abdur-Raheem's house?

20 A.   Yes.  After work, I went over there, and we had pizza while I

21 was watching TV and waiting for Yong to come.

22 Q.   And what was your relationship with Hammad Abdur-Raheem at

23 that time?

24 A.   Friends, really good friends.

25 Q.   So he was one of your better friends?

1  A.   Yes.

2  Q.   And the plan was to have Yong Kwon come meet you there; is

3  that correct?

4  A.   Yes, it was.

5  Q.   And did Kwon ever show up?

6  A.   No, he never showed up.

7  Q.   So what happened?

8  A.   He called me about 10:30-11:00 on my cell phone and told me

9  that he couldn't come, that he's busy and he's taking care of some

10 things.  So I told him that, you know, why do you have me waiting

11 out here?  You know I have to work the next day.  Why do you have

12 me waiting out here until, like, 11:00, knowing that I live in

13 Maryland?

14 Q.   Is it fair to say you were a little bit upset with him?

15 A.   Yeah, I was.

16 Q.   And what was his reaction when you told him that?

17 A.   He said that he can't tell me, that perhaps one day I'll

18 understand it why he couldn't come.

19 Q.   And is that all he told you on your cell phone?

20 A.   Yeah, that's all.

21 Q.   So after you hung up, did you talk to Hammad Abdur-Raheem?

22 A.   After I hung up, yeah, Hammad saw that I was visibly upset

23 and I was getting ready to leave, so he told me -- he couldn't

24 tell me because Yong was planning to go to Pakistan.

25 Q.   And did Hammad Abdur-Raheem explain to you how it came about

1 that Yong Kwon was planning to go to Pakistan?

2 A.    Just briefly, he just told me that they had a meeting over

3 somewhere with Ali Timimi and that Yong had decided that he wanted

4 to go to Pakistan.

5 Q.    And did Hammad Abdur-Raheem tell you that he himself had

6 attended that meeting with Ali Timimi?

7 A.    Yes, he did.

8 Q.    And what did he tell you that Ali Timimi had said in that

9 meeting?

10 A.    He didn't say.  He just said that it was a powerful thing,

11 that he can't repeat everything he said; he doesn't know.  I can

12 ask him when I see him.

13 Q.    Well, when he said it was a powerful thing, did he give you

14 any insights into what it was about the meeting that was powerful?

15         MR. MAC MAHON:  Your Honor, I think the witness answered

16 everything that the gentleman said.  To suggest that there might

17 be more or some emphasis is improper.

18         MR. GIBBS:  Judge, I don't believe that he said that's

19 everything he said.

20         THE COURT:  I don't think that's leading.  I'm going to

21 permit that.  Go ahead.

22         THE WITNESS:  He said that -- that's all I remember him

23 saying really is that he -- it was a powerful speech and that, you

24 know, he decided that -- a few of them had decided that they were

25 going to go to Pakistan, that he couldn't tell me everything that

1 he said because it's too much, he doesn't know -- can't repeat it

2 all, doesn't know how to repeat everything.

3 BY MR. GIBBS:

4 Q.    And he said a few of them had decided to go to Pakistan.  Do

5 you know who that was?

6 A.    Yes.  It was Yong Kwon and Mahmood.

7 Q.    And how did you know those two individuals?

8 A.    From Dar al-Arqam.

9 Q.    And when Hammad Abdur-Raheem told you about this powerful

10 speech that Ali Timimi had given, was that of interest to you?

11 A.    Yes, it was.

12 Q.    And ultimately, at some time after that night at Hammad

13 Abdur-Raheem's house, did there come a time that you got invited

14 to a meeting at Timimi's house yourself?

15 A.    ‑Yes, there was.

16 Q.    When was that roughly?

17 A.    Roughly in October sometime.  I don't know the exact date.

18 Q.    And who was it that invited you to Timimi's house?

19 A.    Hammad told me.

20 Q.    This is Hammad Abdur-Raheem?

21 A.    Yes.

22 Q.    And had you ever been to Timimi's house before?

23 A.    No, I'd never been.

24 Q.    And when Hammad invited you, what did he say the reason for

25 the meeting was?

# Surratt - direct

1   A.   He said it was just going to be a lecture, kind of sort of

2   continuing, like, his series of lectures, and that he would also

3   touch up on some of the things that he said at the meeting that I

4   wasn't able to attend that he went to at first.

5   Q.   That first meeting he talked about as being a powerful

6   lecture?

7   A.   Yes.

8   Q.   And you said you'd never been to Timimi's house before.  Had

9   he ever been to your house before?

10  A.   No, he had not.

11  Q.   And if you'd never been to his house before, how did you get

12  there?

13  A.   I met with Hammad, and then I rode with him in his car

14  because Hammad knew where he lived.

15  Q.   And when you got to Timimi's neighborhood, where did you and

16  Hammad park your car -- or park his car?

17  A.   We parked it along a side street which is near his house and

18  waited for some other people to meet us.

19  Q.   And was there any reason you parked it off on a side street

20  and waited for some of the other people to arrive?

21  A.   Hammad told me that's what -- he was supposed to meet

22  Ibrahim, and supposedly they don't want everybody coming to his

23  house at different times and coming in and creating a big

24  commotion at night.

25          MR. MAC MAHON:  Your Honor, I object.  I think the

1  witness said that he said that. I couldn't tell if Al-Timimi told

2  him to do that or if it was somebody else.

3         THE COURT:  All right, make your answer -- rephrase the

4  question, and let's see what the answer is.

5         MR. GIBBS:  Sure.

6  Q.   Who was it that told you that you had to enter the house a

7  certain way?

8  A.   It was Hammad who told me.

9  Q.   And you said you were waiting for certain people. Did some

10 more people arrive after you and Hammad parked?

11 A.   Yes.  There's more than -- the only person I remember was

12 Ibrahim Al-Hamdi, but I don't remember.  There's more people that

13 came, also.

14 Q.   And did Ibrahim Hamdi join you and Hammad in his car when he

15 first got there?

16 A.   Yes.

17 Q.   And did he wait for some period of time?

18 A.   Yes.  We waited for a few other people to show up, and when

19 they showed up, then we all drove to the front of his house and

20 went in at the same time.

21 Q.   And who exactly was it that all went into Timimi's house at

22 the same time?

23 A.   Who was it?

24 Q.   Yeah.  Who were the people there with you besides -- well, it

25 was you and Hammad, correct?

1  A.   Me, Hammad, and Ibrahim, and I remember Omar Madini, and

2  there's some more people, but I'm not sure if I remember all of

3  them right now.

4  Q.   And where, where were these people from?  Were they people

5  you knew from Dar al-Arqam?

6  A.   Yes.

7  Q.   All right.  And were they people you knew from anywhere else?

8  A.   I didn't know them from anywhere else, no.

9  Q.   And I think we're going to need a spelling.  You said Omar

10  Madini?

11  A.   Yes.  I can spell it, but I don't know how he spells his

12  name.  I can spell it how it sounds, I mean.

13  Q.   Okay.  Yeah, just do the best you can.

14  A.   First name, O-m-a-r.  His last name is M-a-d-a-n-i.

15  Q.   All right.  And if we could pull up, I believe it's in

16  evidence, Exhibit 1J13?

17       Mr. Surratt, do you recognize this individual?

18  A.   Yes.  I think that -- yes, that is.  That's Ali Asad.

19  Q.   And who is Ali Asad?

20  A.   He's just a Muslim guy I know.

21  Q.   Where do you know him from?

22  A.   From around --

23  Q.   And was he one of the people that went to Timimi's house that

24  night as well?

25  A.   Yes, he was.

# Surratt - direct

1 Q.   Now, the people that went to Timimi's house that night, was

2 there anything that all those people had in common?

3 A.   Most of them attended Dar al-Arqam and were all Muslim.  Some

4 of them -- not all of them but most of us, we had played paintball

5 together sometimes.

6 Q.   And just trying to give us sort of a time frame, when was it

7 that you had played paintball with these individuals?

8 A.   It was before 9/11, 2000 and 2001.

9 Q.   Okay.  And in paintball, you're actually using a paintball

10 gun, correct?

11 A.   Yes.

12 Q.   All right.  Did you know anybody that attended the meeting at

13 Timimi's that day that also owned real guns?

14 A.   Besides myself, Hammad did, Caliph did, and Ibrahim did.

15 Those are the only ones I know.  Oh, Omar Madini, also.

16 Q.   And did you know anybody at the meeting at Timimi's including

17 yourself that was ex-military?

18 A.   Me and Hammad.

19 Q.   And what branch of the -- you were not in the active service

20 at that time, though, correct?

21 A.   No, I was not.

22 Q.   What branch of the service had you been in?

23 A.   Marine Corps.

24 Q.   And how about Hammad?

25 A.   In the Army.

1   Q.   And, Mr. Surratt, if I could have you take a look at

2   Government's Exhibit 7A36?  And it's -- actually, the court

3   security officer could probably help us.  It's one of the

4   firearms.

5           THE COURT SECURITY OFFICER:  What's the number?

6           THE COURT:  7A --

7           MR. GIBBS:  7A36.  Thank you.

8           Actually, I'm sorry, Judge; it's my mistake.  7A36 is

9   actually a photograph.  This is one of the ones we got a picture

10  of.

11          THE COURT:  That's all right, Mr. Wood.  We don't have

12  it here.

13          MR. GIBBS:  So instead, I think we'll just go ahead and

14  pull it up, if we can.

15          THE COURT:  There's no objection to that exhibit other

16  than what might have been in the past, right?

17          MR. MAC MAHON:  No objection, Your Honor.

18          THE COURT:  All right, it's in.

19          (Government's Exhibit No. 7A36 was received in

20  evidence.)

21  BY MR. GIBBS:

22  Q.   And, Mr. Surratt, if you can take a look at the screen,

23  Exhibit 7A36 is before you.  Do you recognize that item?

24  A.   Yes, it looks like my rifle.

25  Q.   And what type of rifle did you have?

1  A.    It's a Kalashnikov converted into a hunting rifle.

2  Q.    And what's a Kalashnikov?

3  A.    It's an AK-47-type rifle.

4  Q.    And is there a particular reason you got this type of rifle?

5  A.    Well, I bought the rifle for several reasons.  One of them

6  was I was concerned for my home safety around the year 2000; and

7  second of all, it was cheap; and third, because it's widely used

8  around the world, and I wanted to have a little familiarity with

9  it for my own knowledge.

10  Q.    And when you say "widely used around the world," does that

11  include some of the areas you testified about earlier such as

12  Chechnya and Kashmir?

13  A.    Yes.

14  Q.    All right, thank you.

15         And the next one, I don't know if it's a photograph,

16  Exhibit 3A2, if we have a photograph, we'll just go ahead and --

17  actually, this is one, Judge, if we could have the real item?  I

18  think we do have 3A2.

19         Mr. Surratt, Mr. Wood will hold that there for you.  If

20  you would take a look at it and once you've had a chance to

21  identify it?

22  A.    That was Seif's rifle, but Seif sold it to Ibrahim.

23  Q.    And you say "Seif."  What's his full name?

24  A.    Chapman, I believe.

25  Q.    And do you know what type of firearm this is?

1  A.  It's a Kalashnikov rifle also converted into a hunting rifle.

2  Q.  And you say that Chapman gave it to Hamdi; is that correct?

3  A.  He sold it to him, yes.

4  Q.  Do you know how that came about?

5  A.  No, I have no idea.  I just know that he told me that he sold

6  it to him.

7  Q.  That -- okay.  Thank you.  That's fine.

8       Now, Mr. Surratt, you testified that you and these other

9  people went into Timimi's house as a group.  When you first got

10  inside, what did the people in the house do with their cell

11  phones?

12  A.  They turned them off.

13  Q.  And why did you turn off your cell phones?

14  A.  We turned it off because -- for -- probably for multiple

15  reasons.  One reason was because --

16       MR. MAC MAHON:  Objection, Your Honor.  If it was

17  probable reasons, if it was something that the defendant actually

18  said or if someone else said, he should say it.

19       THE COURT:  Right.  We need to -- not probably.  We need

20  to know exactly why you did it and if you were told by anyone to

21  do it.

22       THE WITNESS:  Well, we weren't told, or it wasn't said.

23  It was understood.

24       THE COURT:  All right.

25       THE WITNESS:  So I don't know why about anybody else.  I

1  know why I turned mine off.

2         THE COURT:  Well, why did you turn yours off?

3         THE WITNESS:  Because for one, I didn't want to disturb

4  Ali Timimi while he talked, and two, it was kind of an

5  understanding that we thought -- I thought that they can listen to

6  conversations through a cell phone.

7  BY MR. GIBBS:

8  Q.    That who can listen to conversations through cell phones?

9  A.    The authorities or anyone who had the technology to do it.

10  Q.   And after everyone at Timimi's house turned off their cell

11  phones, what happened at that point?

12  A.   After we turned off the cell phones?

13  Q.   Right.

14  A.   Then we sat down, and we were talking, and he began to talk,

15  basically give a small lecture from a paper that he had.  First,

16  of course, he began to tell us, you know, he was glad that we're

17  there and that type of thing, welcomed us.  It wasn't just he

18  started talking first of all.

19  Q.   All right.  And this is Ali Timimi talking, correct?

20  A.   Yes.

21  Q.   And how were people arranged in the room when he started

22  talking to you?

23  A.   Well, we were sitting in the living room on his floor in a

24  circle.

25  Q.   And just describe for the jury what Timimi said after he

1 welcomed everybody and he began his talk. What did he say to the
2 group?
3 A. Well, he -- like I say, he began by, you know, praising God
4 and his Prophet, and he said that he would -- he wanted to tell us
5 briefly about stuff that he talked about before, but he wasn't
6 going to go into a lot of detail because it was being repetitive.
7 Some of the guys had been there before. He doesn't want to be
8 repetitive over and over and over again.
9 Q. All right. Was it your understanding this was not the first
10 time he had had a meeting like this?
11 A. It was my understanding this was not the first time.
12 Q. And he said he didn't want to be repetitive of things he had
13 said previously; is that correct?
14 A. Yes.
15 Q. And then what did he say?
16 A. Then he, he talked about -- he had a paper, and he was, he
17 was basically summarizing it for us. It was in Arabic, and the
18 first thing the paper was talking about was sort of the history of
19 America and some of the things and the policies and the ways that
20 America has done in the past, and after he talked about that, the
21 next thing I remember he talked about was 9/11.

22         He talked about whether or not it was -- what happened
23 was legal or not legal in Islam, and he kind of -- I don't
24 remember if it actually gave an actual answer. He kind of was
25 more --

1          MR. MAC MAHON: Your Honor, I object. If he doesn't

2     remember, he doesn't remember.

3          MR. GIBBS: Well, Judge, I think he's testifying to the

4     best of his recollection.

5          THE COURT: I'm going to allow this, and you can probe

6     it more for detail on cross. Go ahead. Overruled.

7          MR. GIBBS: Thank you, Judge.

8          THE WITNESS: Well, like I said, the paper was kind of

9     to me, in my opinion, it was leaving it more -- didn't really give

10    a decisive answer as to whether or not it was legal or not legal,

11    what happened on 9/11, but the reason why I think it was because

12    regardless of whether it was or not, the repercussions of what

13    happened make it not a good thing that happened, meaning the

14    position that it put the Muslims in the world in today made it not

15    something that should have happened.

16    BY MR. GIBBS:

17    Q.   Now, is it your opinion, or is that what was said from the

18    paper?

19    A.   That's what was said from the paper.

20    Q.   And you talked about the paper itself. You said it was in

21    Arabic. What was Timimi doing with this Arabic paper while he was

22    talking to you?

23    A.   He had it in his hand.

24    Q.   And was he referring to it at various times?

25    A.   He'd glance at it and look at it, but he wasn't reading it

1  verbatim, no.

2  Q.  And after that, after he discussed September 11 and the

3  ramifications of that event, what, if anything, did he say to the

4  group there at his house?

5  A.  After that, he talked about that the area of conflict, which

6  I'll say is Pakistan and Afghanistan, was going to -- they're

7  going to need a lot of help, and they're going to need our

8  support, and that it's obligatory for us to help them in whatever

9  way we can.

10  Q.  Obligatory to help whom?

11  A.  The Muslims of that area.

12  Q.  And when you say "that area," what area specifically are you

13  talking about?

14  A.  Pakistan and Afghanistan.

15  Q.  And at that time, was there any distinction in your mind

16  between Pakistan and Afghanistan?

17  A.  Not really, no.

18  Q.  Now, what, if anything, did Timimi say when he talked to the

19  group there at his house about the Taliban?

20  A.  I never actually heard him talk about the Taliban, say the

21  word "Taliban."  I heard him say the brothers and the Muslims for

22  the area, but he just said that they were going to need our help.

23  Q.  And you talk about the area, but did he specify what area of

24  the world this was that he was talking about?

25          MR. MAC MAHON:  That's asked and answered three times

1  now, Your Honor.  He said Pakistan and Afghanistan.

2           THE COURT:  Yes, that's what he said.  Sustained.

3  BY MR. GIBBS:

4  Q.   And at that time, Mr. Surratt, were you following the events

5  that were going on in the world in Pakistan and Afghanistan?

6  A.   Yes, I was following them.

7  Q.   And what was going on in that part of the world at the time

8  of that meeting?

9  A.   It was basically they were accusing Usama Bin Laden of being

10  involved in 9/11 at the time, and they wanted the Taliban to hand

11  him over, and the Taliban refused to do it without proof.  They

12  wanted them to, you know, don't just tell us what you want us to

13  do.  Show us, and then we'll work together and see what you have

14  to say.

15           So it was kind of obvious that they weren't going to

16  give him up and that probably America was going to go to war over

17  it, but -- and Pakistan at the time, we weren't sure if they were

18  going to support Afghanistan or if they were going to support

19  America or if they were going to stay out of it.  It was unclear.

20  Q.   And did Timimi talk at all at his house that day about what

21  the people in that room and the people at his house should do

22  given the fact that it was obligatory to support the people in

23  Pakistan and Afghanistan?

24  A.   Yes.  One of the things that we have to do if we're able to

25  was to go there and support them physically in all ways that we

1 can physically.

2 Q. And can you describe the ways that the people in Pakistan and

3 Afghanistan can be supported physically?

4      MR. MAC MAHON: Objection, Your Honor, as to what

5 Al-Timimi said was the only issue in the case.

6      THE COURT: I think that's correct. Sustained. You

7 need to rephrase the question.

8 BY MR. GIBBS:

9 Q. What was your understanding of what it meant to support the

10 people of Afghanistan and Pakistan physically?

11      MR. MAC MAHON: I'm going to object to that, too, as

12 well, Your Honor, unless it's something that the defendant told

13 him.

14      THE COURT: Sustained.

15      What, if anything, did Dr. Ali Timimi say about how you

16 would go about physically supporting the people in that area? Did

17 he say anything about that?

18      THE WITNESS: Just all ways physically. He didn't say

19 specifically like, you know, any specifics, no.

20      THE COURT: All right.

21 BY MR. GIBBS:

22 Q. Now, when you were there at Timimi's house and he was reading

23 from this Arabic document, did you ask him anything about the

24 document?

25 A. After he concluded about, you know, supporting them

1  physically, if you can't support them physically, support them

2  financially, if you can't support them financially, support them

3  through speaking of them good or telling the good of what they are

4  doing, and if you can't do that, then at least pray for them.

5          And then after he finished and he was done talking, I

6  asked him, you know, what was the paper? Who was, you know, where

7  could I get it? Even though it was in Arabic, I wanted to know if

8  I could get it and whether or not it was in English or not.

9  Q.    And why were you interested in getting the paper?

10 A.    Because he was only summarizing the paper. I wanted to read

11 it all and see everything that it was saying.

12 Q.    And what did he tell you about the paper?

13 A.    He said that it's online, that there's probably some people

14 who are translating it, but he used the language, "There are some

15 brothers probably translating it," that I'd probably be able to

16 find it online.

17 Q.    And did he tell you who the author of the Arabic paper was?

18 A.    He didn't tell me, but I looked at the paper, and I saw that

19 it was Safar Hawaali.

20 Q.    Safar Hawaali?

21 A.    Yes.

22 Q.    All right. Can you read any Arabic?

23 A.    I can read it, yes.

24 Q.    Can you read enough that you can make out the name Safar

25 Hawaali on there?

1  A.   Yes.

2  Q.   And at some point after that meeting at Timimi's house, did

3  you make an effort to find this particular paper online?

4  A.   Yes, I did.  Afterwards, I went online, and I did some search

5  engines, but I didn't really have to go far because I belonged to

6  an e-list called, it was from Al-Jazeera, and there was a link

7  that someone had put on there for the actual, I guess, call it a

8  thesis paper or something from Safar Hawaali.  It was in Arabic,

9  though.

10 Q.   And you were able to get the paper by going through that

11 link?

12 A.   Yes.

13          MR. GIBBS:  All right.  If we could just pull up

14 Government's Exhibit 7D3?

15          THE COURT:  Is this in yet?

16          MR. GIBBS:  I don't know if there's been a stipulation.

17          THE COURT:  Is there any objection to 7D3?

18          MR. MAC MAHON:  I have to see it when it comes up, Your

19 Honor, I'm sorry.  Our exhibit book has fallen apart.

20          THE COURT:  Well, you need to look at it before it goes

21 on the screen.

22          MR. MAC MAHON:  Thank you, Your Honor.

23          No, there's no objection to that.

24          THE COURT:  All right, it's in.

25          (Government's Exhibit No. 7D3 was received in evidence.)

1  BY MR. GIBBS:

2  Q.   All right.  And actually, Mr. Surratt, before you take a look

3  at that, just very quickly, other than telling you that some of

4  the brothers are translating this document online, did Timimi tell

5  you anything about the name of the paper?

6  A.   That it was Statements, Statements to the Ummah.  I don't

7  know the whole, full name.  He gave me the name of what it was.

8  Q.   So at the meeting, he did tell you the name of the paper?

9  A.   Yes.

10 Q.   And you said Statement to the Ummah.  What does "Ummah" mean?

11 A.   It means like the nation of Muslims.

12 Q.   It means like?

13 A.   Like the collective nation of Muslims.

14 Q.   Okay.  And if you could take a look at the exhibit that's

15 before you?  And actually, why don't we, let's -- if we can

16 enlarge that portion?

17      Mr. Surratt, do you recognize Government's Exhibit 7D3?

18 A.   Yes, I do.

19 Q.   What is that?

20 A.   It's an e-mail from me, and I was thanking somebody, I don't

21 know who they were, somebody who was on the e-list for posting the

22 link to the -- one of his papers.

23 Q.   And is this actually the means that you used to get the paper

24 that Ali Timimi was reading from at his house that day?

25      MR. MAC MAHON:  Objection, Your Honor, as to lack of

1  foundation.  Maybe we should approach on this.

2          THE COURT:  All right.

3          (Bench conference on the record.)

4          MR. MAC MAHON:  If I can, Your Honor, they haven't

5  identified the date of this meeting.  Sometime in October is what

6  they said.

7          If you look at the exhibit that's in evidence, you'll

8  see that the Safar Hawaali message that they're discussing where

9  this person first finds it on the Internet is Monday night,

10 October 15, 2001.

11         Now, there has to be some foundation that if this

12 meeting happened beforehand and this document didn't exist, that

13 it shouldn't come in this way if it's coming in.  They have to lay

14 some foundation to show that this meeting took place after -- or

15 before this happened.

16         THE COURT:  The testimony right now is this meeting

17 occurred sometime after September 16, and his testimony was it was

18 sometime in October.  That's enough.  I don't -- if that's the

19 basis for the objection, that's not sufficient.

20         And you again can probe that a little more on cross, but

21 I don't see any reason why that would be inappropriate.  I mean,

22 that's what the testimony is.  You're talking about events that

23 occurred over three years.  If a witness can say, "I remember it

24 happened sometime in October, and thereafter, I went on the

25 Internet, and I did such-and-such," obviously, the meeting was

1  sometime before October 15.

2          MR. MAC MAHON:  Excuse me, Your Honor, what I'm trying

3  to say, if that's what he's going to say, the meeting was after

4  October 15 --

5          THE COURT:  No, the meeting --

6          MR. MAC MAHON:  Well, I'll explore it on cross

7  examination.  Thank you, Your Honor.

8          (End of bench conference.)

9          MR. GIBBS:  Thank you, Judge.

10 Q.   Now, Mr. Surratt, when was the first time you became aware of

11 Safar Hawaali's Statement to the Ummah, that paper?

12 A.   At Ali Timimi's house.

13 Q.   When you saw him with it in his hand?

14 A.   Yes.

15 Q.   And then at some point after that, did you take some steps to

16 try to get your own copy?

17 A.   Yes.  That's when I went online.

18 Q.   And can you explain, I believe it's 7D3, the significance of

19 this document?

20 A.   This is -- it was in response to an e-mail that was sent to

21 the e-list from me thanking them for providing the link for that

22 actual document.

23 Q.   And by using this particular e-link, were you able to get a

24 copy of Safar Hawaali's message to the Ummah in English, or at

25 least part of it?

1  A.  Part of it, yes.

2  Q.  And just real briefly, in the e-mail itself, you talk about a

3  particular individual here, I'll circle it, Sheikh Salman. Do you

4  know who that is?

5  A.  Yeah. That's, his name is Salman Al-Ouda.

6  Q.  And who is Salman Al-Ouda?

7  A.  He is a scholar in the Arabian Peninsula, also.

8  Q.  And why did you want to get a copy of his statement?

9  A.  Because he's well-respected by me, also.

10  Q.  By you as well?

11  A.  Yes.

12       MR. GIBBS: All right. And if we could move down on

13  that e-mail, please? Keep going a little further. All right,

14  that's good.

15  Q.  Now, Mr. Surratt, I also want to circle that paragraph there.

16  You talk about some of the -- there's a discussion in there about

17  some of the peninsular sheikhs, and the first one is Sheikh

18  Shuaibi?

19  A.  Yes.

20  Q.  Do you know first of all that person's full name?

21  A.  Sheikh Hammoud Ibn Uqla Al-Shuaibi or something like that.

22  Q.  And is he ever referred to as Sheikh Uqla?

23  A.  Some people, yes.

24  Q.  And how about the next one, Sheikh Salman?

25  A.  That's Al-Ouda, also.

1  Q.   And then Sheikh Ibn Jibreen, do you know who that is?

2  A.   Yes.

3  Q.   Who is that?

4  A.   He's also a sheikh from the Arabian Peninsula.

5  Q.   And how about the next one, Sheikh Safar?  Is that Safar

6  Hawaali?

7  A.   Yes, it is.

8  Q.   All right, thank you.

9       Now, as a result of going on this e-link, Mr. Surratt,

10  did you, in fact -- you said you got a copy of the Hawaali

11  Statement to the Ummah?

12  A.   Yes.

13  Q.   And if I could have you take a look at another exhibit, it's

14  Government's Exhibit 7A23.

15       THE COURT:  Any objection?

16       MR. MAC MAHON:  Yes, there is an objection to that

17  exhibit, Your Honor.

18       THE COURT:  Hold on, don't post it.

19       MR. MAC MAHON:  The document is incomplete, Your Honor.

20       THE COURT:  Wait a minute.  I'm trying to see my copy of

21  it.  7A23?

22       MR. MAC MAHON:  Yes, Your Honor.  If you flip to the

23  last page of the exhibit, you'll --

24       THE COURT:  Well, it's supposed to be a 22-page

25  document, right?

1        MR. MAC MAHON:  22 of 22 is what I have.

2        THE COURT:  Right.

3        MR. MAC MAHON:  If you look at the bottom of page 22,

4   you'll see the basis for the objection.

5        THE COURT:  I don't think that's enough to keep it out.

6   I mean, if you -- I'm not quite sure I know why it's coming in at

7   this point, but the fact that two pages are missing --

8        MR. MAC MAHON:  Excuse me, it's 11 pages that are

9   missing.  It's a full third of the document.

10       THE COURT:  What's the purpose of this document going

11  in?

12       MR. GIBBS:  Judge, this is the English translation of

13  the document that the witness just testified Timimi was holding in

14  his house when he was at that meeting.

15       THE COURT:  Well, did you actually look at the document

16  that the defendant was holding?

17       THE WITNESS:  Yes, I did.

18       THE COURT:  Did you count how many pages were in it?

19       THE WITNESS:  No.  It was -- the document he had was in

20  Arabic.

21       THE COURT:  Well, this would not have been the document

22  that was being held in any case.

23       MR. GIBBS:  No, this is a translation of that document,

24  Judge.

25       THE COURT:  I think you're going to need to tie this up

1  better than this.  I'm sustaining the objection at this point.

2          MR. GIBBS:  And if I could just clarify a little bit on

3  that, Judge?

4  Q.  In terms of what Timimi told you at his house there when you

5  asked him about the document, well, your testimony was he said

6  that it was being translated?

7  A.  Yes.

8  Q.  And did he give you enough information about the document for

9  you to be able to find it online?

10 A.  Just the name of the document.  That's why I used to do the

11 search --

12 Q.  The name, and did he tell you the author of the document?

13 A.  Safar Hawaali.

14 Q.  And you actually saw that in Arabic on the document?

15 A.  Yes.

16         MR. MAC MAHON:  Yes, Your Honor, this is all asked and

17 answered.

18         THE COURT:  I agree.  Sustained.

19 BY MR. GIBBS:

20 Q.  And when you made efforts to find the document, you testified

21 about Exhibit 7D3 as far as going online to get it.  Did you, in

22 fact, get a copy of Safar Hawaali's Statement to the Ummah?

23 A.  Yes.  The link, actually the one that was on the e-list was a

24 link to the Arabic version.  Then I had to do my own search, which

25 was when I found the English version.

1  Q.   And how did you -- describe the search you made and the

2  connection you made between the Arabic document and the English

3  document that you located.

4  A.   Oh, they had the same name, same author, and same title.   I

5  didn't read all through the Arabic one because my Arabic isn't

6  that good.

7  Q.   And did you print off a copy of the English document and save

8  it?

9  A.   Yes.

10  Q.   And, in fact, did you have that in your house when it was

11  searched by the FBI back in 2003?

12  A.   Yes.

13  Q.   And did you read the document, the Statement to the Ummah

14  that you printed off the Internet?

15  A.   Yes, I did.

16  Q.   And were the things that were said in that document

17  consistent with the things Timimi said at his house the night you

18  went to the meeting there?

19  A.   Yes.

20        MR. MAC MAHON:   Objection as to foundation, Your Honor.

21  All he said was that he summarized a few points in it.

22        THE COURT:   Well --

23        MR. MAC MAHON:   Now he's looking at a 30-page document.

24        THE COURT:   -- a person can testify that a document is

25  consistent or inconsistent with something he heard.   No, I'm going

1 to overrule that objection.

2 BY MR. GIBBS:

3 Q.   And was the, the English document, Safar Hawaali's Statement

4 to the Ummah, consistent with the things Timimi said at his house

5 that day?

6 A.   Yes, it was consistent.

7        MR. GIBBS:  All right.  Now, if we could go back to 7D3

8 for just a moment?  If we could pull up -- if we could just

9 enlarge that, please?

10 Q.   All right.  Now, Mr. Surratt, you testified that in this

11 e-mail, you were responding to another e-mail on this link, and

12 you see the original message from Shibli Zaman.

13 A.   Yes.

14 Q.   Who is Shibli Zaman?

15 A.   I have no idea.

16 Q.   So this was just an individual who had posted to this

17 Al-Jazeera website?

18 A.   Yes.

19 Q.   And can you explain to the jury what an Al-Jazeera website

20 is?

21 A.   It's not really a website.  It's an e-list.  I was told by a

22 friend of mine, Ismail Royer, to -- he gave me the e-mail address.

23 He told me to join it, that it's a good e-mail list, that people

24 talk about a lot of good discussions and Islamic things and

25 topics.  So that's what I did.  I don't know anyone besides Ismail

1  Royer who was on it, the people's e-mails.

2  Q.  And what types of things did you do on the Al-Jazeera e-list?

3  A.  Sometimes I would respond to whatever the topic was, and

4  sometimes I would just read it.

5  Q.  And when you say "respond," you'd send out e-mails?

6  A.  Oh, I'd send out an e-mail.  When you would send e-mail on

7  the e-list, it goes to everybody on the list.  I'd ask questions,

8  or I'd respond, or I would just read it.

9  Q.  And would people ever respond to your e-mails?

10  A.  Sometimes, yes.

11  Q.  All right, thank you.

12      Now, you testified about one of the individuals in that

13  particular document, 7D3, that Sheikh Uqla.  Do you recall that?

14  A.  Yes.

15      MR. GIBBS:  And if I can pull up another document, 7A19?

16      THE COURT:  All right.  Again, any objection to 7A19?

17      MR. MAC MAHON:  We object to that exhibit, Your Honor.

18      THE COURT:  On what ground?

19      MR. MAC MAHON:  We've already gone around the horn on

20  this one exhibit.  I think that you've seen it before, but it

21  doesn't -- it's not tied in here to the defendant.  It's just

22  something that this person was reading on the Internet.

23      THE COURT:  All right, hold on just a second.

24      All right, to move this along, Mr. Gibbs, in terms of

25  documents which this witness had either in his home when it was

1  searched or at various times during the relevant time period, it's

2  of marginal relevance to this case unless you can connect it to

3  the defendant, all right?  So is there any connection with 7A19 to

4  Dr. Al-Timimi?

5          MR. GIBBS:  There is, Judge.

6          THE COURT:  All right.  Well, then you'll need to do

7  that before you can show it to the jury.  It's not in yet.

8          MR. GIBBS:  Okay.  Can we have the witness take a look

9  at 7A19?

10 Q.  Do you recognize that document?

11 A.  Yes, I do.

12 Q.  All right.  What is that document?

13 A.  It's -- it was a fatwa or a religious ruling that was posted

14 on the -- a link to it from the -- on the e-list, also, and I --

15 this actual document is me.  I copied it, and I kind of edited it

16 and put a little -- changed it a little bit so that it's more --

17 it looks better and printed it out.

18 Q.  And did you actually have this document at your house when it

19 was searched by the FBI in 2003?

20 A.  Yes, I did.

21 Q.  And had you actually printed this document out in 2001 and

22 had a discussion with Ali Timimi about it?

23 A.  Yeah.  I asked him about it, but I didn't give it to him.

24 Q.  All right.  And what was the nature of the discussion you had

25 with Ali Timimi about this document?

1        THE COURT: I'm sorry, let's get a time frame. About

2 when did you have a discussion with the defendant about this

3 document?

4        THE WITNESS: It was after 9/11. I'm not sure exact

5 date.

6        THE COURT: Where does it fit in between September 11

7 and the October meeting at the defendant's home?

8        THE WITNESS: Are you asking me where I was at when I

9 asked him?

10        THE COURT: No, no, no. In other words, did you discuss

11 this document with the defendant before the October meeting at his

12 home or after that?

13        THE WITNESS: After. I'm not sure where it was.

14        THE COURT: Where did you discuss it with the defendant?

15        THE WITNESS: I'm not sure. I don't remember where.

16        THE COURT: All right.

17        THE WITNESS: It was just -- it was a two-sentence

18 conversation. It wasn't like I had a big discussion about it.

19        THE COURT: Go ahead, Mr. Gibbs.

20 BY MR. GIBBS:

21 Q. And what did you ask the defendant -- well, first of all, why

22 did you want to ask the defendant about this particular document?

23 A. Well, at the time, it was one of the only documents that I

24 had where somebody was trying to explain what happened on 9/11

25 using the Koran and hadeeth to explain what their religious ruling

1 is concerning it. So I was concerned on some parts of it, on the

2 usage of it, and I started to believe it because that's all I was

3 hearing. I didn't have any refutation of it, so I was seeking a

4 refutation to see if anybody had a scholarly refutation of what he

5 had to say.

6 Q. And was Timimi one of the people who you felt like could give

7 you a scholarly opinion about this document?

8 A. Yeah, he was.

9 Q. And what did he tell you about this document?

10 A. Well, I asked him if he knew who Sheikh Shuaibi was, and he

11 said that he knew who he was and that he's an okay guy, and I

12 asked him did he read the fatwa, and he said, "Yes, I read it,"

13 and that was it. He didn't say anything about it.

14 Q. All right. And Sheikh Shuaibi, that's also -- it's

15 Shuaibi -- or Bin Uqla Al-Shuaibi, correct?

16 A. Yeah, Sheikh Hammoud Bin Uqla Al-Shuaibi.

17         MR. GIBBS: Judge, at this time, I would again move it

18 in, and I would note for the Court that this was the document that

19 the previous witness also testified about.

20         THE COURT: Well --

21         MR. MAC MAHON: Objection. It was not a document. He

22 said he made this up himself, Your Honor, and I think given the

23 time frame and discussion, that's not enough link in this case to

24 put it in against the defendant.

25         THE COURT: Oh, I think it is at this point, so I'm

 1   going to let 7A19 in evidence.

 2            (Government's Exhibit No. 7A19 was received in

 3   evidence.)

 4            THE COURT:   7A23 is not in evidence, just so we're clear

 5   where we've been.

 6   BY MR. GIBBS:

 7   Q.   And if we -- yeah, we could put that up there?

 8            THE COURT:   7A19.

 9            MR. GIBBS:   Correct.  And if we could -- yeah, why don't

10   we go to page 7 of that document if we could.  Actually, one more.

11   Q.   And, Mr. Surratt, we're going to enlarge a paragraph of this

12   particular document and have you take a look at it.

13            Now, you testified that this document related to the

14   events that occurred on September 11?

15   A.   Yes.

16   Q.   And there's a paragraph here you have before you, it

17   says, "Also, whoever says that there are 'innocent victims'

18   without any differentiation between their categories must accept

19   that he is accusing the Prophet and the companions and those after

20   them that they killed 'innocent victims' according to them.

21   Because the Prophet used a catapult in his war against Ta'if, and

22   it is the nature of a catapult is that it does not differentiate.

23   (It only throws what you put in it where you point it.)"

24            Now, Mr. Surratt, is there any similarity between this

25   statement in 7A19 and the things Timimi said at the Dar al-Arqam

1  on September 11?

2  A.  There's a similarity, yes.

3  Q.  And what is that similarity?

4  A.  It's the uses of collateral damage.

5  Q.  Thank you.

6  Now, Mr. Surratt, going back to the meeting at Timimi's

7  house, other than asking him about the Safar Hawaali Statement to

8  the Ummah, what else did you do after he finished talking to the

9  group?

10  A.  That day or are you talking about a different day?

11  Q.  No, actually at his house, after he finished talking.

12  A.  After he finished talking?  I didn't do too much nothing

13  really.  I just talked amongst other friends and stuff.

14  Q.  All right.  Did you have a conversation with Timimi himself

15  after he finished talking?

16  A.  I had a conversation with him about the paper, trying to see

17  where I can get it from, and also, I told him that, that me

18  myself, I couldn't go to -- I wasn't able to go to Pakistan or

19  that area because I had a wife, and I know she wouldn't be able to

20  handle that environment.

21  Q.  And again, Pakistan, in that area, is Pakistan and

22  Afghanistan?

23  A.  Yes.

24  Q.  Now, why did you feel the need to tell Timimi that you

25  couldn't go to Pakistan or Afghanistan?

1  A.    Well, because I felt like that, you know, I felt it was my
2  duty to try to help them in the best I could and that, you know, I
3  felt -- I was kind of upset that, you know, I had the
4  responsibility of my wife, and I didn't want to -- it was kind of
5  a conflict in between myself, so I was basically trying to get his
6  opinion on it.
7  Q.    And why did you feel like it was your duty to help those
8  people over there?
9  A.    Because of the situation they were about to face.  They
10  needed help.  That's why.
11  Q.    And what was your understanding of the situation they were
12  about to face?
13        MR. MAC MAHON:  Your Honor, I object unless it's
14  something that Ali Al-Timimi told him that day.
15        THE COURT:  All right, rephrase the question.
16  BY MR. GIBBS:
17  Q.    Well, based on the talk that Timimi gave you at his house
18  there, what was your understanding of what the people in that part
19  of the world were about to face?
20  A.    They were about to face going to war.
21  Q.    With?
22  A.    With America.
23  Q.    And what was Timimi's response to you when you said that
24  because of your obligation to your wife, that you couldn't go over
25  there to help the people in that part of the world?

1  A.    He just told me that it's okay, that if you can go to another

2  Muslim country and live and be amongst the Muslims and help them,

3  that that's fine, because everybody can't be a doctor, everybody

4  can't be an engineer, that we need all types of people and all

5  types -- there's other places in the world you can go to.

6  Q.    And when he talked about everybody can't be a doctor,

7  everybody can't be an engineer, did he talk about anything else

8  that everybody can't be?

9  A.    Not that I remember, no.

10  Q.    So he just said that if you can't do it because of your wife,

11  that's okay?

12  A.    Yes.

13  Q.    Now, did anybody else that you heard in that meeting talk to

14  Timimi the way you did?

15  A.    I don't know because this is something that I pulled him to

16  the side and I asked him between me and him.  It wasn't something

17  that I asked in front of everybody else.

18  Q.    And did you see anybody else pull him aside and talk to him

19  in the same way?

20  A.    Everybody was talking to him in their own side, like, side

21  conversations.  While maybe me and Hammad were talking, maybe

22  somebody else was talking to him.

23  Q.    And do you know if anybody else from that meeting went

24  overseas?

25  A.    From that meeting?  No, I don't know of anyone else.

1  Q.  All right.  And did you ever discuss with the gentleman you

2  identified as Ali Asad what he was planning to do?

3  A.  No.  I just barely knew the guy.  I didn't discuss anything

4  with him.

5  Q.  All right, Mr. Surratt, I want to go back to one point

6  earlier.  When you first found out that Timimi was meeting with

7  some of the brothers privately from Hammad Abdur-Raheem, did

8  Hammad tell you anything about what Timimi had said to him and the

9  others that prompted them to go overseas to Pakistan?

10          MR. MAC MAHON:  Objection.  Asked and answered, Your

11  Honor, and as to the time frame.

12          THE COURT:  Sustained.

13          MR. GIBBS:  Well, I can clear up the time frame, Judge.

14          THE COURT:  Let's hear you.

15          MR. GIBBS:  All right.

16  Q.  You know what I'm talking about, at Hammad's house, when you

17  were waiting for Yong Kwon.

18  A.  Okay.  Yes.

19  Q.  All right.  During that night at his house, did he tell you

20  anything about what Timimi said that caused those other

21  individuals you've already testified about to leave to go to

22  Pakistan?

23          MR. MAC MAHON:  That asks for hearsay, Your Honor.

24          THE COURT:  That's too far removed.  That's not reliable

25  enough.  Sustained.

1        MR. GIBBS: All right. Well, at this point, Judge, I'd

2 like to have Mr. Surratt identify some documents, and I think what

3 I'll do is I can just show them to Mr. MacMahon, and then if

4 they're acceptable, I can put them on the board.

5        THE COURT: All right.

6        MR. GIBBS: If we could pull up Government's Exhibit

7 7A12?

8        THE COURT: Any objection to 7A12?

9        MR. MAC MAHON: Yes, Your Honor, grounds of relevance.

10        THE COURT: Well, don't pull it up until I've seen it.

11        You need to lay a foundation for this before it can be

12 shown to anyone.

13        MR. GIBBS: That's fine, Judge.

14        If Mr. Surratt could take a look at the exhibit?

15        THE WITNESS: Okay.

16 BY MR. GIBBS:

17 Q. Do you recognize it?

18 A. Yes, I do.

19 Q. And how do you recognize it?

20 A. It's something that I printed offline from a website called

21 azzam.com.

22 Q. And what is azzam.com?

23 A. It's a website that was -- deals with the conflict, basically

24 dealing with the conflict in Chechnya, but they also kind of deal

25 with Indonesia sort of.

1  Q.   And what was the purpose of printing this particular document
2  off of azzam.com?
3  A.   So that I could see sort of the stance that Sheikh Hammoud
4  al-Uqla, who gave the fatwa about 9/11, what his stance was on the
5  Taliban before even all this happened.
6  Q.   All right.   So this is the same Sheikh Uqla you've testified
7  about earlier?
8  A.   Yes.
9  Q.   And did you save this document, actually have it at your
10  house when it was searched in May of 2003?
11  A.   Yes.
12           MR. GIBBS:   Judge, at this point, I would move 7A12 in.
13           MR. MAC MAHON:   Lack of foundation as to this defendant,
14  Your Honor.   This document is dated November of 2000.
15           THE COURT:   Do you remember when you downloaded this?
16           THE WITNESS:   This is after 9/11 I downloaded it.
17           THE COURT:   Had you heard of this person before -- how
18  had you first heard of this particular scholar?
19           THE WITNESS:   After 9/11.
20           THE COURT:   From what source?
21           THE WITNESS:   From that fatwa.
22           THE COURT:   The fatwa that you saw where?
23           THE WITNESS:   Online, the one where I --
24           THE COURT:   Had this person's name been mentioned to you
25  in any respect at any of your meetings with the defendant?

1        THE WITNESS:  No.

2        THE COURT:  Had the defendant ever mentioned this man's

3  name in any of his speeches at the center?

4        THE WITNESS:  Not that I remember, no.

5        THE COURT:  So the first time you heard of him was

6  through your own research on the Internet?

7        THE WITNESS:  Yes.  It was from the e-list someone gave

8  a link to.

9        THE COURT:  That's not enough of a link as to this

10  defendant.  I'll sustain the objection.

11        MR. GIBBS:  All right, Judge, let me -- there's a couple

12  other documents I want to have him go through.

13  Q.  You testified earlier about the Jazeera list, correct?  Do

14  you remember that?

15  A.  Yes.

16  Q.  And again, what's the Jazeera list?

17  A.  It's an e-list of people who have a lot of Islamic

18  discussions and topics.

19        MR. GIBBS:  And if I could just have a moment, Judge?

20        All right, if I can have the witness take a look at

21  7D12?

22        MR. MAC MAHON:  Same objection as before, Your Honor.

23        MR. GIBBS:  Judge, I think these were defense exhibits

24  that were provided to us, and again, I could have the witness

25  identify it and authenticate it.

1      THE COURT:  Well, I think the same concerns I had about
2   the previous exhibit would apply to this one, all right?  So this
3   man's reading material is not relevant unless it's connected to
4   the defendant either because the defendant suggested it or had
5   referenced it in his speeches, then I think it's sufficient.  But
6   just because Mr. Surratt had these materials doesn't mean
7   anything.  So you need to lay a foundation.
8   BY MR. GIBBS:
9   Q.   All right, Mr. Surratt, if you could just identify the first
10  one, 7D12?  Take a look at it, and if you recognize it, indicate
11  how you recognize it.
12  A.   Yes, I recognize it.  It's -- it was a discussion that we had
13  on the Al-Jazeera e-list, also.
14  Q.   And you say "a discussion we had."  Who are you speaking of
15  specifically?
16  A.   I don't know the people.  It's just people who belong to the
17  e-list.  I don't know the actual people who were on the e-list.
18  Q.   And what was the date of this particular document?
19  A.   It's September 18.
20  Q.   Of what year?
21  A.   Of 2001.
22       MR. GIBBS:  All right.  And, Judge, I'd like to just
23  have him go through these fairly quickly, have him authenticate
24  it, and then we'll prove it up with subsequent witnesses.
25       THE COURT:  Okay.

1      MR. MAC MAHON:  I don't have any objection to the

2   authenticity of them.  They all came from a CD that the government

3   gave us of e-mails, and if he wants to show them to me, I'll

4   stipulate to the authenticity of the documents.

5      THE COURT:  All right.  Were these documents seized from

6   the defendant -- from the witness, I'm sorry, from Mr. Surratt?

7      MR. GIBBS:  I actually think we got most of these off of

8   a disk, right?

9      MR. KROMBERG:  Excuse me.  If I may, Judge, these were

10   seized in a different case, in a different investigation, and it

11   just happened that Mr. Surratt can say that yes, they were the,

12   the traffic that was going on this particular Al-Jazeera list,

13   which will be tied up later, Judge.

14      THE COURT:  If it's tied up, then it may come in, but in

15   terms of authenticity, there's no foundational objection to these

16   exhibits; is that right?

17      MR. MAC MAHON:  No, Your Honor.

18      THE COURT:  Then we can move this along, Mr. Gibbs.

19      MR. GIBBS:  Right.  That's fine.  And actually, just for

20   the record, these are the 7D exhibits.  I believe it's 7D1 through

21   7D13, if I'm not mistaken.  14?

22      MR. KROMBERG:  16.

23      THE COURT:  I'm sorry, 7D1 through 7D16?

24      MR. GIBBS:  That's correct, Judge.

25      THE COURT:  All right.  So there's no foundational

1  issue, but whether they come in is another issue.

2          MR. GIBBS:  And it's actually, Judge, 7D1 to 7D15 --

3          THE COURT:  All right.

4          MR. GIBBS:  -- that there's no defense objection to.

5          MR. MAC MAHON:  Just as to foundation, Your Honor, just

6  so the record is clear.

7          THE COURT:  Correct.

8          MR. MAC MAHON:  Authenticity.

9          THE COURT:  Authenticity.

10          MR. MAC MAHON:  Thank you.

11  BY MR. GIBBS:

12  Q.  Now, Mr. Surratt, you testified that at the meeting at

13  Timimi's house, you told him that you couldn't go over to Pakistan

14  and Afghanistan because of your wife; is that correct?

15  A.  Yes.

16  Q.  And what did you tell him that you would be doing instead?

17  A.  That I was going to be going to Egypt and going to school and

18  trying to finish -- live there.

19  Q.  Can you keep your voice up a little bit?

20  A.  That I was going to be going to Egypt and live there.

21  Q.  And did you, in fact, do that move with your wife to Egypt to

22  live there?

23  A.  Yes, I did.

24  Q.  And what was your connection to Egypt?

25  A.  Oh, my wife, her mother is from Egypt, and her mother's side

1  of the family is all in Egypt, so that's why I chose that I was
2  going to go.
3  Q.   And after you got to Egypt, did you stay in contact with Ali
4  Timimi?
5  A.   I only contacted him once through an e-mail.
6  Q.   And at this point, I'd like to have you take a look at
7  Government's Exhibit 7D9.
8           MR. MAC MAHON:  No objection to that.
9           THE COURT:  All right, 7D9 is in.
10          (Government's Exhibit No. 7D9 was received in evidence.)
11          THE COURT:  All right, is there a question, Mr. Gibbs?
12  BY MR. GIBBS:
13  Q.   Have you had a chance to look at it?
14  A.   Yes, I have.
15  Q.   Do you recognize it?
16  A.   Yes.  This is an e-mail that I sent to Ali Timimi and that he
17  responded to it, and then I sent another e-mail to him.
18  Q.   And why did you send this particular e-mail to Ali Timimi?
19  A.   Because I had just left and I had just got there.  I wasn't
20  there very long, and I wanted to let him know everything was fine
21  and that I was doing well in Egypt.
22  Q.   All right.  And if you look at the bottom of page 1, it talks
23  about you're describing Cairo and the area a little bit.
24  A.   Okay.
25  Q.   Talking about how you've settled in Cairo and are doing quite

1  well.  "It is nothing more than expected."

2           Then if we can go over to page 2?  Actually, page --

3  yeah, second page.

4           THE COURT:  Put it on the overhead then.

5           MR. GIBBS:  We will.  This one has got handwriting on

6  it, though, Judge.  I'll get a clean copy.

7  Q.  And you then go on to say on the second page, it's not

8  paradise but 1000 percent better than living amongst the Kufar who

9  kill and hate Muslims.  First of all, what's the Kufar?

10 A.  That's non-Muslims.

11 Q.  Non-Muslims?

12 A.  Yes.

13 Q.  All right.  Now, did you have any concern in putting that in

14 the e-mail to Ali Timimi that you would say anything to offend

15 him?

16 A.  No, I didn't.

17 Q.  And was this statement about the Kufar who kill and hate

18 Muslims, was this consistent with the things that were discussed

19 at Timimi's house that night in October?

20          MR. MAC MAHON:  Your Honor, that's very remote.  This is

21 his own writing to Dr. Al-Timimi.

22          THE COURT:  I think the document speaks for itself.  We

23 don't need that question.  I'll sustain the objection.

24          MR. GIBBS:  That's fine, Judge.

25 Q.  And did Ali Timimi actually respond to this e-mail?

1  A.  Yes, he did.

2  Q.  And did he say anything to object to this comment on page 2?

3  A.  No, he did not.

4  Q.  All right, thank you.

5         And finally, Mr. Surratt, if you could take a look at

6  Government Exhibit 7D10?

7         THE COURT:  Is there any objection to 7D10?

8         MR. MAC MAHON:  No, Your Honor.

9         THE COURT:  All right, 7D10 is in.

10        (Government's Exhibit No. 7D10 was received in

11  evidence.)

12  BY MR. GIBBS:

13  Q.  And what is 7D10, Mr. Surratt?

14  A.  It's an e-mail I sent him from a second address that I was

15  using because my other address was being flooded with spam and

16  stuff.

17  Q.  And who did you send the e-mail to?

18  A.  To Ali Timimi.

19  Q.  And what was the purpose of sending this e-mail to Ali

20  Timimi?

21  A.  To just give him an update of how things were for me and what

22  was going on, and I had a question for him about a book that my

23  wife was asking me a question that I didn't have an answer for.

24  Q.  All right.  And if we could just take a look, if we can blow

25  up this portion?  Because I think it relates to what you just

1  testified about.

2        You said, "On that note, I have a question for you.

3  They have a tafseer class, and the only book they will use is one

4  I don't know about personally. My wife wants me to ask you if

5  there are major problems with it or not and if so, what should she

6  look out for. The name author of the book is Imam Al'alam Sheikh

7  Abdur Rahman bin Nasir Sa'adee. It seems to been have reviewed by

8  Sheikh Uthaymeen, but I am not sure completely."

9        Now, what was it about your relationship with Ali Timimi

10  that you wanted to ask him his advice about this particular book?

11  A.   My relationship to him is one out of respect, and I respect

12  that he knew -- he would know if the book had some major problems

13  or if it had minor problems as far as beliefs are concerned or if

14  it had any problems with it.

15  Q.   And did he ever respond to you?

16  A.   No, he didn't.

17  Q.   And who is Sheikh Uthaymeen, if you know?

18  A.   He's another scholar from the Arabian Peninsula.

19  Q.   All right. So another, I guess they talked about the

20  peninsular sheikhs?

21  A.   He's one of them, yes.

22  Q.   And he would be one?

23        Now, you said you didn't get a response back from

24  Timimi. At some point, did you move back to the United States

25  from Egypt?

1  A.   Yes, I did.

2  Q.   And when did that happen?

3  A.   Approximately about five or six months after being there.  I

4  came back due to a lot of problems, marital problems and other

5  problems, also.

6  Q.   And after you got back to the United States, did you maintain

7  any more contact with Ali Timimi?

8  A.   No.

9        MR. GIBBS:  Okay.  If I could just have a moment, Judge?

10        THE COURT:  Yes, sir.

11  BY MR. GIBBS:

12  Q.   Mr. Timimi, you -- excuse me, Mr. Surratt.  You testified

13  about Mr. Timimi and the meeting at his house in October 2001, and

14  you said that one of the things he told you when you said you

15  couldn't go to Afghanistan or Pakistan was that not everybody

16  could be a doctor and not everybody could be an engineer, correct?

17  A.   Yes.

18  Q.   Okay.  But you yourself are not a doctor, correct?

19  A.   No, I'm not a doctor.

20  Q.   And you yourself are not an engineer, correct?

21  A.   No, I'm not an engineer.

22  Q.   Did he elaborate on what he meant by not everybody can be a

23  doctor and not everybody can be an engineer?

24        MR. MAC MAHON:  Your Honor, objection.  It's been asked

25  and answered for one thing.

1.          THE COURT:  Sustained.  I heard it the first time.

2           MR. MAC MAHON:  Thank you.

3           MR. GIBBS:  That's all I've got, Judge.  Thank you.

4           THE COURT:  All right.  Cross examination?

5                        CROSS EXAMINATION

6   BY MR. MAC MAHON:

7   Q.   Good afternoon, Mr. Surratt.  My name is Edward MacMahon.

8   A.   Good afternoon.

9   Q.   I'm an attorney for Dr. Al-Timimi.

10          Could you put up the e-mail that you just had up,

11  please, 7 --

12          THE COURT:  The very last one?

13          MR. MAC MAHON:  Yes, Your Honor.

14          THE COURT:  7D10.

15          MR. MAC MAHON:  And Mr. Kromberg taught me how to do

16  that, Your Honor, to circle these things.

17          Could you bring that up a little, the one I just

18  circled, please?  No, go down a little bit, please.

19  Q.   Now, in that same e-mail, sir, you told Dr. Al-Timimi that

20  your wife was pregnant, didn't you?

21  A.   Yes, I did.

22  Q.   And that was the kind of information you'd want to share with

23  him, isn't it?

24  A.   Yes.

25  Q.   And in your presence, Dr. Al-Timimi was always very polite to

1  you, wasn't he?

2  A.    Yes, always.

3  Q.    He never acted like a rock star, did he?

4  A.    No, no.

5  Q.    He was also a person who was -- had good manners to other

6  people, correct?

7  A.    Yes.

8  Q.    He was respectful to all the women at the Dar al-Arqam Center

9  as well?

10 A.    Yes.

11 Q.    Okay.  Now, you testified before that you had a rule 35

12 motion pending before the Court, correct?

13 A.    Yes.

14 Q.    And you also know that the government can withdraw that

15 motion if they wish, correct?

16 A.    Yes.

17 Q.    And it's up to them entirely to decide whether or not to

18 withdraw the rule 35 motion, and if they do, you won't get any

19 sentence reduction, right?

20 A.    No.

21 Q.    Okay.  Mr. Gibbs showed you the "Russian Hell 2000" video.

22 Did you see -- do you remember that?

23        You can take this down.  Thank you very much.

24        Do you remember that, sir?

25 A.    Yes, I do.

1  Q.   Okay.  Did you get that in Saudi Arabia?

2  A.   No, I didn't buy it.  I got it from Nabil.

3  Q.   You got it from Nabil Gharbieh?

4  A.   Yes.

5  Q.   Okay.  And that's a very violent video, isn't it, sir?

6  A.   Yes, you could say it's violent.  Yes.

7  Q.   Did you see combat as a United States Marine?

8  A.   No.  Not directly, no.  They didn't consider it combat.  I

9  was in Somalia, but they didn't consider it combat.

10  Q.   And you were in the Marines there, right?

11  A.   Yes.

12  Q.   Okay.  And when you were a Marine, you took orders from

13  people, didn't you?

14  A.   Yes, I did.

15  Q.   Whoever were your superior officers, correct?

16  A.   Yes.

17  Q.   And your relationship with Ali Timimi was nothing like that,

18  was it?

19  A.   No.

20  Q.   He never once gave you any order in the sense that you got

21  orders when you were in the military, correct?

22  A.   No.

23  Q.   Okay.  And the video we saw, we saw it before and didn't have

24  to see it again of the Russian soldier, you never looked at a

25  video like that with Dr. Ali Al-Timimi did you?

1   A.   No.

2   Q.   You never looked at any jihad video with this gentleman, did

3   you?

4   A.   No, I never did.

5   Q.   And you never discussed such a video with him at any time,

6   did you?

7   A.   No, I never did.

8   Q.   And -- because you knew he was an academic, wasn't he?

9   A.   Academic, what do you mean by that?

10  Q.   He was a person who was well read on Islamic issues?

11  A.   Yes.

12  Q.   He is a person who is well read on Islamic issues even today?

13  A.   Yes.

14  Q.   All right.  So when you had questions of theology, questions

15  of how to live your life as a good Muslim, you would seek out his

16  advice, correct?

17  A.   Yes.

18  Q.   And you would seek out the advice of lots of other people,

19  too, didn't you?

20  A.   Yes, not just him.

21  Q.   All right.  And you were actually, we see a very curious

22  person about Islam and current events, weren't you?

23  A.   Yes, I was.

24  Q.   You're a person who spent a lot of time on the Internet

25  reading different things and trying to find out what was happening

1 in the world?

2 A.   Yes.

3 Q.   And you did that partially because of your religion.  You

4 wanted to see how it was that your religion shaped and affected

5 these events as well, correct?

6 A.   I don't know if I'd say that I wanted to see how it shaped

7 and reflected.  I wanted to be aware of what was going on in the

8 world, current events.

9 Q.   Okay.  But most of the research you did was on Islamic

10 websites, right?

11 A.   Yes.

12 Q.   Okay.  And you wanted an Islamic perspective of what these --

13 how these events were portrayed and otherwise, correct?

14 A.   Yes.  It wasn't the only ones I went to, but yes.

15 Q.   There was lots of other sources of information you had other

16 than Dr. Ali Al-Timimi, right?

17 A.   Yes, there was.

18 Q.   And never once did you ever hear him advocate the use of

19 violence or force at any time, did you?

20 A.   Advocate?  Well, I'm not sure what it means.

21 Q.   Did Dr. Al-Timimi ever advocate the use of violence in any

22 speech that you ever heard at Dar al-Arqam?

23 A.   No.

24 Q.   At any speech that you bought at Dar al-Arqam and listened to

25 him talk, did you ever hear him advocate the use of violence?

1  A.  No.

2  Q.  In fact, the whole time that you've known him, you've never

3  once heard him advocate the use of violence, correct?

4  A.  "Advocate" meaning?

5  Q.  Meaning say that that's something that somebody should do,

6  that you're obligated to go use violence.  You never heard him say

7  that, did you?

8  A.  Not in the current affair events, no.

9  Q.  And he would talk about, there are hadeeths and stories in

10  the Koran that are violent, though, aren't they?

11  A.  Yes, there is.

12  Q.  All right.  And you would discuss some of those stories in a

13  theoretical, a theological basis, correct?

14  A.  Yes.

15  Q.  Okay.  Now, the gun, we saw a picture of your gun, sir.  Ali

16  Al-Timimi didn't know that you had a gun, did he?

17  A.  I have no idea if he knew.

18  Q.  Okay.  Well, you never told him that you had a gun, did you?

19  A.  I never told him, no.

20  Q.  All right.  And he never asked you, sir, "Do you have a gun?"

21  A.  No.

22  Q.  Did you ever hear him speak about Muslims owning guns?

23  A.  Not to me, no.

24  Q.  Okay.  Did you go to Mecca on hajj in the year 2001?

25  A.  Yes, I did.

1  Q.   Okay.  And that was arranged at the last minute, wasn't it?

2  A.   Yes, it was.

3  Q.   All right.  And you took your wife, too?

4  A.   Yes.

5  Q.   And what's your wife's name?

6  A.   Yasmeen.

7  Q.   Right.  And you took Yasmeen to Mecca at the last minute on a

8  trip arranged by Ismail Royer, correct?

9  A.   It wasn't arranged by him, but he's the one who told me about

10 it.

11 Q.   He's the one that suggested to you that it would be a good

12 thing to do?

13 A.   Yes.

14 Q.   And that's something as a good Muslim you wanted to do

15 anyway, right?

16 A.   Yes.

17 Q.   Okay.  And when you were in Mecca, isn't it a fact that

18 Mr. Royer introduced you to an LET official in Mecca?

19 A.   I have no idea.

20 Q.   Did he introduce Mr. Kwon in your presence to someone from

21 LET?

22 A.   No.  He introduced me to a guy who was -- he worked at

23 Anderson Consulting, but I don't know if he was an LET guy.  He

24 didn't say.

25 Q.   So nobody there said anything about LET that you heard of

1  in --

2  A.   Not to me, no.

3  Q.   Okay.  And you said before that you heard from LET -- the

4  first time you ever heard about LET was from Randall Royer,

5  correct?

6  A.   Yes.

7  Q.   All right.  And then you had -- you engaged in a lot of

8  Internet research about LET, correct?

9  A.   Yes.

10 Q.   And you said that you had a very brief discussion with

11 Dr. Al-Timimi about LET, correct?

12 A.   Yes.

13 Q.   All right.  And he never told you you should go over there

14 and go to a camp, did he?

15 A.   No.

16 Q.   Now, when, when Mr. Hammad Abdur-Raheem -- well, if I may,

17 Your Honor, can I put this up on the screen just for a second?

18 They've already seen it.

19           THE COURT:  Any objection?

20           MR. GIBBS:  No, Judge.

21           THE COURT:  Do you want that made as an exhibit?

22           MR. MAC MAHON:  Well, it's just a demonstrative exhibit

23 at this point, Your Honor.

24           THE COURT:  All right.

25 BY MR. MAC MAHON:

1  Q.   Mr. Surratt, I'm going to show you a document that we

2  prepared.  It's what we call a demonstrative exhibit which shows

3  phone calls made by Yong Kwon on September 16, 2001.  You've never

4  seen this before, have you?

5  A.   No.

6  Q.   Okay.  Do you see the first call at 2:38 by Yong Kwon on

7  September 16?

8  A.   Yes.

9  Q.   Okay.  Is that your phone number, Mr. Surratt?

10 A.   Yes, it is.

11 Q.   Okay.  And the phone call made at 2:39, is that your phone

12 number as well?

13 A.   Yes, it is.

14 Q.   And then he called you again at 2:40, didn't he?

15 A.   Yes.

16 Q.   Okay.  Do you remember talking to Yong Kwon on the 16th of

17 September, 2001?

18 A.   I'm not sure what -- I don't know if I talked to him or not,

19 but he called me.  I'm not sure if I answered the phone or not.

20 Q.   There was a day in September when he told you he was having a

21 meeting, correct?

22 A.   Yes.

23 Q.   Okay.  And he didn't tell you that Ali Al-Timimi was coming,

24 did he?

25 A.   No.  Are you talking about did he tell me he was having a

1  meeting?

2  Q.   Yes.

3  A.   No, I never talked to him about a meeting.

4  Q.   For all you know, these calls went straight to your voice

5  mail, for all you know?

6  A.   I'm not sure.

7  Q.   Okay.  Thank you.

8           But there was never a time in the middle of September of

9  2001 that Yong Kwon told you that he was having a meeting where

10 people were going to hear Ali Al-Timimi's views of the events of

11 9/11, correct?

12 A.   I knew nothing about it.

13 Q.   And when you talked to your friend Hammad Abdur-Raheem the

14 next day on September 17, did he tell you anything about security

15 precautions being taken at Yong Kwon's house?

16 A.   No.

17 Q.   Did he tell you that people had to unplug answering machines

18 and turn off their cell phones as a precondition of walking in?

19 A.   He didn't tell me anything about the meeting except for what

20 I already said.

21 Q.   The meeting you had on, on or about October 15, are you able

22 to, to place that meeting any better than that, than on or about

23 October 15?

24 A.   No, I'm not.  It's too long ago.  I'm not very good with

25 dates.

1  Q.  Do you remember if Dr. Al-Timimi served pizza that day?

2  A.  That day?

3  Q.  The night -- you went over to his house after work, didn't

4  you?

5  A.  Yes.

6  Q.  And it's your recollection, you told the FBI just recently

7  that it was a Friday night, wasn't it?

8  A.  Possibly.

9  Q.  Right.  And do you remember whether he served pizza at any of

10  those dinners?

11  A.  I don't remember.

12  Q.  Okay.  Going back a little bit, Mr. Gibbs asked you about a

13  meeting you went to Ibrahim Al-Hamdi's house and Al-Timimi was

14  present.  Do you remember that question?

15  A.  Yes.

16  Q.  That was a religious dinner after Ramadan, wasn't it?

17  A.  Yes, it was.

18  Q.  There was nothing nefarious or improper discussed at that

19  dinner, was there?

20  A.  No, there was not.

21  Q.  All right.  And October 15, the meeting you talked about,

22  Omar Madini was present as well, correct?

23  A.  Which meeting?

24  Q.  The meeting that you talked about with Dr. Al-Timimi in

25  testimony before.  Wasn't Mr. Madini there as well?

1  A.   At his house?

2  Q.   Yes.

3  A.   Yes.

4  Q.   At Ali's house.

5  A.   Okay.  Yes.

6  Q.   And Ashraf Ali was there, too?

7  A.   Yes.  He was there as a matter of fact, yes.

8  Q.   And Ashraf Ali is a good friend of yours, isn't he?

9  A.   Yes, he's a friend of mine.

10  Q.   He doesn't own a gun, does he?

11  A.   Not that I know of, no.

12  Q.   And he's a person who really enjoys listening to

13  Dr. Al-Timimi's lectures, doesn't he?

14  A.   As far as I know, yes.

15  Q.   A very attentive person?

16  A.   Yes.

17  Q.   And was Mr. Madini at that meeting, was he paying attention,

18  too?

19  A.   Yes.

20  Q.   Okay.  Now, when you went home from that meeting, you talked

21  to your wife, didn't you?

22  A.   I don't know.

23  Q.   Do you remember telling your wife on or about October 15 that

24  you had -- 2001, that you had gone to a dinner and Ali Al-Timimi

25  had spoken?

1  A.    She knew that I was going there beforehand.  I don't know if

2  I talked to her when I came home.

3  Q.    Don't you remember telling her, sir, that because of what you

4  heard from Dr. Al-Timimi, you were going to make hijra because you

5  were worried about her?

6  A.    Yeah.  We had that discussion, yes.

7  Q.    And you were worried about your wife.  She was fully veiled

8  at the time, wasn't she?

9  A.    Yes.

10  Q.    All right.  And you were concerned that in the United States,

11  that she might be harassed or injured, correct?

12  A.    Yes.  Because she was already beginning to be harassed

13  already.

14  Q.    And how so?

15  A.    Just like if she was driving my car or something, people

16  would say a lot of things to her, start cussing at her and being

17  real rude to her, calling her a terrorist and stuff like that.

18  Q.    And that scared you, didn't it?

19  A.    Yes.

20  Q.    You cared for your wife, didn't you?

21  A.    Yes.

22  Q.    All right.  And that's the reason that you went overseas,

23  correct?

24  A.    That's one of the reasons, yes.

25  Q.    And you knew you'd be safe and she wouldn't be persecuted and

1   you wouldn't be persecuted in Egypt just for being a Muslim,

2   right, sir?

3   A.   Yeah.   That's one of the reasons, yes.

4   Q.   At the dinner on October 15, do you, do you recall

5   Dr. Al-Timimi saying that he hoped there would be reconciliation

6   between the Muslim world and the West?

7   A.   I don't remember that, no.

8   Q.   You don't remember him saying that?

9   A.   No.

10  Q.   Did -- when Hammad Abdur-Raheem talked to you about the

11  meeting at Kwon's house, did he tell you anything about Al-Timimi

12  saying that the signs of the last battle and the Day of Judgment

13  had finally appeared?

14  A.   Did Hammad tell me that?

15  Q.   Yeah.

16  A.   No.

17  Q.   Hammad came back from that meeting wearing a jacket, didn't

18  he?

19  A.   Wearing one?   No.

20  Q.   Yes.   Well, he had a jacket, didn't he?

21  A.   He had one, but I didn't know he had -- where he got it from.

22  He brought it out to me and showed it to me and said that he got

23  it, it was just like the one that Yong had got because it was

24  supposed to be cold in some parts of Pakistan.

25  Q.   It was a, it was a jacket that had been purchased so that

1  they could go overseas, correct?

2  A.  Yes.

3  Q.  Do you know when that jacket was purchased?

4  A.  No, I have no idea.  He just told me that day I was at his

5  house.

6  Q.  And it was before the dinner at Yong Kwon's house, wasn't it?

7  It had to have been, right?

8  A.  I don't know.  He didn't tell me when he got it.

9  Q.  Did he tell you that he had it the day before?

10  A.  He didn't say when he got it.  He just showed it to me.

11  Q.  Do you remember Dr. Al-Timimi on or about October 15

12  stressing the importance of dialogue between the Muslim world and

13  the West?

14  A.  He said that sometimes but not that day I don't remember him

15  saying that.

16  Q.  That was something he stressed to you all the time, correct?

17  A.  Sometimes, yes.

18  Q.  Right.  And in your, in your plea agreement, sir, which is

19  Government's Exhibit 7H11, paragraph 2 says that in February of

20  2000, in Fairfax County, you transported an AK-47-style rifle in

21  interstate commerce to a firing range in Fairfax, Virginia, with

22  reason to know that by using that firearm to train with another to

23  fight against Indians in Kashmir and Russians in Chechnya.  Do you

24  remember that?

25  A.  Yes, I remember that.

## Surratt - redirect

1  Q.  That's the gist of what you pled guilty to, correct?

2  A.  Yes.

3  Q.  All right.  And that conspiracy that you pled guilty to was

4  in full force and effect on or about February 24 of the year 2000,

5  wasn't it?

6  A.  Around, yes.

7  Q.  Okay.  And Dr. Al-Timimi had absolutely nothing to do with

8  that conspiracy, did he?

9  A.  Not that I know of, no.

10  Q.  Well, you never told him about it, did you?

11  A.  No, I didn't.

12          MR. MAC MAHON:  I have no further questions, Your Honor.

13          THE COURT:  All right.  Any redirect?

14          MR. GIBBS:  Yes, Judge.

15                    REDIRECT EXAMINATION

16  BY MR. GIBBS:

17  Q.  Mr. Surratt, you were asked by defense counsel about Ali

18  Timimi's speeches at the Dar al-Arqam.  Do you recall that?

19  A.  Yes.

20  Q.  And you were asked if any of those speeches at Dar al-Arqam

21  ever advocated violence, and you said you couldn't recall any.  Do

22  you remember that?

23  A.  Yes.

24  Q.  Now, do you ever recall Ali Timimi ever giving a speech at

25  Dar al-Arqam where he stated that it was obligatory to go over to

1  physically help the people in Afghanistan and Pakistan from the

2  coming American invasion?

3  A.    At Dar al-Arqam or at --

4  Q.    At Dar al-Arqam.

5  A.    I don't remember him saying that at Dar al-Arqam, no.

6  Q.    So was what he told you at his house in October of 2001

7  different from the things that he said at the Dar al-Arqam in his

8  public speeches?

9  A.    In a way, yes.

10  Q.    And in what way was that?

11  A.    That it was more that it was obligatory for us to assist them

12  and go there if we can.

13  Q.    And "assist them" meaning?

14  A.    The Muslims of Pakistan and Afghanistan.

15  Q.    And you were asked about your wife and the fact that one of

16  your concerns with her was that she's veiled and you didn't want

17  her to be harassed or injured, correct?

18  A.    Yes.

19  Q.    And you had testified earlier that because of your wife, you

20  felt a certain conflict between this obligatory duty and your duty

21  as a husband to your wife.

22  A.    Yes.

23  Q.    Now, can you explain that conflict?  I mean, what was it you

24  were conflicted over?

25  A.    I was conflicted about that I felt like it was my duty to

1  come, you know, not sit back and watch Muslims be slaughtered and

2  done in such a way that if I should go help them, but at the same

3  time, I felt like if I did that and something happened to me, my

4  wife wasn't taken care of, then I'd be held responsible for not

5  making sure my wife was taken care of, also.

6  Q.   And when you say you felt like it was your duty to go and

7  help them, go and help them how?

8  A.   Help them --

9          MR. MAC MAHON:  Objection.  Asked and answered, Your

10 Honor.

11         THE COURT:  No, this is redirect.  I'll permit it.

12         THE WITNESS:  Help them physically, whether it be fight

13 with them, feed them, whatever, help them spread Islam, whatever.

14 Help them physically.

15 BY MR. GIBBS:

16 Q.   All right.  And you talked about -- one of the things you

17 said was fighting.  Fighting on their side?

18 A.   Yes.

19 Q.   Against the Americans?

20 A.   Against anybody who came to kill them.

21 Q.   And when you -- at the meeting at Timimi's house in October,

22 when you went and told him that because of your wife, you couldn't

23 go over there and do that, were you looking for him to -- why did

24 you want to tell him that?  Why did you feel it was important to

25 tell Timimi that you couldn't go and fulfill this obligatory duty?

1  A.   I felt really probably because I wanted to hear him reinforce

2  a decision that I kind of already wanted to -- that I wasn't going

3  to go over there.

4  Q.   And did he reinforce that decision?

5  A.   Yes, he did.

6  Q.   How?

7  A.   By telling me that, you know, that I don't have to go over

8  there to, you know, help them physically, that I can go over to a

9  Muslim country and live and help the Muslims wherever I go, such

10  as Egypt.

11  Q.   And did that make you feel better?

12  A.   Yeah.  It kind of helped me, because I respect what he has to

13  say a whole lot.

14          MR. GIBBS:  One moment, Judge.

15          That's all I have, Your Honor.

16          Thank you, sir.

17          THE COURT:  Mr. MacMahon, any recross?

18                  RECROSS EXAMINATION

19  BY MR. MAC MAHON:

20  Q.   Sir, it was in your mind that you might go fight -- the words

21  that you used -- there, correct?

22  A.   Yes.

23  Q.   All right.  Dr. Al-Timimi never once ever asked you or

24  solicited from you that he thought or wanted you to go over to

25  Afghanistan or Pakistan and fight against Americans, did he?

1  A.  He never used those words, no.

2       MR. MAC MAHON:  Thank you, Your Honor.

3       THE COURT:  All right.  Anybody going to call

4  Mr. Surratt again during the trial?

5       MR. MAC MAHON:  No, Your Honor.

6       MR. GIBBS:  It's possible we will, Judge.

7       THE COURT:  All right.  You're excused as a witness

8  right now, Mr. Surratt.  You may be coming back again.  Don't

9  discuss your testimony with any witness who has not yet testified.

10      THE WITNESS:  Okay.

11           (Witness excused.)

12      THE COURT:  All right, we'll take the afternoon break at

13 this point, and I'm going to give you -- I have something I have

14 to take care of in chambers, so we're going to have a 20-minute

15 break until 10 after today.

16           (Recess from 3:50 p.m., until 4:10 p.m.)

17      THE COURT:  Mr. Kromberg?

18      MR. KROMBERG:  Your Honor, the government calls

19 Detective Hodge --

20      THE COURT:  All right.

21      MR. KROMBERG:  -- who is outside, I believe.

22    DETECTIVE JOHN HODGE, GOVERNMENT'S WITNESS, AFFIRMED

23               DIRECT EXAMINATION

24 BY MR. KROMBERG:

25 Q.  Good afternoon, Detective.  Please state your full name and

1          MR. YAMAMOTO:  No, Your Honor.

2          THE COURT:  All right, Mr. Idris, then you're excused as

3   a witness.  That means you can stay in court and watch the

4   proceedings or leave, but you're not to discuss your --

5          MR. YAMAMOTO:  Your Honor, I'm sorry, we may.

6          THE COURT:  All right.  Then, sir, then you cannot stay

7   in court.

8          THE WITNESS:  Oh.

9          THE COURT:  You're going to have to leave.  Thank you.

10  And do not discuss your testimony with any witness who has not yet

11  testified.

12         THE WITNESS:  Okay.  Thank you.

13                    (Witness stood down.)

14         THE COURT:  All right, your next witness?

15         MR. YAMAMOTO:  Luther Kennedy, Your Honor.

16         THE COURT:  All right.

17         MR. YAMAMOTO:  I'm hoping this will take us to the lunch

18  break and we'll be done with him by the lunch break, Your Honor.

19         THE COURT:  All right.

20         MR. YAMAMOTO:  I'm hoping.

21         THE COURT:  I understand.

22         LUTHER KENNEDY, DEFENDANT'S WITNESS, AFFIRMED

23                    DIRECT EXAMINATION

24  BY MR. YAMAMOTO:

25  Q.   Please state your name for the Court, and spell your name,

1    please.

2    A.    Luther Kennedy, L-u-t-h-e-r K-e-n-n-e-d-y.

3    Q.    Thank you.

4          Mr. Kennedy, what's your present occupation?

5    A.    I'm a systems engineer.

6    Q.    Speak into the microphone.

7    A.    Systems engineer.

8    Q.    And back in 1999, did you start attending the Dar al-Arqam?

9    A.    Yes, sir.

10   Q.    And how did you hear about it?

11   A.    I was visiting the Pentagon, and someone mentioned that they

12   give lectures at Dar al-Arqam and they will be going over a book,

13   I believe the title was Purification of the Soul.

14   Q.    Are you Muslim?

15   A.    Yes, sir.

16   Q.    Had you always been Muslim?

17   A.    No, sir.

18   Q.    When did you become Muslim?

19   A.    '95.

20   Q.    And in '99, you indicated you were visiting the Pentagon.

21   What was your occupation then?

22   A.    Systems engineer.

23   Q.    For who?

24   A.    For the Defense Intelligence Agency in the Air Force, United

25   States Air Force.

1  Q.   Did -- you started to attend the Purification of the Soul

2  lectures?

3  A.   Yes, sir.

4  Q.   When were -- they were given on Fridays at the center?

5  A.   Yes, every Friday.

6  Q.   How many did you attend?

7  A.   I would, I would attend regularly every Friday.  So I

8  couldn't give you an exact number.  I've probably heard over 50 of

9  his lectures.

10  Q.   Lectures meaning Dr. Al-Timimi's lectures?

11  A.   Yes.  Well, he was the main lecturer, but there would be

12  other lecturers.  He's not the sole lecturer.

13  Q.   Okay.  You're saying 50 lectures total, not just

14  Dr. Al-Timimi?

15  A.   The majority would have been of Dr. Al-Timimi.

16  Q.   Okay.  And were his lectures all about purification of the

17  soul?

18  A.   That was the major topic, but, you know, there would be

19  always a question-and-answer session in which one could ask about

20  any topic, but the main topic during those lectures was

21  purification of the soul.

22  Q.   During the question-and-answer sessions, would terrorism or

23  jihad, things like that, come up?

24  A.   When I first went there, you know, I didn't know much about

25  Islam, so I would take those opportunities to ask him, you know,

1  various questions.  I do recall him speaking about terrorism.  I

2  remember him saying terrorism in itself is un-Islamic.  In fact,

3  those Muslims who commit terrorist acts do more harm to Muslims

4  because they bring the wrath of the West upon the defenseless

5  Muslims.

6  Q.   Now, was this a lecture, or was this in response to a

7  question?

8  A.   I know that information.  I know I learned -- I know I heard

9  it from Dr. Timimi.  What lecture on what format I couldn't -- I

10  can't really say.

11  Q.   But it was at the center?

12        MR. KROMBERG:  Objection.  Could we let the witness

13  finish the answer?

14        MR. YAMAMOTO:  I'm sorry.

15        THE COURT:  One at a time.  Let the witness finish.

16  BY MR. YAMAMOTO:

17  Q.   I'm sorry, you can finish.

18  A.   Oh.

19  Q.   Were you done?

20  A.   I heard Dr. Timimi say that about terrorism.

21        MR. KROMBERG:  Judge, forgive me, I didn't catch the end

22  of the answer when the witness was answering the question, did you

23  hear it in a lecture or in the question-and-answer session, when

24  he was answering it.

25        THE COURT:  All right, we'll go over it again.

1    THE WITNESS:  Could you repeat the question, and I'll

2  answer it again?

3    MR. YAMAMOTO:  Can we have his answer read?

4    THE COURT:  No, let's just ask the question again,

5  please.

6  BY MR. YAMAMOTO:

7  Q.   Do you recall if it was given in a lecture or in

8  question-and-answer sessions?

9  A.   I don't recall.

10 Q.   Now, when you went to these sessions, were you dressed in

11 civilian clothes or military clothes?

12 A.   Civilian clothes.

13 Q.   Did Dr. Al-Timimi know you were in the military?

14 A.   Yes, sir.

15 Q.   Did he talk to you about that?

16 A.   We talked about -- the topic came up about what are good

17 jobs, you know.  Is selling alcohol a good job?  Is -- you know, I

18 mentioned that I was in the military.

19    We went down a series of what would be good jobs.  The

20 best job would be, you know, helping people like if you're a

21 doctor or along those lines, those jobs that physically help

22 people.  It was just a basic topic about employment and what jobs

23 would be good jobs and what jobs would be bad jobs, and that's

24 how -- that's how he discovered that I was in the military.

25 Q.   Were people telling him what their occupations were?

1  A.   Exactly.

2  Q.   And what did he say about your occupation?

3  A.   Nothing really specific that I can recall.  He just basically

4  went down the line of what would be good jobs, and, you know,

5  obviously, selling alcohol for a Muslim is not a good job.

6  Q.   Did he say being in the military is good or bad?

7       MR. KROMBERG:  Objection, Judge.  The witness just said

8  he did not remember what Timimi said about his job.

9       THE COURT:  I believe that was the testimony.

10      MR. YAMAMOTO:  That's fine, Your Honor.

11  Q.   Do you recall if you brought up the topic of being in the

12  military and having to fight Muslims?

13  A.   Oh, yes, sir.  He, he said -- okay.  Yeah, he did say that in

14  itself, being in the military is not in itself a bad thing, but,

15  you know, obviously, Muslims can't kill Muslims, something along

16  those lines.

17  Q.   Did he say it was ever okay to kill Muslims?

18  A.   I learned from Dr. Timimi that there was a case when Muslims

19  were being tyrannical, for example.  I believe it was in the case

20  of, I believe it was his, name was Ibn Taimiya.  There was a case

21  of tyrannical Muslims, and the Muslims had to make a decision

22  whether or not to defend themselves against other Muslims, and it

23  was clear that although they were of the same faith as you, it's,

24  you know, it's a Muslim's responsibility to stop tyranny from

25  other Muslims.  So something along those lines.

1  Q.   Was this told to you with a religious basis or a political

2  basis?

3  A.   No politics was discussed at Dar al-Arqam, so there was no --

4  you know, over the lectures, this is something I remember hearing,

5  that there was a case where there was an opportunity -- where

6  Muslims were confused what to do when being attacked by Muslims,

7  and someone had to make a decision, and the decision was, you

8  know, we have to defend ourselves.

9  Q.   Did -- do you recall in any of his lectures if he espoused

10 jihad and going on jihad?

11 A.   There was, there was no espousal or recruitment or anything

12 along those lines.  If someone was to ask a question, he would --

13 he'd be more than happy to answer your question if it was

14 concerning jihad, but there was no jihad or any type of

15 conversation along those lines.

16 Q.   What would you have done had he done something like that?

17 A.   Well, as far as, you know, you know, terrorism, as far as

18 terrorism and those types of things are concerned, you know, I

19 take those things personally because, you know, September 11, for

20 most Americans, that was your first exposure to terrorism, but

21 being in the military, you know, I've had my barracks blown up.

22 I've had restaurants blown up.  I've had -- you know, I was

23 interacting with the Marines who were blown up in Lebanon.

24       So I take those type of things personally.  So I would

25 be one of the first persons to identify an individual who is

1   trying to threaten the United States of America.

2   Q.   And in listening to Dr. Al-Timimi's lectures, did you ever

3   feel like you had to report him?

4   A.   No, sir.  In fact, one of the -- one of the first lectures, I

5   guess one of the speakers, I believe it was a Dr. Idris, he said,

6   "The first thing I want to" --

7           MR. KROMBERG:  Judge, object to what Dr. Idris said

8   coming through this witness.

9           THE COURT:  Well, it depends on whether it's being

10  offered for the truth of its contents or, I mean, a lecture --

11          MR. KROMBERG:  What other reason could there be?

12          THE COURT:  I don't know.

13          Where were you going with this, Mr. Yamamoto?

14          MR. YAMAMOTO:  I don't know what the answer is, Your

15  Honor.

16          THE COURT:  Well, then you shouldn't ask the question.

17  He's your witness.  So I'll sustain --

18          MR. YAMAMOTO:  I didn't -- I wasn't looking for this.

19          THE COURT:  Then I'll sustain the objection.  Rephrase

20  your question.

21          THE WITNESS:  I don't even remember the question.

22          THE COURT:  There's no question pending.

23          MR. YAMAMOTO:  I have no further questions, Your Honor.

24          THE COURT:  All right.  Cross examination?

25                          CROSS EXAMINATION

1  BY MR. KROMBERG:

2  Q.  Good afternoon, Mr. Kennedy.  My name is Gordon Kromberg.

3  We've never met, have we?

4  A.  No, sir.

5  Q.  Have you met anyone, either Mr. Gibbs or Agent Wyman or

6  Mr. Ammerman or Mr. Alter before?

7  A.  I've met Dr. Timimi.  I've met --

8        MR. YAMAMOTO:  He's met me, Your Honor.

9        THE WITNESS:  I met the lawyer.

10  BY MR. KROMBERG:

11  Q.  But nobody on this side of the court?

12  A.  Oh, no.

13  Q.  You say, Mr. Kennedy, that you attended the Purification of

14  the Soul lectures?

15  A.  Yes, sir.

16  Q.  At Dar al-Arqam?

17  A.  Yes, sir.

18  Q.  In 2001?

19  A.  I started in 1999 probably up to May of 2000.

20  Q.  And you didn't hear Ali Timimi talking in the Purification of

21  the Soul about jihad?

22  A.  If you could refresh my memory?  Because --

23  Q.  Well, do you recall him saying that jihad is no good if it's

24  for fame or buthe?

25  A.  No, sir.

1  Q.   That the sustenance of the ummah -- that's the Muslim word,

2  right?

3  A.   Um-hum.

4  Q.   The sustenance of the ummah is through jihad?  Did he say

5  that; do you recall?

6  A.   He may or may not have said that; I do not recall.

7  Q.   Do you recall him asking, "Why are the Muslims the poorest

8  people in the world?  Because there is no jihad.  Jihad in the

9  path of Allah is the way to make the ummah rich, not through the

10 IMF or World Bank loans"?  Do you recall that in the Purification

11 of the Soul lecture?

12 A.   Must have missed that meeting, sir.

13 Q.   How about, "When the lands are conquered, the riches of those

14 lands will be distributed.  Then there won't be any poor people.

15 This time will come"?  Do you recall that?

16 A.   Say that again?

17 Q.   Well, let me just play the tape then, and maybe you'll --

18 maybe this will jog your memory.  This is 10T9, clip 14,

19 "Purification of the Soul," that we obtained from Dar al-Arqam.

20 A.   But I will clarify one thing.  Usually when a non-Muslim says

21 "jihad" to me, that means some type of rape and pillage and kill

22 the infidel, okay?  When you're referring to jihad, I think it

23 helps to define it because if he's saying jihad, I need to

24 understand exactly what you're talking about.

25 Q.   How about when he says, "When the lands are conquered, the

1  riches of those lands will be distributed. Then there won't be

2  any poor people"? Would that be a reference to violent jihad

3  maybe?

4  A.   When the lands are --

5  Q.   Are conquered.

6  A.   When the lands are conquered. That's, that's futuristic.

7  Q.   That's true. That's futuristic. Does that refer to a

8  violent jihad in any way?

9  A.   It could be -- jihad could be an internal. You see, if --

10 Q.   Excuse me, could you conquer a land with --

11         MR. YAMAMOTO: Objection.

12         THE WITNESS: Well, let me answer the question.

13         THE COURT: Just a minute, sir. We can't have three

14 people talking at the same time, and when I'm talking, no one's

15 talking, all right?

16         Now, let the witness answer the question.

17         MR. KROMBERG: Yes, ma'am.

18         THE WITNESS: If people don't internally, okay, if, for

19 example, if I'm doing, committing acts that are harmful to myself,

20 if I don't take care of the internal struggle, the internal jihad

21 for myself, and if I sit back and, and do nothing, it could be

22 physical, or it could be spiritual, or yes, it could be violent,

23 but it really depends on the context of the, of the total topic.

24         And if you don't get it clarified -- in other words, you

25 could be listening to Dr. Timimi, and you could say, Well, you

1  said X, Y, and Z.  I didn't understand it.  And he clarifies it,

2  and he will say, Well, I was speaking of internal/I was speaking

3  of external.

4          The word "jihad" for a Muslim, the word -- it's a very

5  comprehensive word.  So the way that you're saying it is not how I

6  heard it.  I mean, to me, maybe I was at that lecture, but the way

7  that you're saying it, it's almost like the first time that I've

8  heard it.

9  BY MR. KROMBERG:

10 Q.   When Ali Timimi says -- excuse me.

11          During the Purification of the Soul lecture, Ali Timimi

12 said -- referred to when the lands are conquered, the riches of

13 those lands will be distributed.  Does that to you suggest that

14 he's talking about violent jihad?

15 A.   It doesn't seem like he's talking about us doing jihad.  It

16 seems like he's talking about someone else being attacked.  When

17 another country is attacked, being the Muslim country is being

18 attacked, raped, and pillaged.  I mean, that's what I'm hearing.

19 Q.   So --

20 A.   The Muslim is going out and conquering lands.  That's what

21 I'm hearing.  I'm hearing, in other words, there's a Muslim land,

22 and its lands are being attacked, and its riches are being robbed.

23          MR. KROMBERG:  Let's play clip 14 from 10T9 and ask you

24 if you recall hearing this.

25          (Government's Exhibit No. 10T9, Clip No. 14 was played;

1  no government transcript provided.)

2  BY MR. KROMBERG:

3  Q.   Now, Mr. Kennedy, do you recall hearing that part of the

4  Purification of the Soul lecture?

5  A.   Yes, sir.

6  Q.   You were there for that?

7  A.   Yes.

8  Q.   Now, in your view, did you understand Mr. Timimi to be

9  referring to violent jihad when he was talking about killing the

10  kafir?

11  A.   I heard him explain -- this is how I took it, you know, at

12  the time.  This is how I took it:  He was explaining the condition

13  of the current state of the Muslims, and the current state of the

14  Muslim is going out -- he described someone going out, fighting on

15  the battlefield, waging jihad for the sole -- for purposes other

16  than Islam, and in this case, he described purification for all

17  Muslims through jihad, in this case, violent jihad, but he said

18  there's a time will come when a mahdi will come, I believe.

19       So we're talking sometime in the future.  But it was not

20  like at the end of this, "Okay, guys, let's go wage a jihad.

21  Let's go."  No.

22       What he was doing was going through talking points in

23  the book.  In the book, the book mentions jihad.  This is the case

24  of Muslims today when it comes to jihad.  If they're waging jihad,

25  they're doing it for the purpose of money or buthe or something

1  insignificant concerning jihad, you know? And then the next

2  topic, then the next topic, whatever was in the book.

3         But it was not to me, it was not an atmosphere of, okay,

4  let's go wage jihad. It was next topic.

5  Q.   So you would agree with me that this part of Purification of

6  the Soul, Mr. Timimi was referring to violent jihad?

7  A.   Yes, sir.

8  Q.   Now, you also testified, did you not, that no politics were

9  discussed at Dar al-Arqam, correct?

10 A.   That I paid any attention to.

11 Q.   Well, the clip we just heard, when Mr. Timimi said that jihad

12 in the path of Allah is the way to make the ummah rich, not

13 through the IMF or World Bank loans, is that something in the

14 Koran about World Bank or IMF?

15 A.   It wasn't a political discussion. He, he mentioned IMF.

16 Technically, you could put it in the political category. Was it a

17 political discussion about IMF and what Muslims should do

18 politically? Yes, it was political in that regard.

19 Q.   So you would correct your statement, your testimony, would

20 you not, that Dar al-Arqam -- politics was discussed by Ali Timimi

21 at Dar al-Arqam during Purification of the Soul?

22 A.   No, sir.

23 Q.   You would not correct your testimony?

24 A.   Not in the, not in the sense in which I'm talking about as

25 far as it was -- the main topics were best ways to make Salot,

1   best ways to purify one's soul, those types of things.  If you

2   want to talk about Palestine and Israel and what should we do

3   against those rulers who are robbing the Muslim countries and X,

4   Y, and Z, all sorts of things, were not discussed at Dar al-Arqam.

5            Were political topics mentioned intertwined between,

6   between normal conversations about Salot?  I would say yes.  Was

7   political discussions a, a theme?  No.

8   Q.   Do you recall in "Purification of the Soul" Ali Timimi

9   telling you it's -- it was not enough to merely want to know what

10  was going on in Chechnya or Kashmir; it was crucial to go forth

11  fighting in the path of Allah?

12  A.   I don't recall that.

13  Q.   Do you recall him saying -- ever saying in "Purification of

14  the Soul" anything about Chechnya?

15  A.   I would have to listen to the entire "Purification of the

16  Soul" and say yes, he said it.  As far as memory is concerned,

17  I --

18  Q.   You don't recall?

19  A.   I don't recall.

20            MR. KROMBERG:  I'd like to play clip 15 from 10T9 and

21  ask if that refreshes your memory.

22            (Government's Exhibit No. 10T9, Clip No. 15, was played;

23  no government transcript provided.)

24  BY MR. KROMBERG:

25  Q.   Mr. Kennedy, do you recall that portion of "Purification of

1 | the Soul"?

2 | A.   I don't particularly recall it, no, sir.

3 | Q.   Do you recall Mr. Timimi's telling you in the Purification of

4 | the Soul lectures that the sign of a good death is to die as a

5 | shaheed on the battlefield or on the way to the battlefield?

6 | A.   I mean, I don't want to play tapes all day, but this has been

7 | a couple years since I've heard this lecture.  I don't recall

8 | that, either.  You can, I mean, you can play that, also.

9 |         MR. KROMBERG:  Let's try clip 8, 10T9, "Purification of

10 | the Soul."

11 |         (Government's Exhibit No. 10T9, Clip No. 8, was played;

12 | no government transcript provided.)

13 | BY MR. KROMBERG:

14 | Q.   Now, does that refresh your recollection in any way of

15 | whether you've heard that?

16 | A.   I heard it.  I don't remember if it was at the lecture.  I do

17 | remember maybe at least reading it.

18 |         THE COURT:  All right, Mr. Kromberg, how much longer?

19 | I'm not trying to rush you, but I --

20 |         MR. KROMBERG:  I'm guessing ten minutes.

21 |         THE COURT:  I think we ought to take our break then for

22 | lunch so we don't get badly off schedule for the afternoon.  We'll

23 | reconvene at 5 after two.

24 |         (Recess from 1:05 p.m., until 2:05 p.m.)

25 |

1            A F T E R N O O N   S E S S I O N

2                    (Defendant and Jury present.)

3            THE COURT:  All right, where is the witness?

4                    (Witness present.)

5            THE COURT:  All right, Mr. Kromberg?

6                    CROSS EXAMINATION (Cont'd.)

7  BY MR. KROMBERG:

8  Q.    Good afternoon, Mr. Kennedy.

9  A.    Good afternoon, sir.

10 Q.    We were talking about "Purification of the Soul" before the

11 lecture (sic).  Did you buy that lecture by any chance?

12 A.    I bought the book.

13 Q.    The book, okay.  On sale at Dar al-Arqam?

14 A.    Yes, sir.

15 Q.    Did you buy any other tapes at -- excuse me, did you buy any

16 tapes of Mr. Timimi's lectures at Dar al-Arqam?

17 A.    Yes, sir.

18 Q.    Which did you buy?

19 A.    I think he had a tape called "The New World Order."  I think

20 there was a tape, there was a tape about an individual from

21 history.  I forget his name, though.  There was a series of tapes

22 about the mistakes of the youth or something along those lines,

23 the intellectual, intellectual mistakes of the youth, something

24 along those lines.

25 Q.    "The New World Order," "Mistakes of the Youth," and was there

1  another one?

2  A.  Yes, sir, but I -- it was -- I can't remember the name of the

3  tapes.

4  Q.  Okay.  Can you take a look at what we've marked as Government

5  Exhibit 10T1, which is in evidence?

6           And if we can put that one on the screen?

7           Is that the one you bought, "The New World Order"?

8  A.  That was the title.  This is not the cover.

9  Q.  When did you buy your copy of "New World Order"?

10  A.  Probably about five or six years ago.

11  Q.  So you're thinking 1999 to 2000?

12  A.  Yes, sir.

13  Q.  Did you ever see that particular copy -- that cover for "New

14  World Order" at Dar al-Arqam?

15  A.  No, sir.

16  Q.  If you turn over the back, it says "Dar al-Arqam

17  Publications," right?

18  A.  Yes, sir.

19  Q.  But you never saw that?

20  A.  I never saw this cover.

21  Q.  Sir, how old are you?

22  A.  42, 43 in June.

23  Q.  What is your job?

24  A.  I'm an information systems specialist.

25  Q.  Information systems specialist?

1   A.   Computers.

2   Q.   Information systems specialist for the Defense Intelligence

3   Agency?

4   A.   Currently for BAE Systems.  BAE Systems.

5   Q.   BAE Systems.  Is that a defense contractor?

6   A.   Yes, sir.

7   Q.   Okay.  Were you in the military before this?

8   A.   Yes, sir.

9   Q.   When were you in the military?

10   A.   From 1981 to 2001.

11   Q.   When in 2001 were you -- did you get out of the military?

12   A.   September 27 was my final day.

13   Q.   And what was your rank at that time?

14   A.   Technical sergeant, E-6.

15   Q.   I think you had testified earlier that Ali Timimi told you

16   that Muslims in the U.S. Army could not fight against Muslims.  Do

17   I have that right?

18   A.   Muslims cannot kill -- a Muslim cannot kill another Muslim.

19   Q.   And that's what he told you?

20   A.   Yes, sir.

21   Q.   When did he tell you that?

22   A.   It's something that I understand from, from going to the

23   lectures.  I couldn't give you an exact date.

24   Q.   What I'm getting at is, is this while you were in the U.S.

25   military that he told you that?

1  A.  Yes, sir.

2  Q.  Did you disagree with him about that?

3  A.  That Muslims could not kill other Muslims?

4  Q.  Right.

5  A.  No, sir, I don't disagree with it.

6  Q.  But what -- didn't you take an oath to defend the

7  Constitution of the United States in the military?

8  A.  Yes, sir.

9  Q.  Well, what happens -- was there a conflict between the oath

10  to defend the Constitution of the United States and the United

11  States Air Force and the obligation never to kill another Muslim?

12  A.  I never was put in a position to kill another Muslim.

13  Q.  But if you were sent to Iraq before 2001, you would not have

14  killed another Muslim?

15  A.  Yes, sir.

16  Q.  Yes, you would not have?

17  A.  Yes, I would not have killed another Muslim.

18  Q.  So you would -- if that situation had come up, you would have

19  broken your oath to the United States Air Force because that was

20  not as important as the principle that a Muslim does not kill

21  another Muslim?

22        MR. YAMAMOTO:  I think he's asking a hypothetical, and

23  I'm not sure this individual was in combat, so I don't think it

24  was a situation that he would have encountered.

25        THE COURT:  Well, I think the issue, though, about

1  allegiance is relevant among other things to credibility, and so

2  I'll overrule the objection. You may ask the question.

3         MR. KROMBERG: Thank you, Your Honor.

4  Q.  Did you understand the question, Mr. Kennedy?

5  A.  Yes, sir.  I would have done -- I would have done everything

6  in my power -- it's my opinion that they would have worked with

7  me.

8  Q.  Say again?

9  A.  It's my opinion that the military would have worked with me.

10 Q.  But what if there was a conflict between what the military

11 said to do and the enforcing the No Fly Zone over Iraq, for

12 example, which was the issue at the time?

13 A.  I actually enforced the No Fly Zone over Iraq as a Muslim.

14 Q.  Okay.  Was that an issue -- so there was no issue to you

15 there of possibly killing another Muslim?

16 A.  It didn't, it didn't occur to me.

17 Q.  Okay.  How about after 9/11, when you were still in the

18 military?  Obviously, you got out on September 27, but right at

19 that time, if you had been ordered to go to Afghanistan to fight

20 against the Taliban, would you have done that?

21 A.  At that time, when they ran two aircraft into the Empire

22 State Building, I could have done anything to anybody.

23 Q.  That's a fair answer.

24        But what I'm getting at, if there came a time when your,

25 your military duty was to kill another Muslim as part of being in

1  the Air Force, what would you have done?

2  A.   Well, let me, let me explain it this way.

3          MR. YAMAMOTO:  Your Honor --

4          THE WITNESS:  I can answer this question clearly.

5          THE COURT:  Wait, wait, wait, I'm sorry.  You don't

6  control that situation.  The attorney who puts you on the stand

7  does.

8          Mr. Yamamoto, are you objecting?

9          MR. YAMAMOTO:  Your Honor, I think he's answered the

10 question.

11         THE COURT:  Yes, I think now we're beyond where we need

12 to be on a witness, so I'm going to sustain the objection.  You

13 can move on to something else if you have another topic.

14 BY MR. KROMBERG:

15 Q.  So is it correct then that you would break your oath to the

16 United States Air Force if necessary to protect another Muslim?

17         MR. YAMAMOTO:  He didn't say that, Your Honor.  That's

18 putting words in his mouth, and he said --

19         THE COURT:  Wait, don't have an argument on this.

20         MR. YAMAMOTO:  -- "I would do something else."

21         THE COURT:  I don't want the questions, although this is

22 cross examination, they can be leading, but they can't be

23 misleading, all right?

24         MR. KROMBERG:  I'm trying to -- I would love to have --

25         THE COURT:  Well, let's rephrase it, Mr. Kromberg.  Less

1  argument in the question.

2  BY MR. KROMBERG:

3  Q.  Is it correct that if ever you were -- if when you were on

4  active duty, if you had been put in the position where you would

5  have been ordered to do something that would kill another Muslim,

6  that you would have broken your oath to the Air Force?

7  A.  I would defend the United States of America to the best of my

8  ability.

9  Q.  Okay.  Does that mean you would comply with your oath?

10  A.  In a normal situation, for example, I was amongst Muslims.

11  If in Saudi Arabia, in United Emirates, like I said, in those two

12  Muslim countries, had our base been attacked, I would have

13  defended the base.

14  Q.  I'm not -- I appreciate that answer.

15  A.  Put it this way:  I would defend the United States to the

16  best of my ability.  There's no conflict between me being a Muslim

17  and defending the United States of America.  I don't know how more

18  I could plainly put this.

19  Q.  Well, how do you reconcile that with the principle --

20          MR. YAMAMOTO:  I think he's answered the question, Your

21  Honor.

22          THE COURT:  Yes, and I've already ruled we've done

23  enough on this.  Let's move on to another topic, Mr. Kromberg.

24  BY MR. KROMBERG:

25  Q.  Now, it's correct, is it not, that everyone who knew you knew

1  you would defend the United States of America against all enemies,

2  foreign and domestic?

3  A.   Yes, sir.

4  Q.   And all throughout Dar al-Arqam, everybody knew that Luther

5  Kennedy was going to stand up for America against any enemy?

6  A.   I have not talked to this particular topic with everybody at

7  Dar al-Arqam.

8  Q.   To your knowledge, everybody who knew you would think that?

9  A.   To my knowledge, I was a student trying to learn more about

10  Islam.   That's, that's as much as I can give you on that one.

11  Q.   Do you have any reason to believe that anyone at Dar al-Arqam

12  thought that you were anything less than a loyal patriotic

13  American who would defend his country against any enemy?

14  A.   I do not know the answer to that question.

15  Q.   The question is do you have any reason to believe.

16  A.   You're asking me -- ask me it again?

17  Q.   Do you have any reason to believe that anyone at Dar al-Arqam

18  might have questioned your loyalty to the United States?

19  A.   We never had any other topics as far as the military was

20  concerned, or there was no where is your loyalty or -- there was

21  no conversations along that line, so in my opinion, loyalty to the

22  United States, I'm assuming that everyone in there is loyal to the

23  United States.   So it's not like I was in some foreign country.   I

24  was in -- I'm assuming I'm in a place with other Americans.

25  Q.   Mr. Kennedy, please focus on my question.   Are you --

1          MR. YAMAMOTO:  He's answered the question, Your Honor.

2          THE COURT:  His answer is no.  That's what he's saying

3   without saying it.

4          MR. KROMBERG:  That's fine.  That's fine.  The answer is

5   no.

6          THE WITNESS:  No.

7          THE COURT:  You're saying you had no reason to believe

8   that they had that.

9          THE WITNESS:  I had no reason to believe, no.

10  BY MR. KROMBERG:

11  Q.   Okay.  And Mr. Timimi had no reason to believe that you were

12  anything else than a loyal, patriotic American?

13  A.   That question should be addressed to Mr. Timimi.

14  Q.   To your knowledge.

15  A.   To my knowledge, I would see no reason -- he knew I was a

16  member of the United States military.  I see no reason -- he

17  didn't say -- he didn't ask anything specific from me of being in

18  the military.  The conversation clicked to another topic

19  basically.

20         So, I mean, if you're talking to someone who's in the

21  United States military for 18 years, you have to think that they

22  have some loyalty to the United States of America.

23  Q.   So to your knowledge, Randall Royer -- did you know Randall

24  Royer?

25  A.   No, sir.

1  Q.  Did you know Ismail Royer?

2  A.  No, sir.

3  Q.  Did you know Yong Kwon?

4  A.  No.  Well, these, these are new names to me from the press.

5  Q.  Okay.  Thank you for clarifying that.  I'm just focusing

6  on --

7  A.  Right.

8  Q.  -- before September -- before 2002.

9       Before 2002, you didn't know Yong Kwon, right?

10 A.  They may have been in the -- they may have been in the

11 audience, sitting around.  I may have said, "As-salamu alaikum,

12 how are you doing?," those type of things, but they probably never

13 heard of me, and the first time I heard of them was through the

14 press.

15 Q.  So you never engaged in any paintball activities with them,

16 right?

17 A.  No, sir.

18 Q.  And you never went down to the shooting range with them?

19 A.  No, sir.

20 Q.  You never watched jihad videos with them?

21 A.  No, sir.

22 Q.  Had you ever indicated to Ali Timimi in any way that you were

23 interested in going to fight in a violent jihad someplace in the

24 world?

25 A.  No, sir.

1  Q.   Had you ever indicated that to anyone at Dar al-Arqam?

2  A.   No, sir.

3  Q.   And it's correct -- is it correct that no one who knew you

4  would ever think there was any way you would do such a thing?

5           MR. YAMAMOTO:   That's an awfully broad question.

6           THE COURT:   Yes, I don't think there's any way someone

7  can say that they have reason to believe what other people might

8  know or expect of them.   I mean, it's one thing if they had

9  conversations, but trying to opine what people's impressions are,

10 I think, is too broad.   Sustained.

11 BY MR. KROMBERG:

12 Q.   Is it correct that you never intended to tell anyone that you

13 were interested in fighting in a violent jihad somewhere around

14 the world?

15           MR. YAMAMOTO:   That's not a very good question because

16 it's -- there's no good answer to that.

17           MR. KROMBERG:   Sure there is, Judge.

18           THE COURT:   Wait, wait.

19           MR. YAMAMOTO:   It implies an answer, whether it's a yes

20 or a no.

21           THE COURT:   I'm not sure.   Do you think you can answer

22 that question, sir?

23           THE WITNESS:   At the time, I was on jihad for the United

24 States of America in the United States Air Force.

25           MR. KROMBERG:   Thank you, Judge.   I have nothing further

1  for Mr. Kennedy.

2          Thank you, Mr. Kennedy.

3          THE COURT:  All right.  Mr. Yamamoto, is there anything

4  further?

5                    REDIRECT EXAMINATION

6  BY MR. YAMAMOTO:

7  Q.   Mr. Kennedy, you were assigned to the Defense Intelligence

8  Agency?

9  A.   Yes, sir.

10  Q.   What were your duties there?

11  A.   Technical, computers, maintain the computer systems.

12  Q.   Did you have a security clearance?

13  A.   Yes, sir.

14  Q.   What was that?

15  A.   Top secret.

16  Q.   Did you have access to classified information?

17  A.   Yes, sir.

18  Q.   Were you assigned in a combat area?

19  A.   Yes, sir.

20  Q.   Where was that?

21  A.   I was assigned -- the No Fly Zone, Panama.

22  Q.   And you said you were in the Middle East?

23  A.   Yes, sir.

24  Q.   Where?

25  A.   Saudi Arabia and the United Arab Emirates.

1  Q.   What were you doing there?

2  A.   Supporting the No Fly Zone and -- basically just supporting

3  the No Fly Zone.

4  Q.   Now, you went to hear these lectures -- what's a better way

5  to say this?

6         The lectures you attended, what was the basis for these

7  lectures?

8         MR. KROMBERG:  Objection, Judge.  How could, how could

9  the witness know what the basis for the lectures is?

10        THE COURT:  Well, I'm not sure it's a good question.

11 You need to rephrase that.

12 BY MR. YAMAMOTO:

13 Q.   The Purification of the Soul lectures, were they based on a

14 book?

15 A.   Yes, sir.

16 Q.   And that book was --

17        MR. KROMBERG:  Objection, Judge.  How does the witness

18 know whether a lecture was based on a book or not?  He wasn't the

19 one giving it, and he doesn't know what it was based on.  There's

20 a witness who can explain this, but it's not this witness.

21        THE COURT:  All right.  You can't -- the real problem is

22 you can't lead this witness.  He is your witness.

23        MR. YAMAMOTO:  I understand, Your Honor.

24        THE COURT:  All right?

25        MR. YAMAMOTO:  I'm sorry.

1          THE COURT:  So I'll sustain the objection.

2    BY MR. YAMAMOTO:

3    Q.   What book did you purchase for these lectures?

4    A.   Purification of the Soul.

5    Q.   And was the lectures based on the book?

6    A.   Yes, sir.

7          MR. KROMBERG:  Objection, Judge.

8          THE COURT:  What, if any, relationship was there between

9    the tapes and the book, if you know?  If you know.

10          THE WITNESS:  Each book has each chapter.  Each chapter,

11   the first one could be about, you know, you could purify your soul

12   through prayer, for example, you know, and he would have talking

13   points on prayer.  The next chapter, more talking points, next

14   chapter, more talking points.

15   BY MR. YAMAMOTO:

16   Q.   So the -- how many lectures were there?

17   A.   I don't know the answer to that question.

18   Q.   Pardon?

19   A.   I don't know how many lectures there were, but I'd say at

20   least eight -- I attended at least eight weeks' worth.

21   Q.   Eight weeks' worth that you were aware of that you attended?

22   A.   I believe about eight weeks, yes.

23   Q.   And the lectures were based on specific chapters of the book?

24   A.   Each -- yes.  Each chapter, we'd read something from that

25   chapter, and he'd have talking points about that chapter.  He'd go

1  to the next chapter, more talking points.

2  Q.   Now, the government played you a number of tapes -- well,

3  before that, did, did he have the book with him?

4  A.   Yes, sir.

5  Q.   Where was it?

6  A.   He'd have his book -- we'd have the book -- each person would

7  have a book, and he'd have a book with his notes for each chapter.

8  Q.   Would you read from it?

9  A.   Would I read from the book?

10  Q.   Would he read from it?

11  A.   Yes.

12  Q.   And then would you talk based on what he'd read?

13  A.   Yes.

14  Q.   Now, they, they have played you a number of tapes with

15  respect to various portions of these lectures.  Are all these

16  based on the book and your talking points?

17  A.   If it, if it came from Purification of the Soul, that was the

18  whole -- the whole period was about that book, and the lectures

19  were based on that book.

20  Q.   So if he was talking about jihad or some of these other

21  things, they, they were based on what was in the book?

22  A.   Yes, sir.

23  Q.   You bought a number of other tapes, you indicated.

24  A.   Yes, sir.

25  Q.   You didn't hear those lectures live?

ĪW

```
 1  A.   From the tapes that I bought?

 2  Q.   Yeah.

 3  A.   No, sir.

 4  Q.   Did any of those tapes talk about jihad or war that you

 5  can -- if you can recall?

 6  A.   Not that I can recall.

 7  Q.   Okay.  The Purification of the Soul lectures, did they cause

 8  you concern about the security of the United States?

 9  A.   No, sir.

10  Q.   Did you consider any of those topics political?

11  A.   No, sir.

12  Q.   Were the topics anything other than theological?

13  A.   No, sir.

14  Q.   The questions that were asked, would they sometimes be beyond

15  the scope of the lecturß2120Xes?

16  A.   Yes, sir.

17  Q.   And would he answer them?

18  A.   Occasionally.  Sometimes he would want to stick to the topic.

19  Q.   Okay.

20  A.   Based on time.  There would be other times where if it had

21  some relevance, then he would answer some question even though it

22  was off the topic.

23  Q.   Now, in answering the question, would he have any reference

24  to either the Koran or hĭdeeths or some other religious area?

25  A.   Yes, sir.
```

1  Q.   Would he ever stray from that?

2  A.   No, sir.

3            MR. YAMAMOTO:  Thank you.

4            Nothing further, Your Honor.

5            THE COURT:  All right.  Is there any recross?

6            MR. KROMBERG:  Yes, Your Honor.

7                    RECROSS EXAMINATION

8  BY MR. KROMBERG:

9  Q.   Mr. Kennedy, you didn't just say that "The New World Order"

10 didn't have anything to do with jihad or warfare, did you?

11 A.   To be honest with you, I don't even -- it was history.  I

12 really don't remember the tape.  It's been a couple of years, but

13 to the best of my opinion, it was based on the original Christian

14 history and how it evolved into what it currently is and where it

15 possibly could go.

16 Q.   You don't --

17 A.   That's -- like I say, it's been --

18 Q.   You don't recall Ali Timimi saying in "The New World Order"

19 that there was an unrelenting attack to annihilate Islam from the

20 face of the earth?

21 A.   I wouldn't be surprised if that's on the tape.

22 Q.   You don't recall him saying in "The New World Order" that we

23 have to break the attack by any means necessary, including

24 physical attack?

25 A.   I'd have to -- I'm sure it's on the tape, sir.

1  Q.   You don't recall him saying that the summit of peacemakers to

2  discuss the suicide bombing of Israeli buses was really a

3  declaration of war against Islam?

4  A.   I've heard a lot of things over the -- I've heard a lot of

5  things from the past five or six years.  If that's on the tape,

6  it's on the tape.  Ali Timimi said it, it's on the tape.

7  Q.   You don't recall him saying in "The New World Order" that the

8  New World Order is a -- the unit -- excuse me, you don't recall

9  him stating that the New World Order is a big, heavy, single stick

10  to clobber the Muslims, and the Middle East peace process is to

11  make the Arabs slave laborers for the Jewish finance houses

12  controlling Muslim resources?

13  A.   That's heavy, but it's been five-six years since I've heard

14  that tape.

15  Q.   Should I -- should we draw from this that you don't recall

16  what's on that tape?

17  A.   It's on the tape; I believe it's on the tape.  I haven't

18  heard it in five-six years, but you wouldn't be bringing it up if

19  it wasn't on the tape.

20  Q.   Well, when you were responding to Mr. Yamamoto when he asked

21  you was there anything involving jihad or warfare in the tapes you

22  bought, you were mistaken, correct?

23  A.   When we say was there anything on jihad or warfare, when I

24  listened to the tapes, I was listening to it from a New World

25  Order, and this is the current state we're in.  I didn't, I didn't

1  listen to it and it was calling to anything.

2          So when you say jihad was on the tape, the tapes didn't

3  call me to anything.  I was drawn by the history portion of it,

4  and if there's jihad, that didn't stick out to me.

5  Q.  You said that it didn't call you to anything.  You don't

6  recall in "The New World Order" where Mr. Timimi said, "There will

7  not be a day of peace in the Middle East until the Day of

8  Judgment, when the Christians and the Jews are eradicated.  We

9  should fight in jihad in the Middle East for our own salvation

10 because if we don't, Allah will bring some other Muslims who

11 will"?

12         MR. YAMAMOTO:  Your Honor, Mr. Kennedy has indicated he

13 doesn't recall what's on the tapes.

14         THE COURT:  Well, I'm going to give one or two more of

15 these questions, and then we'll stop.  It's getting repetitive.

16 BY MR. KROMBERG:

17 Q.  If we could go back, Mr. Kennedy, didn't you just say that he

18 wasn't calling you in, in that tape to do anything?

19 A.  I didn't feel called to do anything.

20 Q.  Okay.

21 A.  And -- I didn't feel called to do anything from listening to

22 those tapes.

23 Q.  Now, I would like to distinguish between what you felt called

24 to do and what he said.  Do you recall -- don't you recall him

25 saying that we should fight in the jihad in the Middle East for

1  our own salvation because if we don't, Allah will bring some other

2  Muslims who will?

3  A.    I don't want to say I recall it, but I believe they're on the

4  tape.  I believe that's on the tapes.

5  Q.    You recall, don't you, that he discussed HAMAS in "The New

6  World Order" tape?

7  A.    No, sir.

8  Q.    You don't recall him being asked a question regarding the

9  permissibility under the sunnah of HAMAS suicide bombings killing

10  innocent people and his answer that HAMAS has a lot of beliefs

11  that we might find disagreeable.  Some of them are positions that

12  are soft with respect to the Shiah in Iran?

13  A.    That's not on the version of tapes that I have.

14  Q.    Did you buy your version at Dar al-Arqam?

15  A.    Yes, sir -- oh, I can't say that it had it on there.  I can't

16  recall hearing that.

17  Q.    Do you recall him in "The New World Order" saying, "Our enemy

18  until the Day of Judgment is the Christians, the Europeans, and

19  the Westerners"?

20  A.    Say again?

21  Q.    That our enemy until the Day of Judgment is the Christians,

22  the Europeans, and the Westerners?

23  A.    No, sir.

24  Q.    Let me refresh your recollection -- well, never mind.

25        THE COURT:  All right.

1          MR. KROMBERG:  Thank you, Judge.  I have nothing

2     further.

3          THE COURT:  I assume no one's going to call Mr. Kennedy

4     again?

5          MR. YAMAMOTO:  No, Your Honor.

6          THE COURT:  All right, Mr. Kennedy, you're excused as a

7     witness.  You can stay in court and watch the proceedings or

8     leave, but you're not to discuss your testimony or anything you

9     hear with any witness who has not yet testified.  All right,

10    you're free to go.

11                    (Witness excused.)

12         THE COURT:  Call your next witness.

13         MR. YAMAMOTO:  Curt Jamison, Your Honor.

14           CURTIS JAMISON, DEFENDANT'S WITNESS, AFFIRMED

15                    DIRECT EXAMINATION

16    BY MR. YAMAMOTO:

17    Q.   Please speak into the microphone, Professor.  Please state

18    your name and spell your name for the Court.

19    A.   My name is Curtis Jamison.  That's C-u-r-t-i-s J-a-m-i-s-o-n.

20    Q.   Professor Jamison, where do you teach?

21    A.   George Mason University.

22    Q.   What do you teach?

23    A.   Computational biology.

24    Q.   What is that?

25    A.   It's the use of computers to solve biological problems and to

1  manage biological information.

2  Q.  Do you know Dr. Ali Al-Timimi?

3  A.  Yes, I do.

4  Q.  How do you know him?

5  A.  He was my student.

6  Q.  When?

7  A.  From about 2001 through 2004.

8  Q.  And was he more than your student at any point?

9  A.  Yes.  I'm glad to say he became my friend over the course of

10  the studies together.

11  Q.  And in the course of his studies, did he have occasion to

12  work for you or with you?

13  A.  Yes.  At one point, I was able to hire him on a grant that I

14  had.  He worked with us for a year and a half on that grant.

15  Q.  Now, approximately when do you recall he started working for

16  you?

17  A.  As far as I can remember, it was in fall 2001.

18        MR. YAMAMOTO:  Okay.  Can you hand him Defendant's

19  Exhibit 29, please?

20  Q.  Professor, you're going to be -- during the fall of 2001, was

21  there a project you two worked on?

22  A.  Yes.  We were working on a database to handle patient

23  information.

24  Q.  And was that presented anywhere?

25  A.  Yes, that was presented at a meeting in Cold Spring Harbor.

1  Q.   And take a look at Exhibit 29.

2  A.   Yes.

3  Q.   Is that familiar?

4  A.   Yes.  That is the program from the, from the meeting, the

5  abstract book.

6  Q.   And did Dr. Al-Timimi do work for that project?

7  A.   Yes.  We put together a -- we did some work, and we put

8  together a poster for this meeting.

9  Q.   And what was that poster you put together?

10  A.   It was a book -- it was a poster on creating a patient

11  database to study gene expression.

12  Q.   Can you give us a short layman's explanation of what you're

13  talking about?

14  A.   Yes.  With the completion of the genome project, we -- as

15  scientists, we can now measure the expression pattern of all the

16  genes in the human, and these are coupled with clinical trials and

17  clinical studies, and so we needed a way to tie together the gene

18  expression data with the patient data.

19  Q.   Was this the beginning of that project or the end of the

20  project?

21  A.   This was approximately the midpoint of that project.

22  Q.   And what did Dr. Al-Timimi do for that?

23  A.   For this, he had created a database schema and a -- and

24  database tables that we were presenting as a first pass.

25  Q.   And how much time did that take; do you recall?

1  A.   I believe we worked on it over the course of three or four

2  months.

3  Q.   On a regular basis?

4  A.   Roughly, yes.

5  Q.   How many hours a week or --

6  A.   I met with him weekly for an hour or two, and he worked full

7  time on it, 40 hours a week, I presume.

8  Q.   At home and at school?

9  A.   Yes, sir.

10 Q.   Would he use his computers --

11 A.   Yes.

12 Q.   -- for this project?

13 A.   His computers and my computers, yes.

14 Q.   And were you putting something together?  Is this -- was it a

15 new idea that you-all were working on?

16 A.   It was an extension of putting together a bunch of existing

17 ideas into a format that was usable for our specific purposes of

18 doing -- building a patient cancer database.

19 Q.   This conference was, it looks like, September 28 to September

20 30.

21 A.   Yes.

22 Q.   How much time did it take to prepare for this conference?

23 A.   To put together the poster, I'm guessing we probably spent a

24 week or two on it.

25 Q.   And prior to that, were you working on the data?

```
 1  A.    Prior to that, we were working on the design of the database

 2  and gathering the requirements of all the information that we were

 3  going to be storing in it.

 4  Q.    To put on the poster?

 5  A.    Yes.

 6  Q.    Now, did Dr. Al-Timimi talk to you about traveling to New

 7  York and some problems he may have been concerned with?

 8  A.    Yes, he did.

 9  Q.    Can you take a look at Defendant's Exhibit 41, please?

10          THE COURT:   Now, 29 is in evidence, right?   There was no

11  objection to 29?

12          MR. GIBBS:   There's no objection, Judge.

13          THE COURT:   All right.

14          (Defendant's Exhibit No. 29 was received in evidence.)

15          MR. GIBBS:   Judge, I would interpose an objection if

16  we're going to start getting into Mr. Timimi's statement again.

17  It sounds like there's some conversation coming up.

18          MR. YAMAMOTO:   I don't think so.

19          THE COURT:   Well, we're not there, so let's not have

20  preemptive strikes.

21          MR. GIBBS:   Thank you, Judge.

22          THE COURT:   Exhibit 41.

23  BY MR. YAMAMOTO:

24  Q.    Take a look at -- don't show it yet.

25          Take a look at Exhibit 41.
```

1   A.   Yes.

2   Q.   What is that?

3   A.   This is a letter that I wrote for Ali so that he could

4   forfend any possible issues traveling to this conference.

5              MR. YAMAMOTO:  I would like to enter the exhibit.

6              THE COURT:  Any objection?

7              MR. GIBBS:  No, Judge.

8              THE COURT:  All right, 41 is in.

9              (Defendant's Exhibit No. 41 was received in evidence.)

10             MR. YAMAMOTO:  May I publish it, Your Honor?

11             THE COURT:  Yes, sir.

12  BY MR. YAMAMOTO:

13  Q.   Without telling this Court what he said, why did you prepare

14  this letter?

15  A.   This was soon after the 9/11 terrorist attacks, and there was

16  some concern about traveling to this, to this conference.

17  Q.   With his traveling to the conference?

18  A.   With his traveling to the conference, yes.

19  Q.   Thank you.

20             Now, that conference was in Cold Spring Harbor, Long

21  Island, New York?

22  A.   Yes, correct.

23  Q.   Did you travel together?

24  A.   No.  I drove up myself, Ali came up later on the train, and

25  then we drove back together.

1  Q.   Did you-all present in this conference?  What did you do?

2  A.   We put the poster up.  Typically during a conference, there

3  is a poster session and chair sessions.  The chair sessions are

4  20-minute talks, and then the poster session is attended by

5  everybody at, at the conference, and all the results are put up on

6  posters.  And so we just presented at the posters.

7  Q.   Okay.  Can you take a look at Defendant's 30, please?  What

8  is that?

9  A.   Those are some notes that I made and gave to Ali with my cell

10 phone number, my home number, and routing, train routings.

11 Q.   This is for the trip to Cold Spring Harbor?

12 A.   Yes.

13 Q.   So he could contact you?

14 A.   Correct, yes.

15 Q.   Thank you.

16         THE COURT:  Are you moving that in, Mr. Yamamoto?

17         MR. YAMAMOTO:  Yes, Your Honor.

18         THE COURT:  Any objection to Defense 30?

19         MR. GIBBS:  No, Judge.

20         THE COURT:  All right, it's in.

21         (Defendant's Exhibit No. 30 was received in evidence.)

22         MR. YAMAMOTO:  Thank you.

23 Q.   So those were just telling him how to travel and in case he

24 was -- needed to get ahold of you, he had numbers for you?

25 A.   Correct, yes.

1  Q.   Did you have occasion to travel other places with
2  Dr. Al-Timimi?
3  A.   Yes.  The following September 2002, we went to a meeting in
4  Cambridge, England.
5  Q.   I'm going to hand you Defendant's 91.  Do you recognize that?
6  A.   Yes.  This is the program to the meeting that we went to in
7  2002.
8  Q.   And are you-all listed in there?
9  A.   Yes, we are.
10  Q.   And what did you present there?
11  A.   There we presented a different type of program that was --
12  intelligent agents, computer programs that go out to existing
13  databases and retrieve data automatically.
14  Q.   Now, is there a relationship between the conference that was
15  at Cold Spring Harbor and the conference in -- I want to say
16  Cambridge, but that's not what you said.  Wherever that is?
17  A.   Cambridge, Kingstowne.
18       Yes.  The work that we presented in England a year later
19  was pretty much a direct outgrowth of the work that we had been
20  doing before with the databases.  We discovered that we needed
21  mechanisms of collecting the data from external databases and
22  incorporating them into our gene expression database.
23  Q.   Now, were you also his professor?
24  A.   Yes.
25  Q.   And taught him some of his classes?

1  A.   Yes, I did.

2  Q.   Can you take a look at Defendant's 11 and 19, please?

3           THE COURT:  Are you moving 91 in?

4           MR. YAMAMOTO:  Yes, please.

5           THE COURT:  Is there an objection to 91?

6           MR. GIBBS:  I just need to see what it is, Judge.  We

7  don't have a copy in our book.

8           Oh, I'm sorry; it's in.

9           (Defendant's Exhibit No. 91 was received in evidence.)

10          THE COURT:  The next one you're looking at is 30?

11          MR. YAMAMOTO:  Defendant's 11 and 19, Your Honor.

12 Q.   What is that?

13 A.   These appear to be statements from GMU for graduate courses.

14 Q.   Do you recognize any of those courses?

15 A.   Yes.

16 Q.   What do you recognize?

17 A.   On No. 11, the fall '01, CSI 730, Biological Sequence

18 Analysis, was a course that I taught, and then -- yeah, it's the

19 same.

20 Q.   What does "CSI" stand for?

21 A.   It stands for computational sciences and informatics.

22 Q.   Is that your department?

23 A.   That is our old department, yes.  We merged and created a,

24 something called the School of Computational Sciences.

25 Q.   So it appears that all three of these courses are in that

1  department?

2  A.   Yes, they are.

3  Q.   Do you recognize the other two courses?

4  A.   739, Programming for Biologists, that may be a class that I

5  developed.  I'm not sure whether I was teaching it that semester

6  or not.  I think I was.

7       And then 899 is our colloquium, our seminar series.

8       MR. YAMAMOTO:  I'd like to move Defendant's 11 and 19

9  in, Your Honor.

10      MR. GIBBS:  No objection.

11      THE COURT:  All right, they're both in.

12      (Defendant's Exhibit Nos. 11 and 19 were received in

13 evidence.)

14 BY MR. YAMAMOTO:

15 Q.   Now, how many hours of class work did your course involve?

16 A.   The sequence analysis was, well, met from 7:20 to 10 p.m. on

17 Mondays, and then we expected another ten hours or so

18 approximately out of class in terms of homework and readings and

19 so forth.

20 Q.   Was there lab work?

21 A.   There were homeworks, yes.  Not lab per se.  Not -- computer

22 work.

23 Q.   This is biology.  You guys weren't dissecting frogs and

24 stuff?

25 A.   No.  No, it's computational biology.  We just touch

1  keyboards.

2  Q.  And the other two courses, are you familiar with the course

3  material and the coursework?

4  A.  Yes.  The programming course would have actually had a higher

5  requirement for out-of, out-of-class work, so that probably would

6  have taken up 15 to 20 hours a week.  And then the colloquium is a

7  one-credit hour, and that mostly involves showing up and listening

8  to the seminar and writing a report on it.

9  Q.  Do these classes require a knowledge of computers?

10  A.  Yes, they do.

11  Q.  Extensive knowledge of computers and programs?

12  A.  Yes, extensive.

13  Q.  And these courses were during what semester, can you tell?

14  A.  Yeah.  They were in the fall of 2001.

15  Q.  So September to January?

16  A.  September to December.

17  Q.  Now, in addition to these courses, he was working for you on

18  this project?

19  A.  Yes.

20  Q.  I take it the project was funded at some point?

21  A.  Yes.  It was funded by the Commonwealth Research Foundation.

22  Q.  And how long did the project last?

23  A.  That project lasted until June of 2003, I believe.  Is that

24  right?  I'm sorry.  It lasted -- that was a two-year project, so

25  it, I think it ended in, in 2003 or around 2003-2004.

1  Q.    Were there subsequent projects?

2  A.    I moved him for a little while on to another grant, but he --

3  we kept the same project going.

4  Q.    Was Dr. Al-Timimi a good student?

5  A.    Excellent.

6  Q.    Was he a good employee or worker for you?

7  A.    Yes.  He was an excellent employee.

8  Q.    Was he knowledgeable about the area?

9  A.    Very.

10 Q.    Did the coursework require more than just a knowledge of

11 biology or computational biology?

12 A.    The coursework itself, not really.

13 Q.    How about the project?

14 A.    The projects, they did.  For the projects, we needed the

15 ability to synthesize and think clearly and be imaginative.

16 Q.    And when did he work -- do work on the project if he had so

17 much schoolwork?

18 A.    That's a good question.  It's -- we squeeze it in.

19 Q.    You worked together?

20 A.    We worked together, yes, and as a graduate student, you're

21 expected to put in many, many hours.

22 Q.    At some point, did you take on another role with

23 Dr. Al-Timimi?

24 A.    As a friend?

25 Q.    With respect to his either schoolwork or degree work.

1  A.   Oh, yes, I'm sorry. I misunderstood. Yes.

2           In late 2003, he asked me to be his research advisor for

3  his dissertation.

4  Q.   Okay. Now, when you were beginning this project in September

5  and October, I take it you guys were starting up on the project at

6  that point?

7  A.   Yeah.

8  Q.   Was there more work at that point than later, or was it all

9  about the same?

10 A.   It was all about the same. It was pretty much even

11 throughout -- evenly distributed throughout the program that we

12 were working on.

13 Q.   Would you work weekends and evenings?

14 A.   Sometimes. I tried not to, but we would go -- when we had

15 to, like, for example, we had to take a trip down to Charlotte to

16 meet with some folks, so we went down on a Saturday and spent a

17 Saturday down at University of Virginia.

18 Q.   Do you know if he would work on weekends and evenings?

19 A.   Yes. Yes, he would.

20 Q.   Would he contact you about things?

21 A.   Yes.

22 Q.   The dissertation, what was your function with respect to

23 that?

24 A.   I was his advisor, so I helped him formulate the idea, and we

25 discussed his findings as he progressed through it, and then when

1  he was finished with it, I helped him write his dissertation, and

2  then he presented it to the committee.

3  Q.  Can you take a look at Defendant's 31, please?

4  A.  Yes.

5  Q.  Is it -- do you recognize that?

6  A.  Yes.  This is a copy of his dissertation.

7  Q.  And this is the project you worked with him on -- or, excuse

8  me, were his advisor for?

9  A.  Yes, correct.

10  Q.  And it was subsequently published or published at the same

11  time in hardbound; is that right?

12  A.  It -- after one -- one of the university requirements is

13  after it's submitted, it gets bound and placed into the library

14  and into the departmental library and so forth.

15  Q.  And do you have copies?

16  A.  Yes, I do have copies.

17          MR. YAMAMOTO:  May he just show them to the jury, Your

18  Honor?

19          THE COURT:  Well, we've got them -- I assume you're

20  going to move 31 into evidence?

21          MR. YAMAMOTO:  I am, Your Honor.

22          THE COURT:  All right, that's fine.  I assume there's no

23  objection?

24          MR. GIBBS:  There is none, Your Honor.

25          THE COURT:  All right, it's in evidence.

1          (Defendant's Exhibit No. 31 was received in evidence.)

2    BY MR. YAMAMOTO:

3    Q.   I take it he had to defend this?

4    A.   Yes, he did.

5    Q.   When did he do that?

6    A.   He did it in early December.

7    Q.   And I take it since I'm calling him Dr. Al-Timimi --

8    A.   Yes, he was successful.

9    Q.   -- he was successful.

10          Now, going back to 2001, that period in September, we

11   had the 9/11 tragedy.

12   A.   Yes.

13   Q.   Did you-all work -- continue working and continue going to

14   school?

15   A.   Yes, we did.

16   Q.   And the Cold Spring project, that wasn't deterred or slowed

17   down because of the --

18   A.   No, it was not.

19   Q.   Was school closed at any point?

20   A.   School -- yes.  The university closed the day of the attacks

21   at noon, and then I believe it was closed for a day or two after,

22   and then it reopened.

23   Q.   Now, those days that the school was closed, did Dr. Al-Timimi

24   continue to work on the project?

25   A.   Yes.

1  Q.  And you worked with him?

2  A.  Yes.

3  Q.  And that continued on throughout the rest of the -- I guess

4  you worked through -- on beyond the end of the semester.

5  A.  Yes, that's correct.  We worked, we worked through that

6  semester and into the next year.

7  Q.  So I guess -- I'm not familiar with George Mason, but the

8  Christmas break is at Christmastime?  Is that the end of the

9  semester?

10  A.  Yes.  That's the normal end of the semester, yes.

11  Q.  And so the two of you continued to work on through the

12  Christmas holidays?

13  A.  Yes.

14  Q.  So from September on -- did you work through the summer?

15  A.  Through some of the summer, yes.

16  Q.  So this was --

17  A.  He was a full-time employee at that juncture.

18  Q.  So this project began in September.  He's working pretty much

19  full time and going to school through December of that year and on

20  through the next year --

21  A.  Yes.

22  Q.  -- through the summer at some point?

23  A.  Correct, yes.

24  Q.  You-all take off some time during the summer?

25  A.  Sure, as needed.

1 | Q.   But you continued to work on the project?

2 | A.   Yes.

3 | Q.   And it, it continued to be a full-time project?

4 | A.   It did continue to be a full-time project.  The emphasis

5 | shifted around a little bit, depending on the lab that we were

6 | working with, but it was pretty much the same project.

7 | Q.   Was the project successful?

8 | A.   Yes, it was.  We presented a paper at a conference and had it

9 | published in the IEEE Journals, and so that was a fairly

10 | successful project.

11 | Q.   What's the IEEE Journal?

12 | A.   That's the Institute of Electronics and -- IEEE.  It's a

13 | computational society.

14 | Q.   Is this something, is this something that relates to disease

15 | or anything?

16 | A.   No.  It was a computer conference that we put our paper into

17 | because it was actually a computational -- of computational

18 | interests with the way that the program was implemented.

19 | Q.   I'm sorry, the project that you were working on, did that

20 | deal with a disease?

21 | A.   That dealt with cancer, yes.

22 | Q.   And what -- can you give us a little idea of what it was that

23 | you were doing?

24 | A.   Okay.  Yes.  The project was in conjunction with Inova and

25 | Massey Cancer Center in Richmond and the NVCU to collect various

1   types of cancer samples, study the gene expression, and see what

2   genes are turned on and which genes are turned off in cancer, and

3   that was the biological end of it.  The computational end was to

4   analyze all of this data and to perform analysis of the data.

5   Q.   Are you, are you projecting what cells might become

6   cancerous?

7   A.   More we're looking to see what the common causes of the

8   cancer are and to see if, if there are any commonalities that we

9   can see between the cells.

10  Q.   The biological bases?

11  A.   Yes.

12  Q.   What's your degree in?  What's your doctoral in?

13  A.   Molecular biology.

14            MR. YAMAMOTO:  Okay.  Thank you.

15            I have no further questions, Your Honor.

16            THE COURT:  All right.  Any cross?

17            MR. GIBBS:  Briefly, Judge.  Thank you.

18                        CROSS EXAMINATION

19  BY MR. GIBBS:

20  Q.   Good afternoon, Professor Jamison.  My name is John Gibbs.

21  I'm one of the prosecutors in the case.  I just have a couple of

22  questions for you.

23            You talked about your relationship with Ali Timimi, that

24  he was a student and a friend, correct?

25  A.   Yes.

1 Q.   How open was Ali Timimi with you about his life outside of

2 work and outside of school?

3 A.   Fairly open.

4 Q.   Okay.  So did you know that he lectured Friday nights at the

5 Dar al-Arqam Islam Center?

6 A.   I knew that he lectured, yes.

7 Q.   Okay.  Did you ever go see any of his lectures?

8 A.   I did not.

9 Q.   Okay.  And you yourself are not Muslim, correct?

10 A.   No, sir.

11 Q.   Okay.  Did Ali Timimi ever comment to you about the fact that

12 you are not Muslim?

13 A.   No.

14 Q.   Okay.  And the two of you had a very warm, cordial

15 relationship both as a student-teacher and as colleagues, correct?

16 A.   Yes.

17 Q.   And always got along well?

18 A.   Absolutely.

19 Q.   Okay.  Now, you said you never went to any of his lectures at

20 the Dar al-Arqam.  Did you ever meet any of the people that he

21 lectured to at the Dar al-Arqam?

22 A.   I do not know.  I met many people.  I don't know whether they

23 attend his lectures or not.

24 Q.   Okay.  But it's fair to say that on September 16, 2001, you

25 were not at the home of Yong Kwon along with Ali Timimi, correct?

1  A.   No, I was not.

2  Q.   You never met Yong Kwon before?

3  A.   No.

4           MR. GIBBS:  That's all I have.  Thank you, Professor.

5           THE COURT:  Any redirect?

6           MR. YAMAMOTO:  No, Your Honor.

7           THE COURT:  All right.  I assume nobody's going to call

8  the professor again?

9           MR. YAMAMOTO:  No, Your Honor.

10          MR. GIBBS:  No, Judge.

11          THE COURT:  All right.  Sir, then you're free to stay in

12 court and watch the proceedings or leave, but you're not to

13 discuss your testimony with any witness who has not yet testified.

14 Thank you.

15                    ·         (Witness excused.)

16          THE COURT:  Call your next witness.

17          MR. MAC MAHON:  Your Honor, we just want to try to put

18 in some exhibits that we have.

19          THE COURT:  All right.

20          MR. MAC MAHON:  These are all documents, so I don't

21 think we're going to have a problem with them.  Defendant's

22 Exhibit No. 2 is a Borders Books and Music receipt.

23          THE COURT:  Hold on a second.

24          Any objection?

25          MR. KROMBERG:  Yes, Judge.  Maybe I'm missing something.

1   and again, I want to thank you for your service to the Court.

2          We'll stay in session because I have some issues I have

3   to take up with the parties, but thank you.  You're released at

4   this time, all right?

5                       (Jury excused.)

6          THE COURT:  Given the complexity of the issues in this

7   case, I will direct that any posttrial motions be filed within 20

8   days unless there's an objection to that amount of time.  Any

9   objection to that?

10         MR. MAC MAHON:  No, Your Honor.

11         MR. KROMBERG:  No.

12         THE COURT:  No?  All right.

13         Whether we need to address those before sentencing, if

14  you-all want those addressed before the sentencing hearing, then I

15  will, you know, just go ahead and notice it for a Friday.  There

16  will be some Fridays in the next two months when I'm not around,

17  but we can schedule this, you know, for a non-Friday as well.

18         We're going to go ahead at this point and schedule this

19  case for sentencing, and we are into the month of July at this

20  point.  Unless counsel have an objection, how would Wednesday,

21  July 13, be for the sentencing?

22         MR. KROMBERG:  That would be fine, Judge.

23         THE COURT:  Is that all right for the defense counsel,

24  Mr. Yamamoto and Mr. MacMahon?

25         MR. MAC MAHON:  What time, Your Honor?

1          THE COURT:  Wednesday, July 13.  To accommodate your

2     schedule, I don't mind setting that at 10:00 if that makes it

3     easier for you to get in.

4          MR. MAC MAHON:  That's fine, Your Honor.

5          THE COURT:  All right.  Now, the defendant, although

6     convicted of very, very serious crimes, nevertheless has been on

7     bond throughout these proceedings and has been around since 2001,

8     when he was first questioned for the FBI, and I do not see any

9     reason to remand him at this point.

10          MR. KROMBERG:  Judge, I think it's required.  He's been

11     convicted of crimes of violence and offenses for which the maximum

12     sentence is life, and if that's the case, unless the judge finds

13     there's a substantial likelihood that a motion for acquittal or

14     new trial will be granted or the government recommends no sentence

15     of imprisonment, which is obviously not the case, then the

16     defendant by 3143(a)(2) is required to be remanded now.

17          MR. MAC MAHON:  And we, of course, are going to file

18     the -- renew the rule 29 motions and file some other motions as

19     well, Your Honor.  He's been scrupulous in keeping the terms of

20     his bail, and I would hope that the Court would, would leave him

21     out just while we do this and leading up to the sentencing in the

22     case so that we can have his assistance in preparing motions and

23     otherwise.  He's not going anywhere, Your Honor, hasn't -- he's

24     been here every day.

25          And some of these, some of these counts, I think the

1  Court, you know, as we talked about when the jury was
2  deliberating, some of these we're hopeful that you might consider
3  on a rule 29 or renewed motion because of some of the complexity
4  in the questions that we had.  So we think there is grounds for
5  you to vacate some of these convictions hopefully and to let him
6  stay out on bail, Your Honor.  So that would be our request.

7           THE COURT:  I recognize that the -- under normal
8  circumstances, convictions for these types of offenses would
9  result in bond being revoked, but Mr. Ali Timimi has not indicated
10 in any respect that there's any likelihood of flight.  As I said,
11 he's known that he was under investigation for serious charges for
12 some time.  He has not absconded, and he has been here every day
13 on time.

14          Although the underlying crimes are crimes of violence,
15 again, the second- to third-degree-removed nature of the
16 defendant's activities here is such that I'm not going to revoke
17 his bond at this point.  So the government's request is denied.

18          MR. KROMBERG:  Your Honor, I would note that the
19 defendant is now facing a -- mandatory sentences of life plus 30
20 years plus whatever guideline sentence is, and the statute says
21 that the Court shall order that he be detained under these
22 circumstances.

23          THE COURT:  Unless the Court finds that there might be a
24 reasonable basis for some revocation -- or some reversal of the
25 jury's verdict.  I think the legal issues in this case are

1  sufficiently dense that I'm going to give the defendant the

2  benefit of the doubt, and I'm going to let him remain out on bond.

3      He is being electronically monitored by the Pretrial

4  Services Office, correct?

5      MR. YAMAMOTO:  No.

6      THE COURT:  He is not?

7      All right, I think then the appropriate thing would be

8  to add that as an additional condition.  All right?

9      MR. KROMBERG:  Judge, he's on a bond of $75,000 at this

10  point.  This is a man who has traveled around the world, has

11  contacts around the world, traveled to Saudi Arabia after 9/11,

12  is -- and even if the Court were to find that some of the charges

13  were -- there was a grounds for reversal on some of the charges,

14  which obviously we expect the Court not to do, but unless he's

15  going to be acquitted of all the charges, he's going to be facing

16  a significant amount of jail time, and this should not be -- he

17  should not be out now by the law.

18      THE COURT:  All right, Mr. Kromberg.  I'm nevertheless

19  going to let the defendant remain out on bond.  I'm going to

20  increase the bond conditions and require electric monitoring, and

21  that means, Mr. Ali Timimi, that you're going to have to remain in

22  your home at all times unless you've gotten a specific time-out.

23      Now, your time-outs that are permitted are for you to

24  visit with your counsel, to visit with the Probation Office, to

25  come to court, and I will allow you a once-and-week time-out to

1  attend services on Fridays.  You cannot be out for any other

2  reason without explicit permission from the Court.

3        Do you understand that?

4        THE DEFENDANT:  Yes, Your Honor, I do understand that.

5  I'm appreciative of the conditions.  Thank you.

6        THE COURT:  All right.

7        MR. KROMBERG:  If I could add one more thing, Judge?

8        THE COURT:  Mr. Kromberg.

9        MR. KROMBERG:  What happened in the last -- last year,

10 we asked that Pretrial Services be directed to notify the FBI of a

11 person that we designate immediately if the person -- if the

12 defendant on electric monitoring does not appear to be where he's

13 supposed to be.

14       THE COURT:  All right, I will ask them -- include in

15 that direction to Pretrial Services that they do that

16 notification.

17       MR. KROMBERG:  Thank you.

18       THE COURT:  And do you want -- and again, I'm saying

19 electronic surveillance.  If the Probation Office thinks that the

20 global positioning, whatever technology they've got, but basically

21 it's that the defendant is going to be under essentially house

22 arrest with electronic or technological monitoring so that we know

23 exactly where the defendant is at all times, all right?

24       Now, Mr. Timimi, from here today, you need to go first

25 to Pretrial Services, where they will change the conditions of

1  your bond, and then basically across the hall to the Probation

2  Office, where you will sign up for the pre-sentence investigation.

3  Do you understand that?

4          THE DEFENDANT:  Yes, I do, Your Honor.

5          THE COURT:  All right.  And if you fail to comply with

6  any condition of bond or fail to appear, let me just alert you

7  that that would be a new offense called bond jumping, and the

8  government could prosecute you separately for that, and they'll

9  find you, but I have actually no doubt that you'll be here based

10  on your track record to date.

11          So if there's nothing further then, this matter is

12  finished, and we'll call the next matter.  Thank you.

13          MR. KROMBERG:  Thank you, Your Honor.

14          MR. MAC MAHON:  Thank you, Your Honor.

15                    (Which were all the proceedings

16                     had at this time.)

17

18              CERTIFICATE OF THE REPORTER

19     I certify that the foregoing is a correct transcript of the

20  record of proceedings in the above-entitled matter.

21

22

23     _____

24              Anneliese J. Thomson

25



**U.S. Department of Justice**

*United States Attorney's Office*

*Eastern District of Virginia*

---

| | |
|---|---|
| *2100 Jamieson Avenue* | *703/299-3721* |
| *Alexandria, Virginia 22314* | *FAX 703/299-3981* |

July 23, 2003

*Transmitted by Facsimile to 202.887.4288*

Mark J. MacDougal
Heather Pellegrino
Akin Gump Strauss Hauer & Feld LLP.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564

      Re:   <u>Yong Ki Kwon</u>

Dear Mark and Heather:

      Thank you for your letter of July 21, 2003, in which you request our consent for the pre-trial release of Yong Ki Kwon. I will discuss your proposal with my colleagues and supervisory chain but I don't think any decision can be made on it at least until we get through the detention hearings for co-defendants Hasan, Chapman, and Benkhala, which hearings are scheduled to start tomorrow.

      Notwithstanding the pre-trial release issues, I would like to resolve Mr. Kwon's case with the entry of a guilty plea as soon as possible. I realize that you are relatively new to the case, but at least with respect to Mr. Kwon, the facts are pretty straightforward: not only did he help others to do so, but he himself traveled to Pakistan to die as a martyr in support of violent jihad against India, and he used firearms in Pakistan in connection with his jihad plans. Multiple witnesses will testify to these facts and, in any event, Mr. Kwon admitted them. Indeed, as Heather saw last week when she was here, Mr. Kwon admitted the most significant facts to FBI agents during an interview at Dube Kahanamoku Park next to the Hilton Hawaiian Village Hotel, in Honolulu, on the morning of March 23, 2003.

      Moreover, as you know, for months before the indictment, Mr. Kwon was proceeding on a course to enter his guilty plea and testify as a government witness, and we have acted accordingly. Indeed, charging decisions were made in the indictment on the assumption that Mr. Kwon was going to continue on the course on which he had set forth. Nevertheless, since the case has been indicted, I have perceived troubling signals that Mr. Kwon may no longer be willing to plead guilty and testify truthfully as to what happened. For Mr. Kwon's sake as well as that of the government's case, I hope that my impression is incorrect.



As you and I have discussed, Mr. Kwon impressed all of the agents and prosecutors as an individual seeking to accept responsibility for his past actions and take the necessary steps to move past this unfortunate episode in his life. As a result, until the case was indicted, Mr. Kwon was well positioned for a dramatically reduced sentence as a result of cooperation . Accordingly, it would be shame for him ultimately to serve more time than necessary because of cold feet at this hour.

Regardless of whether I am incorrect in my perception that Mr. Kwon is no longer intent on minimizing his jail time by pleading guilty and cooperating, the perception itself is significantly affecting preparation of the case against other defendants. As a result, we need to know as soon as possible whether Mr. Kwon is, in fact, on board as a cooperator and witness. Accordingly, I write this letter to inform you that, if Mr. Kwon agrees to enter his plea to Counts 1 and 33 (Count 33 obviously must be charged against Mr. Kwon through a separate criminal information) by August 8, 2003, I will recommend to my approval authorities that we accept that plea, dismiss the remaining counts against him, and omit him from a superceding indictment. If he does not so agree to enter such a plea by that date, then I expect that he will be included in a superceding indictment that, among other things, will add him as a defendant in at least Counts 33, 35, and 36. Finally, as you can imagine, additional evidence continues to be gathered from multiple sources about the existing charges and even new ones. Accordingly, I cannot predict what our position will be after August 8th with respect to an acceptable plea.

For Mr. Kwon's sake and that of the prosecution of others, this is one instance where I look forward to being shown that I am wrong; indeed, I am eager to hear that Mr. Kwon is just as interested now as he formerly indicated he was in pleading guilty and seeking a substantial sentence reduction for cooperation. Accordingly, please let me know at your earliest convenience whether Mr. Kwon will agree to enter a plea along the lines proposed above.

Thank you for your cooperation.

Sincerely,

Paul J. McNulty
United States Attorney

By: 

Gordon D. Kromberg
Assistant United States Attorney

cc:    Matthew Wartel