No. 20-4441
IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

━━━━━━━━━━━━━━━━━━━━━━━━━

UNITED STATES OF AMERICA,

Appellant,

v.

ALI AL-TIMIMI,

Defendant-Appellee.

━━━━━━━━━━━━━━━━━━━━━━━━━

Appeal from a Judgment of the
United States District Court for the Eastern District of Virginia
The Hon. Leonie M. Brinkema, District Judge
(Dist. Ct. No. 1:04-cr-385-LMB)

───────────────

**BRIEF OF DEFENDANT-APPELLEE**

───────────────

Thomas M. Huff
Attorney-at-Law
P.O. Box 2248
Leesburg, VA 20177
(703) 665-3756

Jonathan Turley
The George Washington
   University Law School
2000 H St., N.W.
Washington, DC 20052
(202) 994-7001

*Attorneys for Defendant-Appellee*

Dated: August 31, 2020

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................i

TABLE OF AUTHORITIES ...........................................................ii

INTRODUCTION AND SUMMARY OF THE ARGUMENT ........................1

STATEMENT OF THE CASE ..........................................................2

ARGUMENT ...........................................................................11

I.   The district court's repeated findings that Al-Timimi's release did not pose a danger to the safety of any other person or the community were based on a thorough analysis of the record and were consistent with prior bail positions of the government ...........................................11

II.   The district court correctly found that Al-Timimi's case presents substantial legal issues pursuant to several intervening Supreme Court decisions and a split of authority that this Court has not yet addressed ...............................................................................15

III.  Both of the "exceptional reasons" that the district court found pursuant to Section 3145(c) are supported by ample caselaw ..............25

CONCLUSION .........................................................................28

CERTIFICATE OF COMPLIANCE.........................................................29

# TABLE OF AUTHORITIES

## CASES

*Pinkerton v. United States*, 328 U.S. 640 (1946) .............................. 17, 22

*Rosemond v. United States*, 572 U.S. 65 (2014) ..................................... 17

*United States v. Davis*, 139 S. Ct. 2319 (2019) ...................................... 16

*United States v. DiSomma*, 951 F.2d 494 (2d Cir. 1991) ........................ 27

*United States v. Evans*, 760 F. App'x 188 (4th Cir. 2019) ...................... 12

*United States v. French*, No. 1:12-cr-00160-JAW, 2020 U.S. Dist. LEXIS 56155 (D. Me. Mar. 31, 2020) ............................................... 25

*United States v. Harris*, 2020 WL 1503444 (D.D.C. Mar. 27, 2020) ...... 25

*United States v. Khan*, 309 F. Supp. 2d 789 (E.D. Va. 2004) ........... 3, 4, 5

*United States v. Lopez*, No. 19-CR-116 (KMW) (JLC), 2020 U.S. Dist. LEXIS 59957 (S.D.N.Y. Apr. 6, 2020) .................................................. 25

*United States v. McDuffie*, No. 19-CR-212 (VEC), 2020 U.S. Dist. LEXIS 59594 (S.D.N.Y. Apr. 3, 2020) ............................................................. 26

*United States v. McKenzie*, 2020 U.S. Dist. LEXIS 55503 (S.D.N.Y. Mar. 30, 2020) ............................................................................................. 25

*United States v. Moussaoui*, CR-01-455 (E.D. Va.) ................................ 14

*United States v. Royer, et al.*, Case No. 1:03-cr-296-LMB (E.D. Va.) ..... 11

*United States v. Spinney*, 65 F.3d 231 (1st Cir. 1995) ............................ 17

*United States v. Steinhorn*, 927 F.2d 195 (4th Cir. 1991) ...................... 16

*United States v. Williams*, 553 U.S. 285 (2008)......................................23

*United States v. Witter*, No. 19-Cr-568 (SHS), 2020 U.S. Dist. LEXIS 53189 (S.D.N.Y. Mar. 26, 2020)...........................................................25

*United States v. Young*, 916 F.3d 368 (4th Cir. 2019) ...........................15

*United States v. Young*, No. 19-4504, 2020 U.S. App. LEXIS 18893 (4th Cir. June 16, 2020) ................................................................................15

## STATUTES

18 U.S.C § 3143(a)(2)..................................................................................5

18 U.S.C. § 3142(f)(1)(B) ...........................................................................5

18 U.S.C. § 3143(b)(1)(A).............................................................. 9, 11, 27

18 U.S.C. § 3143(b)(2)..................................................................................5

18 U.S.C. § 3145(c) ............................................................... 7, 8, 25, 27

18 U.S.C. § 924(c)(3)(B) ..............................................................................5

## OTHER AUTHORITIES

Brief for Professor Eugene Volokh as Amicus Curiae, *United States v. Sineneng-Smith*, Case No. 19-67.........................................................23

U.S. DEPT. OF JUSTICE, USAM CRIMINAL RESOURCE MANUAL § 2483 ....22

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The district court's conditional release order was grounded in a thorough analysis of the record and informed by the court's fifteen years of experience in overseeing the cases of both Al-Timimi and the various principal offenders. Al-Timimi previously remained free throughout his trial, with the government's consent, and scrupulously followed the terms of his release. Notably, the release order here is significantly more restrictive than what the government previously consented to, imposing conditions of home confinement, electronic monitoring, and various restrictions on electronic communications. The government's contention that the district court has committed clear error or otherwise abused its discretion is thoroughly unavailing.

Because of the highly unusual posture of this case, Al-Timimi has now fully discharged his prison sentences on all but four counts—and all four are the subject of active motions with the district court that are grounded in several intervening Supreme Court decisions and a split of authority that this Court has not yet had the opportunity to address. Indeed, the district court has already expressly stated that two of these counts are likely to be vacated shortly. Moreover, because Al-Timimi

has already served fifteen years in prison, he will have already served five years too many if his challenges described below are ultimately successful. The government's request for vacatur of the order should be denied.

## STATEMENT OF THE CASE

1. At its core, this case centers on allegations that Dr. Ali Al-Timimi—a computational biologist and well-known Muslim lecturer in Northern Virginia—made comments at a dinner shortly after 9/11 that the government claims helped to motivate certain men in attendance to go forward with a plan to travel to a camp in Pakistan called Lashkar-e-Taiba (LET), a group the United States would later designate as a foreign terrorist organization. Under assorted theories of inchoate liability—some novel and never before considered by this Court—Al-Timimi was charged with and convicted of ten felonies. *See* JA41-56 (superseding indictment). In a result that the district court described at sentencing as "very draconian," he received a mandatory lifetime prison sentence. *See* JA1389.

2. Although the government states that Al-Timimi "encouraged several of his followers" to attend LET at this dinner, Govt. Br. at 1,

only one trial witness—Yong Kwon—made such a claim, and this witness suffered from credibility issues that were expressly noted by the district court in a related bench trial of the principal offenders. *See United States v. Khan*, 309 F. Supp. 2d 789, 809 (E.D. Va. 2004) (noting it was "troubled by some inconsistencies in Kwon's testimony" with respect to the dinner); *see also* JA567-67. Kwon also originally faced a lifetime prison sentence, JA437-39, and his cooperation came on the heels of an ominously worded letter to his attorney from the government. *See* SA2359 ("[U]ntil the case was indicted, Mr. Kwon was well positioned for a dramatically reduced sentence as a result of cooperation. Accordingly, it would be [a] shame for him ultimately to serve more time than necessary because of cold feet at this hour.") (Def. Trial Ex. 57).

3. The other main principal—Khwaja Hasan—testified that the men at the dinner did not begin to discuss LET until *after* Al-Timimi had already left. JA1150-52. Moreover, all witnesses agreed that the plan was carried out through another defendant, Randall Royer, a former LET affiliate who had been recruiting several of the men for LET for over a year *prior* to the dinner. *See* JA2039-40; JA1150-52;

SA2221; SA2283; *see also Khan*, 309 F. Supp. 2d at 807 (noting that

"[a]s early as April 2000 Royer traveled to LET."); *see also* infra at 18-

21. Royer and these other principal offenders have all since completed

their prison sentences and are no longer in federal custody. See JA1708.

4.   Although Al-Timimi's trial and sentencing occurred in 2005,

his direct appeal remains pending due to a series of complex post-trial

remand proceedings that have involved classified briefing and evidence.

*See* JA1696-97 (Mem. Op.); JA1390-96 (remand orders of this Court).

5.   Al-Timimi remained free on bail throughout the duration of

his 2005 trial, without any form of electronic monitoring, and the

government consented to his release. *See* JA4; JA1699 (Mem. Op.). The

United States Probation Office confirmed that Al-Timimi fully complied

with all conditions throughout that 10-month period. *See* JA1699 (Mem.

Op.).

6.   After his conviction, Al-Timimi was again permitted to

remain free pending sentencing, based on the district court's April 26,

2005 findings by clear and convincing evidence that he did not pose a

danger or a flight risk and that his case involved substantial legal

issues. SA2354-55 (April 26, 2005 post-conviction proceedings); JA1699

(Mem. Op); *see also* 18 U.S.C § 3143(a)(2) (criteria for release pending sentencing).

7.    After Al-Timimi's sentencing hearing, however, his mandatory lifetime prison sentence subjected him to detention under the Bail Reform Act and he was remanded into custody on July 13, 2005. *See* 18 U.S.C. §§ 3143(b)(2) & 3142(f)(1)(B).

8.    Because Al-Timimi has been incarcerated since July 2005, his prison sentences are now fully served on Counts 1-6. JA1696. The remaining Counts 7-10 are the subject of active motions before the district court in light of intervening Supreme Court authority. *See* Dkt. Nos. 432 & 445 (seeking acquittal on Counts 1, 7, and 8 under intervening Supreme Court authority that has invalidated the 18 U.S.C. § 924(c)(3)(B) residual clause on which they were premised) and Dkt. No. 460 (seeking leave to file a motion for new trial on Counts 9 and 10 due to their *Pinkerton* reliance on the Count-1 conspiracy, and also pursuant to intervening Supreme Court authority concerning accomplice liability). The district court has indicated that "at least" two of these convictions are likely to be vacated before Al-Timimi's appeal returns to this Court. *See* SA1892.

9.     Al-Timimi is currently housed at the USP Florence ADMAX prison in Florence, Colorado. He suffers from a variety of medical conditions that place him at elevated risk for severe COVID-19 complications should be become infected, according to CDC guidelines and expert medical authorities. JA1555-57; JA1788-94; JA1798-1801; JA1887. He has uncontrolled hypertension, with several recent blood pressure readings high enough to qualify as "hypertensive crisis" under American Heart Association guidelines—a potential medical emergency. JA1792-94; JA1887. He takes four medications daily for this hypertension. JA1887. Al-Timimi's BMI also exceeds the COVID-19 risk threshold of 30 under the guidelines. JA1794; JA 1865; JA1887. He also has asthma that requires treatment with daily inhaled corticosteroid (ICS) therapy, *see* JA1716; JA1887, and experienced an acute exacerbation as recently as last year that required the use of a nebulizer. JA1887.

10.     Dr. Chris Beyrer, MD, MPH—a professor of epidemiology at the John Hopkins Bloomberg School of Public Health and an expert in emerging diseases—has concluded that "Mr. Al-Timimi is at significantly elevated risk for a COVID-19 complication." *See* JA1557.

Although an ADX physician originally denied that Al-Timimi was at heightened risk for COVID-19 and characterized his hypertension as "stable and [] responding to medication," JA1717, she later amended that claim after defense counsel obtained medical records that appeared to deviate significantly from her account. *See* JA1790-94; JA1863-65. The government has since conceded that Al-Timimi is at heightened risk for severe complications from COVID-19 under CDC guidelines should he become infected. *See* Govt. Br. at 20.

11.    On April 27, 2020, Al-Timimi filed a motion for conditional release pending his appeal under 18 U.S.C. § 3145(c) of the Bail Reform Act, based on the exceptional circumstances presented by the ongoing COVID-19 pandemic and the uniquely complex posture of his case that has resulted in the interim completion of the prison sentences for the majority of the counts against him. JA 1397-1439.

12.    On May 15, the government filed an opposition. JA 1440-67. Broadly speaking, the opposition made two arguments. First, it argued that the legal questions underlying Al-Timimi's challenge to Counts 9 and 10 were not sufficiently substantial. Second, it claimed that the circumstances of his case were not sufficiently "exceptional" to warrant

his conditional release pending appeal. It did not attempt to argue that Al-Timimi posed a danger or flight risk. On My 26, the defense filed its reply. JA 1535-83.

13.    On June 11, the district court held oral argument via a telephonic hearing. *See* JA1584-1604. The district court analyzed all of the elements of 18 U.S.C. 3145(c), and signaled that it did not find the government's opposition to the motion persuasive. With respect to the specific nature of the Al-Timimi's charged conduct vis-a-vis the various principal offenders, the district court observed:

> [E]very other defendant in this multi-defendant case has finished their term of incarceration; and [] unlike Kwon and Khan and the others, Mr. Timimi did not go to Pakistan. He never touched a gun or an explosive. And the people who did touch the guns and explosives didn't get sentences anywhere near as draconian as his.
>
> And so if you look at the entire case and all the players in the case, it is somewhat disconcerting to think that somebody as removed as he—even if he were the instigator . . ., the final acts of the instigation by other players in the conspiracy did not result in anywhere near as long a sentence as he is now serving.
>
> And so I think that certainly is an equity factor that the Court has to have in mind. It goes into the exceptional circumstances factor that we have to look at, and this case has a ton of what I think are complex and difficult legal issues. . . .
>
> So I think this is a very unique case, and it's a . . . troubling one, and so I'm not convinced that there's anything I've seen . . . in the government's papers that really undercuts the defendant's

argument.

JA1591-92. The government then requested leave to make a new argument under Section 3143(b)(1)(A) that Al-Timimi might present a "danger to the safety of any other person or the community," and the district court permitted the request. JA1602-03.

14.  On June 18, the government made a series of public and under-seal filings relating to this element, JA 1605-12; JA1738-87, to which the defense replied with its own series of public and sealed filings on July 6. JA1648-58; JA1804-62. One week later on July 13, the government withdrew its under-seal arguments and stated that it was grounding its dangerousness arguments solely on "the gravity of his offenses of conviction." JA 1659-62. Over the next two months, the parties filed a series of supplemental notices concerning various new developments. JA1681-93.

15.  On August 18, the district court granted Al-Timimi's motion for conditional release into home confinement pending his direct appeal, naming his mother—a retired university professor and mental health specialist—as third-party custodian. JA1710-11; JA1430. The district court issued a conditional release order that, among other things,

mandates that Al-Timimi submit to electronic monitoring and imposes various restrictions on his communications. *Id.* The order was accompanied by a 16-page memorandum opinion detailing the court's reasoning. JA1694-1709.

16.   Over the next week, the parties began to confer with the U.S. Probation Office over the logistics of Al-Timimi's release plan and began to make travel arrangements. The government gave no indication that it planned to appeal. To the contrary, on August 20, government counsel proposed to the defense that FBI agent John Wyman (who previously interviewed Al-Timimi but has since retired from case work) was willing to assist with Al-Timimi's transportation home and was interested in "talking to him about how the world has changed in the last 15 years." SA1893.

17.   On August 25—seven days after the entry of the district court's Order (and halfway through the defendant's court-ordered quarantine period)—the government noticed an appeal. JA1712-13. On August 26, the government filed a motion for stay with the district court, Dkt. No. 525, and then filed an appellate brief with this Court later in the day. ECF No. 5.

18.     The defense filed an opposition to the stay in the early

morning of August 28, Dkt. No. 530, and the district court issued a 3-

page order analyzing and denying the government's motion the same

day. SA1890-93.

19.     The government then filed a motion for stay with this Court.

ECF No. 15. The defense's response to that motion is due today at 2 pm.

## ARGUMENT

**I.    The district court's repeated findings that Al-Timimi's release did not pose a danger to the safety of any other person or the community were based on a thorough analysis of the record and were consistent with prior bail positions of the government.**

The district court's repeated findings that Al-Timimi did not pose

a "danger to the safety of any other person or the community" under §

3143(b)(1)(A) were based on a thorough analysis of the record and were

made with the benefit of the court's fifteen-year history in overseeing

the cases of both Al-Timimi and the various principals charged in

*United States v. Royer, et al.*, Case No. 1:03-cr-296-LMB (E.D. Va.). The

government's argument that these findings amounted to clear error is

not persuasive.

The record reflects that Al-Timimi has demonstrated an

impeccable release history with the U.S. Probation Office, having previously been permitted to remain free on bail throughout his trial, and again after conviction while awaiting his sentencing hearing in 2005. Notably, the former relief was ordered with the government's *consent*, JA1699, at a time when "any when any likelihood of flight or danger was squarely before the court," SA1891—and did not include any of the strict home confinement conditions and communication restrictions outlined in the release order that the government challenges here. *See* JA2355. And the latter relief, ordered over the government's objection in April 2005, was made with the benefit of the district court's contemporaneous observation of the trial evidence, while specifically taking into account the "second- to third- degree-removed nature of the defendant's activities" that formed the basis for his charges. SA2354-55. *Cf. United States v. Evans*, 760 F. App'x 188, 193 (4th Cir. 2019) (noting that clear-error review affords "great deference to the district court's superior position in terms of assessing the credibility of the witnesses and making factual findings based on the entire record and the evidence presented."). As the district court observed in its 16-page memorandum opinion, Al-Timimi scrupulously

followed his terms of conditional release in 2005, *see* JA1699, and aside from a single disciplinary infraction, has also been a model inmate during his fifteen years of incarceration—for example, using his educational background (as a former assistant professor at the George Mason University Center for Biomedical Genomics) to advocate on behalf of other inmates during the ongoing COVID-19 pandemic. JA1699-1700; JA1561-64.

The government repeats its attempt to link the crimes that Al-Timimi was convicted of with "terrorism," but Al-Timimi was not convicted of, nor even charged with, any terrorism crimes; indeed, the government's effort to establish a terrorism enhancement at sentencing was declined by both the U.S. Probation Office (in its sentencing report) and the district court. *See* JA1700. And although the underlying charges in this case are of course serious, they also involve highly complex—and at times unprecedented—legal theories. *See*, *e.g.*, JA1703-04 (district court noting at argument that "this is a tough case because it's almost a third level of culpability . . . It certainly is a unique . . . legal structure."); *see also* infra at 15-24.

It should also be noted that as a sitting judge on the U.S. District

Court for the Eastern District of Virginia, Judge Brinkema has had substantial experience with a wide variety of national security defendants. In presiding over the trial of Zacarias Moussaoui, *United States v. Moussaoui*, CR-01-455 (E.D. Va.), for example, Judge Brinkema displayed no hint of leniency, telling the defendant at sentencing: "You came here to be a martyr . . . instead you will die with a whimper. The rest of your life you will spend in prison." Judge Brinkema's sharply different handling of Al-Timimi's case—including Her Honor's express determination that his alleged activities were several degrees removed from the underlying crimes, SA2354-55—should create a weighty presumption against the government's contention that the district court has committed clear error.

The government's outside-the-record claim that Nicholas Young (an individual whom there is no record of Al-Timimi ever meeting) used to pray for Al-Timimi, Govt. Br. at 12, is wholly irrelevant—particularly considering that Judge Brinkema actually presided over Mr. Young's trial as well and showed no particular leniency in his case either. Indeed, after this Court vacated Mr. Young's obstruction charges and remanded for a new sentencing hearing, *United States v. Young*, 916

F.3d 368, 388-89 (4th Cir. 2019), Judge Brinkema reimposed the

identical 180-month prison sentence. *See United States v. Young*, No.

19-4504, 2020 U.S. App. LEXIS 18893, at *1 (4th Cir. June 16, 2020).

Thus, for this reason too, Judge Brinkema's markedly different

handling of Al-Timimi's case is worthy of deference—particularly when

reviewed for clear error.

The district court correctly found that the government's

arguments that Al-Timimi's release would pose a danger to the safety of

any other person or the community were unpersuasive. JA1699. Indeed,

they are particularly unpersuasive in light of the home confinement and

electronic communication restrictions imposed by the conditional

release order. *See* JA1710-1711; SA1890. The government presents no

justification for disturbing the court's findings now.

## II. The district court correctly found that Al-Timimi's case presents substantial legal issues pursuant to several intervening Supreme Court decisions and a split of authority that this Court has not yet addressed.

The parties agree that Al-Timimi's prison sentences on Counts 1-6

are now fully discharged; accordingly, only Counts 7-10 continue to

subject him to imprisonment. *See* JA1696. Of these remaining four

counts, the government has stipulated that Al-Timimi's pending

challenges to Counts 7-8 (and also Count 1) raise substantial legal issues under the Supreme Court's intervening decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), JA1702; indeed, the district court expressly noted that "Al-Timimi's § 924(c) convictions under Counts 7 and 8 will likely be invalidated before his appeal returns to the Fourth Circuit." JA1709; JA1703. Thus, the government's sole remaining argument is that Al-Timimi has not stated a valid appellate issue on Counts 9 and 10.

Counts 9 and 10 are the subject of an active motion with the district court for leave to seek a new trial, which turns in part on the resolution of his pending acquittal motions on Counts 1, 7, and 8 under *Davis*. *See* JA1697. The government's argument that Al-Timimi has failed so much as to state a substantial legal issue—that is, one that is "a 'close' question or one that very well could be decided the other way," *United States v. Steinhorn*, 927 F.2d 195, 196 (4th Cir. 1991) (citation omitted)—is thoroughly unavailing. In his briefing below, Al-Timimi identified a multitude of substantial questions that, if resolved in his favor, would result in the reversal of Counts 9 and 10.

**First**, Al-Timimi's pending challenge to the Count 1 conspiracy

under *Davis* has at least a substantial likelihood of rendering Counts 9 and 10 unsustainable by negating the *Pinkerton* theory[1] on which they rely. As outlined in Al-Timimi's merits briefing, Counts 9 and 10 depend exclusively on *Pinkerton*; the government's alternative effort to sustain them under standard accomplice liability rests on a now-invalid theory of constructive knowledge that has been foreclosed by the Supreme Court's intervening decision in *Rosemond v. United States*, 572 U.S. 65 (2014), and other controlling precedent. *See* Dkt. No. 477 (reply brief in support of motion for release) at 9. Indeed, even prior to *Rosemond*, leading cases such as *United States v. Spinney*, 65 F.3d 231, 238-40 (1st Cir. 1995), and its progeny required that for a defendant to be held liable as an accomplice to a crime that involves the use of a particular weapon, "the government must establish that the [accomplice] knew to a practical certainty that the principal would be using a [weapon]. . . . a rubric that calls for proof verging on actual knowledge." *Id.* (internal citations and quotations omitted). Accordingly, the government's post-trial Rule 29 opposition brief defended Counts 7-10 exclusively on *Pinkerton*; it did not attempt to support them under standard

---

[1]     *See Pinkerton v. United States*, 328 U.S. 640 (1946).

accomplice liability at all. *See* Dkt. No. 125 at 37-40. Its belated attempt to do so now is unavailing.

The government's response—a cursory claim that Al-Timimi "masterminded" Counts 9 and 10, Dkt. No. 8—is wholly unsupported by citation and defies the record.[2] Although the witnesses split over whether Al-Timimi encouraged their plan to attend LET, *see* supra at 2-4, (a plan that all witnesses agree was initiated by Royer—a LET affiliate who had previously put several of the men in contact with LET, *id*.), it is uncontroverted that Al-Timimi was not involved in any discussion contemplating their use of weapons—and certainly did not counsel or solicit their use of the particular RPG weapons charged in Counts 9 and 10. To the contrary, every witness who was asked about

---

[2]     Notably, even this conclusory (and inaccurate) statement would be insufficient to make a case for ordinary accomplice liability. The *Spinney* Court accepted for purposes of the appeal that defendant Spinney "helped to mastermind" a robbery, but still found the evidence insufficient to support the "requisite inference of practical certainty" that his confederates would be carrying firearms. 65 F.3d 231, 239 (1st Cir. 1995) (emphasis added).

In this case, the record shows that Al-Timimi had zero discussions with principals Kwon or Hasan about any plans to handle weapons— much less the specific RPG weapons charged in Counts 9 and 10. *See* infra at 18-21. In effect, the government's argument amounts to an erroneous attempt to apply a *Pinkerton* standard (i.e. foreseeability) in the context of ordinary accomplice liability.

such a claim flatly repudiated it. Indeed, it is not at all clear on the record that Kwon or Hasan themselves had any particularized expectation of handling an RPG at LET.

*Kwon* testified that he shot one RPG round in a training exercise at LET, JA267-68, but gave no indication that he had any plan in advance to do so, and specifically stated on cross-examination that Al-Timimi never asked him to carry explosives. JA413. Kwon also did not recall ever telling Al-Timimi that he owned firearms or had been training with them, JA405-07, and testified that he had no information that Al-Timimi knew that any of the other people at the dinner owned firearms. JA593. He explained that the men had little personal contact with Al-Timimi, who "wasn't [their] peer," but "more like a teacher." JA591-92. Kwon also explicitly stated that Al-Timimi never told him to commit any crime with a gun. JA412-13. Kwon further explained that he had actually been recruiting for LET prior to the 9/16 dinner under the tutelage of Royer, JA527-31, having previously asked "most" of the dinner's attendees if they were interested in going to the training camps. JA533. Kwon testified that all of this prior recruiting activity for LET was done without Al-Timimi's knowledge. JA535.

***Hasan*** admitted to training on the use of an RPG weapon at LET, JA1180-81, but presented no testimony that he ever communicated with Al-Timimi about this training in any way. He also testified that he "was not a personal friend" of Al-Timimi, JA1194, that Al-Timimi "did not know" about his earlier Virginia paintball and combat training with Kwon and the other men. JA1208.

***Aatique***—another cooperating witness present at the 9/16 meeting—also presented no testimony as to having ever communicated with Al-Timimi about any weapons in any way. Moreover, Aatique had made arrangements to attend LET prior to the 9/16 dinner, having purchased his plane tickets during the first week of September with encouragement and assistance from Hamdi, Kwon, and Royer. SA2039-41. He presented no testimony indicating that Al-Timimi affirmatively instructed him to attend LET, much communicated about any use of any weapons there.

***Donald Surratt*** was a cooperating witness who, while not present at the 9/16 dinner, was an admitted member of the principals' pre-existing firearms conspiracy, for which he was convicted of two felonies. SA2210; SA2290-91. Surratt testified that to his knowledge Al-

Timimi had nothing to do with this firearms conspiracy, JA2291, that he had never heard Al-Timimi advocate violence in the context of current affair. SA2281.

**Nabil Gharbieh** (the original "amir"—or leader—of the principal's paintball group before Kwon and Chapman later took over, SA1981) was another government witness who was one of the founders of the Dar al-Arqam Islamic learning center where Al-Timimi lectured, SA1899, and thus knew Al-Timimi better than most of the other men. See SA1959. Gharbieh was present for only part of the 9/16 dinner and was never charged with a crime. He testified that Al-Timimi had never suggested any sort of jihad training to him, SA1960-61, explaining that while Al-Timimi had discussed combative jihad in the context of theology, SA1963, he had never advocated any implementation of it. *See Id.* ("The only times we talked about violent states of combat is either in his lecture or the book 40 Hadeeths on Jihad, like that. But if you're asking me has he talked about implementing a physical combat against somebody or a country or a government, I don't recall him ever saying something like that.")

**Second**, irrespective of Al-Timimi's *Davis* challenge to Count 1,

*all* of the conspiracies charged in this case remain vulnerable to reversal based on the controversial "aiding and abetting a conspiracy" legal theory that the government used to charge them. As the district court observed, the validity of this theory is the subject of an authority split that neither this Court nor the Supreme Court have yet addressed. *See* JA1703-04 (Mem. Op.) (citing cases). Indeed, the government's own practice manual cautions against this theory on the grounds that several courts have rejected it.[3] Moreover, even if this Court were to ultimately sanction its use, any surviving conspiracy convictions would still lack the critical element of conspiracy membership that *Pinkerton* depends on for scienter. *See generally* JA1540-42 (reply brief in support of motion for conditional release). As the district court observed, courts have consistently held that appeals involving unsettled issues of law qualify as substantial for purposes of conditional release. JA1704 (Mem. Op.) (citing cases).

**Third**, Al-Timimi's appeal continues to present a substantial First

---

[3]  See U.S. Dept. Of Justice, USAM Criminal Resource Manual § 2483, available at http://www.justice.gov/usam/criminal-resource-manual-2483-conspiracy-aid-and-abet ("The concept of aiding and abetting a conspiracy has not been widely adopted. . . . Even in the Seventh Circuit, the concept has been criticized.") (citations omitted).

Amendment question over whether his alleged advocacy—in which he is accused of saying that Muslim men should make "hijra" (leave the country) and be with the mujahideen anywhere in the world—would meet the high specificity threshold required for criminal solicitation. *See United States v. Williams*, 553 U.S. 285, 297 (2008); *see also* Brief for Professor Eugene Volokh as Amicus Curiae, *United States v. Sineneng-Smith*, Case No. 19-67, pp. 3-7, available at: https://www.supremecourt.gov/DocketPDF/19/19-67/124856/20191209115753057_19-67acVolokh.pdf (summarizing solicitation doctrine and noting that *Williams* "distinguished specific advocacy—for instance, of a crime involving a specific item of contraband, a specific victim, or a specific tangible reward—and abstract advocacy.").

Indeed, the government's charge that Al-Timimi solicited treason was largely based on circumstantial evidence, relying for example on an email that Al-Timimi later wrote about the Taliban as evidence of his alleged intent. Moreover, the witnesses split on what Al-Timimi said in a speech at the 9/16 dinner gathering (which forms the basis for the charges in this case), and the government candidly acknowledged that

its witnesses were "subject to significant impeachment." *See* JA990 (government at bench conference on day 6 of trial: "If I could just say, this is not a surprise to anyone, that our witnesses, our cooperating witnesses are subject to significant impeachment, and we don't have a tape recording of what happened on September 16. We have a couple of documents that tend to corroborate what Ali Al-Timimi's position was with respect to his supporting the Taliban.").

**Fourth**, the release of new evidence in 2015 has resulted in this Court remanding the case back to the district court over the government's objection. Briefs and documents have been filed with the district court through a Classified Information Security Officer according to protocol, but suffice it to say here that this Court's granting of an opposed motion for remand suggests the presence of at least a substantial issue of law.

Of course, it is not necessary for this Court to resolve any of these issues now. But the government's argument that Al-Timimi has failed so much as to state a substantial issue—*i.e.*, one that could be decided either way—on Counts 9 and 10 is thoroughly unavailing.

### III. Both of the "exceptional reasons" that the district court found pursuant to Section 3145(c) are supported by ample caselaw.

The government offers no compelling reason to conclude that the district court abused its discretion when it found that two separate exceptional reasons justified Al-Timimi's conditional release pending his appeal. Section 3145(c) establishes a "flexible" test that allows courts "to respond to real-world circumstances in a pragmatic and common-sense manner." *United States v. Harris*, 2020 WL 1503444, at *5 (D.D.C. Mar. 27, 2020). Here, a multitude of district courts throughout the country have already ordered precisely the same relief under Section 3145(c) that the district court granted to Al-Timimi in light of the COVID-19 pandemic, with many of those cases involving inmates with health conditions less acute than those of Al-Timimi. *See United States v. French*, No. 1:12-cr-00160-JAW, 2020 U.S. Dist. LEXIS 56155, at *29 (D. Me. Mar. 31, 2020); *United States v. McKenzie*, 2020 U.S. Dist. LEXIS 55503, at *9 (S.D.N.Y. Mar. 30, 2020); *United States v. Witter*, No. 19-Cr-568 (SHS), 2020 U.S. Dist. LEXIS 53189, at *1-6 (S.D.N.Y. Mar. 26, 2020); *United States v. Lopez*, No. 19-CR-116 (KMW) (JLC), 2020 U.S. Dist. LEXIS 59957, at *5-7 (S.D.N.Y. Apr. 6, 2020);

*United States v. McDuffie*, No. 19-CR-212 (VEC), 2020 U.S. Dist. LEXIS 59594, at *3-4, 10-12 (S.D.N.Y. Apr. 3, 2020); *see also* Mem. Op. at 13-14 (citing cases). The government's attempt to minimize Al-Timimi's health issues as "fairly common" is unpersuasive, *see* supra at 6-7, ¶¶ 9-10, and ignores that his are precisely the underlying conditions that put individuals at high risk according to the Centers for Disease Control and Prevention.

With respect to the highly unusual and complex posture of this case (per which Al-Timimi has now completed his prison sentences on all but Counts 7-10 prior to his direct appeal), JA1708, the government makes the extraordinary claim that "this case is only in such a posture by virtue of the defendant's own choices." Govt. Br. at 23-24. In denying stay below, the district court rejected this argument as particularly unjustified:

> The government's argument that the delays in Al-Timimi's direct appeal are of his own making is not well-taken. Al-Timimi noticed his direct appeal two days after his sentencing and has vigorously pursued that appeal ever since. Moreover, as the government well knows, a significant amount of the delay associated with the Fourth Circuit's first remand of Al-Timimi's direct appeal was due to the government having unreasonably restricted the Court's resources by refusing to clear any of the Court's judicial clerks for access to certain classified materials. Other delays have been caused by significant changes in the legal landscape underlying

> Al-Timimi's convictions. This kind of extremely weak argument
> undermines the integrity of the government's position.

SA1892, n.1. The defense has multiple motions pending with the

district court and cannot reasonably be expected to abandon arguments

on legal questions that were expressly countenanced by remand orders

of this Court.

Finally, it should be noted that the only factor requiring Al-

Timimi to make an "exceptional reasons" showing under Section 3145(c)

at all is the mandatory lifetime prison sentence associated with Counts

7 and 8. Otherwise, he would be eligible to seek release under the less

stringent standard of 18 U.S.C. § 3143(b)(1), which does not require this

heightened showing. The district court expressly noted that Counts 7

and 8 are likely to be invalidated under *Davis*, *see* Mem. Op. at 15-16,

thus rending the requirements "for release pending appeal . . . far less

onerous." *Id*.; *accord United States v. DiSomma*, 951 F.2d 494, 497-98

(2d Cir. 1991) (affirming conditional release under "exceptional reasons"

standard where "[t]he element of the crime called into question on

appeal is the element of the bail statute that bars release").

## CONCLUSION

The Conditional Release Order was the product of extensive briefing and a thorough analysis of this case's uniquely complex nature, long history, and extensive record. The government's claim that the district court committed clear error or otherwise abused its discretion is unavailing. The district court's order should be affirmed.

Respectfully submitted,

/s/ Thomas M. Huff_____
Thomas M. Huff
Attorney-at-Law
P.O. Box 2248
Leesburg, VA 20177
(703) 665-3756
thuff@law.gwu.edu

Jonathan Turley
The George Washington University
    Law School
2000 H Street, N.W.
Washington, D.C. 20052
(202) 994-7001
jturley@law.gwu.edu

Counsel for Defendant-Appellant
Dr. Ali Al-Timimi

Dated: August 31, 2020

## CERTIFICATE OF COMPLIANCE

I certify that this Appellee's Brief was written using 14-point Century Schoolbook font in Microsoft Word. I further certify that this brief does not exceed 15,300 words, as required by Federal Rule of Appellate Procedure 28(e)(2)(B)(i), and is more specifically 5,491 words.

/s/ Thomas M. Huff_____
Thomas M. Huff
Attorney-at-Law
P.O. Box 2248
Leesburg, VA 20177
(703) 665-3756
thuff@law.gwu.edu

Counsel for Defendant-Appellant
Dr. Ali Al-Timimi